## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ME-WUK INDIAN COMMUNITY     )
OF THE WILTON RANCHERIA,     )
7201 Sunbreeze Lane     )
Sacramento, CA 95828-6263,     )
    )
          Plaintiff,     )
    )
   v.     )
    )
DIRK A. KEMPTHORNE,     )
*in his official capacity as*     )
*Secretary of the Interior,*     )
U.S. Department of the Interior     )
1849 C Street, NW     )
Washington, DC 20240-0002,     )
    )
          Defendant.     )

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This action is brought by the Me-Wuk Indian Community of the Wilton Rancheria (the "Tribe" or "Plaintiff") to compel agency action unlawfully withheld and unreasonably delayed. Specifically, the Tribe seeks a court order directing Secretary of the Interior Dirk A. Kempthorne (the "Secretary"), *inter alia,* to publish a list of federally recognized tribes as required by section 104(a) of the Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, 108 Stat. 4791 (codified at 25 U.S.C. § 479a-1(a)), with such list to include the Tribe's name. Further, the Tribe requests a court order directing the Secretary to take into trust such lands owned and designated by the Tribe located within a 25-mile radius of the former site of the Wilton Rancheria ("Designated Lands"), with such lands to be considered "Indian country" as defined in 18 U.S.C. § 1151 and "restored lands" as defined by 25 U.S.C. § 2719(b)(1)(B)(iii). And, finally, the Tribe seeks a court order declaring that the Tribe is

eligible for the protection, services and benefits of the federal government available to Indian tribes by virtue of their status as tribes.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States.

3.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1361 in that the Tribe seeks to compel officers and employees of the United States and its agencies to perform duties owed to the Tribe.

4.      Venue lies in this district pursuant to 28 U.S.C. § 1391(e) because the Secretary resides in this district and a substantial part of the events or omissions giving rise to the Tribe's claims occurred in this district.

## PARTIES

5.      Plaintiff is an American Indian Tribe consisting of Indian members and their descendants, and/or their Indian successors in interest, for whose benefit the United States acquired and created the Wilton Rancheria, a parcel of land located in Sacramento County, California. The Tribe was formally recognized as an Indian Tribe by the United States from at least 1936 until 1964, when it was purportedly terminated under the Act of August 18, 1958, Pub. L. No. 85-671, 72 Stat. 619, as amended by the Act of August 11, 1964, Pub. L. No. 88-419, 78 Stat. 390 ("California Rancheria Act"). Since the time of its purported termination, the Tribe has been continuously identified as an American Indian Tribe and has maintained its existence as a distinct community from historical times to present. The Tribe has also maintained autonomous political influence and authority over members of the group from historical times to present.

2

6.      Defendant Dirk A. Kempthorne is the Secretary of the Interior.  The Secretary is an officer or employee of the United States and has a direct statutory duty to carry out the provisions of the Federally Recognized Indian Tribe List Act of 1994 ("Tribe List Act").  The Secretary is sued in his official capacity only.

## STATEMENT OF FACTS

### *Establishment of the Wilton Rancheria*

7.      The Bureau of Indian Affairs ("BIA") is a subagency within the United States Department of the Interior.

8.      On November 25, 1927, the BIA acquired a 38.9-acre parcel of land in Sacramento County, California, for the benefit of the Tribe.

9.      This parcel of land, from its purchase in 1927 until 1964, was held in trust by the United States for the benefit of the Tribe and its members.

10.     On January 15, 1936, then-Secretary of the Interior Harold L. Ickes approved a Tribal Constitution adopted by the Tribe under the provisions of the Indian Reorganization Act of 1934 ("IRA"), ch. 576, 48 Stat. 984.

### *The California Rancheria Act*

11.     On August 18, 1958, Congress enacted the California Rancheria Act, authorizing—but not requiring—the Secretary of the Interior to terminate the trust status of the lands and the status as Indians of the people of 41 specifically enumerated California Rancherias, including the Wilton Rancheria, under certain specific and mandatory conditions.

12.     Under the California Rancheria Act, termination was to be the result of a process in which the Rancheria Indians of California could decide to accept termination in exchange for

3

free title to Rancheria assets, and the provision of certain improvements and services aimed at providing the soon-to-be-terminated Indians with adequate infrastructure to subsist without treatment as Indians by the federal government.

13.    The process for termination under the California Rancheria Act required the Secretary of the Interior, after consultation with the Indians of the Rancheria to be terminated, to prepare a distribution plan detailing the measures that would be undertaken to successfully achieve the requirements of the Act.

14.    Before the distribution of Rancheria assets could be finalized and termination completed, section 3 of the California Rancheria Act specifically required the Secretary of the Interior to take certain actions to prepare the Rancheria for termination *before* conveying individual deeds to distributees.  The Secretary of the Interior was to, *inter alia*:

> A.    Survey Rancheria boundaries to ensure marketable title to individual parcels (California Rancheria Act § 3(a));
>
> B.    Bring Indian Bureau roads serving the Rancheria up to comparable standards for similar county-maintained roads (*id.* § 3(b)); and
>
> C.    Install or rehabilitate irrigation and domestic water systems as the Secretary of the Interior and Rancheria residents agreed upon (*id.* § 3(c)).

15.    Section 8 of the California Rancheria Act instructed the Secretary of the Interior that before he could convey property pursuant to the Act, he was to "protect the rights of individual Indians who are minors, *non compos mentis*, or in the opinion of the Secretary in need of assistance in conducting their affairs, by causing the appointment of guardians for such Indians in courts of competent jurisdiction, or by such other means as he may deem adequate, without application from such Indians . . . ."

16.     Section 9 of the California Rancheria Act instructed the Secretary of the Interior to implement education and vocational training programs for the benefit of the Rancheria Indians before the distribution of Rancheria assets could be finalized and termination completed.

17.     The provisions set forth in sections 3, 8 and 9 of the California Rancheria Act were conditions precedent to lawful distribution of Rancheria assets and termination of the Indian status of Rancheria Indians.

### The Wilton Rancheria Distribution Plan

18.     Soon after the enactment of the California Rancheria Act, the Secretary of the Interior, acting through his subordinates in the BIA, prepared a proposed distribution plan for the Wilton Rancheria.  Under the provisions of that plan the Rancheria was to be divided into 14 parcels.  Twelve of the parcels were to be individually deeded and the other two were to remain communal property no longer held in trust by the United States.

19.     In addition to the road, water and irrigation system improvements required by the California Rancheria Act, the Wilton Rancheria's distribution plan specifically called for:

      A.      The Tribe to be made into a legal entity that could accept conveyance of the communal properties;

      B.      Further specific improvements to the Tribe's water system, including the replacement of leaky and defective pipes;

      C.      Adequate water connections to all occupied residences or residences constructed or in the course of construction and more than 50 percent complete within a 90-day period after the approval of the distribution plan; and

      D.      Road improvements sufficient so that the Wilton Rancheria's roads met the standards of the Sacramento County Road Department.

20.      The distribution plan further stipulated that when all the requirements in the plan were met by the federal government and the Tribe was satisfied with such efforts, the Tribe would then have its constitution and bylaws revoked and termination would be finalized.

21.      The proposed Wilton Rancheria distribution plan was accepted by the Secretary of the Interior in July of 1959.

22.      Induced by the promises of improvements set forth in the California Rancheria Act and the proposed distribution plan, the original Wilton Rancheria distributees voted to accept the distribution plan on September 25, 1959.

### *Failure to Execute the Wilton Rancheria Distribution Plan: County Road Standards and Subdivision Requirements*

23.      The distribution plan for the Wilton Rancheria called for division of the Rancheria land into three lots, which would then be further divided into 14 parcels.

24.      Under California statutes in effect at the time, this division constituted the creation of a "subdivision," triggering specific requirements for water supply and access roads.

25.      To bring the Wilton Rancheria into conformance with Sacramento County subdivision standards required that:

      A.      All lots be not less than 10,000 square feet where domestic water was supplied from a central source and septic tanks were used;

      B.      All lots face an improved street;

      C.      The main access road come from Green Road to eliminate a second railroad crossing;

      D.      Green Road have a 60-foot right-of-way;

E.    All other roads have a 52-foot right-of-way; and

F.    Lots held in common ownership be two acres or more in size.

26.    Section 3(b) of the California Rancheria Act specifically instructed the Secretary of the Interior to complete any construction or improvement needed to bring roads serving the Rancheria up to "adequate standards comparable to standards for similar roads of the State or subdivision thereof."

27.    The BIA purposely and with knowledge chose not to file a subdivision plan with the appropriate state authorities and rushed to complete road improvements on the Rancheria in an effort to avoid costs imposed under county subdivision requirements and soon-to-be-more-stringent county road standards.

28.    Specifically, the BIA sought to avoid, *inter alia,* potential costs associated with additional road construction, adding additional wells, a pressure tank and fire hydrants.

29.    During the termination process only one road construction project was completed, which consisted of improvement of .28 miles of Rancheria Road S-160.

30.    The remainder of the Rancheria roads failed to comply with county standards and were in need of considerable improvement.

31.    The Rancheria roads were subject to frequent flooding problems, making transportation to and from the Rancheria very difficult and living on the Rancheria very burdensome.

32.    If the distribution plan proposed by the Secretary of the Interior had met the requirements of the California Rancheria Act and conformed to the subdivision requirements of Sacramento County, the deficient road conditions and flooding problems would have been eliminated.

*Failure to Execute the Wilton Rancheria Distribution Plan:*
*Water and Sanitation Systems*

33.    The California Rancheria Act was amended by the Act of August 11, 1964, Pub.

L. No. 88-419, 78 Stat. 390.  The Act of August 11, 1964, amended section 3 of the Act of

August 18, 1958, such that the Secretary of the Interior was directed to "construct, improve,

install, extend, or otherwise provide, by contract or otherwise, . . . irrigation facilities for Indian

homes, communities, and lands" *prior to* distributing title to Rancheria lands.  Act of August 11,

1964 § (e).

34.    In addition, the 1964 Amendments to the California Rancheria Act specified that

the Secretary of Health, Education and Welfare was to "construct, improve, install, extend, or

otherwise provide . . . sanitation facilities (including domestic and community water supplies and

facilities, drainage facilities, and sewage and waste-disposal facilities, together with necessary

appurtenances and fixtures) . . . . in accordance with the provisions of section 7 of the Act of

August 4, 1954 (58 Stat. 674), as amended (42 U.S.C. 2004a)."  *Id.*

35.    Thus, under the 1964 Amendments to the California Rancheria Act, the provision

of services detailed in Public Law No. 86-121 (42 U.S.C. § 2004a) was made a mandatory

condition precedent to termination.

36.    Further, in order for Sacramento County to assume responsibility of the domestic

water system on the Rancheria, the BIA was required to make certain improvements to the

Rancheria's water system, including installation of two wells with pressure tanks and adequate

pumping equipment, fire hydrants and water mains.

37.    However, the distribution plan to be carried out by the Secretary of the Interior

called only for the rehabilitation of the present domestic water system by replacing all leaky and

defective water pipes, and providing water connections to all occupied residences or other

residences constructed or in the course of construction and more than 50 percent completed by December 24, 1959.

38.     Despite more modern water systems being present in surrounding communities, the water system on the Rancheria consisted only of an elevated 1,000-gallon galvanized iron tank; a 250 gallons per minute deep well turbine pump with a 7.5 horse power motor; and a well with a 12-inch diameter, 100-foot depth, and 3/16-inch plate steel casing.  Water ran from a four-inch asbestos cement pipe mainline that supplied each household through small galvanized pipes.

39.     The water system on the Rancheria served both domestic and irrigation purposes, despite a 1952 BIA study indicating that such a system was inappropriate.

40.     The BIA failed to improve the Rancheria's sanitation system in any regard, thereby rendering the system below the requirements of the California Rancheria Act in its original form and as amended, as well as under applicable Sacramento County standards following purported termination.

41.     Living with substandard sanitation facilities made life very difficult and unpleasant to those living on the Rancheria.

42.     In an attempt to stop the termination process, the Tribe in 1961 submitted a formal request to the BIA for the installation of sanitation facilities.  However, the BIA provided no further assistance in this regard, including the failure to renegotiate the distribution plan to conform to applicable law.

43.     After attempts to obtain assistance from the BIA for sanitation facilities were denied, in February 1964 the Tribe (now operating as a non-profit organization) received a grant in the amount of $4,650 from the U.S. Department of Health, Education and Welfare for the installation of septic tanks and seepage pits on the Rancheria lands.

### *Failure to Execute the Wilton Rancheria Distribution Plan: Provision of Educational and Vocational Training*

44.    Section 9 of the California Rancheria Act states:

Prior to the termination of the Federal trust relationship in accordance with this Act, the Secretary of the Interior is authorized to undertake, within the limits of available appropriations, a special program of education and training designed to help the Indians to earn a livelihood, to conduct their own affairs, and to assume their responsibilities as citizens without special services because of their status as Indians. Such programs may include language training, orientation in non-Indian community customs and living standards, vocational training and related subjects, transportation to the place of training or instruction, and subsistence during the course of training or instruction.

45.    The Secretary of the Interior failed to inform the Tribe's members about the availability of federally funded education and training.

46.    As a result, many of the Tribe's members went without educational or vocational training because of the economic status of residents of the Rancheria and lack of access to comparable educational or training programs.

47.    The lack of educational and vocational training added to the ongoing economic hardship and substandard living conditions the Tribe's members endured on the Wilton Rancheria.

### *Purported Termination of the Wilton Rancheria*

48.    Despite the failure to execute the distribution plan by its own terms or in accordance with applicable law as detailed above, the BIA considered its improvements to the Rancheria infrastructure satisfactory and sought to complete the termination process.

49.    On May 19, 1961, the Assistant Secretary for Indian Affairs pronounced that the requirements of the California Rancheria Act had been satisfied and revoked the constitution and bylaws of the Tribe. This action purportedly terminated federal recognition of the Tribe.

10

Following this pronouncement, the BIA made no further improvements to the Rancheria's infrastructure.

50.     The BIA issued its Completion Statement for termination of the Wilton Rancheria on July 19, 1961.

51.     Then-Secretary of the Interior Stewart L. Udall published a formal Termination Proclamation in the *Federal Register* on September 22, 1964.  *See* 29 Fed. Reg. 13,146.

### *Duties of the Secretary of the Interior*

52.     At all times pertinent hereto, the majority of the original distributees, those living comprising a portion of the Tribe's membership, had received minimal formal education and were unsophisticated and inexperienced in handling even simple business or legal affairs.

53.     At the time of the Secretary's approval of the Wilton Rancheria Distribution Plan, the Tribe was not represented by counsel and was given no impartial advice as to the following:

      A.     Its legal rights under the California Rancheria Act, generally;

      B.     The adequacy of proposed improvements to roads, water systems and sanitation systems;

      C.     The adequacy of proposed educational or vocational training;

      D.     Its right to insist upon the adequate improvement of such systems; and

      E.     Its right to insist upon provision of such services and facilities under sections 3 and 9 of the California Rancheria Act.

54.     Beginning at least with the establishment of the Rancheria in 1927, a trust relationship existed between the United States and the Tribe and its membership.

55.    Under that trust relationship, the conduct of the United States in its dealings with the Tribe and its members is held to the heightened standard of care that governs the actions of a private trustee toward a private beneficiary.

56.    The United States, acting through the Secretary of Interior, "has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards." *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942).

57.    Under the California Rancheria Act, and as a trustee of the Indians subject thereto, the Secretary of the Interior was obligated to enter into whatever agreement or agreements with Indians of a given Rancheria electing to terminate thereunder as might be necessary to ensure that upon distribution of the Rancheria assets, the Rancheria's water supply, water distribution, sanitation and other facilities would be adequate to meet the reasonable present and foreseeable needs of all the people of the Rancheria.

58.    Under the California Rancheria Act, and as a trustee of the Indians subject thereto, the Secretary of the Interior was obligated to enter into whatever agreement or agreements with Indians of a given Rancheria electing to terminate thereunder as might be necessary to ensure that upon distribution of the Rancheria assets the Tribe's membership would be prepared to receive and capably manage such assets and facilities.

59.    Prior to seeking approval of the distribution plan by the members of a given Rancheria, the Secretary of the Interior was obligated to provide to tribal members such accurate and adequate information, advice and assistance as reasonably required by them in order that the members of the Rancheria could understand their individual rights and the obligations of the United States under the California Rancheria Act.

60. The Secretary of the Interior was also obligated to provide tribal members such accurate and adequate information as to the relative advantages and disadvantages of accepting termination, the options available to them under the California Rancheria Act, and the legal consequences of exercising those options.

### Effects of the Tribe's Purported Termination

61. As a result of the Tribe's purported termination, the Tribe and its membership have been greatly damaged, including but not limited to the following losses:

A. The Tribe has been prevented from participating in government programs specifically intended for American Indian Tribal Governments;

B. The Tribe's ability to govern itself and exercise its sovereignty and dominion has been compromised;

C. The Tribe members' land became taxable under the laws of the State of California but for the wrongful termination of the Tribe;

D. The Tribe's members, few if any of whom received any training in financial management contemplated by the Act, were unable to pay said property taxes and were forced to sell their land at a fraction of its true value to avoid foreclosure sales;

E. The Tribe members' trust land became an available asset subject to creditor process.

F. Many of the Tribe's members lost their land to satisfy creditor's claims;

G. The Tribe's members were denied access to BIA programs and grants and had to go without training or higher education or seek loans to provide such opportunities;

13

H.    The Tribe's members residing on the Wilton Rancheria, following the wrongful termination of their status as Indians, were ineligible for housing grants and loans provided to Indians because of their status as Indians;

I.    The Tribe's members were forced to comply with local building and sanitary codes due to their land being removed from trust status, resulting in expensive alterations, license fees, inspections, condemnations, etc; and,

J.    The Tribe's members have not had the benefit of adequate water, sanitation or irrigation systems, or housing, and have lived on the Wilton Rancheria under unhealthful and unsanitary conditions, suffering damage to their physical and mental health.

### *Subsequent Litigation Invalidating Terminations Under the California Rancheria Act*

62.    The Secretary of the Interior's failure to implement legally the California Rancheria Act was the basis of substantial litigation over the course of two decades and resulted in the reinstatement of formal recognition of a majority of the tribes terminated under the Act.

63.    For example, *Knight v. Kleppe*, Civ. No. C-74-0005 WTS (N.D. Cal. 1976), was a class action brought on behalf of the dependent members of the terminated Rancherias who sought to reverse their termination.  A final declaratory judgment and permanent injunction was entered in that case by the U.S. District Court for the Northern District of California on February 20, 1976.  Among other things, the court permanently enjoined the Secretary of the Interior from treating any person listed in a California termination roll as a "dependent member" of a distributee's immediate family as a terminated Indian.

64.    In *Duncan v. Andrus*, 517 F. Supp. 1 (N.D. Cal. 1977), the district court specifically held that the Secretary of the Interior's termination of the Robinson Rancheria was unlawful. The court reached that conclusion after determining that the Secretary had failed to provide adequate water facilities before conveying tribal land to individual distributees and because tribal members had not been represented by counsel in negotiating and approving the distribution plan. *See id.* at 6; *see also* 42 Fed. Reg. 33,099 (June 29, 1977) (announcing restoration of Robinson Rancheria in accordance with court order). During that litigation, the Secretary conceded that the termination was unlawful because of his failure to comply with the requirements of the California Rancheria Act. *See Duncan*, 517 F. Supp. at 4.

65.    Likewise, in *Smith v. United States*, 515 F. Supp. 56 (N.D. Cal. 1978), the Secretary of the Interior conceded—and the district court found—that the termination of the Hopland Rancheria had been unlawful and that, as a result, the tribe would not be treated as terminated because of the Secretary's failure to provide adequate water facilities before conveying Rancheria land to individual distributees. *See id.* at 59.

66.    In *Upper Lake Pomo Association v. Watt*, No. C-75-0181 (N.D. Cal.), the district court entered an order on May 15, 1979, restoring the Upper Lake Rancheria because the Secretary of the Interior had breached his obligations under the California Rancheria Act by failing to provide adequate water facilities before conveying Rancheria land to individual distributees.

67.    In *Table Bluff Band of Indians v. Andrus*, 532 F. Supp. 255 (N.D. Cal. 1981), the Secretary of the Interior again conceded—and the district court likewise found—that the Table Bluff Rancheria had been unlawfully terminated because the Secretary failed to fulfill his duties under section 3(c) of the California Rancheria Act. *See id.* at 259.

68.    In *Tillie Hardwick v. United States*, No. C-79-1710-SW (N.D. Cal.), individuals

from 34 of the terminated Rancherias commenced similar litigation.  In an order entered on

December 22, 1983, the district court restored 17 of the plaintiff-Rancherias previously

terminated under provisions of the California Rancheria Act.  *See also* 49 Fed. Reg. 24,084

(June 11, 1984) (announcing restoration of 17 Rancherias pursuant to court order).  Specifically,

the following Rancherias were restored as a result of the court's December 22, 1983 order:

(1) Big Valley, (2) Blue Lake, (3) Buena Vista, (4) Chicken Ranch, (5) Cloverdale, (6) Elk

Valley, (7) Greenville, (8) Mooretown, (9) North Fork, (10) Picayune, (11) Pinoleville,

(12) Potter Valley, (13) Quartz Valley, (14) Redding, (15) Redwood Valley, (16) Rohnerville

and (17) Smith River.

69.    Claims asserted on behalf of the remaining plaintiff-Rancherias, which included

the Wilton Rancheria, were dismissed without prejudice subject to their being refiled in another

action.  In dismissing these claims without prejudice, the district court in *Tillie Hardwick* ordered

that the Secretary of the Interior could not assert any laches defense in any such subsequent

action.

70.    Finally, in *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v.*

*United States*, No. C-86-3660-WWS (N.D. Cal.), the district court approved settlements in which

the Secretary of the Interior conceded that the termination of four additional Rancherias had been

unlawful.  *See also* 57 Fed. Reg. 5214 (Feb. 12, 1992) (announcing restoration of the Guidiville

Band of Pomo Indians, the Scotts Valley Band of Pomo Indians and the Lytton Indian

Community of California in accordance with court-approved settlement); 57 Fed. Reg. 19,133

(May 4, 1992) (announcing Chico Rancheria restoration in accordance with court-approved

settlement).

71.    Following *Scotts Valley*, 23 of the 41 Rancherias listed in the original California Rancheria Act had been restored via court order.

### Tribe List Act

72.    In 1994, Congress enacted the Tribe List Act in response to a "growing and disturbing trend" on the part of the BIA to "capriciously and improperly withdraw[] federal recognition from a native group or leader." H.R. Rep. No. 103-781, at 3 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3768, 3769 (footnotes omitted).

73.    The Tribe List Act requires the Secretary to "publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." Tribe List Act § 104(a) (codified at 25 U.S.C. § 479a-1(a)).

74.    In enacting the Tribe List Act, Congress made several "findings." For example, Congress found that the "list published by the Secretary should be accurate, regularly updated, and regularly published, since it is used by the various departments and agencies of the United States to determine the eligibility of certain groups to receive services from the United States." Tribe List Act § 103(7) (codified at 25 U.S.C. § 479a note). Congress also found that the "list of federally recognized tribes which the Secretary publishes should reflect all of the federally recognized Indian tribes in the United States which are eligible for the special programs and services provided by the United States to Indians because of their status as Indians." Tribe List Act § 103(8) (codified at 25 U.S.C. § 479a note).

75.    The Tribe List Act commands the Secretary to publish the list of tribes every year on or before January 30. Tribe List Act § 104(b) (codified at 25 U.S.C. § 479a-1(b)).

76.     The Secretary is currently in breach of the annual publication requirement, having last caused a list to be published on November 25, 2005.  *See* 70 Fed. Reg. 71,194.

77.     The Secretary has delegated responsibility for publishing the list to the Assistant Secretary for Indian Affairs.  *See id.*  However, as the officer of the United States specifically named in the Tribe List Act, the Secretary retains ultimate responsibility for assuring compliance with the Tribe List Act.

### *Basis for Belief that the Secretary Currently Recognizes the Tribe*

78.     Upon information and belief, which is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, the Secretary currently recognizes that the Tribe's purported termination was unlawful and that the Tribe satisfies all requirements for being eligible to participate in the special programs and services provided by the United States to Indians because of their status as Indians.

79.     For example, in testimony before the House Resources Committee on May 16, 2000, then-Assistant Secretary for Indian Affairs Kevin Gover repeated a finding made by an advisory group charted by Congress, which in 1997 had recommended that the Tribe be immediately restored.  *See* Testimony of Kevin Gover, Assistant Secretary for Indian Affairs, Department of the Interior, Hearing before the House Resources Committee on H.R. 946, the Graton Rancheria Restoration Act, available at http://www.doi.gov/ocl/2000/hr946.htm. Specifically, Mr. Gover quoted the recommendation of the Advisory Council on California Indian Policy, which had been created by Congress a few years earlier.  *See id.*; *see also* Advisory Council on California Indian Policy Act of 1992, Pub. L. No. 102-416, § 4(a), 106 Stat. 2131, 2132 (codified at 25 U.S.C. § 651 note).  At the time he made this statement, Mr. Gover was the official to whom the Secretary of the Interior had delegated responsibility for publishing

the list required by the Tribe List Act. *See* 65 Fed. Reg. 13,298, 13,299 (Mar. 13, 2000) (listing recognized tribes and bearing Mr. Gover's signature).

80.     Recent statements by agency personnel provide further evidence that the Secretary currently recognizes that the Tribe satisfies all requirements for being eligible to participate in the special programs and services provided by the United States to Indians because of their status as Indians. For example, in a June 14, 2006 memorandum written by Troy Burdick, Superintendent of the BIA's Central California Agency, Mr. Burdick concludes:

> [T]he tribe has over time reconstructed their tribal, cultural and political history to the extent that they have demonstrated beyond a doubt that the tribe meets the following criteria for federal acknowledgment: (1) The group has been identified as an American Indian entity on a substantially continuous basis since 1900; (2) A predominant portion of the group comprises a distinct community and has existed as a community from historical times to the present; (3) A copy of the group's present governing document including its membership criteria *[sic]*; (4) The group's membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes, which combined and functioned as a single autonomous political entity; [and] (5) The membership of the group is composed principally of persons who are not members of any acknowledged North American Indian tribe.

Mr. Burdick's statement tracks the Secretary's heightened standards for those tribes seeking acknowledgment who were not previously recognized by the United States. *See* 25 C.F.R. § 83.7. Importantly, a lower threshold is applied to those tribes who were previously recognized by the United States. *See id.* § 83.8.

81.     An almost identical memorandum was issued by Mr. Burdick's predecessor, Dale Risling Sr., on September 17, 2004. Mr. Risling also concluded that the Tribe has "maintained political influence or authority over its members as an autonomous entity from historical times to present."

82.     Earlier statements by agency personnel only serve to support the conclusion that the Secretary currently recognizes that the Tribe's purported termination was unlawful and that

the Tribe satisfies all requirements for being eligible to participate in the special programs and services provided by the United States to Indians because of their status as Indians. For example, in a 1987 memorandum to the Assistant Secretary for Indian Affairs, BIA Area Director Maurice W. Babby recommended that a "proposal [to settle claims belonging to those tribes not part of the *Tillie Hardwick* settlement] receive favorable consideration as to the following [R]ancherias: . . . Wilton."

83.     At no time since the enactment of the Tribe List Act has the Tribe been listed as a federally recognized tribe even though the Secretary, as noted above, has conceded on numerous occasions that the termination of the Tribe's recognition under federal law—purportedly accomplished by the California Rancheria Act—was unlawful.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty)

84.     The Tribe realleges paragraphs 1 through 83, and incorporates those paragraphs herein as if set forth in full.

85.     The Secretary, acting on behalf of the United States, owes a fiduciary duty to the Tribe because the Tribe's purported termination was not effectuated in conformance with the requirements of the California Rancheria Act, thereby rendering the Tribe's purported termination void and of no legal effect.

86.     The Secretary's fiduciary duty to the Tribe imposes upon the Secretary "moral obligations of the highest responsibility and trust," *Seminole Nation*, 316 U.S. at 297, and his conduct must be judged "by the most exacting fiduciary standards." *Id.*

87.     The Secretary's fiduciary duty is further evidenced by the numerous federal statutes in which Congress has made express findings regarding the existence of such a duty. *See, e.g.*, Native American Housing and Self-Determination Act, 25 U.S.C. § 4101(2)-(4)

(finding that "there exists a unique relationship between the Government of the United States and the governments of Indian tribes;" the United States has "undertaken a unique trust responsibility to protect and support Indian tribes;" and "Congress . . . has assumed a trust responsibility for the protection and preservation of Indian tribes"); Indian Health Care Improvement Act, 25 U.S.C. § 1601(a) (finding that "Federal health services to maintain and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique legal relationship with, and resulting responsibility to, the American Indian people"); Indian Child Welfare Act, 25 U.S.C. § 1901(2) (finding that "Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources").

88.     The Secretary breached his fiduciary duty to the Tribe by failing to include the Tribe on the statutorily mandated list of federally recognized tribes, despite the fact that the Secretary currently recognizes that the Tribe's purported termination was unlawful and that the Tribe satisfies all requirements for being eligible to participate in the special programs and services provided by the United States to Indians because of their status as Indians.

89.     As a direct and proximate result of the Secretary's failure to include the Tribe on the statutorily mandated list of federally recognized tribes, the Tribe has been and continues to be ineligible for the "protection, services and benefits of the Federal government available to Indian tribes by virtue of their status as tribes" pursuant to 25 C.F.R. § 83.2.

WHEREFORE, the Tribe prays for relief as set forth below.

## SECOND CAUSE OF ACTION
### (Agency Action Unlawfully Withheld or Unreasonably Delayed)

90.    The Tribe realleges paragraphs 1 through 83, and incorporates those paragraphs herein as if set forth in full.

91.    The Administrative Procedure Act ("APA") authorizes judicial review for those suffering legal wrong because of agency action.  5 U.S.C. § 702.

92.    An agency's "failure to act" constitutes "agency action." *Id.* § 551(13).  The APA therefore authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

93.    The Secretary's failure to publish a list of federally recognized tribes that includes the Tribe's name constitutes "agency action."

94.    Upon information and belief, which is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, the Secretary currently recognizes that the Tribe's purported termination was unlawful and that the Tribe satisfies all requirements for being eligible to participate in the special programs and services provided by the United States to Indians because of their status as Indians.

95.    As a direct and proximate result of the Secretary's failure to include the Tribe on the statutorily mandated list of federally recognized tribes, the Tribe has been and continues to be ineligible for the "protection, services and benefits of the Federal government available to Indian tribes by virtue of their status as tribes" pursuant to 25 C.F.R. § 83.2.

WHEREFORE, the Tribe prays for relief as set forth below.

## THIRD CAUSE OF ACTION
### (Failure to Conclude a Matter Within a Reasonable Time)

96.     The Tribe realleges paragraphs 1 through 83, and incorporates those paragraphs herein as if set forth in full.

97.     The APA provides that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 552(b).

98.     Upon information and belief, which is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, the Secretary has recognized since at least 1987 that the Tribe's purported termination was unlawful and that the Tribe satisfies all requirements for being eligible to participate in the special programs and services provided by the United States to Indians because of their status as Indians.

99.     Despite the foregoing, the Secretary has failed to publish within a reasonable time a list of federally recognized tribes that includes the Tribe's name.

100.    As a direct and proximate result of the Secretary's failure to include the Tribe on the statutorily mandated list of federally recognized tribes, the Tribe has been and continues to be ineligible for the "protection, services and benefits of the Federal government available to Indian tribes by virtue of their status as tribes" pursuant to 25 C.F.R. § 83.2.

WHEREFORE, the Tribe prays for relief as set forth below.

## FOURTH CAUSE OF ACTION
### (Arbitrary and Capricious Agency Action)

101.    The Tribe realleges paragraphs 1 through 83, and incorporates those paragraphs herein as if set forth in full.

102.    The APA provides that a court must hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

103.    The Secretary's failure to publish a list of federally recognized tribes that includes the Tribe's name constitutes "agency action."

104.    Upon information and belief, which is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, the Secretary currently recognizes that the Tribe's purported termination was unlawful and that the Tribe satisfies all requirements for being eligible to participate in the special programs and services provided by the United States to Indians because of their status as Indians.

105.    Therefore, the Secretary's failure to publish a list of federally recognized tribes that includes the Tribe's name is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

106.    As a direct and proximate result of the Secretary's failure to include the Tribe on the statutorily mandated list of federally recognized tribes, the Tribe has been and continues to be ineligible for the "protection, services and benefits of the Federal government available to Indian tribes by virtue of their status as tribes" pursuant to 25 C.F.R. § 83.2.

WHEREFORE, the Tribe prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, the Tribe respectfully requests that this Court enter an order:

A.    Directing the Secretary to publish a list of recognized tribes in accordance with section 104(a) of the Tribe List Act, 25 U.S.C. § 479a-1(a), with such list to include the Tribe's name;

B.      Declaring that the Tribe is eligible for the protection, services and benefits of the federal government available to Indian tribes by virtue of their status as tribes;

C.      Directing the Secretary to take into trust such lands owned and designated by the Tribe located within a 25-mile radius of the former site of the Wilton Rancheria ("Designated Lands"), with such lands to be considered "Indian country" as defined in 18 U.S.C. § 1151 and "restored lands" as defined by 25 U.S.C. § 2719(b)(1)(B)(iii);

D.      Directing the Secretary to initiate and supervise the installation of utilities on the Designated Lands, with such utilities to be installed at the Tribe's sole cost and expense;

E.      Awarding the Tribe attorneys' fees and reasonable expenses incurred in connection with this action; and

F.      Granting such other relief as the Court deems just and proper.

Dated: February 28, 2007                     Respectfully submitted,

                                             By: _____
                                                 Mark J. Biros (DC Bar No. 181719)
                                                 James F. Segroves (DC Bar No. 480360)
                                                 PROSKAUER ROSE LLP
                                                 1001 Pennsylvania Avenue, NW
                                                 Suite 400 South
                                                 Washington, DC 20004-2533
                                                 202.416.6800
                                                 202.416.6899 (fax)
                                                 mbiros@proskauer.com
                                                 jsegroves@proskauer.com

Travis W. Trueblood (DC Bar No. 474797)
TRUEBLOOD LAW GROUP, P.A.
6099 Stirling Avenue, Suite 218
Davie, FL 33314-7236
954.581.6628
954.581.6680 (fax)
TTrueblood@truebloodlawgroup.com

*Attorneys for Plaintiff Me-Wuk Indian
Community of the Wilton Rancheria*

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Me-Wuk Indian Community of the Wilton Rancheria | Dirk A. Kempthorne, Secretary of the Interior |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888 <br> (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT <br> (IN U.S. PLAINTIFF CASES ONLY) <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) <br><br> Proskauer Rose LLP <br> 1001 Pennsylvania Avenue, NW <br> Suite 400 South <br> Washington, DC 20004-2533 <br> 202.416.6800 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ● 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

- ☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

● **C. Administrative Agency Review**

- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

○ **G. Habeas Corpus/ 2255**

- [ ] 530 Habeas Corpus-General
- [ ] 510 Motion/Vacate Sentence

○ **H. Employment Discrimination**

- [ ] 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

○ **I. FOIA/PRIVACY ACT**

- [ ] 895 Freedom of Information Act
- [ ] 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

○ **J. Student Loan**

- [ ] 152 Recovery of Defaulted Student Loans (excluding veterans)

○ **K. Labor/ERISA (non-employment)**

- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Labor Railway Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

○ **L. Other Civil Rights (non-employment)**

- [ ] 441 Voting (if not Voting Rights Act)
- [ ] 443 Housing/Accommodations
- [ ] 444 Welfare
- [ ] 440 Other Civil Rights
- [ ] 445 American w/Disabilities-Employment
- [ ] 446 Americans w/Disabilities-Other

○ **M. Contract**

- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholder's Suits
- [ ] 190 Other Contracts
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

○ **N. Three-Judge Court**

- [ ] 441 Civil Rights-Voting (if Voting Rights Act)

---

**V. ORIGIN**

- ◉ 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Action for declaratory and injunctive relief to, inter alia, compel listing of tribe under 5 U.S.C. § 702; 25 U.S.C. § 479a-1(a); and 28 U.S.C. §§ 1331, 1361

---

| VII. REQUESTED IN COMPLAINT | [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ 0.00 JURY DEMAND: | Check YES only if demanded in complaint YES [ ] NO [X] |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES [ ]   NO [X]   If yes, please complete related case form.

DATE   2.28.07    SIGNATURE OF ATTORNEY OF RECORD   _W Solin_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.