**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| ME-WUK INDIAN COMMUNITY | ) | |
| OF THE WILTON RANCHERIA, | ) | |
| 4380 Fallow Drive | ) | |
| Sacramento, CA 95823-4419, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:07CV00412 (RCL) |
| | ) | |
| v. | ) | |
| | ) | |
| DIRK A. KEMPTHORNE, | ) | |
| *in his official capacity as* | ) | |
| *Secretary of the Interior*, | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240-0002; | ) | |
| | ) | |
| Defendant. | ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO PROPOSED INTERVENERS' MOTION TO INTERVENE

COMES NOW Plaintiff, ME-WUK INDIAN COMMUNITY OF THE WILTON

RANCHERIA, by and through its undersigned counsel, respectfully submits this

Response and Memorandum of Law in Opposition to Proposed Intervenors' WILTON

MIWOK RANCHERIA, et. al's Motion to Intervene made pursuant to Fed. R. Civ. P. 24.

Plaintiff opposes this Motion for the reasons as set forth in the accompanying

Memorandum of Law in Support of Plaintiff's Opposition to Proposed Intervenors'

Motion to Intervene.

Dated:  June 18, 2007                                    Respectfully submitted,


                                                         /s/ Travis W. Trueblood

Travis W. Trueblood (D.C. Bar No. 474797)
TRUEBLOOD LAW GROUP, P.A.
P.O. Box 1270
Moore Haven, FL  33471-1270
863.946.9160
863.946.9162 (fax)
ttrueblood@truebloodlawgroup.com

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE IN
OPPOSITION TO PROPOSED INTERVENORS' MOTION TO INTERVENE**

**PRELIMINARY STATEMENT**

Proposed Intervenors filed their Motion to Intervene and accompanying
documents pursuant to Fed. R. Civ. P. 24, claiming that intervention is proper based on
Plaintiff's failure to assert certain claims based on breaches of the California Rancheria
Act.  If allowed to intervene, Proposed Intervenors will immediately seek to transfer this
action to the Federal District Court for the Northern District of California.  (*See* Mot. to
Intervene ¶4).

In their Motion, Proposed Intervenors also attempt to bring before this Court the
issue of who is the authorized representative body of the Tribal membership.  To this end,
Proposed Intervenors throughout their Motion and supporting documents attempt to
discredit Plaintiff's authority to bring suit on behalf of the Tribe.  (*See* Mot. to Intervene
¶2; Decl. of Mary Tango ¶ 12.)  However, Proposed Intervenors' account of their
authority is severely deficient.  (*See* Declaration of Mildred Williams ¶¶3-9, attached
hereto as Exhibit "A"; Declaration of Henry Sangmaster ¶¶ 3-7, attached hereto as
Exhibit "B").  More importantly, the overwhelming majority of the Tribe's membership
recognizes Plaintiff as the authorized representative body to pursue the Tribe's legal
rights.  (*See* Williams Dec. ¶¶ 5, 9; Sangmaster Dec. ¶¶ 3-6; Letter to Clay Gregory dated
March 4, 2006, attached hereto as Exhibit "C").  Nonetheless, any issue concerning
Tribal leadership is immaterial at this time.  Rather, the only issue to be decided presently
is whether the Proposed Intervenors should be allowed to intervene in this action.

As fully discussed *infra,* Proposed Intervenors attempt to broaden the scope of the
current litigation by interjecting new issues, causes of action, remedies, and parties not

currently contemplated by the original parties to the litigation.  Admittedly, Proposed Intervenors base their right to intervention in part on Plaintiff's omission of claims based on breaches of the California Rancheria Act.  (*See* Mem. P. & A.  p. 16.)  The new issues set forth by the Proposed Intervenors fall outside of the scope of the current litigation.  Furthermore, Proposed Intervenors have already asserted these causes of action in other litigation pending in the Northern District of California.  (Mot. to Intervene ¶3.) Accordingly, Proposed Intervenors' motion should be denied.

Alternatively, should Proposed Intervenors be allowed to intervene, the scope of their participation in this litigation should be limited to those claims asserted in the Proposed Complaint in Intervention.

## ARGUMENT

### I.    The proposed intervention is inappropriate because it broadens the scope of the current litigation

It is well established that a proposed intervenor "may join issue only on a matter that has been brought before the court by another party."  *Illinois Bell Telephone Co. v. FCC,* 911 F.2d 776, 786 (D.C. Cir. 1990) (*citing Vinson v. Washington Gas Light Co., 321 U.S. 489, 498* (1944) ("an intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues.")).  *See also Edison Elec. Inst. v. EPA*, 391 F.3d 1267, 1274 (D.C. Cir. 2004) ("The procedural device of intervention does not contemplate so broad a compass."); *Alabama Mun. Distribs. Group v. F.E.R.C.,* 300 F.3d 877, 880 (D.C. Cir. 2002); *California Dept. of Water Res. v. F.E.R.C.*, 306 F.3d 1121, 1126 (D.C. Cir. 2002) ("intervenors may join issue only on a matter that has been brought before the court by a petitioner.") (quoting *Alabama Mun. Distribs. Group v. F.E.R.C.,* 300 F.3d 877, 879 (D.C. Cir. 2002)); *Nat'l Ass'n of*

*Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 141 n.12 (D.C. Cir.

1998) ("[A]n intervenor can only address issues raised by a party.").

Limiting intervention on the scope of the existing claims prevents "an intervenor

from circumventing other rules of procedure by simply intervening in another's lawsuit

and expanding the scope of the issues presented therein." *Seminole Nation of Oklahoma*

*v. Norton,* 206 F.R.D. 1, 7 (D.D.C. 2001) (citing *Illinois Bell Telephone Co.,* 911 F.2d at

776); *Vinson,* 321 U.S. at 489.

This Court squarely addressed this issue in *Seminole Nation of Oklahoma v.*

*Norton,* 206 F.R.D. at 1.  The litigation in *Seminole Nation of Oklahoma* stemmed from

the Seminole Nation's challenge of the Department of the Interior's ("DOI") refusal to

recognize certain amendments to the Tribe's constitution.  *Id.* at 3.  One amendment

sought to eliminate the tribal citizenship of the "Freedman," a portion of the Tribe's

membership whose lineal ancestry is attributed to escaped African slaves.  *Id.* at 4–5.

The Seminole Nation filed suit challenging the DOI's action which presented causes of

action based on violations of the Administrative Procedures Act, 5 U.S.C. §701 *et seq.*

("APA").  *Id.* at 6.  Thereafter, the Freedman attempted to intervene asserting that the

*Seminole Nation* litigation threatened to impair their interest as citizens of the Tribe.  *Id.*

at 5.  The Freedman filed a ten count complaint in intervention with several causes of

action not raised by the parties to the original litigation.  *Id.* at 5–6.  As in the Motion to

Intervene and supporting documents before this Court, the issues raised by the

Freedman's proposed complaint in intervention duplicated those raised by the Freedman

in separate concurrent litigation in another federal district court. *Id.* at 6-7.

This Court denied the Freedman's motion to intervene as a matter of right under Rule 24(a) and permissively under Rule 24(b), holding that based on the "present narrow framing of the claims in the litigation, the Freedman cannot . . . be permitted to intervene . . . ." *Id.* at 10–11. Despite the Freedman's significant stake in the outcome of the litigation in their identification as members of a federally recognized tribe, the Court held that the Seminole Nation's APA claims presented in the original litigation did not address the issue raised by the Freedman in their Proposed Complaint in Intervention. *Id.* at 6–7.

Also critical to the Court's analysis was the Freedman's attempt to surreptitiously associate the *Seminole Nation* litigation in the D.C. District Court with the Freedman's ongoing litigation in the Western District of Oklahoma. *Id.* at 7–8. The Court found "little if any basis for the Freedman to intervene on the plaintiff's side of this APA suit" and noted that the issues falling outside of the scope of the current litigation were already being adjudicated elsewhere. *Id.* at 7. This Court rebuked the proposed intervenors for attempting to engage in "judge shopping" and their "ubiquitous and persistent attempt to expand the scope" of the *Seminole Nation* litigation. *Id.* ("[I]t is not the present configuration of the suit which guides the Freedman's attempt to intervene as Plaintiff, but rather, the Freedman's vision of the broad expansion of the suit wherein they, as Plaintiff, may assert a new universe of claims against both parties presently in litigation.").

### a. Allowing intervention will interject new issues, causes of action, and parties not contemplated by the scope of the current litigation

As in *Seminole Nation of Oklahoma,* the Proposed Intervenors in the present case attempt to broaden the scope of the current litigation by interjecting new issues not contemplated by the original parties. In fact, Proposed Intervenors by their own

admission base their right to intervene in this action of Plaintiff's failure to assert claims

based on violations of the California Rancheria Act, explicitly stating:

> *Plaintiff . . . has expressly disavowed any attempt to remedy the effect of the California Rancheria Act on the Tribe, <u>the gravamen of the proposed Complaint in intervention.</u>*

(Mem. P. &A. p. 16) (emphasis supplied). (*See also* Mot. to Intervene 1-2, "[t]he Wilton

Miwok Rancheria . . . move pursuant to Fed. R. Civ. P. 24 and LCvR 7, to intervene in

this action to assert claims that the Plaintiff . . . has failed to assert in its Complaint.").[1]

Furthermore, Proposed Intervenors seek as redress for their California Rancheria

Act based claims that the Court declare, *inter alia,* that the Tribe was wrongfully

terminated under the California Rancheria Act and that the lands comprising the former

Wilton Rancheria are "Indian Country" and thus such lands are immune to state and local

regulatory jurisdiction.  As a result, adjudication of Proposed Intervenors' claims would

require judgment by this Court regarding the Tribe's termination under the California

Rancheria Act and a determination of the proper regulatory status of former Wilton

Rancheria land.[2]

The claims presented in Plaintiff's Complaint and Proposed Intervenors'

Proposed Complaint in Intervention have little, if any, commonality.  Plaintiff's

Complaint sets forth no cause of action based on the California Rancheria Act.  Rather,

---

[1] Specifically, Proposed Intervenors premise their proposed claims on breaches of the California Rancheria Act, breaches of the California Rancheria Act as amended, and Breach of Trust based on violations of the California Rancheria Act (Proposed Compl. in Intervention ¶¶ 50-61.)

[2] Notably, nearly half of the land comprising the former Wilton Rancheria is no longer owned by Tribal members. (*See* Proposed Compl. in Intervention, Ex. H.) Interjecting the Proposed Intervenors' new issues in regarding the ownership and regulatory status of the former Wilton Rancheria would subject this litigation to substantial delay and further intervention by state regulatory authorities and current land owners.

Plaintiff establishes claims premised principally on breaches of the APA and does not seek a declaration that the Tribe was unlawfully terminated. (Pl.'s Compl. ¶¶ 84-106.) Moreover, Plaintiff's claims do not seek as redress by this Court any declaration or injunctive relief from this Court concerning the lands comprising the original Wilton Rancheria. (Pl.'s Compl. ¶¶ 84-106.) Additionally, Proposed Intervenors seek to add four previously unnamed defendants to the litigation. (Proposed Compl. in Intervention ¶¶ 7-12.) Undoubtedly, adjudication of the litigation as by the Proposed Intervenors would require determination of additional uncontemplated issues, consideration of additional theories of recovery, subject this litigation to involvement by new defendants, and subject this litigation to further intervention by new parties. Accordingly, Proposed Intervenors' Motion to Intervene should be denied.

### b.  Intervention would result in duplicative litigation.

The Supreme Court has held that "as between the federal district courts . . . the general principle is to avoid duplicative litigation." *Colorado River Water Conservation Dist. v. U.S.,* 424 U.S. 800, 817 (1976). Courts employ this principle in order to promote judicial efficiency and "comprehensive disposition of litigation." *Id. See also Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv*., Civ. No. 01-765, slip op. at 11 (D.D.C. 2001) (Court denying intervention as to issue based in part to proposed intervenor's admission of having a forum in which to adjudicate its views), attached hereto as Exhibit "D".

However, prior to seeking intervention in this action, Proposed Intervenors filed suit in the District Court for the Northern District of California asserting nearly identical claims to those set forth in their present Proposed Complaint in Intervention to this

action. (Mem. P. & A. p. 16.) Granting intervention in the current action would result in duplicative litigation and unnecessarily expend this Court's judicial resources in adjudicating the claims set forth in the Proposed Intervenors' Proposed Complaint in Intervention. As a result, intervention in this case is unwarranted in view of Proposed Intervenors' attempt to duplicate its claims currently in litigation in the Northern District of California and its stated purpose of interjecting new claims not previously asserted by Plaintiff.

        **c.  Proposed Intervenors seek to substantially alter the current litigation.**

If allowed to intervene, Proposed Intervenors will immediately seek to transfer and associate this action with its pending litigation in the Northern District of California. (Mot. to Intervene ¶4.) ("If allowed to intervene, Plaintiffs/Intervenors will seek to have their action, together with the action filed by nominal Plaintiff herein in this District, transferred to the Northern District of California . . . .").

Based on its own explicit assertions, it is clear that Proposed Intervenors' motive is to transform this litigation into something far different than originally contemplated by the original parties. *See Seminole Nation of Oklahoma,* 206 F.R.D. at 8 (Court admonishing proposed intervenor's attempt to expand the scope of the litigation and associate the case with pending litigation elsewhere). Allowing the proposed intervention under these known pretenses will deny Plaintiff the ability to conduct this litigation as it intended. *See Time Sec. Mgmt., Inc. v. Pittway Corp.,* 422 F. Supp. 2d 907, 913 (W. D. Tenn. 2006) ("It is basic to our system of justice that in civil action the plaintiff is in control of her own case and can proceed as she sees fit"). Accordingly, Proposed Intervenors' Motion to Intervene should be denied.

II.    **Proposed Intervenors' desire to transfer this litigation to the Northern District of California is immaterial to this Court's determination of whether intervention should be granted**

Proposed Intervenors argue as a primary basis for intervention that this suit should be transferred and associated with its pending litigation in the Northern District of California. (See Mot. to Intervene ¶15.) To support this tactic, Proposed Intervenors preemptively attached as an exhibit to its Motion to Intervene a "Motion to Transfer Venue to the Northern District of California and Opposition to Defendant's Motion to Transfer Venue to the Eastern District of California." In both their Motion to Intervene and Motion to Transfer Venue, Proposed Intervenors argue at length why a transfer to the Northern District of California would serve their interests as a potential party to this litigation. (*See* Proposed Mot. Transfer 3-10.)

However, Proposed Intervenors' desire to transfer this case upon gaining intervention is not a relevant factor in this Court's determination of whether Proposed Intervenors should be granted intervention. *See e.g., Beam Laser Sys., Inc. v. Cox Commc'n*, 117 F. Supp. 2d 515, 516 (E.D. Va. 2000) ("there is authority for the proposition that an intervenor . . . may not question venue.") (citing *Trans World Airlines, Inc. v. Civil Aeronautics Bd.,* 339 F.2d 56, 63 (2nd Cir. 1964) ("a person intervening on either side of the controversy may not object to improper venue.")); *Asbury v. Southwest Mortgage Co.,* 776 F. Supp. 1093, 1096 (W.D.N.C. 1991) (declaring as a general rule that an intervenor cannot question venue); *Commonwealth Edison Co. v.Train,* 71 F.R.D. 391, 394 (N.D. Ill. 1976) ("intervenor enters action subject to venue that already exists."); *See also* 7C Charles Alan Wright, Arthur R. Miller & Mary Kane, *Federal Practice and Procedure* §1918, 485 (2007) ("By voluntarily bringing himself

8

into the action [the intervenor] has waived his privilege not to be required to engage in litigation in that forum.").

Furthermore, any consideration of Proposed Intervenors' Motion to Transfer Venue is premature. *See e.g., David v. Alphin*, Slip op. WL39400 (N.D. Cal. 2007) (when 3rd Party intervention is a possibility but has yet to occur, plaintiff's choice of forum "remains entitled to deference and weighs against transfer").

### III.    Alternatively, intervention should be limited to the Breach of Rancheria Act claims set forth by in the Proposed Intervenors' Proposed Complaint in Intervention

Assuming, *arguendo*¸ that this Court granted Intervenor's Motion, the scope of the intervention should be limited. The scope of an intervenor's participation in a case should correspond with that party's interest in the particular counts before the Court.[3] *See Hawaii Longline Ass'n*, Civ. No. 01-765, slip op. at 2-3 (D.D.C. 2001) ("it should be noted that courts need not consider a motion to intervene as an all-or-nothing proposition, but may limit intervention accordingly.") (citing *Harris v. Pernsley,* 820 F.2d 592, 599 (3rd Cir. 1987) (proposed intervenors may have sufficient interest to intervene, but not have an interest in the litigation as a whole)); *United States v. S. Fla. Water Mgmt. Dist.,* 922 F.2d 704, 707 n.4 (11th Cir. 1991).

At best, the proposed intervention warrants a limited scope. Should Proposed Intervenors be allowed to intervene in this action, their participation should be limited

---

[3] The Advisory Committee Notes to the 1966 amendment of Rule 24 state that intervention "may be subject to appropriate conditions or restrictions responsive, among other things, to the requirements of efficient conduct of the proceedings." Fed. R. Civ. P. amend. n. 24 (1966). Intervenors, whether as of right or permissive, can be subjected to court imposed conditions to protect the interests of the original parties. *See also Hawaii Longline Ass'n*, Civ. No. 01-765, slip op. at 2-3.

only to the breach of the California Rancheria Act claims asserted in its Proposed

Complaint in Intervention.  As discussed *supra,* Proposed Intervenor admittedly premises

its right to intervention on Plaintiff's omission of redress sought for breaches of the

California Rancheria Act.  (*See* Mem. P. & A. p.16.)  Accordingly Proposed Intervenors'

Proposed Complaint in Intervention asserts new causes of action based on the California

Rancheria Act and the California Rancheria Act as amended but does not assert any

claims based on the APA, which is the primary thrust of Plaintiff's complaint.  Thus,

Proposed Intervenors' participation in this action, if any, should be limited to

determination of its causes of action based on breaches of the California Rancheria Act.

## **CONCLUSION**

For the reasons set forth above, Proposed Intervenors' Motion to Intervene should

be denied.  Alternatively, Proposed Intervenors' intervention in this case should be

limited to determination of its causes of action based on the California Rancheria Act and

the California Rancheria Act as amended.


Dated: June 18, 2007                              Respectfully submitted,


                                                  /s/ Travis W. Trueblood
                                                  Travis W. Trueblood (D.C. Bar No. 474797)
                                                  TRUEBLOOD LAW GROUP, P.A.
                                                  P.O. Box 1270
                                                  Moore Haven, FL  33471-1270
                                                  863.946.9160
                                                  863.946.9162 (fax)
                                                  ttrueblood@truebloodlawgroup.com

## EXHIBIT "A"

Declaration of Mildred Williams and Supporting Documents

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ME-WUK INDIAN COMMUNITY OF THE WILTON RANCHERIA, 4380 Fallow Drive Sacramento, CA 95823-4419, | ) ) ) ) ) |  |
| Plaintiff, | ) ) | Case No. 1:07CV00412 (RCL) |
| v. | ) ) |  |
| DIRK A. KEMPTHORNE, *in his official capacity as Secretary of the Interior,* 1849 C Street, NW Washington, DC 20240-0002; | ) ) ) ) ) ) |  |
| Defendant. | ) ) ) |  |

<u>**DECLARATION OF MILDRED WILLIAMS, COUNCIL MEMBER OF THE
ME-WUK INDIAN COMMUNITY OF THE WILTON RANCHERIA IN
SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO PROPOSED
INTERVENORS' MOTION TO INTERVENE**</u>

I, Mildred Williams, declare:

1.      I am personally familiar with the facts set forth in this Declaration and if I am sworn as a witness, I could competently testify to the following from my personal knowledge, except as to those matters set forth upon information and belief and as to such matters, I believe them to be true.

2.      I am a member of the Me-Wuk Indian Community of the Wilton Rancheria (the "Tribe") and the daughter of Archie Williams, an original distributee of the Wilton Rancheria.

3.      I currently serve as a Council Member of the Tribal Council. The following individuals currently serve on the Tribal Council in their respective positions:

| | |
|---|---|
| Chairman: | Henry Sangmaster |
| Vice-Chairman: | Juanita Smith |
| Secretary: | Roland Smith |
| Treasurer: | Robin Sangmaster |
| Council Member 1: | Muriel Sangmaster |
| Council Member 2: | Cindy Jinzo |
| Council Member 3: | Mildred Williams |
| Council Member 4: | Mia Villanueva |
| Council Member 5: | Salina Smith |

4.     The Tribe has been working diligently for over ten years to obtain restoration as a federally recognized Indian Tribe. In that time, the Tribe's leadership has taken different forms, resulting in the Tribal Council as set forth above.

5.     The Tribal membership consists of over 300 members. The Tribal Council conducts regularly scheduled meetings in which Tribal members are encouraged to attend and participate.

6.     On November 22, 1999, two competing factions of the Wilton Miwok Cultural Preservation Association, a state incorporation non-profit, signed a Mediation agreement in which certain individuals declared themselves the Interim Tribal Council. Under the mediation agreement, these individuals agreed to work together in order to help the Tribe gain legislative restoration in the Omnibus Bill of 1999. However, the Tribal membership neither knew nor approved of the establishment of this Interim Tribal Council. Furthermore, there was no indication to the Tribal membership that the Interim Tribal Council would serve indefinitely or continue to be the representative body of the Tribe until restoration was obtained.

7.     Ultimately, the Tribe was not included in the Omnibus Bill of 1999.

8.    On August 30, 2003, the Tribal membership held an election that resulted in the installation of new council members. The Bureau of Indian Affairs received notification of the election results on or about September 17, 2003. (*See* Certified Letter from Chairman Henry Sangmaster dated September 16, 2003 and USPS return receipt (attached hereto as Exhibit "A"). In 2005, the Tribal membership conducted another election, resulting in the Tribal Council as set forth above.

9.    Since 2003, the Tribal Council has expended significant efforts to obtain restoration of the Tribe. The Tribal Council as set forth above was elected by the majority of the Tribal membership and is the authorized representative to protect the Tribe's legal rights.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 17th day of June, 2007 in Sacramento, California.

Mildred Williams
Council Member

**EXHIBIT "A"**

**U.S. Postal Service™**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

SACRAMENTO CA 95814    OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.37 |
| Certified Fee | | $2.30 |
| Return Reciept Fee (Endorsement Required) | | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $4.42 |

Postmark Here    SEP 16 2003    09/16/2003

Sent To  *Bureau of Indian Affairs*
Street, Apt. No.; or PO Box No.
City, State, ZIP+4

PS Form 3800, June 2002    See Reverse for Instructions

September 16, 2003

Bureau of Indian Affairs
Central California Agency
650 Capitol Mall, Suite 8500
Sacramento, Ca 95814

To Whom It May Concern:

This is to advise you on the recent action of the Me-wuk Indian Community of The Wilton Rancheria.

The General Community Council held a special meeting on August 30, 2003 as provided for under our Constitution and By-laws. Action taken by the General Community Council resulted in the following:

| | |
|---|---|
| Chairman, | Henry Sangmaster |
| Vice Chair, | Anthony Sanchez |
| Secretary, | Juanita Smith |
| Treasurer, | Robin Sangmaster |
| Council Member #1 | Muriel Sangmaster |
| Council Member #2 | June Taylor |
| Council Member #3 | Mildred Williams |

The General Community Council does not recognize any other individuals as legal representatives of the Wilton Rancheria and has taken such action through resolution adopted at the August 30, 2003 Special Meeting.

All business of the Wilton Rancheria will be conducted through these elected officials. All communications should be forwarded to Mr. Henry Sangmaster, Chairman, Wilton Rancheria, 4380 Fallow Drive, Sacramento, Ca 95823.

Sincerely,

*Henry Sangmaster*

Mr. Henry Sangmaster
Chairman

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Bureau of Indian Affairs Central California Agency 650 Capitol Mall Suite 8500 Sacto, CA 95814*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *M. Facio*    ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
M. FACIO

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Transfer from service label)

7003 1010 0000 0305 1184

PS Form    PRI-03-P-408

**<u>EXHIBIT "B"</u>**

Declaration of Henry Sangmaster and Supporting Documents

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ME-WUK INDIAN COMMUNITY OF THE WILTON RANCHERIA, 4380 Fallow Drive Sacramento, CA 95823-4419, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:07CV00412 (RCL) |
| v. | ) ) ) | |
| DIRK A. KEMPTHORNE, *in his official capacity as Secretary of the Interior,* 1849 C Street, NW Washington, DC 20240-0002; | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

### DECLARATION OF HENRY SANGMASTER, CHAIRMAN OF THE ME-WUK INDIAN COMMUNITY OF THE WILTON RANCHERIA IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO PROPOSED INTERVENORS' MOTION TO INTERVENE

I, Henry Sangmaster, declare:

1.    I am personally familiar with the facts set forth in this Declaration and if I am sworn as a witness, I will competently testify to the following from my personal knowledge, except as to those matters set forth upon information and belief and as to such matters, I believe them to be true.

2.    I was born Me-Wuk Indian and am a member of the Me-Wuk Indian Community of the Wilton Rancheria (the "Tribe").

3.    I was first elected as Chairman of the Tribal Council in 2003. Notification of said election was delivered and accepted by the Central California Agency Office of the Bureau of Indian Affairs on or about September 17, 2003 (attached hereto as Exhibit

"A"). I was re-elected as Chairman by the Tribal Membership in 2005 and presently

serve in that capacity. The Tribal Council was elected by the majority of Tribal

membership. The Tribal Council has the Tribal membership's support as the

representative body of the Tribe.

    4.    The Tribal Council has be recognized as the representative body of the

Tribe by several third-parties, including, but not limited to the Inter-Tribal Council of

California, Inc. and California Indian Legal Services; the firm responsible for institution

the Tillie Hardwick litigation (*See* Exhibit "B" and Exhibit "C" attached hereto).

    5.    Since 2003, the Tribal Council, with support of the Tribal membership has

taken significant steps in the effort to obtain restoration of the Tribe, including but not

limited to the following examples:

    a.    The Tribal Council engaged the professional ethno-historian firm

    McClurken & Associates to research and present the Tribe's history

    supported by personal accounts and documentation. McClurken &

    Associates developed a comprehensive document, entitled "The Me-Wuk

    Indian Community of the Wilton Rancheria: A Social, Political and

    Community History" (hereafter "Core Report") (attached hereto as Exhibit

    "D").

    b.    The Core Report was hand delivered to California Regional Area Office of

    the Bureau of Indian Affairs ("BIA") officials in 2006 with a cover letter

    signed individually by 125 of our members that were proven to have

    descended from members named on the Distributee List (attached hereto

    as Exhibit "E"). We then met regarding the Core Report with the

2

California BIA officials, including Regional Director Clay Gregory and Dale Risling on June 6, 2006.

c.  On August 28, 2006, I, the Tribe's General Counsel, Joseph L. Kitto, and Dr. James McClurken of McClurken & Associates, met with Scott Keep and Barbara Cohen of the Department of the Interior Solicitors Office, Lee Fleming of the Office of Federal Acknowledgement and other BIA officials in Washington, D.C. to again request that the Secretary correct the error of not listing the Wilton Rancheria and informing the BIA of our intention to institute litigation to pursue the Tribe's rights.

6.  On February 15, 2007 the General Membership voted to authorize Proskauer Rose, the Trueblood Law Group and the General Counsel, Joseph L. Kitto to pursue litigation on behalf of the Tribe in the District Court for the District of Columbia. This litigation maintains the full support of the Tribal Council.

7.  On May 31, 2007, I learned that Fredericks & Peebles, LLP were purporting to be the Tribe's attorneys and that they had filed a Motion to Intervene in this action asserting that they are the authorized representatives of the Tribe. On the same date, I also learned that Fredericks & Peebles, LLP filed suit in the District Court for the Northern District of California on behalf of certain individuals of the Tribe. These actions were not authorized by the elected Tribal Council. Furthermore, the attorneys representing these individuals to my knowledge did not contact the Tribal Council and have not been formally retained by either the Tribal Council or the General Membership.

3

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15th day of June, 2007 in Sacramento, California.

_Henry Sangmaster_

Henry Sangmaster
Chairman, The Me-Wuk Indian Community of the
Wilton Rancheria

4

**EXHIBIT "A"**

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

SACRAMENTO CA 95814    OFFICIAL USE

| | |
|---|---|
| Postage | $  $0.37 |
| Certified Fee | $2.30 |
| Return Receipt Fee (Endorsement Required) | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $  $4.42 |

Postmark Here
SEP 16 2003
09/16/2003

Sent To  Bureau of Indian Affairs
Street, Apt. No.; or PO Box No.
City, State, ZIP+4

PS Form 3800, June 2002    See Reverse for Instructions

7003 1010 0000 0305 1184

September 16, 2003

Bureau of Indian Affairs
Central California Agency
650 Capitol Mall, Suite 8500
Sacramento, Ca 95814

To Whom It May Concern:

This is to advise you on the recent action of the Me-wuk Indian Community of The Wilton Rancheria.

The General Community Council held a special meeting on August 30, 2003 as provided for under our Constitution and By-laws. Action taken by the General Community Council resulted in the following:

| | |
|---|---|
| Chairman, | Henry Sangmaster |
| Vice Chair, | Anthony Sanchez |
| Secretary, | Juanita Smith |
| Treasurer, | Robin Sangmaster |
| Council Member #1 | Muriel Sangmaster |
| Council Member #2 | June Taylor |
| Council Member #3 | Mildred Williams |

The General Community Council does not recognize any other individuals as legal representatives of the Wilton Rancheria and has taken such action through resolution adopted at the August 30, 2003 Special Meeting.

All business of the Wilton Rancheria will be conducted through these elected officials. All communications should be forwarded to Mr. Henry Sangmaster, Chairman, Wilton Rancheria, 4380 Fallow Drive, Sacramento, Ca 95823.

Sincerely,

*Henry Sangmaster*

Mr. Henry Sangmaster
Chairman

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Bureau of Indian Affairs Central California Agency 650 Capitol Mall Suite 8500 Sacra, CA 95814

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  M. Facio    ☐ Agent  ☐ Addressee
B. Received by (Printed Name)    C. Date of Delivery
M. FACIO
D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number (Transfer from service label)
7003 1010 0000 0305 1184

PS Form    PRI-03-P-408

**EXHIBIT "B"**



# Inter-Tribal Council of California, Inc.
**An Association Designed For The Unity of All California Indians**

June 14, 2005

**Board Of Directors**

**Area I**
Resighini
Rancheria
Rick Dowd
Secretary

**Area II**
CA Assoc. of
Am. Ind. Women
Lynda Shoshone
President

**Area III**
Ione
Rancheria
Matt Franklin
Vice President

**Area IV**
Big Pine
Rancheria
Patricia Vance
Treasurer

**Area V**
La Jolla
Reservation
Wendy Schlater
Delegate

**Area VI**
Cold Springs
Rancheria
Sheila Edd
Alt. Delegate

**Area VII**
Chemehuevi
Tribe
Brian McDonald
Delegate

An Association
of 41 Tribes
and Tribal
Organizations

Wilton Rancheria
4380 Fallow Drive
Sacramento, CA 95823

Honorable Chairperson Henry Sangmaster:

I would like to invite you to join the General Council of the Inter-Tribal Council of California at their annual meeting. The General Council will be meeting July 13, 14, 15, to discuss the annual goals of the Corporation. We know you Chair our member tribes, consortia members, or recipients of our services.

On July 13th we will be conducting a Chairman's Forum during which time we would like to hear your position or recommendations on a number of key topics. You are welcome to make a presentation at this meeting on any topic you feel needs attention by the tribes. Your resolution position paper or recommendations will be considered by all in attendance and give everyone an opportunity to have input.

Please call our office as soon as you get this letter to talk with staff about your registration. Your call will be confirmation that you plan to attend. Also, at this time, you can discuss any assistance you need in getting information together. Staff will be glad to help you.

Please choose from the list attached or offer your own topics by filling in the line under "OTHER" with details. You can fax this sheet to ITCC at (916) 973-0117.

In The Spirit Of Unity Among The Tribes,

Matthew Franklin

Matthew Franklin
Vice President
Board of Directors

Attachment

**2755 Cottage Way, Suite 14, Sacramento, CA 95825**
**(916) 973-9581 • (916) 973-0117 Fax**

**<u>EXHIBIT "C"</u>**

STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
PO BOX 942857
SACRAMENTO CA 94257-0500

**ADDRESS VERIFICATION NOTICE**

DATE:  07/14/04
ENTITY ID:
CCRP 2657811

NOTICE NUMBER:  0947288040708  1
ME-WUK INDIAN COMMUNITY OF THE WILTON RANCHERIA HISTORICAL
CA INDIAN LEGAL SERV,
510 16TH ST FL 4
OAKLAND CA 94612-1520

We have been advised that the above business entity will be receiving returns or other documents from the Franchise Tax Board. Our records indicate that the mailing address shown above is current. If the address is incorrect, please provide the correct information below and mail this form to: Franchise Tax Board PO Box 942857, Sacramento CA 94257-0500. If applicable, please provide any additional identification numbers

CARE OF NAME (If Applicable)           Federal Employer Identification Number

STREET           Employment Development Department Account Number

CITY     STATE     ZIP           Board of Equalization Account Number

### NOTICE TO INCORPORATING ATTORNEY

If you are the incorporating attorney, please provide us with the current address for the above business entity. If you no longer represent the business entity, please forward this request. If we cannot establish and maintain contact with the business entity, it may be subject to penalties for failing to comply with the law.

TAXPAYER SERVICES

### TELEPHONE AND INTERNET ASSISTANCE

From within the United States, call ................................ ......... **(800) 352-5711**
From outside the United States, call (not toll-free) .... ......... **(916) 845-6500**

Website at: **www.ftb.ca.gov**

**Assistance for persons with disabilities:** We comply with the Americans with Disabilities Act. Persons with hearing or speech impairments please call TTY/TDD (800) 822-6268.

FTB 4729 MEO (REV 08-1999)



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
PO BOX 651
SACRAMENTO CA 95812-0651
TELEPHONE (916) 845-4900

**WITHHOLDING TAX AT SOURCE
REQUIREMENTS
INDEPENDENT CONTRACTORS**

DATE:    07/14/04

NOTICE NUMBER:   0947287040708   1
ME-WUK INDIAN COMMUNITY OF THE WILTON RANCHERIA HISTORICAL
CA INDIAN LEGAL SERV,
510 16TH ST FL 4
OAKLAND CA 94612-1520

ENTITY ID: CORP 2657811
IN REPLY,REFER TO:
767:HW:        :ICLTR

**Why did you receive this letter?** Does your company make payments to nonresidents of California? If so, California law (Revenue and Taxation Code section 18662) requires you to withhold and remit income tax payments in certain instances. If you don't withhold and remit, you may have to pay the withholding plus penalties. We are sending this letter to explain the withholding requirements, and to give you the information you need to explain these requirements to nonresident payees.

**What types of income are subject to withholding?** Withholding is generally required on payments made to people who don't reside in California but are paid:

- For services performed by an independent contractor in California,
- Rents or royalties on assets such as commercial real estate, wells, mines and equipment located in California, and
- Distributions from California estates and trusts.

**What is the withholding rate?** The rate is seven percent of the gross amount of the payment of California source income.

**What are the exceptions?** No withholding for income or franchise tax purposes is required if any one of the following applies:

1. The payment is for goods.
2. The payment is made to a resident of California, to a corporation that has a permanent place of business or is qualified to do business in California, or to a partnership that has a permanent place of business in California. **IMPORTANT NOTE: If the California resident, qualified corporation or partnership is acting as an agent for the nonresident payee, this exception does not apply.**
3. The total payments of California source income to the independent contractor are less than $1501 for the calendar year.
4. The payment is to an organization that is exempt from tax under California or federal law.
5. The payments are compensation from a motor carrier providing transportation in two or more states, subject to Section 11504(b) of the United States Code.
6. The payments are wages paid to employees (wage withholding is administered by the California Employment Development Department).
7. The payment is to a bank or banking association.
8. The payment is to a nonresident corporate director for director services, including attendance at board of directors' meetings.
9. The payee or payer has a written authorization from us (the California Franchise Tax Board) waiving withholding.

**MORE INFORMATION:** FTB Publication 1023, Nonresident Withholding - Independent Contractor, Rent & Royalty Guidelines, answers many common questions about withholding requirements, forms, waivers, reporting, and making payments. To obtain a copy, call (916) 845-4900 or write to Nonresident Withholding Section, PO Box 651, Sacramento CA 95812-0651. You can also find forms, publications and other information at the FTB home page on the Internet at http://www.ftb.ca.gov.

FTB 4086 MEO (REV 02-1999)

# CALIFORNIA INDIAN LEGAL SERVICES

**Oakland Office**

510 16th Street, Fourth Floor, Oakland, CA 94612 ♦ Phone: 510/835-0284 ♦ Fax: 510/835-8045
www.calindian.org ♦ contactCI_S@calindian.org

**BISHOP**

**EUREKA**

**ESCONDIDO**

E. Ann Gilmour, Staff Attorney
(510) 835-0284, Ext. 354
agilmour@calindian.org

**OAKLAND**

**SANTA ROSA**

**WASHINGTON, D.C.**

July 19, 2004

Henry Sangmaster, Chairman
Me-Wuk Indian Community of the Wilton Rancheria
4380 Faliow Drive
Sacramento, CA 95823

### Re: Incorporation of Non-Profit

Dear Henry:

I am enclosing for you several notices which we received from the Franchise Tax Board.
I believe they are self explanatory. You will need to complete and return the address notice so
that it reflects your address as the place for service of these notices. Please send me a copy of
that completed form when you send it to the Franchise Tax Board. I hope all is well with you.

Yours truly,
CALIFORNIA INDIAN LEGAL SERVICES

E. Ann Gilmour
Staff Attorney

EAG:ls
Enclosures

**<u>EXHIBIT "D"</u>**

# The Me-Wuk Indian Community
# of the Wilton Rancheria:
# A Social, Political, and Community History

prepared for
the Me-Wuk Indian Community
of the Wilton Rancheria

by
Heather A. Howard, PhD

with the assistance of
James M. McClurken, PhD
Laurie Leclair, MA
Leah Vetne, BA

James M. McClurken & Associates
1120 Keystone Avenue
Lansing, Michigan 48911

1 June 2006

# Table of Contents

**Report**

I. Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

II. Historical Background and Context  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Tribal Background and the Impacts of Contact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Ancestors of the Tribe under Early American Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . 6
    Principal Family Lines, 1900-1930 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    The Establishment of the Wilton Rancheria  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III. The Wilton Rancheria: Community Actions and Concerns, 1927-1949 . . . . . . . . . . . . . . . 24
    Community Conditions and Decisions in the 1930s  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    The Wilton Rancheria Community and the Indian Reorganization Act  . . . . . . . . . . . . 28
    Community Issues on the Rancheria  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
           Water, Irrigation, and Farming  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
           Failed Plans for Communal Farming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    Poverty and Poor Living Conditions: Ongoing Concerns of the Wilton
        Me-Wuk Community  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

IV. Preparations for Termination, 1949-1964 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    Pre-Termination Needs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    The Plan for the Distribution of the Assets of the Wilton Rancheria  . . . . . . . . . . . . . 58
    Road, Water, and Sanitation Issues in the Termination Process of the
        Wilton Rancheria  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    The Cosumnes River Indian Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

V. Continuity, Despondency, and Optimism in the Post-Termination Years, 1964-1980  . . . . . 73
    Continuity of Social and Community Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
    The California Rancheria Task Force Investigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
    Tillie Hardwick et al. v. the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

VI. Social and Political Continuity and Restoration Efforts, 1980s-Present . . . . . . . . . . . . . . . 92
    Recommendations for Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
    Interactions and Identifications of the Wilton Me-Wuk Community . . . . . . . . . . . . . . . 96
    Wilton Rancheria Governance and Federal Recognition Efforts  . . . . . . . . . . . . . . . . 101
        The Interim Council and the Wilton Miwok Cultural
                Preservation Association, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
        The Elections Board Council . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
        The Wilton Miwok Indian Rancheria Restoration Act  . . . . . . . . . . . . . . . . . . . . 109
        Omnibus Bill for the Restoration of Terminated California Tribes . . . . . . . . . . 112
    Tribal Organization, 2000-Present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

VII. Summary and Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

**Appendices**

Appendix A:   Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian
                     Community of the Wilton Rancheria

Appendix B:   Map: Demographics of the  Me-Wuk Indian Community of the Wilton Rancheria,
                     1990-present, by Zip Code

Appendix C:   Genealogical Charts
                     Genealogical Chart of the Andrews Family
                     Genealogical Chart of the Blue and McKean Families
                     Genealogical Chart of the Brown Family
                     Genealogical Chart of the Daniels Family
                     Genealogical Chart of the Dupree Family
                     Genealogical Chart of the Evans Family
                     Genealogical Chart of the Smith Family
                     Genealogical Chart of the Taylor Family
                     Genealogical Chart of the Williams Family
              Sources for Genealogical Charts

Appendix D:   Pending, Current, and Deceased Membership

## I. Introduction

The Wilton Rancheria was established in 1927 when the federal government purchased lands located about twenty-one miles southeast of the City of Sacramento for the members of the Me-Wuk Indian Community of the Wilton Rancheria (the Tribe).[1]  Today, in relation to the southeastward sprawl of the city, the Rancheria lands are in close proximity to towns now considered suburbs of Sacramento.[2]  The Wilton Rancheria was one of the forty-one rancherias names in the Rancheria Act of 1958 (Public Law 85-671), and, in September 1964, was the Wilton Rancheria was terminated under this Act.[3]  The Act terminated the status of rancheria communities as federally recognized Indian tribes, ended the official Indian status of individuals who were identified as members of these communities, and distributed the assets of the rancherias.[4]

Of the tribes named in the Rancheria Act, nearly all have been restored as federally

---

[1]  Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

[2]  Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

[3]  Office of the Secretary, "Property of California Rancherias and of Individual Members Thereof: Termination of Federal Supervision," *Federal Register* 29, no. 185 (22 September 1964), pp. 13146-13147; *An Act to provide for the distribution of land and assets of certain Indian rancherias and reservations in California, and for other purposes*, approved 18 August 1958, 72 *Stat.*, 619-621.

[4]  *An Act to provide for the distribution of land and assets of certain Indian rancherias and reservations in California, and for other purposes*, approved 18 August 1958, 72 *Stat.*, 619-621.

recognized tribes through litigation or specific legislation.[5]  The Wilton Rancheria was initially included in these efforts, but was dismissed without prejudice from the class action suits.  Since the mid-1990s, the Tribe has been working towards restoring federal recognition to its community through legislation of its own.  The Tribe is pursuing federal recognition through legislation because, as a terminated tribe, it has been excluded from participating in the Federal Acknowledgment Process (FAP) through the Branch of Acknowledgment Research (BAR).  Although the Tribe is ineligible to participate in the FAP, BAR criteria for federal acknowledgment of an Indian tribe is nonetheless relevant to the Tribe's restoration efforts.  BAR regulations call for evidence of (a) continuous identification as an American Indian entity since the tribe was last federally recognized; (b) existence as a distinct community from historical times to the present; and (c) autonomous political influence and authority over members of the group from historical times to the present.  The Me-Wuk Indian Community of the Wilton Rancheria meets all of these criteria.

This report, which provides an ethnohistory of the Me-Wuk Indian Community of the Wilton Rancheria, is therefore mindful of ongoing recognition of the Tribe as a social and political entity by Tribe members and others.  The discussion presented throughout this report is

---

[5]  Twenty-one tribes were restored under the stipulated judgements of *Tillie Hardwick et al. v. The United States*, and *Scotts Valley et al. v. The United States*.  Numerous others have been restored through specific legislation, such as for example the Graton Rancheria.  Order Approving Entry of Final Judgment in Action, *Tillie Hardwick, et al. v. the United States of America, et al.*, 27 December 1983, 9th Circuit Federal Court, Northern District of California, Case no. 79-1710sw, FRC-San Bruno, accession no. 21-88-0010, box 16; Stipulation for Entry of Judgment, *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria, et al. v. United States of America, et al.*, No. C-86-0660 WWS, revised 17 August 1990, BIA-Central California Agency, Sacramento, CA, 3703-P5 FY90-91, Minutes, Resolutions, Guidiville Rancheria; *Graton Rancheria Restoration Act*, 19 June 2000, H. Rpt. 106-677 (106-2), pp. 1-5.

based on both primary and secondary sources, and on interviews with Tribe members.[6]

Although the particular focus of the report is on the time period spanning from termination in

September 1964 through the present, any discussion of the Wilton Me-Wuk Indian Community's

evolution requires context.  Researchers therefore begin with a brief account of the Tribe's

historical background in relation to Indian history and policy in California.  Following this

discussion, researchers describe the Tribe's ancestral community between 1900 and 1927, and

the Tribe's experiences on the Wilton Rancheria from 1927 until termination in 1964.  Finally,

researchers detail the Tribe's political and social history since termination.

The Rancheria Act required that a distribution plan be drawn up which named the adult

heads of households – the "distributees" – to whom the rancheria lands were distributed as fee-

patented individual parcels, as well as the distributees' dependent family members.[7]  After a tribe

accepted its distribution plan, the federal government was responsible for fulfilling the terms of

the agree-upon plan.  When the federal government believed that the terms of the plan had been

met, it declared the rancheria terminated.  Termination became official when it was announced in

the *Federal Register*.  Upon this announcement, all named persons were no longer "entitled to

any of the services performed by the United States for Indians because of their status as Indians,

[and] all statutes of the United States which affect Indians because of their status as Indians ...

[became] inapplicable to them...."[8]  At the time of termination, eleven individuals and twenty

---

[6]  Most primary sources were collected by the Tribe from the National Archives in San Bruno,
California.

[7]  A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions
of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria.

[8]  *An Act to provide for the distribution of land and assets of certain Indian rancherias and
reservations in California, and for other purposes*, approved 18 August 1958, 72 *Stat*., 619-621; Office of

iv

dependent members were listed on the Plan for the Distribution of the Assets of the Wilton Rancheria.[9]  The distributees were members of six interrelated families: the McKean, Daniels, Taylor, Brown, Williams, and Andrews families.[10]

The families of the Me-Wuk Indian Community have lived in close proximity to each other and operated as a social and political community recognized by others before their rancheria was established in 1927 and since termination in 1964.  In fact, three-quarters of the families present on the Wilton Rancheria at the time of termination still hold title to and occupy their Rancheria parcels.[11]  Over 95 percent of the Tribe's members live within a 50-mile radius of the Rancheria lands, and 65 percent within a 20-mile radius, primarily in neighboring towns and in the City of Sacramento.[12]  The Tribe's demographics have remained consistent since 1964; of a sampling of 117 members born after 1960, about 80 percent were born within 30 miles of the Rancheria lands since termination.[13]  While Tribe members have dispersed slightly

---

the Secretary, "Property of California Rancherias and of Individual Members Thereof: Termination of Federal Supervision," *Federal Register* 29, no. 185 (22 September 1964), pp. 13146-13147.

[9]  A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria.

[10]  Appendix C: Genealogical Charts.

[11]  Nine of the eleven distributees or their descendants still have property on the Wilton Rancheria, according to current resident and Tribe member, William Daniels.  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, p. 12.

[12]  Appendix B: Maps: Demographics of the  Me-Wuk Indian Community of the Wilton Rancheria, 1991-present, by Zip Code [Note: Percentages are based on Tribe members' zip code information that was available to researchers at the time of the writing of this report.  Researchers examined 158 tribal enrollment files, of which 146 of listed zip codes.  Percentages are calculated using a total of 146.  This information is located on the table accompanying the map in Appendix B.]

[13]  See table titled "Demographics of the Me-Wuk Indian Community of the Wilton Rancheria, 1960-Present, by Birthplace" on page 79 of this report.

away from the former Wilton Rancheria, they continue to function and exist as tribal community.

Others, including state and federal governments and officials, have continued to view the Tribe as a distinct Me-Wuk Indian entity since the time of termination. Four years after termination, a report on the needs of the Wilton Rancheria described the community as an ethnically and geographically distinct entity whose members lacked economic and educational opportunities.[14] In the 1970s, the Commissioner of Indian Affairs visited terminated tribes and also found their conditions deplorable. As a result, the California Rancheria Task Force was formed to assess the conditions of terminated rancheria communities and to provide cost estimates for construction and repairs to rancheria infrastructures, as much of what had been installed or upgraded under the terms of the Rancheria Act was broken or substandard.[15] The Task Force reported that most of the Wilton Rancheria distributees and their families were still

---

[14] "Wilton Indian Rancheria: An Assessment of Community Needs" by M. Kenyon Fullard, May 1968, Private Collection of Wilton Rancheria.
   Although this document contains some basic useful information, the reader should note that it is also significantly flawed by other biases and uninformed opinion. For example, while the document states that the Cosumnes River Indian Association (CRIA) did not provide leadership for the community, numerous primary documents demonstrate that this was not the case. The report is also fundamentally flawed because the writer, Fullard, appears to have been unsuccessful in gaining the trust and cooperation of the residents of the Wilton Rancheria, and thus little detailed information about their lives.

[15] California Rancheria Task Force Report, 2 February 1972, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report [see III: Mission and IV: Recommendations under "Introduction"].
   A careful review of the California Rancheria Task Force Report indicates that the document was transferred to the National Archives at San Bruno, California in a disorganized manner, which does not appear to reflect the actual organization of the document and makes comprehension of it difficult. For clarity, researchers have reorganized the Task Force Report according to the list (on the last page of the "Introduction"), which indicates the correct order of the "Exhibits"; by examining introductory statements and titling; and by making other inferences based on the text. The reader should note that the organization of the Task Force Report (provided in the documents in evidence for this report) represents researchers' best effort to present the document as accurately as possible.

residing on the former Rancheria lands, and reported that about $93,000 would be needed to complete the repairs and construction necessary to meet county codes.[16]

This attention to the federal government's failure to fulfill the terms of the Rancheria Act triggered the legal actions of the 1970s, 1980s, and 1990s, which have successfully restored most other tribes which, like the Wilton Rancheria, were unlawfully terminated under the Rancheria Act. California Indian Legal Services (CILS) developed a litigation strategy for many tribes.[17] CILS attempted to ensure the inclusion of all the tribes terminated under the Rancheria Act; however, the conditions of poverty and the dispersal of community members brought on by the termination process itself made it difficult for many to participate – the Wilton Rancheria was no exception.

As this report details, the conditions which were the basis of the positive findings for the plaintiffs in these cases parallel the experience of Wilton Rancheria community. In these cases, the court determined that the federal government had failed on numerous counts to proceed with termination in accordance with the 1958 Rancheria Act, including its obligations to provide roads, sanitation, and water systems that met local and county code standards. Furthermore, the federal government was responsible for ensuring that terminated tribe members were provided with vocational training and educational opportunities, but it was also found to have not

---

[16] The Task Force Report lists the repairs estimate at $102,224; however, when the itemized costs are added up, the sum is actually $93,000. California Rancheria Task Force Report, 2 February 1972, NARA-SB, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report [see Exhibit A under "Report on the Wilton Rancheria"].

[17] Advisory Council on California Indian Policy, "The ACCIP Termination Report: The Continuing Destructive Effects of the Termination Policy on California Indians," *Final Reports and Recommendations to the Congress of the United States Pursuant to Public Law 102-416* (September 1997), p. 19 [Hereafter Advisory Council, "Termination Report"].

adequately supplied these.  All of these specific failures apply to the termination process as experienced by the Me-wuk Indians of the Wilton Rancheria.  A 1976 lawsuit restored the Indian status of persons named as the dependents of distributees on rancheria distribution plans, and some Tribe members have since regained their Indian status.[18]  Collectively, however, the Tribe remains unrecognized.

In 1987, the Area Director of the Sacramento Area Office of the Bureau of Indian Affairs (BIA), recommended to the Assistant Secretary of Indian Affairs that the Wilton Rancheria, along with nine other tribes, be restored as a federally recognized tribe.[19]  Throughout the 1990s and into the present, the Tribe has worked toward restoration of its federal recognition.  Most notably, the Advisory Council on California Indian Policy (ACCIP), commissioned by Congress in 1992, recommended that the Me-Wuk Indian Community of the Wilton Rancheria "should be immediately restored" by Congress.[20]  In the late 1990s, the Tribe attempted to draft a bill aimed specifically at the restoration of the Wilton Rancheria as a federally recognized tribe; however, this bill did not survive the legislative process.  In 2000, the Tribe joined forces with the Graton Rancheria and the Alexander Valley Mishewal Wappo Tribe on an omnibus bill in efforts to draft legislation that would collectively restore federal recognition to these tribes.  Just as it was

---

[18]  William E. Finale to All Indians Whose Names Have Been Listed as Dependent Members of Distributees on Distribution Plan of Any of the Following Rancherias, 26 March 1976, BIA-Central California Agency, Sacramento, CA, 3701-P3, Related Correspondence; see also California Indian Legal Services Newsletter, 15 January 1976, Oakland Community History Project, Periodicals, California Indian Legal Services Newsletter; William E. Finale to Commissioner of Indian Affairs, 26 March 1976, BIA-Central California Agency, Sacramento, CA, 3704-P5 FY92, Tribal Enrollment Correspondence, Guidiville Rancheria.

[19]  Maurice M. Babby to Assistant Secretary - Indian Affairs, attn: Deputy to the Assistant Secretary, 5 June 1987, Private Collection of Wilton Rancheria.

[20]  Advisory Council, "Termination Report," p. 5.

about to move forward, both the Alexander Valley and Wilton rancherias were dropped from the bill.  The Graton Rancheria went forward and in 2000 regained its status as a federally recognized tribe.[21]

Like many government officials, agencies, and committees, the Tribe has also continued to view itself as a distinct entity, and its members have continuously participated in community social events and tribal politics from termination to the present.  In addition to remaining in close proximity to one another, the members of the Wilton Me-Wuk Community meet regularly for celebrations, sporting and recreation, ceremonies, intertribal and cultural activities, and other events.  Funerals for Tribe members are widely attended, and ancestors of the Tribe have consistently been buried in the Hicksville Cemetery, which is located about ten miles away from the Wilton Rancheria.  Younger members of the Tribe who have moved to more urban areas for employment and education opportunities return to the Rancheria lands often to visit elder family and community members and to participate in social events.

Tribe members have also continued to come together to maintain and participate in their organizing structures.  From 1936 until termination, the Tribe was governed by a constitution established when the community reorganized under the Indian Reorganization Act (IRA) of 1934.  After termination in 1964, the Tribe – whose members still lived on or nearby the Rancheria lands – continued to govern itself through the Cosumnes River Indian Association (CRIA), a political organization established to manage and oversee the Tribe's communal lands, which included parcels set aside for the community's utilities, such as the water supply system, and a playground/recreation area.  CRIA served as an organizational and leadership structure for

---

[21] *Graton Rancheria Restoration Act*, 19 June 2000, H. Rpt. 106-677 (106-2), pp. 1-5.

the Wilton Rancheria community after termination through the 1990s, when the Tribe worked towards reestablishing an elected Tribal Council. However, CRIA also continues to operate and serve the community.

In the last ten years, the Tribe's leadership has focused on federal recognition. While restoration of federal recognition has been a goal of all Tribe members, they have not always agreed on how to accomplish it. Such disputes are a natural element of a diverse community in which members are passionate about issues affecting them all. The section of the ACCIP's report titled "Difficulties encountered in reconstituting tribal communities under unified leadership" states that re-establishing tribal governments is a direct consequence of the flawed termination process itself.[22] Furthermore, as in the case of the Me-Wuk Indian Community of the Wilton Rancheria, "Where some original rancheria lands remain, disputes frequently arise between those who remained on the rancheria during termination and those who left the grinding poverty of these rural enclaves to seek a better life elsewhere."[23] Despite these difficulties, the Tribe's leadership has persisted in its efforts to unify Tribe members. As some members stated in 1998: "we are not divided because we all want restoration for our people."[24]

---

[22] Advisory Council, "Termination Report," p. 23.

[23] Advisory Council, "Termination Report," p. 24.

[24] Wilton Rancheria Corporation and Council to Wilton Rancheria Tribal Members and Other Interested Parties, 9 February 1998, Private Collection of Wilton Rancheria.

x

## II. Historical Background and Context

In aboriginal times, the ancestors of the Wilton Me-Wuk Community were a hunting and gathering people who were part of the Plains Miwok linguistic family.[25]  The arrival of the Spanish, Mexicans, and Americans, and the disease and destruction accompanying these incursions, severely disrupted aboriginal life in California.  Miwok peoples were taken in large numbers onto Spanish missions, and, later, Mexican ranchos, where they essentially worked as slaves.  After the discovery of gold and the beginning of American jurisdiction, conditions improved little for the ancestors of the Tribe.  Mining and settlement destroyed the natural resources upon which the Plains Miwok were dependent, and erected boundaries around lands they had once accessed freely.  By the mid-nineteenth century, many Plains Miwok people had fled east and south to the communities of their neighbors and kin in modern-day El Dorado, Amador, and Calavaras counties.

In 1850, California legislation legalized the indenture of Native people, and the Plains Miwok were directly impacted by this law.  Many Native peoples resisted enslavement and the

---

[25]  In the anthropological literature, the spelling "Miwok" is most common.  However, C. Hart Merriam, who documented ancestors of the Tribe in the early twentieth century, more specifically noted linguistic distinctions and used the term "Me-wuk," which the Tribe prefers.  C. Hart Merriam, "Ethnographic Notes on California Indian Tribes," *Reports of the University of California Archaeological Survey*, ed. and comp. Robert F. Heizer, no. 68, pt. I (Berkeley, CA: University of California Archaeological Research Facility, Department of Anthropology, October 1966), pp. 6-63 [Hereafter Merriam, "Ethnographic Notes"]; C. Hart Merriam, "Ethnographic Notes on California Indian Tribes," *Reports of the University of California Archaeological Survey*, ed. and comp. Robert F. Heizer, no. 68, pt. III (Berkeley, CA: University of California Archaeological Research Facility, Department of Anthropology, October 1966), pp. 323-370 [Hereafter Merriam, "Ethnographic Notes," pt. III].

forces of settlement.  Tensions between the Native and non-Native populations escalated to such

a point of chaos and violence that in 1851 and 1852 federal treaty commissioners traveled

throughout the state to negotiate treaties of peace with tribes.  The ancestors of the Tribe were

represented on one of these treaties, which provided for land cessions and reservations.

Although the treaties were never ratified by Congress, reservations were loosely established in

California, a system that failed by the late 1860s.  Between the late 1860s and the turn of the

twentieth century, Native peoples who had been removed to reservations or had fled returned to

their homelands to find them overrun by settlement.  The period between 1860 and 1900 was one

of federal neglect of Native peoples in California.  In the first three decades of the twentieth

century, many prominent Wilton Me-Wuk families appear on censuses in the Wilton area.

Advocacy groups began efforts to acquire land for homeless Indians in the late nineteenth

century, and these efforts led to the Indian Appropriations Act under which the Wilton Rancheria

was established in 1927.[26]  By 1931, several Wilton Me-Wuk families inhabited the Rancheria,

where they lived as a federally recognized tribe on trust lands until termination in 1964.


*Tribal Background and the Impacts of Contact*

    The citizens of the Me-Wuk Indian Community of the Wilton Rancheria are members of

the California Indian group more broadly referred to by anthropologists as Plains Miwok.[27]

---

[26] *An Act Making appropriations for the current and contingent expenses of the Indian Department, for fulfilling treaty stipulations with various Indian tribes, and for other purposes, for the fiscal year ending June thirtieth, nineteen hundred and ten*, 3 March 1909, 35 *Stat.*, 781-815.

[27] Richard Levy, "Eastern Miwok," *Handbook of North American Indians, California*, ed. Robert F. Heizer, vol. 8 (Washington, D.C.: Smithsonian Institution, 1978), pp. 398-413. [Hereafter Levy, "Eastern Miwok"].

According to Samuel L. Barrett and Richard Levy, Plains Miwok occupied settlements and seasonal encampments along the "lower reaches of the Mokelumne and Cosumnes rivers and both banks of the Sacramento River from Rio Vista to Freeport" in aboriginal times.[28]  C. Hart Merriam, who conducted extensive studies in the area between 1900 and 1905, first referred to Miwok linguistic family as "Me-wuk."[29]  He classified the Plains Miwok as a sub-family of Me-wuk, called "Mew-ko," which consisted of ten tribes, including the "Mo-koz-um-ne," or Cosumne.[30]

The Me-wuk were a hunting and gathering society, organized socially through moieties.[31] The political structure of the Me-wuk resembled that of their neighbors, with whom they interacted extensively through activities such as trade.[32]  Typical of hunter-gatherers, the Me-wuk lived in small groups, sometimes referred to as tribelets.  An elite family generally

---

[28]  Levy, "Eastern Miwok," p. 398; Samuel A. Barrett, "The Geography and Dialects of the Miwok Indians," *University of California Publications in American Archaeology and Ethnology*, vol. 6, no. 2 (Berkeley, CA: University of California Publications, 1908) [Hereafter Barrett, "The Geography"]; Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

[29]  Merriam, "Ethnographic Notes," p. I, pp. 6-63; Merriam, "Ethnographic Notes," pt. III, pp. 323-370.

[30]  Merriam, "Ethnographic Notes," pt. III, p. 323.
Elizabeth Pinkerton explains that the word "Cosumnes" is believed to be a derivative of *kossum*: "The suffix *sumne* means tribe or people.  There have been many interesting spellings, and there still are today."  She also notes that the Miwok word for salmon as *kus-sum* and *kus-sum-mi*.  Elizabeth Pinkerton, *History Happened Here, Book I  - River, Oaks, Gold: Stories of Elk Grove, Sloughhouse, Sheldon, Franklin, Florin, Wilton, Laguna Creek and other places in South Sacramento County, California* (Laguna Publishers, October 2000), p. 37 [Hereafter Pinkerton, *History Happened Here*].

[31]  Levy, "Eastern Miwok," p. 411; E. W. Gifford, "Miwok Lineages and the Political Unit in Aboriginal California," *American Anthropologist*, New Series, vol. 28, no. 2 (April 1926), pp. 389-401 [Hereafter Gifford, "Miwok Lineages"].

[32]  Levy, "Eastern Miwok," pp. 410-412.

controlled the economic and social life of the group; however, the hereditary "chief" or "captain" led his community through advice and example.[33]

The Plains Miwok found an abundance of edible nuts, seeds, bulbs, berries, roots, insects, waterfowl, fish, and game within their range, providing them with a balanced diet.[34] They traded foodstuffs unique to their locale and specialized goods for other items, such as salt, with neighboring tribes.[35] As is the case throughout central to northern California, acorn was the staple foodstuff. Fishing – for salmon, in particular – was the most important aspect of the Plains Miwok subsistence economy, and they diversified their fishing implements and methods considerably.[36] The Plains Miwok also hunted deer extensively, using both communal and individual hunting methods.[37]

The Me-wuk continued to use acorn, fish salmon, and hunt deer well into the twentieth century, largely by using adapted aboriginal methods. Elder citizens of the Me-Wuk Indian Community of the Wilton Rancheria who were interviewed for this report recalled fishing in the Cosumnes River for salmon, and participating in individual and communal hunting well into the 1960s, usually to supplement their meager earnings as seasonal farm workers.[38] However, in the

---

[33] Stephen Powers, "The Miwok," *Tribes of California* (1877; reprint, Berkeley: University of California Press, 1976), pp. 352-355; Gifford, "Miwok Lineages."

[34] Levy, "Eastern Miwok," pp. 402-403; Barrett, "The Geography," pp. 336-338.

[35] Levy, "Eastern Miwok," pp. 402-403.

[36] Levy writes that the Plains Miwok used seines, harpoons, hook and line, spear, basket traps, weirs, and stupefaction "with crushed buckeye nuts and soaproot." Levy, "Eastern Miwok," pp. 403-404.

[37] Levy, "Eastern Miwok," p. 404.

[38] Levy, "Eastern Miwok," p. 401; Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, pp. 4-5; Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, pp. 14-15;

late 1960s, after termination, game wardens enforced a ban on hunting and fishing on or in the vicinity of the former Wilton Rancheria lands.[39]

The lands the Plains Miwok inhabited, south and east of the Sacramento Delta Area, were located along a path of massive death and destruction of California Indians caused by Spanish, Mexican, and American military incursions, disease and slavery, and the violence accompanying mining and settlement.[40]  The Me-wuk first encountered non-Native people at the beginning of the nineteenth century when the Spanish established missions and military outposts in the San Francisco Bay Area.  During the first three decades of the nineteenth century, the Me-wuk population began to steadily decline, as Me-wuk people were decimated by disease and removed in large numbers to missions.[41]  As Richard Levy writes:

> Plains Miwok converts from the westernmost delta begin appearing in the Book of Baptisms of Mission San Jose in 1811.  It appears that many Bay Miwok and Plains Miwok tribelets disappeared through the combined effects of removal of the population to the missions and epidemics, which killed many thousands of persons in the central valley in the first half of the nineteenth century.[42]

Between 1811 and 1834, over 2,100 Plains Miwok were baptized at Mission San Jose, where most of them were taken.[43]  Plains Miwok were the largest single group of Native people at

Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006,Wilton Rancheria of Me-Wuk Indians, pp. 4, 9-10.

[39] Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, p. 4.

[40] Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

[41] Levy, "Eastern Miwok," p. 400.

[42] Levy, "Eastern Miwok," p. 400.

[43] Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

5

Mission San Jose.[44]  When neophytes fled, "Military expeditions were sent to bring the fugitives back to the mission establishments."[45]  The Me-wuk resisted and militarized themselves considerably against the Mexicans during the 1820s and 1830s.[46]

During these decades, California came under the rule of the Mexican Republic.  Missions were secularized, and large ranchos dominated the landscape.  Native communities continued to be the subjects of raids and massacres by slavers supplying Mexican ranchos with labor.  The conditions of slavery continued throughout the Mexican rancho era and for nearly two decades after the United States assumed jurisdiction over California.

*Ancestors of the Tribe under Early American Jurisdiction*

In 1848, the United States and Mexico signed the Treaty of Guadalupe Hidalgo, which gave the Americans, among other lands, 70,000,000 acres of aboriginal land in California.[47]  Although the American government made an initial attempt to resolve Indian claims, the discovery of gold in 1848 attracted thousands of non-Native people.  These immigrants, intent on making their fortunes from the mineral and agricultural wealth of the new territory, clashed violently with Native people.[48]  Mining operations caused ecological damage to fish stocks and

---

[44]  Levy, "Eastern Miwok," p. 401.

[45]  Levy, "Eastern Miwok," p. 400.

[46]  Levy, "Eastern Miwok," p. 400.

[47]  Advisory Council on California Indian Policy, "Executive Summary," *Final Reports and Recommendations to the Congress of the United States Pursuant to Public Law 102-416* (September 1997), p. 2 [Hereafter Advisory Council, "Executive Summary"].

[48]  Advisory Council, "Executive Summary," p. 2.

game, and aboriginal land was appropriated for gardens and livestock. In some cases, access to acorn was cut off as stands of oak trees were fenced in and the acorn used as hog fodder.[49]

The Me-wuk population near the Cosumnes River, estimated at the turn of the nineteenth century at 11,000 individuals, was drastically reduced by mid-century. As historian Elizabeth Pinkerton writes, the Spanish explorer Gabriel Moraga recalled in 1845 that "the Cosumne Indians, who have left their name on this river ... have been driven away from it within a few years and dispersed among other tribes..."[50] Linked through kinship ties, ancestors of the Tribe fled to the communities of their neighbors at the eastern reaches of the Cosumnes River in the Sierra Nevada foothills, in what are now El Dorado and Amador counties, and to the south to Calavaras County.[51] They returned to the western Cosumnes River area in the late nineteenth century and early twentieth century as migrant farm workers. When C. Hart Merriam conducted his studies at the turn of the twentieth century, he did not document Me-wuk in the vicinity of the Wilton Rancheria; however, he did acknowledge that the area was within their territory.[52] Family histories suggest that the ancestors of the Tribe were distributed at this time among several of the settlements Merriam visited, such as West Point, Ione, Buena Vista, and the Jackson Reservation.[53]

---

[49] C. E. Kelsey, *Report of Special Agent for California Indians*, 21 March 1906, California State Library (Sacramento), California History Room, Annie Bidewell Papers (microfilm), Reel 2, p. 12.

[50] Pinkerton, *History Happened Here*, p. 35.

[51] See footnote 58 in this report.

[52] Merriam, "Ethnographic Notes," pt. III, pp. 323-324, 354.

[53] Merriam, "Ethnographic Notes," pt. III, pp. 354-369; Appendix C: Genealogical Charts; Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, p. 2; Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, pp. 11, 13, 29; Appendix A: Map: Places of Significance to

The dispersal of the Plains Miwok was due in part to the aggressive settlement of individuals like John Sutter, who founded Sacramento at the union of the Sacramento and American Rivers.  Pinkerton writes: "[Sutter] killed 30 Miwok people at Cosumne and signed a treaty with those who were left.  He then moved the survivors to the American River where he used them for his private labor force, and other villages unfortunately suffered the same fate."[54]  Sutter's approach to Native people was largely sanctioned by California State legislation, popularly known as the 1850 Slave Act, which provided for the indenture of Native children and "vagrant" adults.[55]  The ancestors of the Tribe were likely impacted significantly by this law, as they were located where it was most actively enforced in North-central California.[56]

The chaos and violent conflict that characterized relations between Native people and settlers as California entered statehood compelled the federal government to send representatives to negotiate treaties with Native peoples for the cession of their lands and for their removal to reservations.  Between March 1851 and January 1852, three commissioners hastily negotiated eighteen treaties with representatives of some of the aboriginal population in California.[57]

The ancestors of the Tribe were party to the treaty signed at the Forks of the Cosumnes

---

the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

[54]  Pinkerton, *History Happened Here*, p. 38.

[55]  *Act for the Government and Protection of Indians*, passed 22 April 1850, *Statutes of California*, Chapter 133, pp. 408-410.

[56]  This law was not repealed until two years after the thirteenth amendment to the United States constitution ended slavery in 1865.

[57]  Robert F. Heizer, "Treaties," *Handbook of North American Indians, California*, ed. Robert F. Heizer, vol. 8 (Washington, D.C.: Smithsonian Institution, 1978), pp. 701-704.

River on 18 September 1851.[58]  One man who lived at the Wilton Rancheria in 1929, William

---

[58]  Charles J. Kappler, comp., "Treaty with the Cu-Zu, Yas-Si, etc., 1851," *Indian Affairs: Laws and Treaties*, vol. 4 (Washington, D.C.: Government Printing Office, 1929), p. 1115 [Hereafter Kappler, "Treaty with the Cu-Zu, Yas-Si"].

Information regarding the Tribe and this treaty was derived from the data collected on applications made under the Act of May 18 1928 (45 *Stat.* L. 602), legislation which allowed the Indians of the State of California to bring a case against the United States before the Court of Claims based on the treaties of 1851 and 1852.  These applications gathered data regarding the applicants' knowledge of the treaties to which they or their "ancestors were a party," and who the "Chiefs, Captains and Headmen of the Tribe or Band to which ... [their] ancestors belonged on June 1, 1852, who executed the Treaty or Treaties" on their behalf.   A sampling of applications of lineal and lateral ancestors of the Tribe were examined for this report, all of which identify the treaty made at the Forks of the Consumnes River as the treaty to which their ancestors were party.  While some identified as "Mee-wuk," most listed their tribe as the Indians of Amador, El Dorado, Sacramento, and or Alameda counties.  One exception, Colonel Brown, was a Concow Maidu born on the Round Valley Reservation who moved permanently to the Wilton Rancheria when it was established.  The vast majority of the applications examined listed Elk Grove, Galt, or Wilton as the applicant's current addresses in 1930.  The applicants also consistently listed Sacramento, Alameda, El Dorado, Amador, and, on a few occasions, Placer, as the counties of their birth locations, and places where they had lived throughout their lives at various times.  Application No. 7293 of Elverine Blue for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7293, Blue, Elverine; Application No. 7291 of Aleck Blue Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932,7291, Blue, Aleck; Application No. 7287 of Louis Taylor Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7287, Taylor, Louis; Application No. 7295 of Annie F. Mc Kean Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to enrollment of California Indians, Applications, 1928-1932, 7295, Mc Kean, Annie F.; Application No. 3916 of Colonel Brown for enrollment with the Indians of the State of California, 18 July 1929, NARA-DC, 75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 3916, Brown, Colonel; Application No. 7236 of Charlie McKean for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7236, McKean, Charlie; Application No. 2937 of Charles Kellogg for Enrollment with the Indians of the State of California, 18 May 1929, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 2937, Kellogg, Charles; Application No. 7301 of Maggie Rhoan for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7301, Rhoan, Maggie; Application No. 7292 of Frank Blue Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7292, Blue, Frank; Application No. 7290 of Ada Madrigal for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7290, Madrigal, Ada; Application No. 7285 of Angeline Rey Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7285, Rey, Angeline;

Joseph, stated that he was the grandson of Hol-loh, a signatory to the treaty.  He also knew the names of four other signatories who negotiated on behalf of the "Loc-lum-ne" and the "Wo-pum-nes"; Joseph referred to himself as of the "Wo-pum-ne" tribe.[59]  C. Hart Merriam names these two tribelets as the "Hul-poom-ne" and "Mo-kal-um-ne" among the ten he considered "Mew-ko" (Plains Miwok).[60]  The Treaty of the Forks of the Cosumnes River ceded the lands on which the Wilton Rancheria was later established, but promised to establish a reservation beginning at the Cosumnes River, "on the Western line of the county, running south on and by said line to its terminus, running east on said line twenty-five miles, thence north to the middle fork of the Cosumnes river, down said stream to the place of beginning."[61]  This reservation was never established.

 While the treaty commissioners traveled throughout California, the Senate passed the

---

Application No. 7237 of Hattie McKean for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7237, McKean, Hattie; Application No. 7286 of Nancy Fernandez for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to enrollment of California Indians, Applications, 1928-1932, 7286, Fernandez, Nancy; Application No. 7294 of William Blue Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7294, Blue, William.

[59]  William Joseph was referring to Hin-Coy-E, Mattas, Boyer, and Pol-tuck in addition to his grandfather, Hol-loh.  Application No. 3001 of William Joseph Household for Enrollment with the Indians of the State of California, 18 May 1929, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 3001, Joseph, William; Kappler, "Treaty with the Cu-Zu, Yas-Si," p. 1115.

[60]  Merriam, "Ethnographic Notes," pt. III, p. 323.

[61]  Kappler, "Treaty with the Cu-Zu, Yas-Si," p. 1115; Charles Royce, comp., "Indian Land Cessions in the United States" *Eighteenth Annual Report of the Bureau of American Ethnology, 1896-1897*, pt. 2 (Washington, D.C.: Government Printing Office, 1899), maps entitled "California 1" and "California 2."

Land Claims Act of 1851.[62]  This act stated that all California lands yet to be claimed by a tribe within two years of the passage of the legislation, or lands upon which invalid claims had been laid would become public land at the at the expiration of the two-year period.  About the Land Claims Act, the ACCIP wrote: "Thus, while the treaty negotiations were in progress, the limitations period on all California land claims, including Indian claims, was running as matter of federal law."[63]  Native people, who were unaware of this legislation, missed the 1853 deadline for staking land claims, and thus became landless.

Although Indian treaties had been negotiated, the United States Senate, pressured by Congressional representatives from California, refused to ratify them.  Moreover, these eighteen treaties were placed under a seal, where they remained for over fifty years.[64]  In the interim, thousands of California Indians, including the Me-wuk, were dispossessed of their lands and forced to relocate as American settlers took over the landscape.  Between 1860 and 1900, most of the existing, precarious reservations formed for California Native peoples in the 1850s were closed while non-Native settlement increased.[65]  The ancestors of the Tribe were among Native people who had fled or been removed to reservations and, by the late nineteenth century, returned to their lands to find them occupied by settlers and dramatically altered by ranching and

---

[62] *An Act to Ascertain and Settle the Private Land Claims in the State of California*, 3 March 1851, 9 *Stat.*, 631-634.

[63] Advisory Council, "Executive Summary," p. 2.

[64] Advisory Council, "Executive Summary," p. 2.

[65] Very little documentation regarding the lives of Indigenous Californians exists for the years 1860 through 1900.

agribusiness.[66]  They became squatters on their own land, and worked as slaves or indentured laborers.  From the late 1860s until about 1905, California Native people, including ancestors of the Tribe, were largely neglected by the BIA.

In 1905, an order from the Senate lifted the injunction of secrecy on the eighteen unratified California Indian treaties, making them public.  Lobby groups, such as the Northern California Indian Association (NCIA) took up the cause of "landless Indians" and influenced Congress to pass legislation to provide land for homeless Indians.[67]  The Secretary of the Interior appointed C. E. Kelsey, who was secretary for the NCIA, to investigate the conditions of California tribes.  Kelsey found that California's Native people had been: "plunged into the extreme of destitution and misery.  The vices and diseases imported with civilization have been fatal to the majority, and the mortality has been so great that it is estimated that their number today is not more than twelve or fifteen percent of their number sixty years ago."[68]  As a result of Kelsey's investigations, Congress passed the Indian Appropriation Act to purchase lands for California Native peoples.[69]

--------

[66]  While it is estimated that most of the Tribe's ancestors were from the Cosumnes River area (that is from the Sierra Nevada foothills to the Sacramento Delta area), there are a few who emanated from other parts of California, such as Colonel Brown, who was a Concow Maidu, and other Miwok from the San Joaquin Valley area to the south.   See footnote 58 in this report.

[67]  The Northern California Indian Association to the Congress of the United States, 1905, NARA-DC, RG75, Central Classified Files, 1907-1939, California Special, 34993-1908-150 to 85552-1909-300 Part I, PI-163 E-121, Box 2, 85552-1908, 300.

[68]  The Northern California Indian Association to the Congress of the United States, 1905, NARA-DC, RG75, Central Classified Files, 1907-1939, California Special, 34993-1908-150 to 85552-1909-300 Part I, PI-163 E-121, Box 2, 85552-1908, 300.

[69]  *An Act Making appropriations for the current and contingent expenses of the Indian Department, for fulfilling treaty stipulations with various Indian tribes, and for other purposes, for the fiscal year ending June thirtieth, nineteen hundred and ten*, 3 March 1909, 35 *Stat.*, 781-815.

While Kelsey's report led to the passage of legislation to make appropriations for the purchase of rancheria lands which continued into the 1920s, he had not included Sacramento, nor any of the Bay Area counties except Alameda, in his research. The ancestors of the Tribe thus remained homeless for two more decades before a rancheria was purchased for them. The Tribe's genealogy and Kelsey's census show that the Tribe shares ancestors with the federally recognized Ione, Buena Vista, and Jackson rancherias. These documents also demonstrate that the ancestors of the Tribe moved extensively along the Cosumnes River in Alameda, Amador, and El Dorado counties, until they finally returned to a specific area along the Cosumnes River.[70]

---

[70] While at least one ancestor of the Tribe, Besita Blue was known to have been born in Alameda County, she died before Kelsey's census was taken, and the names of her other relatives are not known. It is therefore not possible to say if any of the Native people counted by Kelsey in Alameda County in 1905 were related to the Tribe. C. E. Kelsey, Schedule showing non-reservation Indians in Northern California, ca. 1905 to 1906, NARA-DC, RG75, CCF-California Special 5340-1909, 034, "Alameda County"; Appendix C: Genealogical Chart of the Blue and McKean Families.

Some of the Tribe's ancestors were counted by Kelsey in nearby Amador County, hence their close relationship to the federally recognized tribes in that vicinity such as the Ione Band of Miwok Indians, Buena Vista, and the Jackson Rancheria. For example, ancestors of the Tribe in Amador County according to Kelsey include the Smiths, Tripps, and Harts at Enterprise (near Plymouth). These were the Smith siblings: Mary, Agnes, and William (Billy), and their spouses and children. William Smith and his wife Alice Daniels are direct lineal ancestors to the members of the Wilton Rancheria. Mary Smith and her husband Tim Franklin are also ancestors of the Tribe, as we all of the Ione Band. Their son was Bill Franklin, well known for his involvement in the restoration and preservation of Miwok culture in the area. History of William Franklin, ca. 1996, Private Collection of Wilton Rancheria; Pinkerton *History Happened Here*, pp. 42-44; C. E. Kelsey, Schedule showing non-reservation Indians in Northern California, ca. 1905 to 1906, NARA-DC, RG75, CCF-California Special 5340-1909, 034, "Amador County," pp. 6-9; Appendix C: Genealogical Chart of the Daniels Family; Appendix C: Genealogical Chart of the Smith Family.

The Alecs, Reys, Jimmisons, and Browns that Kelsey counted in the vicinity of Buena Vista and Ione in 1905 are likely the same families as those in the Wilton Rancheria family histories. The Tribe's ancestor Alec Blue was counted by Kelsey with his wife and six children at Ione. His daughter Annie Blue was also counted by Kelsey living alone at Ione. C. E. Kelsey, Schedule showing non-reservation Indians in Northern California, ca. 1905 to 1906, NARA-DC, RG75, CCF-California Special 5340-1909, 034, "Amador County," pp. 7-8.

The Tribe's ancestor Louis Evans and six children were listed by Kesley at the Jackson Reservation in 1905. C. E. Kelsey, Schedule showing non-reservation Indians in Northern California, ca. 1905 to 1906, NARA-DC, RG75, CCF-California Special 5340-1909, 034, "Amador County," pp. 8-9; Appendix C: Genealogical Chart of the Evans Family.

Finally, Kelsey counted individuals who appear to be relatives – Reys, Jimmisons, and Tripps, for

13

As detailed below, the Tribe moved throughout this area between 1900 and 1930. The eventual clustering of Native people on the Cosumnes River, just south of the City of Sacramento, was not noted by federal officials until 1927 when the BIA moved to establish the Wilton Rancheria.[71]

*Principal Family Lines, 1900-1930*

Evidence suggests that the ancestors of the Tribe were composed primarily of individuals who returned or came to the Wilton area during the latter half of the nineteenth century to work as ranch and farm laborers, and to subsist from the natural resources available there. As is the case for most Native people in California, there is little documentary record dealing with the lives of the ancestors of the Tribe during this period of neglect by the BIA. Nonetheless, census records provide a glimpse of the Tribe's principal family lines during the first three decades of the twentieth century, leading to and including their reappearance in federal records when the Wilton Rancheria was established in 1927.

Available documents show that ancestors of the Tribe were in the Wilton area by 1900. From the late nineteenth century forward, their burials are recorded in the Hicksville Cemetery, a

---

example – in El Dorado County, where it is known that the ancestors of the Tribe also lived. The available records between 1900 and 1930 (as detailed in the next subsection of this report, "Principal Family Lines, 1900-1930") demonstrate the movement of the ancestors of the Tribe along or in close vicinity to the Consumnes River, between El Dorado and Sacramento counties, settling finally on the Wilton Rancheria when it was purchased for them in 1927. C. E. Kelsey, Schedule showing non-reservation Indians in Northern California, ca. 1905 to 1906, NARA-DC, RG75, CCF-California Special 5340-1909, 034, "El Dorado County," pp. 1-5.

[71] List of Indians near Wilton, California, ca. 1927, Private Collection of Wilton Rancheria; L. A. Dorrington to Commissioner of Indian Affairs, 31 October 1927, Private Collection of Wilton Rancheria.

cemetery which the Tribe continues to use today.[72]  Prior to, and during the first two decades

after the establishment of the Wilton Rancheria, the ancestors of the Tribe worked as seasonal

produce pickers, moving around to the tomato, hops, and grape fields, or pear and plum orchards

of the region.  Some of the men also worked at the nearby McLelland Air Force Base.[73]  As

migrant farm workers on the move around the Wilton/Galt/Elk Grove area, very few were

recorded on census records.[74]  However, members of all the principal family lines of the Tribe

have longstanding roots in the area where the Rancheria was established in 1927.

    Aleck Blue and his family, ancestors to the descendants of the McKean distributees,

appear on federal census records for the Wilton area consistently from 1900 to 1930.[75]  This

---

[72]  American Indian Burials, Hicksville Cemetery, compiled June 2002,
<http://www.galtarnocemdist.com/gac-hc.htm>, accessed 6 April 2006; Appendix A: Map: Places of
Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.
    For a more detailed discussion of the Tribe's use of the Hicksville Cemetery, see section VI of
this report, in the sub-section titled "Interactions and Identifications of the Wilton Me-Wuk Community."

[73]  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton
Rancheria of Me-Wuk Indians, pp. 2-3, 5; Interview with Mildred Williams by Heather Howard and
Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 6.

[74]  Appendix A: Map: Places of Significance to the Ancestors and Members of the Me- Wuk
Indian Community of the Wilton Rancheria.

[75]  Census for Aleck Blue Household, ED 69, Dry Creek Township, Sacramento County,
California, 16 June 1900, *Twelfth Census of the United States, 1900,* p. 32A [Note: The Blue family is
listed near the Hanson family]; Census Alex Blue Household, ED 87, Dry Creek Township, Sacramento
County, California, 12 May 1910, *Thirteenth Census of the United States, 1910,* p. 23A [Note: The
members of the Blue family are the only Indians listed on this census.  By this time, Alice was not living
at home.  The family includes: Alex Blue (50), Lucy (45) Mary (17), John (15), Felix (13) and Louise
Nye, who is a granddaughter]; Census for Aleck Blue Household, ED 75, Dry Creek Township,
Sacramento County, California, 20 January 1920, *Fourteenth Census of the United States, 1920,* p. 10B
[Note: The Blues are listed along the County Road.  This Aleck Blue appears to have a birth date of 1847,
and therefore he would be a full ten years older than Annie Blue's father]; Census for Alec Blue
Household, ED 34-28, Lee Township, Sacramento County, California, 2 April 1930, *Fifteenth Census of
the United States, 1930,* p. 9B [Note: Alec has been erroneously transcribed as "Alan"]; A Plan for the
Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671,
Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria; Appendix C:
Genealogical Chart of the Blue and McKean Families.

family has lived in the vicinity of Wilton and in the southern Sacramento area for generations, moving back and forth between these areas and Amador County where they had kin.  According to local histories of Dry Creek Township in Sacramento County, a nine-year-old Me-wuk boy named Aleck Blue "mysteriously" showed up on the doorstep of the rancher William Hicks in the mid-1860s.[76]  Hicks had become friends with John Sutter, who helped Hicks acquire a large Mexican land grant running along the Cosumnes River and the Monterey Trail.[77]  Aleck gained the rancher's respect through hard work and loyalty, and he worked on the Hicks ranch for most of his life.  As a result, Hicks reserved an eastern portion of his family cemetery for Aleck's

---

[76]  American Indian Burials, Hicksville Cemetery, compiled June 2002, <http://www.galtarnocemdist.com/gac-hc.htm>, accessed 6 April 2006.

This local history version of the story is partially corroborated by census records, and more likely fits with the State of California's history of legalized Indian slavery than with the romanticized local history.  While an Indian boy named Alec Blue is not found on early census records with the Hicks family, there is one named "Frank," aged nine, on the 1870 census.  This may be Alec, another Indian boy, or perhaps they Alec and "Frank" were both among many Indians who were indentured by Hicks and other local ranchers under the 1850 *Act for the Government and Protection of Indians*.  Popularly known as the California Slave Act, the Act provided  for the indenture of Native children and homeless adults under certain circumstances.  The Act also prohibited Native people from testifying against non-Natives in court, making it impossible for Native people to seek any legal recourse when non-Natives did not fulfill the Act's conditions.  For example, children could be taken away from Native families without the family's consent, and the parents could not legally complain against kidnappers.  The Me-wuk population were highly impacted by this legislation.  The Act could work against adult Natives as well.  As Edward Castillo writes, "This law declared that any Indian, on the word of a White man, could be declared a vagrant, thrown in jail, and have his labor sold at auction for up to four months with no pay."  Even when the proclamation for the emancipation of slaves was issued 1863, which would repeal the California law in 1867,  Native people, particularly women and children, continued to be kidnapped and sold.  Census for Wm. Hicks Household, Dry Creek Township, Sacramento County, California, 19 August 1870, *Ninth Census of the United States, 1870*, p. 15; Census for Frank Indian, Dry Creek Township, Sacramento County, California, 19 August 1870, *Ninth Census of the United States, 1870*, p. 15; *Act for the Government and Protection of Indians*, passed 22 April 1850, *Statutes of California*, Chapter 133, pp. 408-410; Edward D. Castillo, "The Impact of Euro-American Exploration and Settlement," *Handbook of North American Indians*, *California*, ed. Robert F. Heizer, vol. 8 (Washington, D.C.: Smithsonian Institution, 1978), pp. 108-109; Robert F. Heizer and Alan F. Almquist, "The Indian and the White Californian, 1850s to 1870s," *The Other Californians: Prejudice And Discrimination Under Spain, Mexico, And The United States to 1920* (Berkeley: University of California Press, 1971), pp. 39-64.

[77]  Pinkerton, *History Happened Here*, p. 237.

16

family.[78]  At some point in the late nineteenth century, that eastern portion of the cemetery

became known as a Native American cemetery, and the Tribe has continuously used the

cemetery since this time.[79]

Aleck married a woman named Besita, an "Alameda County Indian" who passed away in

1886.  He and Besita had at least four children, including Annie McKean, from whom the

members of the McKean family currently enrolled with the Tribe descend.[80]  Aleck lived to be

seventy-eight, and was buried in the Hicksville Cemetery in 1935.[81]  He did not know much

about his parents, saying only, in 1930, when he was living near Galt, that they both died "long

ago," suggesting that he and his parents may have been separated early in his life.[82]

Aleck Blue appears on the federal census in the area of Wilton in 1900.[83]  However, in

---

[78]  American Indian Burials, Hicksville Cemetery, compiled June 2002, <http://www.galtarnocemdist.com/gac-hc.htm>, accessed 6 April 2006.

[79]  American Indian Burials, Hicksville Cemetery, compiled June 2002, <http://www.galtarnocemdist.com/gac-hc.htm>, accessed 6 April 2006.

[80]  The children were Annie Florine, born in 1883, Frank Blue, apparently also born in 1883, William, born in 1877, and Mary.  Application of Annie Florine (Blue) McKean for Enrollment with the Wilton Reservation, 12 June 1952, Private Collection of Wilton Rancheria; Application No. 7291 of Aleck Blue Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932,7291, Blue, Aleck.
Aleck remarried in approximately 1891 to a woman named Lucy, and the couple also had four children together,  Census Alex Blue Household, ED 87, Dry Creek Township, Sacramento County, California, 12 May 1910, *Thirteenth Census of the United States, 1910,* p. 23A.

[81]  American Indian Burials, Hicksville Cemetery, compiled June 2002, <http://www.galtarnocemdist.com/gac-hc.htm>, accessed 6 April 2006.

[82]  Application No. 7291 of Aleck Blue Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932,7291, Blue, Aleck.

[83]  Census Alex Blue Household, ED 87, Dry Creek Township, Sacramento County, California, 12 May 1910, *Thirteenth Census of the United States, 1910,* p. 23A.

1905, he was counted by Kelsey at Ione in Amador County.[84]  In 1910, the federal census listed

Aleck as a general farm laborer and that his children had been born in the Ione Valley.[85]  By

1920, Aleck was living with his son John in Sacramento County.[86]  In 1930, Aleck was

considered the "Chief" of the Indians of the area near the Wilton Rancheria.[87]  In preparation for

the case of the *Indians of California vs. the United States* brought before the Court of Claims, in

1930, Superintendent L. A. Dorrington of the Sacramento Agency corresponded with Aleck Blue

about holding a meeting at the Wilton Rancheria regarding the enrollment of the area Native

people.  Dorrington wrote that if Aleck wanted to hold the hearing at the Rancheria, "I am

always glad to accommodate applicants and if that is the best place to hold the hearing in your

vicinity, I shall be pleased to hold it there."[88]  Superintendent Dorrington wrote elsewhere that he

considered Aleck Blue "one of the leading Indians of that [Galt, Sacramento County]

---

[84]  C. E. Kelsey, Schedule showing non-reservation Indians in Northern California, ca. 1905 to 1906, NARA-DC, RG75, CCF-California Special 5340-1909, 034, "Amador County," p. 7.

[85]  Census Alex Blue Household, ED 87, Dry Creek Township, Sacramento County, California, 12 May 1910, *Thirteenth Census of the United States, 1910,* p. 23A.

[86]  Census for Aleck Blue Household, ED 75, Dry Creek Township, Sacramento County, California, 20 January 1920, *Fourteenth Census of the United States, 1920,* p. 10B

[87]  Census for Alec Blue Household, ED 34-28, Lee Township, Sacramento County, California, 2 April 1930, *Fifteenth Census of the United States, 1930,* p. 9B; Application No. 7291 of Aleck Blue Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932,7291, Blue, Aleck [see attached letter].

[88]  Census for Alec Blue Household, ED 34-28, Lee Township, Sacramento County, California, 2 April 1930, *Fifteenth Census of the United States, 1930,* p. 9B; Application No. 7291 of Aleck Blue Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932,7291, Blue, Aleck [see attached letter].

jurisdiction."[89]

The McKeans descend from Annie Blue McKean, the daughter of Alec Blue.  Annie Blue was born at Hicksville in 1883 and counted by Kelsey at Ione in 1905.[90]  She later married Charlie McKean, Sr., and together they formed one of the founding families of the Wilton Rancheria.[91]

Virgie (Smith) Hatch, herself a distributee and ancestor to the Andrews family, was also recorded in the area prior to the establishment of the Wilton Rancheria.[92]  Likewise, although he was born on the Round Valley Reservation, Tribal ancestor Colonel Brown (grandfather to Donald Brown and Debra Brown listed on the Wilton Rancheria distribution plan) was also on the first census of the Indians for whom the Rancheria was established.[93]

Millard Taylor, the first husband of distributee and ancestor to current Tribe members

---

[89]  Application No. 7291 of Aleck Blue Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932,7291, Blue, Aleck [see attached letter].

[90]  Application of Annie Florine (Blue) McKean for Enrollment with the Wilton Reservation, 12 June 1952, Private Collection of Wilton Rancheria; C. E. Kelsey, Schedule showing non-reservation Indians in Northern California, ca. 1905 to 1906, NARA-DC, RG75, CCF-California Special 5340-1909, 034, "Amador County," p. 8.

[91]  C. E. Kelsey, Schedule showing non-reservation Indians in Northern California, ca. 1905 to 1906, NARA-DC, RG75, CCF-California Special 5340-1909, 034, "Amador County," p. 8; Appendix C: Genealogical Chart of the Blue and McKean Families.

[92]  List of Indians near Wilton, California, ca. 1927, Private Collection of Wilton Rancheria; A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria; Appendix C: Genealogical Chart of the Daniels Family.

[93]  List of Indians near Wilton, California, ca. 1927, Private Collection of Wilton Rancheria; A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria; Appendix C: Genealogical Chart of the Brown Family.

Ella Porter Williams, was born near Plymouth in 1889 and was also in the vicinity of Wilton

with his family in 1927.[94]  While it is not known for sure when Ella came to the area, there was a

large Native family of Porters in the vicinity of the Wilton Rancheria before it was established.[95]

Ella Porter's parents lived on the Jackson Rancheria, where Ella spent her childhood, although

they were from Todd's Valley in Placer County.[96]  Ella's second husband and ancestor to current

Tribe members, Tuck Williams, was also from Placer County.[97]  He, like a few others, generally

came from neighboring counties to the east in the foothills of the Sierra Nevada Mountains,

although it is likely that Tuck Williams' ancestors fled to the mountains earlier to escape Spanish

and Mexican incursions.

Those who trace their ancestry through the Daniels family line descend from Steve and

Kittie Daniels of El Dorado County.  Steve and Kittie Daniels are the grandparents of

distributees Ada Madrigal and Eva Irish, and the great-grandparents of Billie, Jimmie, and

Richard Daniels, who are also listed on the distribution plan.[98]  Ada and Eva were among the

---

[94]  List of Indians near Wilton, California, ca. 1927, Private Collection of Wilton Rancheria; Appendix C: Genealogical Chart of the Taylor Family.

[95]  List of Indians near Wilton, California, ca. 1927, Private Collection of Wilton Rancheria; A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria.

[96]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, pp. 7-8, 23; Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria; Appendix C: Genealogical Chart of the Taylor Family.

[97]  Application for Enrollment of Archie Williams, Wilton Reservation, 16 June 1952, Private Collection of Wilton Rancheria; Appendix C: Genealogical Chart of the Williams Family.

[98]  Appendix C: Genealogical Chart of the Daniels Family.

first residents of the Wilton Rancheria when it was established.[99]

It is unclear who specifically and how many of these ancestors of the Tribe came to live at the Wilton Rancheria around the time of its establishment, or if these ancestors were in the area earlier in the twentieth century. The families are all generally interrelated across the generations and throughout the century, so in many instances it is possible for current members of the Tribe to trace their lineages to several ancestors with early associations with the area surrounding the Rancheria.[100]

*The Establishment of the Wilton Rancheria*

The BIA conducted a census of the "Indians near Wilton" in 1927, and found 148 Native people there, including many ancestors of the Tribe.[101] In a letter to the Commissioner of Indian Affairs, California Superintendent of Indian Affairs L. A. Dorrington was optimistic that the mostly Me-wuk families in the Wilton area could be settled on their own rancheria: "It is with considerable satisfaction that we are able to report at this time that a splendid proposition, as regards Indians living in Sacramento County, is under negotiation."[102] He reported that for the cost of $5,000, the BIA could provide:

homes for thirty odd families ... all of whom are absolutely homeless, and who

---

[99] Ada Madrigal is mistakenly listed here as Ada "McGrill." List of Indians on the Wilton Rancheria, January 1931, Private Collection of Wilton Rancheria.

[100] Appendix C: Genealogical Charts.

[101] List of Indians near Wilton, California, ca. 1927, Private Collection of Wilton Rancheria; Appendix C: Genealogical Charts.

[102] L. A. Dorrington to Commissioner of Indian Affairs, 31 October 1927, Private Collection of Wilton Rancheria.

reside in Sacramento County for the purpose of procuring employment at various seasons throughout the year.  The location that we are negotiating for is ideal and very centrally located, it being possible to reach all labor localities without inconvenience.[103]

Dorrington referred to the impending purchase of a parcel of land on the south side of the Cosumnes River near the Wilton postal station, offered for sale by a Sacramento-area land company, the Consumnes Company Limited.[104]  This tract, made up of three large farm lots, contained 38.9 acres.[105]

Congress voted to expend $7,000 for the purchase of lands for homeless California Indians.[106]  Following a series of  exchanges, the BIA and the Cosumnes Company reached an agreement for the purchase of the Wilton Rancheria property on 25 November 1927.[107]  As part of the deal, the Cosumnes Company agreed to "put down one good well for the furnishing of domestic water."[108]  The following month, the Department of the Interior advised Superintendent Dorrington to choose the well site: "so that all the Indians will have ready and convenient access

---

[103]  L. A. Dorrington to Commissioner of Indian Affairs, 31 October 1927, Private Collection of Wilton Rancheria.

[104]  L. A. Dorrington to the Consumnes Company, c/o Capital Nation Bank, attn: Clarence S. Jarvis, 2 February 1928, Private Collection of Wilton Rancheria.

[105]  Cosumnes Company by Clarence Jarvis to the Department of the Interior, Office of the Secretary, 1 November 1927, Private Collection of Wilton Rancheria.

[106]  Charles J. Kappler, comp., "Indian Lands," *Indian Affairs: Laws and Treaties*, vol. 4 (Washington, D.C.: Government Printing Office, 1929), pp. 914-915.

[107]  L. A. Dorrington to Clarence E. Jarvis, 20 December 1927, Private Collection of Wilton Rancheria; Cosumnes Company by Clarence Jarvis to the Department of the Interior, Office of the Secretary, 1 November 1927, Private Collection of Wilton Rancheria and L. A. Dorrington to Clarence E. Jarvis, 20 December 1927, Private Collection of Wilton Rancheria and Deed between the Cosumnes Company and the United States of America, 28 December 1927, Private Collection of Wilton Rancheria.

[108]  Proposal for the Sale of Lands, 1 November 1927, Private Collection of Wilton Rancheria.

to the water."[109]  The Department of the Interior added that "This matter should be given your careful consideration and the proper location selected before drilling is permitted."[110]  By April 1928, a well capable of running 100 gallons per minute had been dug on the property, and the Rancheria was ready to be occupied.[111]

In January 1931, the BIA conducted its first census of the "Indians on the Wilton Rancheria," counting four families totaling twenty-one people.  These included the McKeans, Browns, Taylors, and Daniels – all lineal and lateral ancestors to current members of the Tribe.[112] For the next four decades, while they lived as a federally recognized tribe on trust lands, the ancestors of the Tribe would struggle with water supply problems among other issues.  When the Wilton Rancheria was terminated in 1964, these and other problems persisted for Tribe members who remained on the Rancheria lands (as was the experience of many other tribes inhabiting rancherias in California).  The next two sections of this report detail these issues.

---

[109]  E. B. Merritt to L. A. Dorrington, 7 December 1927, Private Collection of Wilton Rancheria.

[110]  E. B. Merritt to L. A. Dorrington, 7 December 1927, Private Collection of Wilton Rancheria.

[111]  L. A. Dorrington to the Commissioner of Indian Affairs, 19 April 1928, Private Collection of Wilton Rancheria.

[112]  Those named Irish, Fernandez, and Madrigal are members of the Daniels family line. Appendix C: Genealogical Chart of the Brown Family, Genealogical Chart of the Daniels Family, Genealogical Chart of the Blue and McKean Families, Genealogical Chart of the Taylor Family; List of Indians on the Wilton Rancheria, January 1931, Private Collection of Wilton Rancheria.

### III. The Wilton Rancheria: Community Actions and Concerns, 1927-1949

Once the ancestors of the Tribe were recognized by the federal government with the establishment of the Wilton Rancheria, the records of this relationship shed more light on their daily lives. During the difficult years of the Great Depression, the members of the Wilton Me-Wuk community lived in state of poverty unlike that of their non-Indian neighbors. These conditions provided the impetus for continued Tribal political action. Under the IRA, the Tribe formally organized and created a constitution and bylaws to guide their IRA Tribal government. Despite their model participation in the processes established through the IRA, the members of the Wilton Rancheria struggled with poverty, insufficient housing, undeveloped farm land, irrigation problems, poor roads, and an inadequate water supply. The Tribe consistently petitioned the BIA to fulfill its obligations to the community; however, few improvements resulted from these efforts.

An unreliable irrigation system on the Rancheria lands prevented Tribe members from cultivating the land in any significant way, which forced them to supplement their seasonal wage labor income by continuing to hunt, fish, and gather resources to meet their basic subsistence needs. Throughout the 1930s, 1940s, and 1950s, the Wilton Me-Wuk community members continued to come together to address the needs of their community, engage in reciprocity, and socialize. The hardships endured by the Wilton Me-Wuk community were similar to those experienced by rancheria communities all over California. The federal government did little to

24

alleviate these conditions, and eventually passed the Rancheria Act of 1958 to sever its

relationship with and eliminate its obligations to California's rancherias.

*Community Conditions and Decisions in the 1930s*

By the early 1930s, the Wilton Rancheria community numbered twenty-one

individuals.[113] Although they were no longer landless, Tribe members struggled economically on

the substandard Rancheria lands.  The Cosumnes Company had built a well on the property;

however, according to a 1935 report of a BIA field agent for the Sacramento Area Office, the

lands were not sufficient to support the families residing on the Rancheria.[114]  In order to make a

living, many Tribe members either lived off the trust lands, or worked on farms and ranches

located nearby the Rancheria.[115]  In the same 1935 report, the BIA field agent described the

Wilton Rancheria economy and noted these circumstances:

> They have poor and insufficient land and depend entirely upon seasonal work in
> hop fields, orchards and vineyards for their support.  The employment season
> lasts about six months out of the year, and then during the winter and spring they
> shift around trying to find any kind of work they can.[116]

Although the Tribe had land on which to live, the Wilton community members faced

employment, habitation, and economic problems that required the mobilization and support of

---

[113]  List of Indians on the Wilton Rancheria, January 1931, Private Collection of Wilton
Rancheria; Indians on Wilton Rancheria, Population 30, November 1933, Private Collection of Wilton
Rancheria.

[114]  Memorandum concerning insufficient land and work for Me-wuk Indians by Acting Field
Agent in Indian Reorganization, 9 September 1935, Private Collection of Wilton Rancheria.

[115]  Indian Census Roll, 1 April 1933, Private Collection of Wilton Rancheria.

[116]  Memorandum concerning insufficient land and work for Me-wuk Indians by Acting Field
Agent in Indian Reorganization, 9 September 1935, Private Collection of Wilton Rancheria.

their Tribal government.

Other records from this era report the employment patterns of the Wilton community. Under the Act of May 18 1929 (45 *Stat.* L. 602), legislation that allowed the California Indians to bring cases based on the treaties of 1851 and 1852 against the United States before the Court of Claims, the majority of the ancestors of the Tribe applied to be enrolled with the Indians of the State of California. Most male Wilton residents listed their occupations as laborers or ranch workers on these applications. For example, Louis Taylor reported that he was a "rancher and ranch laborer."[117] Frank and William Blue and Charlie McKean also listed their occupations as ranch laborers.[118] Charles Kellogg considered himself a "General Laborer."[119] Most of the women who filled out these applications defined their occupations as "house wife." Two women, Maggie Rhoan and Florence Tom Jackson, reported that they worked outside of their homes: Rhoan as a domestic and Jackson as an itinerant fruit picker.[120]

---

[117] Application No. 7287 of Louis Taylor Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7287, Taylor, Louis.

[118] See Application No. 7292 of Frank Blue Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7292, Blue, Frank; Application No. 7294 of William Blue Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7294, Blue, William; Application No. 7236 of Charlie McKean for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7236, McKean, Charlie.

[119] Application No. 2937 of Charles Kellogg for Enrollment with the Indians of the State of California, 18 May 1929, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 2937, Kellogg, Charles.

[120] Application No. 7301 of Maggie Rhoan for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932, 7301, Rhoan, Maggie; Application No. 8444 of Florence Tom Jackson for Enrollment with the Indians of the State of California, 9 February 1931, NARA-DC, RG75, Entry 576

The absence of year-round employment and the ephemeral nature of seasonal work put the families of the Wilton Rancheria in such a state of poverty that they were compelled to request federal aid. In January 1931, Ella Taylor wrote to the BIA for assistance to acquire some basic necessities:

> I wanted to ask you if I could get some clothes for my childrens. I have two of them going to school and 2 littles at home[.]... [M]y husband has no work and it is pretty hard for us to live. [A]nd the two boys goes to school every day but now they are out of shirts and overalls[.] [I]t makes it bad[.] I don't like to keep them out of school if I only could get clothes for the ones going to school it would be good. All the childrens in other country got clothes. We have no money to come down and talk with you so this all let me know in the return letter please.[121]

Ella Taylor's letter illustrates the difficulties experienced by Wilton families during the Depression years. While neighboring non-Native communities eventually moved on from these harsh years economically, the Tribe continued to struggle with poverty.

During these difficult times, Tribe members held meetings to make collective decisions concerning their community. For example, at one meeting, community members decided to allow new individuals to reside on the Rancheria, and they sent petitions to the superintendent in Sacramento informing him when the newcomers became residents on the Rancheria lands.[122] The community also allowed members living off the Rancheria to return and be given land assignments. For instance, Ella Taylor and seven other members of the Wilton Me-Wuk community informed Lipps' successor Roy Nash that Charles McKean, Jr. wanted to move on to

---

Records Relating to Enrollment of California Indians, Applications, 1928-1932, 8444, Jackson, Florence Tom.

[121] Ella J. Taylor to Sir, 10 January 1931, Private Collection of Wilton Rancheria.

[122] Nancy Fernandez, et al. to O. H. Lipps, 3 August 1933, Private Collection of Wilton Rancheria.

the Rancheria, writing: "As his father and mother live on this rancheria and as he has lived hereon at various times in the past, we feel that both Mr. McKean and his wife and family should be given permission to move on the rancheria and build their house thereon."[123]  These actions demonstrate the inclusive nature of the Wilton Me-Wuk community.

During the Depression years, the Wilton Me-Wuk community continued to function politically and socially.  Community members continued to meet to discuss and decide upon issues they considered important, including extending aid to members in need of land and a place to live.  By the mid-1930s the members of the Wilton Rancheria adapted this communal structure for decision-making to the formally organized Tribal government they created under the IRA.

*The Wilton Rancheria Community and the Indian Reorganization Act*

The Wilton Rancheria qualified to vote to accept or reject the Indian Reorganization Act of 1934.  The purposes of the IRA were: "to conserve and develop Indian Lands and resources; to extend to Indians the right to form business and other organizations; to establish a credit system for Indians; to grant certain right of home rule to Indians; to provide for vocational education for Indians; and for other purposes."[124]  The IRA's potential to bring about enhanced and proactive rights and privileges appealed to the Wilton Rancheria community.  By June 4 1935, the BIA approved the Tribe's list of qualified voters, and the members of the Wilton Rancheria held their referendum on 15 June 1935.  Twelve of the fourteen eligible voters

---

[123]  Ella Taylor et al. to Roy Nash, 10 October 1935, Private Collection of Wilton Rancheria.

[124]  *An Act, to conserve and develop Indians lands and resources; to extend to Indians the right to form business and other organizations; to establish a credit system for Indians; to grant certain rights of home rule to Indians; to provide for vocational education for Indians; and for other purposes*, 18 June 1934, 48 *Stat.*, 984-988.

accepted the IRA.[125]

Under the conventions of the IRA, the Tribe drafted their constitution and bylaws during the fall of 1935. They chose an election board and held a ratification vote on 7 December 1935, at which time the voters unanimously agreed to adopt and certify the drafted IRA constitution.[126] The constitution and bylaws were recommended for approval by Assistant Commissioner of Indian Affairs William Zimmerman on 7 January 1936, and Secretary of the Interior Harold L. Ickes approved the Wilton Rancheria's constitution and bylaws on 15 January 1936.[127]

The Tribe drafted its IRA constitution with the assistance of a BIA field officer from the Sacramento Area Office, and therefore its constitution followed a relatively standardized format. It addressed tribal jurisdiction and membership requirements, laid out the structure for the Tribe's governing body and its powers, and established procedures for future amendments to the constitution. Tribal jurisdiction allowed for the Tribe to acquire additional lands, and membership criteria allowed for adoptions. The structure of the Tribal government followed the

---

[125] Approved List Of Voters For Indian Reorganization Act On Wilton Rancheria, 4 June 1935, NARA-SB, RG75, Sacramento Agency, Records of Indian Organizations, 1936-1946, Indian Reorganization Act Referendum and Election Records, 1934, Indian Reorganization Act Referendum Ballots and Returns, 1935, Box 1, Indian Reorganization Act Referendum and Election Records #2; Revised Tabulation of Election Returns on the Indian Reorganization Act, rec. 26 June 1935, NARA-SB, RG75, Sacramento Area Office, Coded Records, 1910-1958, of Programs & Administration, 1950-1958, Code 013 - 020, box 3, 013 Indian Reorganization Act, Special Election (California Rancherias, no. 2). [Note: The number of individuals who appear on the Approved List of Voters contrasts with the number reported in the Tabulation of Election Returns. The voter list contains the names of eleven individuals, whereas the tabulated results state that fourteen were eligible and twelve voted, accepting the IRA unanimously.].

[126] William Zimmerman, Jr. to Roy Nash, 1 November 1935, Private Collection of Wilton Rancheria; Constitution and By-Laws, Wilton Rancheria, 15 January 1936, Private Collection of Wilton Rancheria.

[127] Constitution and By-Laws, Wilton Rancheria, 15 January 1936, Private Collection of Wilton Rancheria.

corporate model: the community council (governing body) would be composed of qualified members who had resided on the Rancheria for a period of at least one year.  All Tribe members, regardless of their residence, could vote on amendments to the constitution and bylaws.  A quorum constituted a majority of the eligible voters, therefore requiring that half plus one of the adults on the Rancheria participate in meetings and voting.  This requirement was easily met by the Tribe, as broad participation by community members in organizing and decision-making characterizes the Tribe's history.  The Tribal government had the power to negotiate with all levels of United States government, to hire legal counsel, to deal with land transactions, to manage the financial affairs of the Tribe, and to enforce law.[128]

By the time the Tribe's IRA constitution was adopted, the number of people living on the Rancheria had increased to fifty-three persons.[129]  The first meeting of the Community Council of the reorganized Wilton Rancheria took place on the evening of 3 February 1936.  Superintendent Roy Nash chaired the meeting, and was accompanied by Senior Clerk E. W. Hooper and Field Agent K. A. Marmon from the BIA.  During the meeting Nash explained the community structure under the IRA and "told of plans for the purchase of additional land for the Rancheria in the near future."[130]  Participants checked the voters list and held elections for the executive council.  Six individuals ran for office: Charlie McKean, Jr. was voted in as chairman; Charlie McKean, Sr. as vice-chairman, Ada Madrigal as secretary, and Lizzy Rodriguez as

---

[128] Constitution and By-Laws, Wilton Rancheria, 15 January 1936, Private Collection of Wilton Rancheria.

[129] List of 12 Wilton Rancheria Families and 53 Individuals, 6 January 1936, Private Collection of Wilton Rancheria.

[130] Minutes on the Election of Community Council Officers, 3 February 1936, Private Collection of Wilton Rancheria.

treasurer.[131]  Field Agent K. A. Marmon reported positively that "Members of the seven families residing on the rancheria were present and manifested a great deal of interest in the evening meeting."[132]  As discussed in the remainder of this report, the members of the Wilton Me-Wuk community would continue to take an active interest in their Tribal government and affairs well beyond the operation of the IRA government they formed in the mid-1930s.

*Community Issues on the Rancheria*

Meetings of the Wilton Rancheria Community Council were held at Vice-chairman Charles McKean Sr.'s home.[133]  Land use and water resources were issues of discussion from the time of the first executive council.  On 28 February 1936 a special meeting was called "to explain to the Me-Wuk Indians of Wilton Rancheria about the water and pumping plant to put in on a loan or on a grant."[134]  As well, Chairman Charles McKean Jr. spoke about "plans for loans or a grant, on wells and houses and out buildings, garages, fences."[135]  After a vote, the Wilton Rancheria community determined that each household wanted "their own pumping plant," and

---

[131]  Minutes on the Election of Community Council Officers, 3 February 1936, Private Collection of Wilton Rancheria.

[132]  Minutes on the Election of Community Council Officers, 3 February 1936, Private Collection of Wilton Rancheria.

[133]  Minutes on the Election of Community Council Officers, 3 February 1936, Private Collection of Wilton Rancheria.

[134]  Minutes of the Community Council Meeting, 28 February 1936, Private Collection of Wilton Rancheria.

[135]  Minutes of the Community Council Meeting, 28 February 1936, Private Collection of Wilton Rancheria.

31

that community members were willing to "take a loan out for themselves" to achieve this goal.[136]

Other topics of importance were the division of the Rancheria land and farming. These issues were central to a 3 March 1936 meeting, as was continued discussion about water resources. Secretary Ada Madrigal took minutes at this meeting, and her notes reflect the concerns of the Wilton Me-Wuk community, the politics surrounding land apportioning, and the individual personalities involved in these discussions:

> This meeting was called to order by Chairman C. J. McKean, Jr. to explain about our Rancheria lands and how shall get water and about dividing the land in to [sic] Sections so it can be used by the Community within the Rancheria and none other outside of the Wilton Rancheria at this meeting as to date Monday, March 3, 1936. Anyone don't use the land as listed out let the next party use it, and the following year he will raise his share what he wants – and if he don't do any improvement, he will lose its rights to the land inside of this 2 years. Its no lots on this Deal. Its been promised to give 5 acres to each farmer. On Rancheria surveyed out in equal parts, to raise anything when get our running water on the ground. C. Brown don't want anything to do with our new plans, for farming. He said he is going out on a W.P.A. loan. And rent land for himself[.] [H]e wasn't interested in our Rancheria at all. Eva Cifuentes said she isn't interested in our water and farming, but is satisfied with her own little pumping plant, and Archie is interest in a  [blank]  for his family (new comer) or land no house yet built is on our loan.[137]

These minutes also speak to the spirit of tolerance and open discussion within the Community Council.

After discussion, the Council members voted seven to four in support of communal farming and water plant efforts. Council members also made plans for the construction of a new community-funded pumping plant. Ada Madrigal wrote: "Pumping plant is drawed up in loan for 40 years to pay.... Lowest loan payments we can get down to – to help out us Indians on this

---

[136] Minutes of the Community Council Meeting, 28 February 1936, Private Collection of Wilton Rancheria.

[137] Community Meeting, 3 March 1936, Private Collection of Wilton Rancheria.

Rancheria.  Everything is up to our officers here on Rancheria."[138]  The same ratio also voted for

exclusivity, with "nothing rented out or sold to white – got to be Indian blood."[139]  The

cohesiveness of the Wilton Me-Wuk community is evident in the events of this meeting;

community members expressed their desires to improve their lives and protect their Rancheria

lands for their exclusive use.

In the late 1930s, many members of the Tribe applied for government housing loans,

amounting to a total loan request of $18,400, so this may have been busy time for construction

on the Rancheria.  Of the six members who applied for the loan, two requested funds to build a

new home; the remaining families had already started building their houses but needed financial

help to finish them.[140]  As the Wilton Me-Wuk community worked towards constructing housing

for its members, water resources and farming continued to be the most significant and discussed

problems – problems that the Tribe faced collectively through its governing Council.

<u>Water, Irrigation, and Farming</u>

---

[138]  Community Meeting, 3 March 1936, Private Collection of Wilton Rancheria.

[139]  Community Meeting, 3 March 1936, Private Collection of Wilton Rancheria.

[140]  See Community Meeting, 3 March 1936, Private Collection of Wilton Rancheria.  The
minutes record:
 C.J. McKean, Jr. on a loan for Finish
 Charley McKean on a loan.  Finish
 Mrs. Valentine Madrigal on a loan.  Finish
 Nancy Fernandez on a loan.  Finish
 Eva Cifuentes on a loan. Finish.
 Virgie Hatch on a loan – House
 Cornel Brown on a loan.  Finish
 Archie Williams on a loan – Just moved in-for house.
Presumably, "finish" indicated funding needed to complete the construction of a dwelling.

The Wilton community's anticipated building projects called for improvements to the Rancheria's water system.  In summer 1936, the BIA sent out tenders for the drilling of a well, and in so doing initiated what would become a history of design and construction errors made worse by the Department of the Interior's neglect and parsimony, which continued to plague the Wilton Me-Wuk community well beyond termination.  In the "Specifications for Construction of Wells" section of the tender, the project requirements ordered that "test pits" be dug to ensure a good location for a well that would be "drilled, cased, perforated, sand-pumped and tested ... near the town of Wilton," and, if necessary, "pilot holes" be drilled to facilitate proper functioning.[141]  That the Department of the Interior tendered out for a well in 1936 suggests that the well constructed by the Cosumnes Company in 1928, a condition for the sale of the lands, had not been satisfactorily completed.

Constructing the water pumping system for the Rancheria was a slow and piecemeal process.  The project began in December 1936, when Superintendent Roy Nash wrote to Mr. Miller, Instrument Man, Sacramento Indian Agency that "It is our understanding at Wilton, irrigation will pipe water in a stand pipe at each house," and instructed that the system be designed so that "if any of the Indians so desire they can pipe water into the house."[142]  The pump house and related supplies arrived at the Elk Grove railroad station on 20 January 1937.[143]

---

[141]  Once located, the well was to be: "12 inches in diameter and approximately from 60 to 200 feet deep.  The pilot holes, which may or may not be required, may be from 4 to 6 inches in diameter, and from 50 to 200 feet deep.  The final depth, in each case will be determined by the Engineer."  Bid Forms and Specifications for Well Drilling on Wilton Rancheria, 1 July 1936, Private Collection of Wilton Rancheria.

[142]  Roy Nash to Mr. Miller, 23 December 1936, Private Collection of Wilton Rancheria.

[143]  E. H. H. to Mr. Miller, 20 January 1937, Private Collection of Wilton Rancheria; see also W. L. Miller to Commercial Sheet Metal Work, attn: William Gardner, 25 January 1937, Private Collection

However, the house appeared damaged.[144]  Further, in April 1937, the Tribe's chairman complained that although the trenches for the water pipes were dug, the pipes remained at the depot, and over time the excavations had filled with water and were caving in.  Nash worried that the irrigation system would be completed too late in the season, and was concerned that "if this water is to do them any good for this season's gardens, the work should be done at the earliest possible moment."[145]

The members of the Wilton Rancheria community were eager to garden.  They told Sidney Thomas, an investigator with the BIA, that "they would put in gardens as soon as the water was connected."[146]  Thomas noted in his report that "[n]one of them want to move, but several would like to have a larger tract of watered lands to farm as supplementary to wage work."[147]  The project had started in December 1936, and by the following May the well had been dug and "a tank put up, and most of the pipes already laid to the houses"; however, the irrigation system had yet to be completed.[148]  This schedule for completion of the work stretched well beyond the original time frame set out in the tender, which stated: "Work shall be started

of Wilton Rancheria.

[144]  When Mr. Miller inspected the pump house, he found that the "roof plate had been torn loose from the 'L' stiffner at five rivet holes and that two of the 3/16th-inch vertical 'L' columns were badly bent."  Miller proposed to have a welder repair the damage.  W. L. Miller to Commercial Sheet Metal Work, attn: William Gardner, 25 January 1937, Private Collection of Wilton Rancheria.

[145]  Roy Nash to Charles A. Engle, 22 April 1937, Private Collection of Wilton Rancheria.

[146]  "The Wilton Rancheria, Sacramento County, California" by Sidney J. Thomas, May 1937, Private Collection of Wilton Rancheria.

[147]  "The Wilton Rancheria, Sacramento County, California" by Sidney J. Thomas, May 1937, Private Collection of Wilton Rancheria.

[148]  "The Wilton Rancheria, Sacramento County, California" by Sidney J. Thomas, May 1937, Private Collection of Wilton Rancheria.

35

within fifteen (15) calendar days from date of receipt of the order to proceed, and all work provided in the contract and specifications shall be completed within forty (40) days from date of receipt of such notice."[149]

By fall 1938, the Rancheria's irrigation system functioned only intermittently. Chairman McKean again complained to the BIA that the automatic device on the pump had stopped working.[150] Conversely, during the periods when the irrigation system was working, the Tribe's gardening efforts were reasonably successful. A BIA report for the year noted that the Wilton Rancheria was under constructed canals. Although the BIA's irrigation system was not complete, Tribe members used the infrastructure to irrigate one-third of the property upon which they raised crops valued at $800.[151] The Wilton Me-Wuk community was ready and willing to farm their land. However, two years after the BIA issued a tender to construct a quality water and irrigation system on their Rancheria, the work was only partially done and was the subject of many delays and complaints. Despite their best efforts, the Wilton community members would continue to face the challenges of an incomplete and substandard water system throughout their existence as a federally recognized tribe living on trust lands, and long after termination in 1964.

Failed Plans for Communal Farming

Along with an unreliable irrigation system, the small size of the Rancheria lands prohibited any

---

[149]  See no. 20 Time Limit in Specifications for Construction of Wells in Sacramento County, California. Bid Forms and Specifications for Well Drilling on Wilton Rancheria, 1 July 1936, Private Collection of Wilton Rancheria.

[150]  Memo by M. H., 21 September 1937, Private Collection of Wilton Rancheria.

[151]  Sacramento Jurisdiction form for Wilton Rancheria, ca. 1938, Private Collection of Wilton Rancheria.

kind of profitable communal farming.  During the late 1930s, there is evidence that the BIA

entered into preliminary discussions with local realtors to buy additional agricultural lands for

the Tribe.  The Wilton Rancheria community was informed of this plan, and was optimistic

about expansion.[152]  They continued to meet and discuss the possibilities of land acquisitions,

and communicated with BIA officials about the progress of the proposed acquisitions and

alternate avenues to acquire more property for communal farming.  In the Tribal council minutes

taken on 3 February 1936, the business committee secretary recorded that "We got two places

with best land on this river is 80 acres on Brites [sic] Ranch; the other one is on Brook's Ranch

good bottom land – top is good for grain – that's all."[153]  The government had already appraised

the Bryte property and was given six months to purchase the more than 188-acre property at

$100 per acre.[154]

    Earlier that year, the government also considered a much larger tract of land located

about seven miles away from the Wilton Rancheria.  E. M. Johnston, the Land Field Agent for

the BIA had approached real estate brokers in Sacramento at the Morrissey Company, who

suggested that the BIA may wish to purchase lands near Arno Station.  The available 5,340-acre

parcel, known as the Valensin Ranch, was made up of "about two thousand acres of bottom land,

---

[152]  W. J. Cubberly to E. M. Johnston, 24 March 1936; Offer to Sell Lands to the United States, 6 January 1936, Private Collection of Wilton Rancheria; Minutes on the Election of Community Council Officers, 3 February 1936, Private Collection of Wilton Rancheria. Council minute notes, "Superintendent Nash presided as chairman and was assisted by Mr. Hooper, senior clerk, and K. A. Marmon, field agent, Supt. Nash...told of plans for the purpose of additional land for the Rancheria in the near future."

[153]  Community Meeting, 3 March 1936, Private Collection of Wilton Rancheria.

[154]  Report of Inspection and Appraisement for Wilton Rancheria, 15 April 1936, Private Collection of Wilton Rancheria.

and thirty-three hundred acres of upland, which is suitable for raising grain, fruit, and

vineyard."[155]  The Morrissey Company also posted that "In fact, this soil will raise successfully

most anything planted there."[156]  The property was also comparatively close to the Wilton

Rancheria:

> This property, bordering Stockton Boulevard, twenty miles from Sacramento,
> seven miles from Galt, about seven miles from Elk Grove, is fairly close in, and
> with improvements of about six dwellings, one consisting of thirteen rooms, one
> twelve rooms and the balance six rooms or more, several garages, dairy barns,
> and other improvements.[157]

The property was offered for $85 per acre.  However, the Bryte, Brook, or Valensin Ranch

properties were never purchased for the benefit of the Tribe.

Under the terms of the IRA, the Wilton Rancheria needed to incorporate in order to

independently pursue the large land acquisitions under negotiation.[158]  In January 1937, the

---

[155]  Morrissey Company by W. J. Cubberley to E. M. Johnston, 24 March 1936, Private
Collection of Wilton Rancheria.
    The Valensin Ranch lands were originally a part of the William Hicks ranch; the Hicks and the
Valensin families were related through marriage.  In 1997, 4,300 acres of the Valensin Ranch were
purchased by private buyers and remain as a natural conservation area.  See Pinkerton, *History Happened
Here*, pp. 233-273.

[156]  Morrissey Company by W. J. Cubberley to E. M. Johnston, 24 March 1936, Private
Collection of Wilton Rancheria.

[157]  Morrissey Company by W. J. Cubberley to E. M. Johnston, 24 March 1936, Private
Collection of Wilton Rancheria; Appendix A: Map: Places of Significance to the Ancestors and Members
of the Me-Wuk Indian Community of the Wilton Rancheria.

[158]  The entire Sec. 17 of the Indian Reorganization Act read:
The Secretary of the Interior may, upon petition by at least one-third of the adult Indians,
issue a charter of incorporation to such tribe: *Provided,* That such charter shall not
become operative until ratified at a special election by a majority vote of the adult Indians
living on the reservation.  Such charter may convey to the incorporated tribe the power to
purchase, take by gife [sic], or bequest, otherwise, own, hold, manage, operate, and
dispose of property of every description, real and personal, including the power to
purchase restricted Indian lands and to issue in exchange therefor interest in corporate
property, and such further powers as may be incidental to the conduct of corporate
business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or

voting members of the Tribe petitioned the Secretary of the Interior "to issue and submit a charter of incorporation for ratification by the adult members of the tribe residing on the reservation in accordance with section 17 of the said Act of June 18, 1934 [IRA]...."[159]  The timing of the Tribe's application for incorporation and the BIA's overtures to real estate companies suggest that the Wilton Me-Wuk's efforts were motivated by the prospect of land acquisition, and the nature of the real estate sought by the BIA indicates that its intentions were to acquire land suitable for economically viable community farming projects.

Yet, by spring 1938, the Wilton Me-Wuk community had received no word from the BIA regarding its charter application.  Chairman McKean asked Superintendent Nash about it, and was informed that the BIA had decided not to issue any further charters for tribes of fifty or fewer voting members.[160]  In June, Nash wrote to Chairman McKean that in lieu of incorporation the United States agreed:

> to place at my disposal sufficient funds out of the regular reimbursable funds to take care of any legitimate credit needs.  If either the individuals or the group at Wilton desire money for the purchase of a team or any similar economic purpose, if you will bring it to my attention I think the matter can be easily arranged.[161]

---

lease for a period exceeding ten years any of the land included in the limits of the reservation.  Any charter so issued shall not be revoked or surrendered except by Act of Congress.
*An Act, to conserve and develop Indians lands and resources; to extend to Indians the right to form business and other organizations; to establish a credit system for Indians; to grant certain rights of home rule to Indians; to provide for vocational education for Indians; and for other purposes*, 18 June 1934, 48 *Stat.*, 984-988; see also Petition for Incorporation, 4 January 1937, Private Collection of Wilton Rancheria; Roy Nash to the Commissioner of Indian Affairs, 4 January 1937, Private Collection of Wilton Rancheria; see Report of Inspection and Appraisement for Wilton Rancheria, 15 April 1936, Private Collection of Wilton Rancheria.

[159]  Petition for Incorporation, 4 January 1937, Private Collection of Wilton Rancheria.

[160]  Roy Nash to Charles J. McKean, Jr., 3 June 1938, Private Collection of Wilton Rancheria.

[161]  Roy Nash to Charles J. McKean, Jr., 3 June 1938, Private Collection of Wilton Rancheria.

There was no further discussion of purchasing the Bryte, Brook, or Valensin Ranch properties following this news that the Tribe could not become incorporated, and the Tribe's efforts towards self-sufficiency were thwarted.

From 1937 onwards, the Wilton Rancheria community continued to hold elections and meet frequently to address many aspects of its Tribal government and the socio-cultural life of the Rancheria. For example, during their 13 November 1939 meeting, the Tribe discussed drafting regulations that would restrict adoptions to individuals who were "at least 1 quarter Indian blood."[162] Two months later, the Tribe's ordinance on adoptions had been approved by the Council and by Superintendent Roy Nash.[163] All of the governing activities of the Tribe were carried out without any communal Tribal funds, and thus occurred exclusively through the volition and will of the membership.[164]

*Poverty and Poor Living Conditions: Ongoing Concerns of the Wilton Me-Wuk Community*

Throughout the 1940s and 1950s, the issues of land improvement, irrigation, housing, and government funding continued to be of importance to the Wilton Rancheria community and

---

[162] Meeting Minutes, 13 November 1939, Private Collection of Wilton Rancheria; see also Treasurer's Annual Report signed by Lizzie Rodriguez, 13 November 1939, Private Collection of Wilton Rancheria.

[163] An Ordinance to Govern Adoption into this Mewuk Indian Community of the Wilton Rancheria, 23 January 1940, Private Collection of Wilton Rancheria.

[164] During their regular Council meeting held on 13 November 1939, the treasurer reported that there were no funds "to the credit of the council." Meeting Minutes, 13 November 1939, Private Collection of Wilton Rancheria; see also Treasurer's Annual Report signed by Lizzie Rodriguez, 13 November 1939, Private Collection of Wilton Rancheria.

its Tribal government.  The members of the Wilton Rancheria community continued to seek aid

to increase the amount of useable land on the Rancheria and to improve their houses and

sanitation system.  The oral histories of Tribe members highlight the economic struggles of the

Wilton community, circumstances which required them to integrate subsistence work and wage

labor in order to survive.  In the face of these challenges and conditions, the Wilton community

members banded together to ensure the welfare of all Rancheria residents as the Tribal Council

continued to pursue assistance and relief aid to ease the hardships created by poverty and

persistent poor living conditions on the Rancheria.  During the 1940s and 1950s, the Wilton Me-

Wuk community and its Tribal Council remained politically active in order to address these

issues.

After the Tribe learned that it could not incorporate, its members focused on seeking BIA

assistance.[165]  At a January 1940 meeting, for example, the Tribal Council requested "that [a]

Farm Agent make a Survey of rancheria Lands."[166]  The council also asked for "necessary

financial assistance in order that they might farm," and reported that they needed, "equipment

and seed."[167]  The Tribe requested that the superintendent look into the "status of the irrigating

system," and to grant the authority "to grub out oak trees in field in order that more land might

---

[165]  Agnes Ault to Mr. Nash and Mr. Hooper, 19 September 1938, Private Collection of Wilton Rancheria; Minutes of regular semi-annual meeting of the Wilton Community Council, 23 January 1940, Private Collection of Wilton Rancheria; Memorandum for Files regarding Wilton Rancheria by Michael Harrison, 29 January 1940, Private Collection of Wilton Rancheria.

[166]  Minutes of regular semi-annual meeting of the Wilton Community Council, 23 January 1940, Private Collection of Wilton Rancheria.

[167]  Minutes of regular semi-annual meeting of the Wilton Community Council, 23 January 1940, Private Collection of Wilton Rancheria.

41

be cultivated."[168]  The Tribe also wanted to work with the BIA to create a land code.[169]

By May 1940, the Tribe succeeding in getting the attention of Field Office Agent Harrison.  Harrison reported in a 3 May 1940 memorandum that he had met with Tribal Chairman Charles McKean, who had again requested agricultural subsidies.  Harrison hoped to visit the Wilton Rancheria with BIA representatives to assess the situation: "I think with a little assistance in the way of reimbursable loans," he suggested, "we can help these people to a nice set-up."[170]  He reported favorably on the Rancheria residents, saying "They seem to be hard-working and industrious – they have vegetable gardens – and there is a possibility that more acreage can be put in cultivation."[171]  Harrison also acknowledged that the responsibility of the BIA toward the Wilton Rancheria community, adding that "This will take a bit of help on our part, however."[172]

Tribe members were aware of IRA policy.  They were committed to working within the existing legislation, and, in council, agreed to send U. S. Senator Elmer Thomas a petition against the repeal of the IRA.[173]  They wrote: "It is the wish of the Wilton Community

---

[168]  Minutes of regular semi-annual meeting of the Wilton Community Council, 23 January 1940, Private Collection of Wilton Rancheria.

[169]  Minutes of regular semi-annual meeting of the Wilton Community Council, 23 January 1940, Private Collection of Wilton Rancheria.

[170]  Memorandum regarding Wilton Rancheria by Harrison, 3 May 1940, Private Collection of Wilton Rancheria.

[171]  Memorandum regarding Wilton Rancheria by Harrison, 3 May 1940, Private Collection of Wilton Rancheria.

[172]  Memorandum regarding Wilton Rancheria by Harrison, 3 May 1940, Private Collection of Wilton Rancheria.

[173]  Charles McKean, Jr. and Edith Williams to Elmer Thomas, rec. [8 January 1940], Private Collection of Wilton Rancheria.

Organization, in regular meeting assembled that we not be excluded from the provisions of the Indian Reorganization Act without a hearing."[174]

Despite the Tribe's commitment to regular meetings and its efforts to improve community welfare, the living standards on the Wilton Rancheria declined significantly during the 1940s. Tribe member Mildred Williams, interviewed for this report, recalls living on the Rancheria when she was a child in the late 1940s:

> we made our own toys to play with. We took the top off an old car and had a frame and we'd all push it down the hill and we'd jump on top of it just to get a little ride. There wasn't what everybody else would think was fun, but to us it was fun. Then we'd even help our moms. When we were little we would help our moms gather the clothes. We would have to go down to the river and she would wash our clothes in the river and dry them on the trees right there. Then when they would get dry she would put them in the basket and we'd bring them right back home with us...
>
> we didn't have no washing machines. We didn't have anything like that until we got older.[175]

Mildred's cousin, Muriel Sangmaster, also has memories of an impoverished childhood and of the failing water system on the Rancheria:

> From what I remember, my father used to have to haul water in a bucket. He used to bring it from over there and he used to bring it to our house. We had no running water, no inside bathrooms, anything like that. Of course, my poor mother, us kids all liked wash day because that's when we got to go to the river. I know she'd put all the clothes in a sack then she'd drag them on down to the river, hit them on the rocks and use whatever soap she had there..."[176]

---

[174] Charles McKean, Jr. and Edith Williams to Elmer Thomas, rec. [8 January 1940], Private Collection of Wilton Rancheria.

[175] Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 12.

[176] Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, p. 22.

43

Living closely together in such conditions strengthened the bonds between Tribe members as they worked alongside one another to complete the everyday tasks of housework and cooking, using what few tools they had to accomplish their work.

Conditions on the Rancheria demanded that its residents engage in wage labor as well as traditional subsistence work in order to provide enough food to feed their families. The Tribe's economic pattern of moving between seasonal work and subsistence work continued throughout the 1940s and 1950s. Both Muriel Sangmaster and Mildred Williams recall how their fathers had to leave the Rancheria to find work. Muriel recalls moving off the Rancheria lands in 1946 to live for a time on a ranch in the Sheldon area.[177] Mildred, whose permanent home has been the Rancheria for all of her life, remembers that most of the men had to leave to pursue employment, and that their families moved around with them: "when I was five or six we moved to Martell. You see, the people, the father kind of followed his job at that time."[178] Mildred explains that community members would return to the Rancheria: "All of the men did [leave for work] for a little bit, just for the season, then we'd all come back to Wilton."[179]

During the 1950s, Archie Williams, who considered himself lucky to have a permanent job, had to pay ¢75 a day to commute from the Wilton Rancheria to his job at the McClelland

---

[177] Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, p. 3

[178] Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 1; Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

[179] Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 2.

Air Force Base.[180]  Tribal member William Wayne Daniels remembers: "Most of the people around here, well, when I grew up too, went to work on the farms out here.  The hops ranch, tomato ranch, pear ranches, all seasonal work.  Until everyone graduated from grammar school and high school that went to work on the road."[181]  Daniels also remembers that high school students as well as adults had to go out to work in the fields in order to provide their families with enough money to survive.[182]

When the men were not off the Rancheria working, they supplemented the family diet with the salmon they speared in the nearby Cosumnes River.  Muriel Sangmaster explains: "We had the river there.  My uncles did the fishing.  We would go down and watch them do the fishing for salmon.  They used to take the spear and spear the salmon."[183]  Mildred Williams also recalls the boys fishing for salmon with a pitchfork, providing "fish every day."[184]  Mildred explains that along with beans, rice, and macaroni, the family relied heavily on the salmon catch for sustenance: "Now, I can't even look at the stuff, I won't eat it," she stated.[185]  Muriel concurred that "salmon was our biggest thing," and further explains: "We never bought any

---

[180]  Archie G. Williams to L. M. Hill, 30 April 1957, Private Collection of Wilton Rancheria.

[181]  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, p. 3.

[182]  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, p. 3.

[183]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, p. 4.

[184]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 14.

[185]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 14.

meats at the store hardly at all.  If we did it was a real treat because they used to kill deer, we'd

eat a lot of jackrabbit, and they used to kill squirrel.  They would pot fry that, I remember." [186]

William Wayne Daniels remembers fishing for perch and catfish as well.[187]  The Tribe's diet

consisted of wild meats and fish as they continued to use traditional methods of hunting and

fishing.  However, because of the location of the Rancheria – which was bounded by railway

tracks, ranches, and eventually the encroaching City of Sacramento – these hunting and fishing

practices were drastically curtailed.

Many of the Tribe's social activities were centered around the Cosumnes River.  In

addition to using the river for fishing and laundry, Tribe members also gathered wood for

cooking fires from the banks of the river, and hauled water from the river to their houses.  A

large number of children born and raised on the Rancheria, who are the current members of the

Tribe, either watched the fishermen or helped the women.  The Tribe also had a tradition of

gathering at the river for a communal meal.  Muriel Sangmaster explains:

> the only time we ever ate any meat was if we were going on what was called a
> weenie roast down at the river.  They would go to the store and buy hotdogs and
> everyone at the Rancheria would get together and all go down to the river.  There
> would be a big bonfire and then there was singing and they would have a weenie
> roast.  That would happen maybe three times a year and that was a lot of fun.
> That was something really big. [188]

Mildred Williams also remembers this time fondly, remembering that "When we were growing

---

[186]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006,
Wilton Rancheria of Me-Wuk Indians, p. 10.

[187]  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton
Rancheria of Me-Wuk Indians, p. 4.

[188]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006,
Wilton Rancheria of Me-Wuk Indians, p. 10.

46

up, us kids ... they would all get together, all the grown-ups, and have a big old wiener roast

down at the river.  All the families would gather."[189]  She recalls how these activities were

planned by the chairman's wife, Mrs. McKean, and how these big celebrations tapered off

following Mrs. McKean's death in the mid 1940s.

In the late 1940s, several people living around the Rancheria became concerned about the

welfare of its residents and wrote the BIA on their behalf.[190]  For example, in early 1949,

engineers from the municipality of Sacramento informed the BIA that the three phase water

pump servicing the Rancheria had broken down and was "throwing water all over the place."[191]

By October of the same year, the Rancheria's water supply had been cut off altogether, and

representatives from the County School and the County Health offices wrote to complain about

this "deplorable situation."[192]  BIA Welfare Department Worker Mildred Van Every reported

that the issue of water supply at the Rancheria was "critical," and that "Four families with

children in school (Dillard School) have no way to get water for baths."[193]  Van Every noted that

there was no source of potable water on the Rancheria, and that "They carry drinking water from

---

[189]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 18.

[190]  Mildred E. Van Emery to Mr. Sogsden, 14 October 1949, Private Collection of Wilton Rancheria.

[191]  James B. Ring to John S. Ryder, 11 February 1949, Private Collection of Wilton Rancheria.

[192]  James B. Ring for J. M Stewart to W. L. Miller, 21 October 1949, Private Collection of Wilton Rancheria.

[193]  Mildred E. Van Emery to Mr. Sogsden, 14 October 1949, Private Collection of Wilton Rancheria. The town of Sheldon is located about 2 miles away from Wilton.

the store at Sheldon in bottles."[194]

The conditions at Wilton were typical of the situation in other rancherias across California. Only about 12 percent of rancheria and reservation lands were considered irrigable, and very few acres were actually under cultivation by 1952. Residents of rancherias all over the state suffered from poverty, and a "substantial need for improvements to roads, housing, water systems, irrigation and sanitation systems."[195] Moreover, the BIA in California was understaffed, with only 150 employees and a reduced health and education staff.[196]

The weaknesses of Indian policy were noted in Washington as early as 1944, and doing away with federal responsibilities towards Indians became the favored solution. In 1949, the California Indian Agency issued a report describing its proposed program for the "withdrawal of the Bureau of Indian Affairs from the State of California within five years from the approval of the program by the Interior Department and the passage of the necessary implementing of legislation by the Congress."[197] That legislation was the Rancheria Act of 1958, which provided for the termination of the federal government's over California's rancherias. In preparation for

---

[194] Mildred E. Van Emery to Mr. Sogsden, 14 October 1949, Private Collection of Wilton Rancheria; Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

[195] Advisory Council, "Termination Report," p. 11.

[196] The BIA retained only two full time doctors, nine part-time doctors, eight nurses, one special officer, and three Indian policemen to service the entire Native population of California – some 10,817 individuals living on 115 reservations and rancherias. Report On A Program For The Termination Of Indian Bureau Activities In The State Of California, June 1949, NARA-San Bruno, RG75, Sacramento Area Office, Irrigation and Water Rights Files, 1968-1969 (92-003), Box 1, Termination Investigations, 341.7, pp. 18-19.

[197] Report On A Program For The Termination Of Indian Bureau Activities In The State Of California, June 1949, NARA-San Bruno, RG75, Sacramento Area Office, Irrigation and Water Rights Files, 1968-1969 (92-003), Box 1, Termination Investigations, 341.7, p. 1.

termination, the BIA visited the California rancherias during 1951 and 1952, including the

Wilton Rancheria.  The next section of this report describes these circumstances, which led to

the termination of the Wilton Rancheria in 1964.

## IV. Preparations for Termination, 1949-1964

In 1949, the government surveyed the living conditions of California Indians, research which culminated in a document titled *Report on a Program for Termination of Indian Bureau Activities for the State of California*, published in June of that year.  Written by State Director Walter V. Woehlke and Assistant State Director James B. Ring, this report provided a comprehensive account of the problems affecting California Indians.  Ultimately, the purpose of the report was to suggest the most efficient way the BIA could divest itself of its relationship with California tribes – a relationships which were portrayed as financial and socio-cultural disasters.  The report recommended a five-year termination plan involving enhanced government expenditures to repair reservation and rancheria roads, improve irrigation systems, and provide education and financial assistance programs.  Following repairs to the infrastructure of the reservations and rancherias, additional assistance was to be provided to transfer the several thousand acres of federally administered land into fee-simple plots owned by individual Indians.[198]

The members of the Wilton Rancheria were concerned primarily with the improvement of their roads; repairs and upgrades to their domestic water supply, inefficient irrigation system, and sanitation system; and assistance with constructing adequate housing.  In anticipation of the

---

[198]  Report On A Program For The Termination Of Indian Bureau Activities In The State Of California, June 1949, NARA-San Bruno, RG75, Sacramento Area Office, Irrigation and Water Rights Files, 1968-1969 (92-003), Box 1, Termination Investigations, 341.7, pp. 37-39.

passage of the termination legislation, the BIA visited the Wilton Rancheria in 1952 and issued a brief study on the conditions and quality of the Tribe's lands, roads, and water system.[199]  As responsibilities over rancheria lands were to be transferred to counties after termination, the BIA's 1952 study contained recommendations to bring the Wilton Rancheria roads and water, irrigation, and sanitation systems up to Sacramento County standards for a subdivision, a classification under which the Rancheria rightfully fell.

However, the desire of county officials and BIA agents to lower the costs of improvements to the Wilton Rancheria prevented realization of this subdivision plan.  Although the Rancheria Act of 1958 required that the BIA complete the necessary repairs, upgrades, and improvements to the Rancheria's infrastructure before the termination process could be completed, in the end the BIA only provided the Wilton Rancheria with less than a quarter-mile of improved road and minimal plumbing.  The federal record indicates that the Wilton Rancheria community was not fully informed about the BIA's plans for and methods of implementing the requirements for termination; however, the Wilton Rancheria residents and Community Council actively pursued completion of the preparations for termination.  The Wilton Me-Wuk community's involvement in and the BIA's handling of the preparations for termination are detailed in this section.


*Pre-Termination Needs*

According to the *Report on a Program for Termination of Indian Bureau Activities for the State of California*, the BIA sought to turn responsibility for reservation road systems over to

---

[199]  Study of the Wilton Rancheria, November 1952, Private Collection of Wilton Rancheria.

county authorities.[200]   In order to procure enough funds to rehabilitate roads on California

reservations – estimated at $750,000 – the report suggested that counties should receive federal

subsidies until Indian lands could be placed on the county tax rolls.[201]  A subdivision road and

property distribution plan were suggested for the Wilton Rancheria, and in order for the

Rancheria roads to meet county standards, they had to be upgraded.[202]

The Rancheria's irrigation and domestic water systems also needed upgrading.  In

particular, the communal pumping station had to be repaired before termination could be

completed.[203]  As the BIA termination report stated:

> Reports from this rancheria during April 1949 reveal that the casing at the bottom
> of the present well has completely rusted away and sand is cutting the pump.  It
> will therefore be necessary to replace casing and gravel pack the well.  At the
> same time it will be necessary to replace the old 3,000 gallon steel storage
> reservoir and completely rehabilitate the domestic water system.[204]

The termination report noted that twelve families (forty individuals) depended on this water

---

[200]  Report On A Program For The Termination Of Indian Bureau Activities In The State Of
California, June 1949, NARA-San Bruno, RG75, Sacramento Area Office, Irrigation and Water Rights
Files, 1968-1969 (92-003), Box 1, Termination Investigations, 341.7, p. 20.

[201]  Report On A Program For The Termination Of Indian Bureau Activities In The State Of
California, June 1949, NARA-San Bruno, RG75, Sacramento Area Office, Irrigation and Water Rights
Files, 1968-1969 (92-003), Box 1, Termination Investigations, 341.7, pp. 20-21.

[202]  Leonard M. Hill to Charles McKeen, 24 December 1952, Private Collection of Wilton
Rancheria.

[203]  James B. Ring to John S. Ryder, 11 February 1949, Private Collection of Wilton Rancheria;
Report On A Program For The Termination Of Indian Bureau Activities In The State Of California, June
1949, NARA-San Bruno, RG75, Sacramento Area Office, Irrigation and Water Rights Files, 1968-1969
(92-003), Box 1, Termination Investigations, 341.7, p. 60.

[204]  Report On A Program For The Termination Of Indian Bureau Activities In The State Of
California, June 1949, NARA-San Bruno, RG75, Sacramento Area Office, Irrigation and Water Rights
Files, 1968-1969 (92-003), Box 1, Termination Investigations, 341.7, p. 60.

system.  With donated Indian labor, the estimated cost to repair the pump would be $4,690.[205]

The Wilton Rancheria's Tribal government took a active role in preparation for termination.  During June 1952, Tribe member Raymond Taylor worked with BIA agents to update the Wilton Rancheria membership list to help community members living on the Rancheria and those living off the Rancheria enroll with the Wilton "Reservation."[206]  Sometime in 1952, Charles McKean replaced Raymond Taylor as Tribal Chairman, and McKean immediately took action to have the roads and water system repaired.[207]  BIA officials noted McKean's work on behalf of the Tribe, describing him as "an active leader of the group, with the overall interest of the community in mind."[208]  In fact, the day after he was elected, McKean wrote to the BIA about the water and road problems plaguing the Rancheria.[209]  As early as 1950, Assistant Director Ring was attempting to reduce the cost of terminating California tribes, and as such had decided that the Wilton Rancheria's roads were comparable to "secondary dirt roads serving rural areas," so they would only need to be maintained, not upgraded.  Ring also cut the Wilton Rancheria budget for repairs to its water pumping station from the $4,690 to

---

[205]  Report On A Program For The Termination Of Indian Bureau Activities In The State Of California, June 1949, NARA-San Bruno, RG75, Sacramento Area Office, Irrigation and Water Rights Files, 1968-1969 (92-003), Box 1, Termination Investigations, 341.7, p. 60.

[206]  Leonard M. Hill to Raymond Taylor, 3 July 1952, Private Collection of Wilton Rancheria.

[207]  Henry Harris, Jr. to Charles McKean, Jr., 9 December 1952, Private Collection of Wilton Rancheria.

[208]  Study of the Wilton Rancheria, November 1952, Private Collection of Wilton Rancheria.

[209]  Henry Harris, Jr. to Charles McKean, Jr., 9 December 1952, Private Collection of Wilton Rancheria.

$4,000.[210]

In 1952, the government assessed conditions on the Wilton Rancheria and recommended a subdivision plan for the improvement of the Rancheria. The study concluded that one of the three lots making up the Rancheria's 38.9 acres should be subdivided into thirty-nine 60x170-foot lots to accommodate the resident twelve families, as well as allow for future expansion.[211] The majority of the community would be concentrated on one lot, which was already "served by two streets running north east, two alleys the same and one cross street."[212] There were also streets running to the well and the Cosumnes River. Other road allowances and alleys had been planned, but existed "only on paper."[213] The 1952 study described the water system as "a well, tanks and automatic pump maintained by the Council."[214] In reality, when the pump did function, it was only capable of serving homes and could not be used for irrigation. The BIA noted that the Rancheria needed additional wells to supply water for farming or grazing, and "that a Co. Coult be organized to operate and maintain the existing water system for the benefit of the council members."[215]

Housing on the Wilton Rancheria was also inadequate. One of the original distributees, Archie G. Williams, wrote to Agent Hill on this topic:

---

[210] "California Indian Termination Program," 25 August 1950, NARA-San Bruno, RG75, Sacramento Area Office, Irrigation and Water Rights Files, 1968-1969 (92-003), Box 1, Termination Investigations, 341.7, pp. 12, 50.

[211] Study of the Wilton Rancheria, November 1952, Private Collection of Wilton Rancheria.

[212] Study of the Wilton Rancheria, November 1952, Private Collection of Wilton Rancheria.

[213] Study of the Wilton Rancheria, November 1952, Private Collection of Wilton Rancheria.

[214] Study of the Wilton Rancheria, November 1952, Private Collection of Wilton Rancheria.

[215] Study of the Wilton Rancheria, November 1952, Private Collection of Wilton Rancheria.

> ... I think I need help.  I would like a help in finishing my house as it needs a
> double wall very badly.  I have 7 children in school[.]  [A]ltogether, I have 11
> children; 3 daughter are married and my son is in the Service, will be home soon.
> I don't make much but at least I have a year around job.  [A]s I don't have a high
> education, with 7 children in school it is very hard to keep them in clothing and
> lunches.[216]

Williams' letter demonstrates the poor living conditions on the Rancheria, and the degree of

poverty in which its residents lived.  The Wilton community members were not well informed

about the specifics of the termination process, which they seemed to believe would improve their

situation.

Gertrude DuPree, for example, told the *Sacramento Bee* in 1957, that she believed she

could not make improvements on her Rancheria assignment, such as erecting a building, until

after termination.[217]  Tribal Chairman McKean was also interviewed for this *Sacramento Bee*

article, which noted that the Rancheria lands were "covered by sand" and "practically useless,"

and that the houses on the Rancheria were "old buildings which the Indians feel would have to

be improved if the residents were left on their own."[218]  The *Bee* reported, in general, "the

residents would ask for some help to improve their houses and provide a better access road."[219]

McKean continued to press the issues of roads and irrigation throughout the termination process

by working with the Area Director to implement improvement projects and pursuing funding for

---

[216]  Archie G. Williams to L. M. Hill, 30 April 1957, Private Collection of Wilton Rancheria;
Appendix C: Genealogical Chart of the Williams Family.

[217]  "Resident of Rancheria Calls It Home, Wants to Stay and Own Plot," 3 June [1957], *The
Sacramento Bee (California)*, Private Collection of Wilton Rancheria.

[218]  "Resident of Rancheria Calls It Home, Wants to Stay and Own Plot," 3 June [1957], *The
Sacramento Bee (California)*, Private Collection of Wilton Rancheria.

[219]  "Resident of Rancheria Calls It Home, Wants to Stay and Own Plot," 3 June [1957], *The
Sacramento Bee (California)*, Private Collection of Wilton Rancheria.

an irrigation system.  Despite the BIA's policy to refrain from building new roads on

reservations, the Area Director informed McKean of the BIA's plans to construct a half-mile

road on the Rancheria in 1954.[220]  By December 1955, McKean submitted to the BIA a list of the

residents of the Wilton Rancheria by lot assignment.[221]

The devolution of federal control to state and local governments called for the

cooperation of several agencies, circumstances which had deleterious repercussions for the

affected tribes.  Following the passage of Public Law 280 in 1953, which delegated to the State

of California civil and criminal jurisdiction over Indian land within that state from the federal

government, the BIA drastically reduced services to all California Indians: "even though no

California tribes were actually terminated until 1961.  In fact, federal health services for

California Indians were completely discontinued by 1955."[222]  Termination projects on the

Wilton Rancheria got underway during this time despite some resistance from local non-Natives.

Since the fall of 1952, the BIA had already discussed arrangements for Sacramento County to

assume responsibility for the roads and for the organization of a mutual water company to

undertake the operation and maintenance of the water system.[223]  The BIA also asked that the

Rancheria lands be placed under the jurisdiction of the Sloughhouse Soil Conservation District, a

---

[220]  Leonard M. Hill to Charles J. McKean, Jr., 21 July 1954, Private Collection of Wilton Rancheria.

[221]  Charles J. McKean, Jr. to Leonard M. Hill, 17 December 1955, Private Collection of Wilton Rancheria.

[222]  Advisory Council, "Termination Report," p. 11.
The report points out that "The BIA drastically reduced services to all California Indians, even though no California tribes were actually terminated until 1961."  Advisory Council, "Termination Report," p. 11.

[223]  Study of the Wilton Rancheria, November 1952, Private Collection of Wilton Rancheria; J. J. Colbert to Earl B. Allison, 21 November 1957, Private Collection of Wilton Rancheria.

state-monitored body located in Florin.[224]

On 2 January 1958, the Wilton Rancheria Community Council voted to grant Sacramento County a 50-foot right of way for the new road through the Rancheria.[225]  A week later the BIA approved construction of a levee to be built along an 800-foot strip of land bordering on the south bank of the Cosumnes River, and a contractor was chosen by the end of the following year.[226]  Although the levee had state approval, it met with much resistance from the contiguous non-Native landowners who wanted the earthwork breached, claiming that their ranches were being flooded.[227]  At every step of its preparations for termination, the Wilton Rancheria met with resistance, lack of funding, vacillating BIA plans, and conflict with and among local non-Natives, companies, governments, and agencies.  When Congress passed the Rancheria Act in 1958, however, it appeared to the Wilton Rancheria community that their plans for improvements may yet materialize.

---

[224]  J. N. [Lowe] to Board of Directors, Sloughouse Soil Conservation District, c/o William Balisay, 3 July 1956, Private Collection of Wilton Rancheria; Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

[225]  Resolution of the Tribal Council of Wilton Rancheria, 2 January 1958, Private Collection of Wilton Rancheria.

[226]  As part of the improvement to the irrigation system, a new levee was planned for 1956.  See Leonard M. Hill to Sacramento District Engineer, 15 March 1956, Private Collection of Wilton Rancheria; Leonard M. Hill to Marvin L. Landon, 27 December 1957, Private Collection of Wilton Rancheria; Application to the Reclamation Board of the State of California for Approval of Plans, 9 January 1958, Private Collection of Wilton Rancheria; Marvin L. Landon to U.S. Department of the Interior, Bureau of Indian Affairs, 28 January 1958, Private Collection of Wilton Rancheria; Order of the Reclamation Board, 5 February 1958, Private Collection of Wilton Rancheria.

[227]  George T. Nordstrom to Lyle F. Warnock, 20 October 1958, Private Collection of Wilton Rancheria.

*The Plan for the Distribution of the Assets of the Wilton Rancheria*

Although the Wilton Rancheria Community Council continued to work towards solidifying plans to fulfill the needs of the community, very little had been accomplished when the Rancheria Act (Public Law 85-671) was passed on 18 August 1958.[228]  The Act was intended to be the final legislative step in terminating the BIA's administrative involvement with the "land and assets of certain Indian rancherias and reservations in California," and to terminate the Indian status of those individuals associated with these lands and assets.[229]  The Wilton Rancheria was named in the Act as one of forty-one California reservations and rancherias considered ready for termination.  The Act required the federal government to meet certain preparatory responsibilities before termination could be completed, including making surveys of lands to be distributed or sold, and canceling debts to the United States.

Most importantly for the Wilton Rancheria, the Act required that construction and improvement projects be completed to "adequate standards comparable to standard for similar roads of the State or subdivision thereof...  [and] install or rehabilitate such irrigation or domestic water systems as he [the Secretary of the Interior] and the Indians affected agree, within a reasonable time, should be completed by the United States."[230]  Furthermore, the Act authorized the Secretary of the Interior to provide education and training programs to assist those slated to lose their status as Indians to "earn a livelihood, to conduct their own affairs, and to assume their

---

[228] *An Act to provide for the distribution of land and assets of certain Indian rancherias and reservations in California, and for other purposes*, approved 18 August 1958, 72 *Stat.*, 619-621.

[229] *An Act to provide for the distribution of land and assets of certain Indian rancherias and reservations in California, and for other purposes*, approved 18 August 1958, 72 *Stat.*, 619-621.

[230] *An Act to provide for the distribution of land and assets of certain Indian rancherias and reservations in California, and for other purposes*, approved 18 August 1958, 72 *Stat.*, 619-621.

responsibilities as citizens without special services because of their status as Indians."[231]

With the passage of the Rancheria Act, the BIA sped up its development of plans for the distribution of the assets of the California's rancherias.[232] The Wilton Rancheria distribution plan was approved by July 1959.[233] The Rancheria lands were divided into thirteen parcels, eleven of which were individually deeded, and two of which were to remain communal property no longer in trust: a small parcel for the water pump system, and one reserved for community recreation and a playground. The eleven distributees of the assets of the Rancheria were: Charles McKean, Jr., Ella Taylor, Archie G. Williams, Dorothy Andrews, John McKean, Jane Brown, Mrs. Gertrude Dupree-Fernandez, Mrs. Ada L. Madrigal, Mrs. Eva Irish, Annie McKean, and Virgie Hatch.[234] Twenty dependent members of the families of distributees were also listed on the plan. The current membership of the Tribe includes many of these individuals originally named in the Wilton Rancheria distribution plan.[235]

In addition to the road, irrigation, and potable water system repairs and upgrades noted as necessary during the pre-termination period, the Wilton Rancheria distribution plan further specified that the federal government see to both communal and individual property issues. The Tribe asked that their community be made into a legal entity which could own and convey

---

[231] *An Act to provide for the distribution of land and assets of certain Indian rancherias and reservations in California, and for other purposes*, approved 18 August 1958, 72 *Stat.*, 619-621.

[232] Advisory Council, "Termination Report," p. 15.

[233] A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria.

[234] A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria; Appendix C: Genealogical Charts.

[235] See Appendix C: Genealogical Charts.

common properties such as the water pumping area (Lot 9) and playground (Lot 12).  The Tribe also requested further improvements to its water system with the replacement of "all leaky, defective water pipes" and that water connections be made to "all occupied residences or other residences constructed or in the course of construction and more than fifty percent complete within a ninety (90) day period after approval of this plan by the Indians of the Wilton Rancheria."[236]  In relation to the road construction project, promised since 1954, the Tribe specified in their distribution plan that it meet with Sacramento County Road Department standards.[237]

According to the Wilton Rancheria distribution plan, Tribe members were asked if they wanted to participate the BIA vocational training program, to which they were entitled under the terms of the Rancheria Act, but "no one has indicated any interest."[238]  However, elder Tribe members who participated in the termination process remember differently: one did not rec all being given such an opportunity, another had some training partially provided for by the BIA, and another recalled that the vocational choices were very limited.[239]  The Wilton Rancheria distribution plan also stated that when all of the requirements stipulated in the plan were met by

---

[236]  A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria.

[237]  A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria.

[238]  A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria.

[239]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, p. 5; Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, pp. 17-18; Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 10.

the federal government, and the community was satisfied, the Wilton Rancheria was to have its

constitution and bylaws revoked and termination would be finalized.[240]  Encouraged by the

promises outlined in the distribution plan, the Wilton Rancheria distributees voted to accept the

plan unanimously on 25 September 1959, and BIA Assistant Area Director Guy Robertson

instructed the Realty Branch to "proceed with the various actions required by the Plan."[241]


*Road, Water, and Sanitation Issues During the Termination Process of the Wilton Rancheria*

The BIA proceeded with implementation of the Wilton Rancheria's distribution plan with

speed and parsimony, cutting corners where possible.  For the Tribe, implementing the "various

actions required by the Plan" meant improvements to roads, sewers, water supply, and general

living standards.[242]  In its haste to complete termination, the BIA had not accounted for the full

costs of the subdivision plan – the plan recommended in the BIA's initial study of the Wilton

Rancheria and which the Tribe expected.[243]  In addition, as attorneys would later argue:

> [to] secure passage of the [Rancheria] Act Interior Department officials had
> agreed that they would never seek the appropriation of funds ... to provide the
> various services described in ... the Act and that as a result the said department

---

[240]  A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria.

[241]  A Plan for the Distribution of the Assets of the Wilton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, 6 July 1959, Private Collection of Wilton Rancheria; Guy Robertson to Branch of Realty and Branch of Land Operations, 1 October 1959, Private Collection of Wilton Rancheria.

[242]  Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton Rancheria.

[243]  Study of the Wilton Rancheria, November 1952, Private Collection of Wilton Rancheria; Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton Rancheria.

did not have sufficient funds to completely fulfill ... [its] trust obligations.[244]

Without the possibility of additional appropriations to cover the actual costs of implementing the Tribe's distribution plan, the BIA sought to fulfill the plan's requirements in the most minimal way. The correspondence in the federal record indicates that the Tribe was not informed about the details of the ways in which the BIA cut costs. Most importantly, the Tribe was not made aware that the BIA hastened road construction to avoid the costs of meeting county road standards that were about to be raised.

The BIA had to meet Sacramento County standards in order for the county to agree to take over responsibility for the Rancheria roads. According to state statutes: "any Land parcel divided for sale into more than three residential sites constitutes a subdivision."[245] The planned division of the Rancheria lands – consisting of three lots, divided into fourteen parcels – qualified the Wilton Rancheria as a subdivision, and subdivision plans had to meet Sacramento County standards.[246] To bring the Wilton Rancheria up to standard required that:

> a. All lots must be not less than 10000 square feet each where domestic water is supplied from a central source and septic tanks are used.
>
> b. All lots must face an improved street.
>
> c. The main access road should come from Green Road so as to eliminate the second railroad grade crossing. This road to have 60 foot right-of-way. Other roads to have 52 foot right-of-way.

---

[244] Complaint for Injunctive Relief, and Damages, *Tillie Hardwick et al. v. the United States*, 12 July 1979, 9th Circuit Federal Court, Northern District of California, Case no. 79-1710sw, FRC-San Bruno, accession no. 21-88-0010, box 16, p. 18.

[245] Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton Rancheria.

[246] Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton Rancheria.

d. Lots held in common ownership to be not less than 2 acres in area.[247]

Not only did the Wilton distribution plan not conform to Sacramento County standards, the BIA realized that it may be required to pay for additional road construction, another well, a pressure tank, fire hydrants, and more.

In his report to the BIA Area Director, Lyle F. Warnock, Land Operations and Roads Officer, outlined these problems. Furthermore, Warnock alerted the Area Director about impending Sacramento County road standard changes, which would likely lead to even greater costs for the BIA. Warnock advised the Area Director to act swiftly to complete the construction projects on the Wilton Rancheria while the lower standard was still in effect:

> the Board of Supervisors is considering the deletion of Class "B" roads from the County standards and requiring the construction of Class "A" roads. Class "A" roads are 40 feet in width with curbs and sidewalks. He [Guy Pearce, Assistant County Engineer] suggested that we initiate the Bureau-County agreement as soon as possible so that the Class "B" roads may be built...

> [W]e should proceed immediately with the road work without filing a subdivision plat for the area...

> [I]t appears that the filing of a subdivision plat for Wilton Rancheria in order to issue deeds by lot numbers will compel the Bureau to expend considerable funds for road improvements and domestic water system. While no information was sought concerning sanitary facilities, such an approach could well lead to the installation of septic tanks and possibly other costly improvements.[248]

Warnock recommended that the BIA enter into its agreement within 60 days "to preclude the construction of Class "A" streets," and "issue deeds to the individuals for property described in

---

[247] Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton Rancheria.

[248] Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton Rancheria.

metes and bounds description and disregard the filing of a subdivision plat."[249]  While Warnock

did state that these revised plans "need to be explained and cleared with the Indian people on the

rancheria," it is not clear from the federal record that the Tribe was fully informed of their

options, if there were any.[250]

      Tribe members remember the poor condition of the Wilton Rancheria roads.  Mildred

Williams, for example, remembers the difficulty the roads caused in her and her family's

everyday life.  She explains:

> we had dirt roads, we didn't have any paved roads.  My dad had to walk across
> the river to work to support us.  There was no welfare at that time... Every time
> my dad would get stuck in the mud we would have to go and push him out.  We'd
> be soaking wet and ready for school but we'd have to push him out of the holes
> when he'd get stuck in the holes.[251]

Mildred Williams also remembers that the Rancheria lands often flooded "clean up to the

tank."[252]  She continues, saying: "There was an old tank back there and it would flood every

winter.  The whole back part out there used to flood out."[253]  Tribe member William Wayne

Daniels also recalls the poor condition of the roads:

> This is when the government took over.  When we got on the Rancheria we had a
> paved road.  But in the summertime it was great but in the wintertime it was total

---

[249]  Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton
Rancheria.

[250]  Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton
Rancheria.

[251]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006,
Wilton Rancheria of Me-Wuk Indians, p. 2.

[252]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006,
Wilton Rancheria of Me-Wuk Indians, p. 3.

[253]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006,
Wilton Rancheria of Me-Wuk Indians, p. 3.

> heck.  We'd have to get out there and push the cars out of the puddles.  There
> would be cars sliding off the road into somebody's else's property.  Like now, if
> you hit somebody's post or break a fence down, instead of having the guys that do
> it fix it back up, they would sue them and take them to court.  Before they'd all
> get together and help everybody out.[254]

The roads needed considerable improvement, and the originally proposed subdivision plan would have resolved not only the road conditions, but also the flooding problems.

The BIA instead opted for the quickest and least costly solution to the Wilton Rancheria's problems.  Only one road construction project was completed: in about one month's time, .28 miles of Rancheria Road S-160 were improved.[255]  However, the Tribe had already consented to surrender the right of way for the road without compensation in 1958.[256]  The Rancheria road was transferred to the County of Sacramento at the end of 1959.[257]

The BIA approached upgrading and repairing the water system in a similar way.  In order for the county to assume responsibility for the domestic water system on the Rancheria, "two wells with pressure tanks and adequate pumping equipment," fire hydrants, and mains were

---

[254] Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, p. 9.

[255] Schedule of Damages of Tribal Land, Wilton Rancheria, 26 February 1960, Private Collection of Wilton Rancheria; Earl B. Allison to Area Road Engineer, 6 November 1959, Private Collection of Wilton Rancheria; Leonard M. Hill to Paul J. Moore, Incorporated, 3 December 1959, Private Collection of Wilton Rancheria.

[256] Schedule of Damages of Tribal Land, Wilton Rancheria, 26 February 1960, Private Collection of Wilton Rancheria.

[257] The entire metes and bounds description for the .28 mile long road read: "Beginning at Wilton on the east side of the Central California Traction Company track and at a junction with Sacramento County Road No. PS 37, Green Road; thence northeasterly 686.26 ft., thence northwesterly 185.65 ft., thence northeasterly 373.06 ft., thence northwesterly 218.69 ft., located in Sacramento County, Rancho Omochumnes, T.7N., R6E., M.D. B. [Mount Diablo Meridian] & M."  See  Harlan V. Thoreson to Sacramento Area Director and California Division Engineer, 2 February 1960, Private Collection of Wilton Rancheria; see also Leonard M. Hill to Commissioner of Indian Affairs, attn: Realty, 8 March 1960, Private Collection of Wilton Rancheria.

required.[258]  Once the Tribe had accepted the distribution plan on 25 September 1959, the

Department of the Interior only ordered the BIA to:

> [r]ehabilitate the present domestic water system by replacing all leaky, defective
> water pipes and providing water connections to all occupied  residences not now
> connected or other residences constructed or in the course of construction and
> more than 50% completed by December 24, 1959.[259]

Despite county standards, constructing a second well, upgrading pressure systems, and installing

hydrants were simply not included in the Department's orders.

Although substandard, the novelty of running water was a boon to Wilton Residents.

However, the quality was not on par with general standards.  Mildred Williams recalled when

her father, Archie, was finally able to have running water piped into their house:

> Yes, our plumbing was good.  Even dad got one of those great, big, old round
> galvanized [wash tubs] ... only it had a hole on the top so he made a shower out of
> it for us.  And a little room where he made a shower, it was just for our shower,
> we could go take a shower.  Which, whoever was first taking a shower that night,
> they had to get up there and fill up the tank.  They had to fill up the tank with a
> hose so we could have a shower and then by night time it would be nice and
> warm...
>
> In the wintertime they had a tub where you had to heat your water and go in the
> middle of the room and take your bath while everyone else stayed in the other
> room.  I'm telling you, it was a hard life.  We thought it was peaches and cream
> but now that you can look back on it, it was hard. But we had to do it in order to
> survive.  We did what our mom and dad told us to do.[260]

Even though Mildred considered the plumbing in her home "good," the details of how the family

---

[258]  Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton
Rancheria.

[259]  Guy Robertson to Branch of Realty and Branch of Land Operations, 1 October 1959, Private
Collection of Wilton Rancheria.

[260]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006,
Wilton Rancheria of Me-Wuk Indians, p. 22.

creatively managed the water supply illustrate the difficulties Wilton families experienced while living in substandard conditions.

By 9 June 1960, cold water was piped into each house on the Wilton Rancheria. Although the BIA had determined in its 1952 study that it was inappropriate to do so, the water system served both domestic and irrigation purposes.  Likewise, no second well was dug, nor a second tank and pump installed.  The system was comprised of an elevated 1,000-gallon galvanized iron tank; a 250 g.p.m. deep-well turbine pump and 7 1/2 H.P. motor; and a well with a 12-inch diameter, 100-food depth, and 3/16 plate steel casing.  Water ran from  a 4-inch asbestos-cement pipe mainline and supplied each household through smaller galvanized steel pipes.[261]

The BIA considered its repairs to the Wilton Rancheria infrastructure as satisfactory by early 1961, and so it moved to complete the distribution of the Rancheria lands, marking the final steps in the termination process.  The BIA transferred the roads to Sacramento County in the most expeditious and economical manner possible, and proceeded with the property appraisals necessary for the land to become subject to tax assessments. [262]  Following the

---

[261]  Land Operations & Roads-Irrigation Section to Chief Appraiser, Branch of Realty, 9 June 1960, Private Collection of Wilton Rancheria.

[262]  Request for Real Estate Appraisal, signed by H. Martin Maloney, 5 January 1960, Private Collection of Wilton Rancheria; Herbert M. Ziegler to Acquisition and Disposal Section, 7 April 1961, Private Collection of Wilton Rancheria; Leonard M. Hill to John McKean, 18 May 1961, Private Collection of Wilton Rancheria; Deed between the United States of America and John McKean for Parcel 7, 30 March 1961, Private Collection of Wilton Rancheria; Area Director to Gertrude Dupree, 18 May 1961, Private Collection of Wilton Rancheria; Leonard M. Hill to Annie McKean, [18 May 1961], Private Collection of Wilton Rancheria; Leonard M. Hill to Arthur M. Taylor, 18 May 1961, Private Collection of Wilton Rancheria; Deed between the United States of America and County of Sacramento, State of California for Rancheria Drive, Cecastra Drive and Green Road, 30 March 1961, Private Collection of Wilton Rancheria; Description for U.S. Department of Interior, 24 October 1960, Private Collection of Wilton Rancheria.

67

appraisal, each distributee received a deed to his or her land, stating the property's base value ($1,750) and any additional value for improvements.[263]  On 19 May 1961, Assistant Secretary of the Interior John M. Kelly pronounced: "Upon examination of the records, I find the requirements set forth in the Act have been satisfied.  Accordingly, the Constitution and Bylaws for the Me-Wuk Indian Community of the Wilton Rancheria are hereby revoked."[264]  The BIA issued its Completion Statement for termination of the Wilton Rancheria on 19 July 1961.[265]  However, there were still outstanding issues affecting the sanitation of the Rancheria which kept the BIA from officially terminating the Tribe.  The Tribe did not agree that termination could

---

[263]  Request for Real Estate Appraisal, signed by H. Martin Maloney, 5 January 1960, Private Collection of Wilton Rancheria; Herbert M. Ziegler to Acquisition and Disposal Section, 7 April 1961, Private Collection of Wilton Rancheria; Leonard M. Hill to John McKean, 18 May 1961, Private Collection of Wilton Rancheria; Deed between the United States of America and John McKean for Parcel 7, 30 March 1961, Private Collection of Wilton Rancheria; Area Director to Gertrude Dupree, 18 May 1961, Private Collection of Wilton Rancheria; Leonard M. Hill to Annie McKean, [18 May 1961], Private Collection of Wilton Rancheria; Leonard M. Hill to Arthur M. Taylor, 18 May 1961, Private Collection of Wilton Rancheria; Deed between the United States of America and County of Sacramento, State of California for Rancheria Drive, Cecastra Drive and Green Road, 30 March 1961, Private Collection of Wilton Rancheria; Description for U.S. Department of Interior, 24 October 1960, Private Collection of Wilton Rancheria; Receipt for Deed in the name of Ada Madrigal, 16 May 1961, Private Collection of Wilton Rancheria; Receipt for Deed in the name of Archie G. Williams, 16 May 1961, Private Collection of Wilton Rancheria; Receipt for Deed in the name of Annie McKean, 16 May 1961, Private Collection of Wilton Rancheria; Receipt for Deed in the name of Arthur M. Taylor and Ella Taylor, 16 May 1961, Private Collection of Wilton Rancheria; Receipt for Deed in the name of Charles McKean, Jr., 16 May 1961, Private Collection of Wilton Rancheria; Receipt for Deed in the name of Dorothy Andrews, 16 May 1961, Private Collection of Wilton Rancheria; Receipt for Deed in the name of John McKean, 16 May 1961, Private Collection of Wilton Rancheria; Receipt for Deed in the name of Virgie Hatch, 16 May 1961, Private Collection of Wilton Rancheria; Receipt for Deed in the name of Eva Irish, 16 May 1961, Private Collection of Wilton Rancheria; Receipt fo Deed in name of Gertrude Dupree, 17 May 1961, Private Collection of Wilton Rancheria; Receipt for Deed in the name of The Trustees of the Cosumnes River Indian Association, 17 May 1961, Private Collection of Wilton Rancheria; Receipt for Deed in the name of Jane Brown, 17 May 1961, Private Collection of Wilton Rancheria.

[264]  John M. Kelly to Sir through Sacramento Area Director, 19 May 1961, Private Collection of Wilton Rancheria; see also Leonard M. Hill to Charles J. McKean, Jr., 24 May 1961, Private Collection of Wilton Rancheria.

[265]  Wilton Rancheria Completion Statement by Leonard M. Hill, 19 July 1961, Private Collection of Wilton Rancheria.

68

proceed until septic tanks were installed.  The Wilton Rancheria residents submitted a formal request for the installation of sanitation facilities in December 1961, bringing the termination process to a halt.[266]

The BIA was neither willing nor able to acquire additional funds for the Wilton sanitation project, and the Tribe, now organized as a non-profit organization, had to apply for a grant to complete the project.  In February 1964, the Tribe received a $4,650 grant from the federal Department of Health, Education and Welfare for the installation of septic tanks and seepage pits on the Rancheria lands.[267]  As noted above, the installation of septic tanks was an expense Lyle F. Warnock, the Land Operations and Roads Officer, had wished to avert by avoiding the submission of a subdivision plan.  Despite the BIA's failure to proffer these basic amenities as part of the preparations for termination, it incurred no further expenses.  The responsibility fell to the Tribe to "formally request" sanitation facilities, and construction of these facilities took three more years to complete.[268]

After the installation of septic tanks to the individual households, the BIA considered its relationship with the Wilton Rancheria and its members terminated.  Termination of the Wilton Rancheria was formally completed when notice appeared in the *Federal Register* on 22 September 1964, stating that the distributees and their dependent family members:

are no longer entitled to any of the services performed by the United States for

---

[266]  Leonard M. Hill to Commissioner of Indian Affairs, attn: Office of Tribal Operations, 13 July 1964, Private Collection of Wilton Rancheria.

[267]  "Me-wuk Indians Get $4,650 Grant," 28 February 1964, *The Sacramento Bee (California)*, Private Collection of Wilton Rancheria.

[268]  Leonard M. Hill to Commissioner of Indian Affairs, attn: Office of Tribal Operations, 13 July 1964, Private Collection of Wilton Rancheria.

> Indians because of their status as Indians, and all statutes of the United States
> which affect Indians shall be inapplicable to them and the laws of the several
> States shall apply to them in the same manner as they apply to other citizens or
> person within their jurisdiction. Title to the lands on this Rancheria has passed
> from the United States Government under the distribution plan of the
> Rancheria.[269]

Following this official proclamation of termination, the Wilton Rancheria community continued to struggle with poor living conditions, largely perpetuated by the substandard repairs and upgrades to the Rancheria's infrastructure. Responsibility for improving their living conditions, after 22 September 1964, rested solely on the Rancheria members themselves. In the coming years, they would continue to mobilize and adapt their Tribal government to address their needs and achieve a higher quality of life on the Wilton Rancheria.

*The Cosumnes River Indian Association*

In March 1961, the Community Council of the Me-Wuk Indians of the Wilton Rancheria held its last meeting as this entity. There, the Council members established a new, incorporated, non-profit organization to address the needs of the Wilton community: the Cosumnes River Indian Association (CRIA), an organization "authorized to receive community property under the termination plan."[270] That is, CRIA was responsible for overseeing the land used as a public

---

[269] Office of the Secretary, "Property of California Rancherias and of Individual Members Thereof: Termination of Federal Supervision," *Federal Register* 29, no. 185 (22 September 1964), pp. 13146-13147.

[270] Leonard M. Hill to Commissioner of Indian Affairs, attn: Tribal Programs, April 1960, Private Collection of Wilton Rancheria; Unknown to Leonard M. Hill, 6 February 1961, Private Collection of Wilton Rancheria. The author, probably the Wilton Community Council acting secretary wrote to Agent Hill, " We voted to name the association Consumnes river Indian Association. We voted to hold the annual meeting of share holders on the first Friday in February. In paragraph 11 of the association we voted 100% of the shares be present at the meeting..." Cosumnes River Indian Association, Articles of Association of Nonprofit Association, rec. 15 March 1961, Private Collection of Wilton Rancheria.

park or gathering spot and managing the community water system.[271]  Some of the individuals

who had sat on Community Council assumed the same positions on the Executive Council of

CRIA, as the Wilton Rancheria distributees were CRIA's shareholders.[272]  The distributees were

also stockholders, with each distributee "represented by one (1) certificate of stock."[273]  In

conformity with the Rancheria Act, the Tribe also passed a resolution at this meeting to have its

constitution and bylaws revoked.[274]

The Tribe governed community affairs through CRIA as it had under its IRA Community

Council: CRIA met at regular intervals, held annual meetings, had elections, and required a

majority vote to carry out the affairs of the Association.[275]  In a sense, CRIA required even

greater cooperation from its members than had been necessary under the Community Council.  It

had been acceptable for the Community Council to pass resolutions with only a quorum

---

[271] Leonard M. Hill to Commissioner of Indian Affairs, attn: Tribal Programs, April 1960, Private Collection of Wilton Rancheria; Unknown to Leonard M. Hill, 6 February 1961, Private Collection of Wilton Rancheria.
    The author, probably the Wilton Community Council acting secretary wrote to Agent Hill: " We voted to name the association Consumnes river Indian Association.  We voted to hold the annual meeting of share holders on the first Friday in February.  In paragraph 11 of the association we voted 100% of the shares be present at the meeting..."  Cosumnes River Indian Association, Articles of Association of Nonprofit Association, rec. 15 March 1961, Private Collection of Wilton Rancheria.

[272] Cosumnes River Indian Association, Articles of Association of Nonprofit Association, rec. 15 March 1961, Private Collection of Wilton Rancheria.

[273] Cosumnes River Indian Association, Articles of Association of Nonprofit Association, rec. 15 March 1961, Private Collection of Wilton Rancheria.

[274] Leonard M. Hill to Commissioner of Indian Affairs, attn: Tribal Programs, April 1960, Private Collection of Wilton Rancheria.
    The treasurer of the Wilton Me-Wuk Community Council reported that $238.61 were funds on deposit in the local bank, Bank of America, Elk Grove, California; there were no funds in the custody of the Treasurer.  Me-Wuk Indian Community of the Wilton Rancheria: Resolution and Financial Statement, approved 10 March 1961, Private Collection of Wilton Rancheria.

[275] Cosumnes River Indian Association, Articles of Association of Nonprofit Association, rec. 15 March 1961, Private Collection of Wilton Rancheria.

majority; however, CRIA required a united voice.  For example, the consent of all shareholders

was needed to generate any money apart from that raised by the levy of assessments.[276]

Important decisions such as land sales or conveyances needed "the consent in writing or as

expressed by vote at a duly called meeting of 100 percent of the shareholders of stock."[277]  CRIA

acted successfully under the conditions of increased community participation.  Most notably,

between 1961 and 1964, CRIA secured and managed the grant money from the Health,

Education and Welfare Department to install basic sanitation equipment on the Rancheria.

Ironically, it was the Tribe – not the BIA – which took responsibility for completing the last

tasks necessary to finalize termination.[278]

---

[276] Cosumnes River Indian Association, Articles of Association of Nonprofit Association, rec. 15 March 1961, Private Collection of Wilton Rancheria.

[277] Cosumnes River Indian Association, Articles of Association of Nonprofit Association, rec. 15 March 1961, Private Collection of Wilton Rancheria.

[278] "Me-wuk Indians Get $4,650 Grant," 28 February 1964, *The Sacramento Bee (California)*, Private Collection of Wilton Rancheria; Leonard M. Hill to Commissioner of Indian Affairs, attn: Office of Tribal Operations, 13 July 1964, Private Collection of Wilton Rancheria.

### V. Continuity, Despondency, and Optimism in the Post-Termination Years, 1964-1980

In the fifteen years after termination, the Wilton Me-Wuk Indian Community of the Wilton Rancheria continued to exist as a distinct social, cultural, and political entity. Its members interacted at social and sporting events, and they continued to observe and pass along to younger generations Me-Wuk cultural practices, such as dancing and acorn production. From the 1970s forward, younger community members found it increasingly necessary to move away from the Rancheria lands in pursuit of employment and education in more urban areas. These circumstances did not, however, sever their ties with the Wilton Rancheria community; many returned often to visit family members and friends still living on the Rancheria lands and to attend social events. The City of Sacramento, whose suburbs were encroaching on the Rancheria lands by the 1970s, was the major urban destination of young Tribe members.[279]

In the early 1970s, concerns arose about living conditions on California's rancherias. These concerns led to the formation and investigative efforts of the California Rancheria Task Force, which visited the Wilton Rancheria in 1972. The Task Force found many of the original distributees and their families still living on the Wilton Rancheria, although the Rancheria's housing, water and irrigation systems, and roads remained in deplorable condition. In fact, the only item on the Rancheria grounds that was up to code was the sewage system that the Tribe

---

[279] Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

had itself installed.  The Task Force determined that the federal government had not fulfilled the terms of the Wilton distribution plan or the Rancheria Act, and made a series of recommendations for repairs and upgrades.

The Task Force's assessment of the living conditions on the Wilton Rancheria closely resembled those of many other rancherias throughout the state.  In 1979, a class-action suit was launched the members of these rancherias against the United States – *Tillie Hardwick et al. v. the United States* – for failing to fulfill the terms of the distribution plans and the provisions of the Rancheria Act.  Although the Wilton Rancheria was unable to participate in the litigation, the complaints outlined in the lawsuit ran parallel to the persisting problems on the Wilton Rancheria.  Nonetheless, the social and community life of the Tribe continued.

*Continuity of Social and Community Life*

Following the Tribe's official termination in September 1964, the Wilton Me-Wuk community continued to exist as a socio-cultural entity.  Today, three-quarters of the families who lived on the Wilton Rancheria at the time of termination still hold title to and occupy their Rancheria parcels.[280]  As shown in Appendix B, on the map titled "Demographics of the  Me-Wuk Indian Community of the Wilton Rancheria, 1990-present, by Zip Code," over 95 percent of the Tribe's members live within a 50-mile radius of the Rancheria lands, and 65 percent within a 20-mile radius, primarily in neighboring towns and in the City of Sacramento.[281]  The

---

[280]  Nine of the eleven distributees or their descendants still have property on the Wilton Rancheria, according to current resident and Tribe member, William Daniels.  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, p. 12.

[281]  Appendix B: Maps: Demographics of the  Me-Wuk Indian Community of the Wilton Rancheria, 1991-present, by Zip Code.

Tribe's demographics have remained consistent since 1964: out of a total of 117 members born after 1960, about 80 percent were born within 30 miles of the Rancheria lands since termination. The following table demonstrates these trends:

While Tribe members have dispersed slightly away from the former Wilton Rancheria, they

| | Demographics of the Me-Wuk Indian Community of the Wilton Rancheria, 1960-Present, by Birthplace* | | | | | |
|---|---|---|---|---|---|---|
| | **1960s** | **1970s** | **1980s** | **1990s** | **2000-2004** | **Total all years** |
| **Total Number of Births, 1960-Present** | **16** (13.68%) | **18** (15.38%) | **39** (33.33%) | **32** (27.35%) | **12** (10.26%) | **117** (100%) |
| **Number of births above within a 30 mile radius of the Wilton Rancheria** | **10** (62.50%) | **15** (83.33%) | **30** (76.92 %) | **28** (87.50%) | **10** (83.33%) | **93** (79.49%) |
| | | | | | | |
| * Statistical data taken from a sampling of members of the Wilton Rancheria of Me-Wuk Indians, for w hich researchers had sufficient city and zip code information. This table reflects the births of all 117 members from this sampling w ho w ere born from 196 | | | | | | |

continue to function and exist as tribal community.

Tribe members continued to come together for social events, which were often centered around community picnics and sporting events. William Wayne Daniels, a Tribe member who still resides on the Rancheria lands, remembers that Indian dancing continued to be an important event in the lives of the Wilton community members. He said:

> We have one road coming in here [to the Rancheria] and at the end of it, it has a big circle. We would put some tires in the middle and do some Indian dances...
>
> [M]ainly some of it would be like a deer dance ... snake dance, some other kind of dance....
>
> [T]hey would have parades and stuff. That's what I used to do. I used to dance

with Bill Franklin. Every Friday night until Sunday afternoon we would go.[282]

Daniels also relates how these dances are passed down through the generations:

> I've got nieces and nephews that do the Indian dances now.  They're in their early twenties or thirties.  Some of them still do it and then their kids get into it.  It goes right down the line.  As soon as the kids get to a certain age, about five or six, they put them right in there so they can learn...[283]

Daniels' nieces grew up in the post-termination era but nonetheless continued to practice aspects of Me-wuk culture as members of the Wilton Rancheria community.  Today, Daniels' nieces continue to pass these traditions from generation to generation by teaching their children Indian dancing.

Likewise, acorn preparation was an activity that continued to bring the community's women together, even though many lived off the Rancheria property in the nearby suburbs of Sacramento after 1970.  Tribe members Muriel Sangmaster and Mildred Williams both comment on the family practice of gathering and preparing acorn, which continued long after their childhoods, into the 1960s and 1970s.[284]  As Mildred says: "After we grew up, we used to have to drive my mom and my grandmother to go and find acorns.  My mom, sometimes we would jump in the car and go and we'd pick acorn then when we came back her and my grandmother would crack it, then grind it up.  I know a little bit how to make it."[285]  As Tribe members'

---

[282]  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, pp. 7-8.

[283]  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, p. 9.

[284]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 14; Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, pp. 9-10.

[285]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 14.

memories indicate, the cultural traditions of the Wilton Me-Wuk community were not lost after 1964.

Mildred Williams also recalls her family's participation in the Wilton community baseball team from the time she was a young girl in the 1950s through the 1970s.  When Mildred was young, her father "ran a baseball [team] where all Indians were on the team, for about four years," and, when she was a teenager, she: "used to follow them around....  I'd drive my mom around too because she never drove so I used to have to drive one car and my dad would have to drive the other car."[286]  Mildred says that the Wilton baseball team was part of league, and that they would travel around to play against other teams as well as host games in their community: "We'd go to Tuolumne and we used to go to Stockton, all of them little towns.  Then they used to come to Wilton."[287]  Muriel Sangmaster agrees with Mildred, noting that "Our fathers, uncles, cousins, everybody played baseball."[288]

The 1970s and 1980s presented Wilton Rancheria community members, particularly the younger generations, with employment opportunities which compelled them to live closer to Sacramento proper more permanently.  Nonetheless, many regularly returned to visit their families and attend community social events.  Mildred Williams, who was raised on the Wilton Rancheria, traveled "[a]ll around" for jobs picking hops, plums, and tomatoes during the

---

[286]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, pp. 12, 20-21.

[287]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 12; Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

[288]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, pp. 4, 10-11.

1950s.[289]  During the 1960s, when Mildred held a more permanent job closer to the Rancheria, she visited more often:

> I kind of moved back in with my mom and them ... and they were still living there then.  So of course I would go back to see them every day because I was never used to being away from them.  I went back and forth.  And they'd tell me, "Don't come every day, your car it's brand new."[290]

When her daughters were babies in the early 1970s, Mildred left Sacramento and returned to the Rancheria to live for a short period of time until her home there was destroyed by fire.[291]

As Mildred further contends, it was common for families to commute between the city and the Rancheria to visit and keep up their connections with the community.  Her family, for example, visited with the Daniels family, and members of both of these major family lines lived (and continue to live) on and off of the Rancheria lands.[292]  Muriel Sangmaster also notes that she returned to the Rancheria to visit her grandmother, distributee Ella Taylor, and that she took her children "over to visit my relatives who mainly were the Williams family and my grandmother, and she also had a son who lived with her named Arthur Taylor and I would visit with them."[293]  Muriel made trips to the Rancheria to see her grandmother "at least three times a

---

[289]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 6.

[290]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 16.

[291]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 9.

[292]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 27.

[293]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, p. 3; Appendix C: Genealogical Charts.

month."[294]  Throughout the 1970s, large families like the Williams and the Taylors hosted

parties, and, according to William Wayne Daniels, everyone attended these events.  As he stated:

"All the relatives would.  All the people that moved away.  The young generation, they'd all

come out here and have a good time."[295]  The Rancheria became a place where the elder

community members lived and the younger members visited.

Problems arising from the failure of the termination process were noted as early as 1970.

These observations prompted the formation of the California Rancheria Task Force.  The Wilton

Rancheria was among those visited by the Task Force, and this discussion turns now to examine

the conditions of the Wilton Rancheria as reported the Task Force and by its residents.

*The California Rancheria Task Force Investigation*

By the 1970s, the universal failure of termination under the Rancheria Act of 1958 and its

particularly injurious effect on California Indians caused Commissioner of Indian Affairs John

Crow to order an investigation.  In the letter "establishing a California Rancheria Task Force,"

Crow wrote: "The objective of the task force shall be to determine the existence of substandard

living conditions on California Rancherias, including those terminated pursuant to the 1958 and

1964 Rancheria Acts, and set forth cost estimates for correcting such deficiencies..."[296]  The

---

[294]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, p. 3.

[295]  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, p. 14.

[296]  John O. Crow to Area Director, Sacramento, 5 November 1971, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report.

California Rancheria Task Force argued that the government, when implementing termination, had assumed that:

> a number of Indian communities were ready to accept full responsibility for their affairs, that they were integrated into the social and economic life of the local community, and that termination of the special relationship between them and the Federal Government would impose no particular hardship on them...
>
> [and] that the physical conditions in the community were such that local laws on health, sanitation and housing, when made applicable, would not adversely affect the community or an individual.[297]

The Task Force concluded that policymakers must have believed these assumptions were true, as otherwise "the Government would be placed in a most embarrassing position of fostering termination and leaving the rancheria residents to face possible eviction from their homes by application of local health and safety laws."[298]

The Task Force also found that the federal government allowed tribes to enter into termination plans with substandard water, sewage, and road systems. In its report, the Task Force shows that the government did not promulgate accepted and universal standards or meet the standards set by the local and state governments which assumed responsibility over former rancheria lands. Further, the Task Force implied that the BIA did not take full advantage of the monies made available for implementing the Rancheria Act's provisions.[299] The BIA's failure to

---

[297] John O. Crow to Area Director, Sacramento, 5 November 1971, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report.

[298] John O. Crow to Area Director, Sacramento, 5 November 1971, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report.

[299] California Rancheria Task Force Report, 2 February 1972, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report; John O. Crow to Area Director, Sacramento, 5 November 1971, NARA-

inform individual rancheria residents about the availability of federally funded educational and retraining opportunities was another criticism noted in the Task Force report.[300]

All of these issues have direct bearing on the experience of the Wilton Rancheria. As detailed above, BIA agents altered and expedited road construction plans for the Wilton Rancheria to avoid having to meet Sacramento County standards that were about to become more stringent. To meet county standards, the BIA would have been responsible for "costly improvements," as the BIA Land Operations and Roads Officer had described them.[301] As a result, the BIA did not install the roads, sewer systems, and fire hydrants required under its original plan to turn the Rancheria into a subdivision. The Tribe was forced to install septic tanks itself, and as the Wilton Rancheria virtually became a suburb of the City of Sacramento, its health and safety standards remained substandard in comparison with neighboring non-Indian communities.

While the BIA agent who helped draft the Wilton Rancheria's distribution plan had mentioned vocational training, it is unclear how broadly this information was disseminated. Muriel Sangmaster, for example, received no assistance and her husband had to pay for her nursing education: "I could never get help for anything because they told me we were not a

---

San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report.

[300]    California Rancheria Task Force Report, 2 February 1972, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report [see II: Problems in "Introduction"]; John O. Crow to Area Director, Sacramento, 5 November 1971, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report.

[301]  Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton Rancheria.

recognized tribe, so I could never get anything like that."[302]  Alternately, some Tribe members

sought BIA-sponsored vocational training.  Mildred Williams' mother: "got us in one of these

things where the Indians could send their kids off to go to training to go to work.  I was here in

Sacramento, my brothers got sent to 'Frisco.'"[303]  Some, like William Wayne Daniels, transferred

from one school to another.  Daniels went to a trade school in Oakland but transferred to a

school closer to home:

> What they did was they took me down there and they paid for a place to live and
> all of that.  I got back to where my counselor was and had them transfer me to
> American River's Junior College in Sacramento...
>
> They didn't give you very much to train from.  I had a choice of a mechanic, a
> painter, and a welder, and I took up English, I think it was.[304]

A few members of the Wilton Rancheria community were able to participate in some vocational

training; however, all who did so had to leave the Rancheria lands and travel to cities.  These

individuals did not sever their connections with the Rancheria community by doing so, as many

returned frequently to attend social events and visit family (as discussed above).

When the Task Force field officers visited the Wilton Rancheria in January 1972, they

found seven households: six still owned by the original distributees and one occupied by heirs or

descendants of the distributee.  An examination of the names listed on the report reveal that eight

---

[302]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006,
Wilton Rancheria of Me-Wuk Indians, p. 5.

[303]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006,
Wilton Rancheria of Me-Wuk Indians, p. 6.  Mildred's brother trained in dentistry; she attended Heald
Business College.

[304]  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton
Rancheria of Me-Wuk Indians, pp. 17-18.

of the original eleven distributees were still living on the Rancheria lands in 1972.[305]  Two of the

original distributees had passed away: Virgie Hatch and Annie McKean.[306]  Distributee John

McKean was listed as selling his property.[307]  Thus, in the decade following termination a large

majority of the surviving distributees remained on the Rancheria lands despite the substandard

living conditions.  The Task Force reported that the Rancheria residents' homes were

"substandard" and "unsanitary," and that the electrical service, house wiring, plumbing, and

heating were inadequate and or unsafe.[308]  The Task Force estimated the necessary repairs and

upgrades to the distributees' homes at $68,000, with an additional $21,000 for temporary

---

[305]  The original distributees who still lived on the Rancheria in 1972 were Jane Brown, Archie Williams, Eva Irish, Ella Taylor, Dorothy Andrews, Gertrude Dupree, and Charles McKean, Jr.  See California Rancheria Task Force Report, 2 February 1972, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report.

[306]  Virgie Hatch passed away on 27 January 1963.  See Death Record for Virgie D. Hatch, 1998-2006, Ancestry.com, *California Death Index, 1940-1997* [online database], Provo, UT: Ancestry.com, accessed 5 April 2006 [Original electronic data: State of California, *California Death Index, 1940-1997*, Sacramento, CA: State of California Department of Health Services, Center for Health Statistics].
    Annie McKean died on 31 May 1971.  See Death Record for Annie McKean, 1998-2006, Ancestry.com, *California Death Index, 1940-1997* [online database], Provo, UT: Ancestry.com, accessed 5 April 2006 [Original electronic data: State of California, *California Death Index, 1940-1997*, Sacramento, CA: State of California Department of Health Services, Center for Health Statistics].

[307]  According to John McKean's mother, Annie McKean, he was born on 21 June 1916.  He would have been about 56 years old in 1972.  No information is available regarding his life after leaving the Rancheria.  Application No. 7295 of Annie F. Mc Kean Household for Enrollment with the Indians of the State of California, 31 March 1930, NARA-DC, RG75, Entry 576, Records Relating to enrollment of California Indians, Applications, 1928-1932, 7295, Mc Kean, Annie F.; California Rancheria Task Force Report, 2 February 1972, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report [see Exhibit A under "Report on the Wilton Rancheria"].

[308]  California Rancheria Task Force Report, 2 February 1972, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report [see Exhibit A under "Report on the Wilton Rancheria"].

housing while these repairs were being completed.[309]

The Task Force also recommended several repairs to the water system. Its report notes that the "pump is approaching the end of its economic life and should be replaced," that the well needed work, and that the "existing [water] storage tank is pitted and undersized."[310] These repairs would cost approximately $4,000.[311] Contrarily, the septic tanks and leaching fields built with CRIA's construction grant money in 1964 were up to code and functioning.[312] Daniels remembers that the water system was upgraded, but he believes that the money for the repairs "came out of the people that live here."[313]

The recommendations made by the Task Force in 1972 were issues that the BIA was aware of during the early stages of the termination process, twenty years previous. These issues were shelved because the BIA did not have the necessary budget to complete the upgrades and repairs the Wilton Rancheria community needed. Any structures and systems that were up to

---

[309] California Rancheria Task Force Report, 2 February 1972, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report [see Exhibit A under "Report on the Wilton Rancheria"].

[310] California Rancheria Task Force Report, 2 February 1972, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report [see Exhibit A under "Report on the Wilton Rancheria"].

[311] The Task Force Report lists the repairs estimate at $3,000; however, when the costs of the itemized repairs are added up, the sum is actually $4,000. California Rancheria Task Force Report, 2 February 1972, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report [see Exhibit A under "Report on the Wilton Rancheria"].

[312] California Rancheria Task Force Report, 2 February 1972, NARA-San Bruno, RG75, Central California Agency, Tribal Group Files, Box 1, Rancheria Act Information (1958-1972), California Rancheria Task Force Report [see Exhibit A under "Report on the Wilton Rancheria"].

[313] Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton Rancheria of Me-Wuk Indians, p. 17.

standard in 1972 had been constructed through the efforts of the Wilton community's tribal government.   The termination experience of the Wilton Rancheria was structurally determined by the overall approach of the BIA to disengage from responsibility to Indians in California at as low a cost as possible.  Agent Leonard Hill openly admitted this when he was called upon to provide a deposition before the courts in litigation against the United States, which resulted directly from this neglect.[314]

Hill's testimony suggests that deception was integral to convincing tribes that terminated would be advantageous.  Hill stated that the BIA informed tribes that "the likelihood that they would get them [improvements] without it [agreeing to termination] was not very good."[315] Furthermore, Hill attested to an "arrangement" made between Congress and the BIA regarding appropriations to pay for improvements and other costs of the termination process.  In this arrangement, Congress voted for an appropriation for the termination process but also "strongly discouraged the Bureau of Indian Affairs from actually coming to Congress and asking for the money."[316]  The BIA's goal to keep the costs of improvements to a minimum is evident in the Wilton case, particularly regarding the distribution of the Rancheria property in terms of a subdivision plan, and the costs of meeting county code that proceeding with a such a plan would

---

[314]  Mabel Duncan et al., v. the United States, Excerpts from the Deposition of Leonard M. Hill, ca. 2 September 1975, Private Collection of Wilton Rancheria.

[315]  Mabel Duncan et al., v. the United States, Excerpts from the Deposition of Leonard M. Hill, ca. 2 September 1975, Private Collection of Wilton Rancheria.

[316]  Mabel Duncan et al., v. the United States, Excerpts from the Deposition of Leonard M. Hill, ca. 2 September 1975, Private Collection of Wilton Rancheria.

have entailed.[317]

Agent Hill believed his actions to avoid making the Wilton Rancheria into a subdivision were consistent with the overall practices of the BIA at the time.  When asked if it was in his practice to consult with county officials about standards such as those required for fire hydrants, sewer systems, and domestic water service, Hill replied that "our stand was, this was a federal matter, and that we did not have to comply with subdivision standards."[318]  Hill stated the general approach of the BIA was that the Indian rancherias were not like "subdivision[s] in the usual sense," because they were "generally in ... rural areas," and therefore there was no reason to provide Indians with improvements that would exceed the standards of their non-Indian rural neighbors.[319]  However, Hill also noted that there were objections raised in the cases of some rancherias that were located nearer to urban areas, such as the Auburn Rancheria.  In that case, he noted that:

> they were insisting that this was a subdivision, and as a regular subdivision that they would have to approve it, and if they did not approve it that they would require water to the vacant lots and fire protection facilities, and a lot of other things that we didn't feel were appropriate.

And we maintained that this was not a subdivision in the usual sense.[320]

Hill was adamant in his view that county government concerns were irrelevant, arguing that "We

---

[317]  Lyle F. Warnock to the Area Director, 17 October 1958, Private Collection of Wilton Rancheria.

[318]  Mabel Duncan et al., v. the United States, Excerpts from the Deposition of Leonard M. Hill, ca. 2 September 1975, Private Collection of Wilton Rancheria.

[319]  Mabel Duncan et al., v. the United States, Excerpts from the Deposition of Leonard M. Hill, ca. 2 September 1975, Private Collection of Wilton Rancheria.

[320]  Mabel Duncan et al., v. the United States, Excerpts from the Deposition of Leonard M. Hill, ca. 2 September 1975, Private Collection of Wilton Rancheria.

didn't think ... they had any authority to dictate the manner in which we subdivided the land or issued the deed."[321]

When pressed on the consequences of leaving terminated Indians with the problems of facing compliance with county standards after they were no longer under federal jurisdiction, Hill replied:

> Well, we assumed that they would do the same as they they [sic] had in the past. They had been building homes out there, and then, of course, the counties did not exercise their authority on the Indian reservations...
>
> ... I don't think that we had that as one of our standards that these reservations or that the Indian properties would be in compliance with all of the county ordinances. We knew that the water supply in some of these places did not come up to what was required of a municipality for instance or in a formal subdivision, we knew that there wasn't sufficient water, there was no facility for protection from fire, just as there weren't on a lot of other places that were not Indian land, and were not formal subdivisions....
>
> [W]e didn't follow that through. We didn't intend that we should make these properties or improve these properties to the point there would be no problem involved.[322]

This parallels the approach Leonard Hill took in the Wilton Rancheria case. Suburbs of the City of Sacramento were quickly encroaching upon the rural area where Wilton Rancheria was located. Hill avoided the subdivision issue by hurrying along road construction plans before county standards changed to require a subdivision plan as the area became urbanized. The 1972 Rancheria Task Force Report exposed the neglect of the BIA in the termination process, and therefore opened the way for legal actions against the federal government. Class action suits, including the one for which Hill gave the above deposition were filed by the mid-1970s,

---

[321]  Mabel Duncan et al., v. the United States, Excerpts from the Deposition of Leonard M. Hill, ca. 2 September 1975, Private Collection of Wilton Rancheria.

[322]  Mabel Duncan et al., v. the United States, Excerpts from the Deposition of Leonard M. Hill, ca. 2 September 1975, Private Collection of Wilton Rancheria.

resulting in the restoration of Indian status of those who had been named as dependents in distribution plans, as well as the restoration of the status of several rancherias as federally recognized Indian tribes.  One of the more significant of these cases, *Tillie Hardwick et al. v. the United States*, further highlights the parallels between those restored tribes and the Wilton Rancheria.

*Tillie Hardwick et al. v. the United States*

The report of the California Rancheria Task Force led, in part, to class action lawsuits brought against the United States for failure to meet the requirements of the Rancheria Act. Most notably, the 1979 case of *Tillie Hardwick et al. vs. the United States*, for which a stipulated judgement was entered in 1983, restored federal recognition to seventeen tribes that had been terminated alongside the Wilton Rancheria.  The Wilton Rancheria was not among the tribes whose status was restored by the *Tillie Hardwick* judgement; however, the complaints of the plaintiffs are relevant – if not identical – to those experienced by the members of the Wilton Rancheria following termination in 1964.

Specifically, the grounds for the *Tillie Hardwick* decision were based on the fact that the Rancheria Act required the Secretary of the Interior:

> to take certain actions to prepare the Rancherias for termination <u>before</u> making conveyances of individual deeds authorized by the Act.  Specifically, the Secretary was to, <u>inter alia:</u>
>
> a. Survey Rancheria boundaries to ensure marketable title to individual parcels (§3);
>
> b. Bring Indian bureau roads serving the Rancherias up to comparable standards for similar county maintained roads (§3b); and

88

c. Install or rehabilitate irrigation and domestic water systems as the Secretary and Rancheria residents agreed upon (§3c).[323]

The *Tillie Hardwick* plaintiffs complained that "the federal defendants conveyed deeds to plaintiffs ... before and/or without negotiation for or providing irrigation and domestic water systems adequate to meet the needs of said plaintiffs for such domestic water and irrigation."[324] Because of this neglect of duty, the distribution plans were voided, "except to the extent that they created vested beneficial interests in the distributees."[325]

The plaintiffs further argued that "[b]ecause of the invalidity of the termination plans, the resulting loss of Indian status was void and without legal effect."[326] On the basis that the distribution plans were invalid, the plaintiffs asserted that their status as federally recognized Indians and tribes were also never terminated, and therefore claimed damages for "breach of trust, misrepresentation and nondisclosure of material facts" in that the "the federal defendants in approving distribution plans that failed to adequately provide for the water and sanitation needs of the Rancherias, constitute willful and/or negligent breaches of the fiduciary duty of loyalty

---

[323] Complaint for Injunctive Relief, and Damages, *Tillie Hardwick et al. v. the United States*, 12 July 1979, 9th Circuit Federal Court, Northern District of California, Case no. 79-1710sw, FRC-San Bruno, accession no. 21-88-0010, box 16, pp. 15-16, emphasis in original.

[324] Complaint for Injunctive Relief, and Damages, *Tillie Hardwick et al. v. the United States*, 12 July 1979, 9th Circuit Federal Court, Northern District of California, Case no. 79-1710sw, FRC-San Bruno, accession no. 21-88-0010, box 16.

[325] Complaint for Injunctive Relief, and Damages, *Tillie Hardwick et al. v. the United States*, 12 July 1979, 9th Circuit Federal Court, Northern District of California, Case no. 79-1710sw, FRC-San Bruno, accession no. 21-88-0010, box 16; Order Approving Entry of Final Judgment in Action, *Tillie Hardwick, et al. v. the United States of America, et al.*, 27 December 1983, 9th Circuit Federal Court, Northern District of California, Case no. 79-1710sw, FRC-San Bruno, accession no. 21-88-0010, box 16.

[326] Complaint for Injunctive Relief, and Damages, *Tillie Hardwick et al. v. the United States*, 12 July 1979, 9th Circuit Federal Court, Northern District of California, Case no. 79-1710sw, FRC-San Bruno, accession no. 21-88-0010, box 16, p. 16.

and due care that the defendants owed plaintiffs...."[327]  The *Tillie Hardwick* judgement stated that

the federal government failed in its obligations to provide roads, sanitation, and water systems

that met local and county code standards.  The federal government was also responsible for

ensuring that terminated tribe members were provided with vocational training and educational

opportunities, but it did not adequately supply these.  In accordance with the *Tillie Hardwick*

complaint, then, the Wilton Rancheria, as well as all other tribes terminated under the 1958

Rancheria Act, suffered because of a much broader "pattern and practice" among the BIA's

agents and employees, which was "designed to advocate termination rather than to provide

plaintiffs with a full, complete, and accurate understanding of the negative as well as the positive

consequences of termination...."[328]

Indeed, as the historical record demonstrates and this report details, the experiences of

plaintiffs in the *Tillie Hardwick* case and those of the Wilton Rancheria parallel each other.  The

BIA did not fully inform the Tribe about its financial concessions in fulfilling the terms of the

distribution plan, and it conveyed deeds three years before the sanitation system was completed.

In particular, the BIA was privy to information about changes to Sacramento County's road

standards – information which the historical record indicates was not shared with the Tribe.  The

BIA expedited the Wilton Rancheria's road construction project to meet the lower standard only

days before the Sacramento County amended its codes, leaving the Tribe with substandard roads

---

[327] Complaint for Injunctive Relief, and Damages, *Tillie Hardwick et al. v. the United States*, 12 July 1979, 9th Circuit Federal Court, Northern District of California, Case no. 79-1710sw, FRC-San Bruno, accession no. 21-88-0010, box 16, p. 17.

[328] Complaint for Injunctive Relief, and Damages, *Tillie Hardwick et al. v. the United States*, 12 July 1979, 9th Circuit Federal Court, Northern District of California, Case no. 79-1710sw, FRC-San Bruno, accession no. 21-88-0010, box 16, p. 18.

at the time of termination. And, as the California Rancheria Task Force found in 1972, the BIA had also failed to provide adequate and safe housing, water, and irrigation for the Wilton Rancheria.

CILS led the litigation efforts for many tribes in the *Tillie Hardwick* case.[329] While CILS attempted to include all of the tribes terminated under the Rancheria Act, the conditions of poverty and dispersal of tribe members brought on by the termination process itself made it difficult for many to participate. These conditions largely prevented the Wilton Rancheria's participation in the lawsuit. While the Tribe was initially included in the *Tillie Hardwick* complaint, it, along with many other tribes, was dismissed from the case without prejudice.[330] Another lawsuit, decided in 1976, had unterminated those named as the dependents of distributees on the rancheria distribution plans, thus some members of the Wilton Rancheria regained their Indian status.[331] However, the Tribe collectively remained unrecognized.

---

[329] Advisory Council, "Termination Report," p. 19.

[330] Legal Notice, Notice of Hearing On Approval Of Proposed Class Action Settlement, ca. 1983, California Indian Legal Services, Oakland, California, Scotts Valley Rancheria Case Files; Order Approving Entry of Final Judgment in Action, *Tillie Hardwick, et al. v. the United States of America, et al.*, 27 December 1983, 9th Circuit Federal Court, Northern District of California, Case no. 79-1710sw, FRC-San Bruno, accession no. 21-88-0010, box 16, p. 7.

[331] William E. Finale to All Indians Whose Names Have Been Listed as Dependent Members of Distributees on Distribution Plan of Any of the Following Rancherias, 26 March 1976, BIA-Central California Agency, Sacramento, CA, 3701-P3, Related Correspondence; see also California Indian Legal Services Newsletter, 15 January 1976, Oakland Community History Project, Periodicals, California Indian Legal Services Newsletter; William E. Finale to Commissioner of Indian Affairs, 26 March 1976, BIA-Central California Agency, Sacramento, CA, 3704-P5 FY92, Tribal Enrollment Correspondence, Guidiville Rancheria.

## VI. Social and Political Continuity and Restoration Efforts, 1980s-Present

The victories of the *Tillie Hardwick* case motivated the Wilton Me-Wuk community to more vigilantly pursue restoration of its status as a federally recognized Indian tribe. Beginning in the late 1980s, BIA Agent Maurice Babby and CILS began advocating for and assisting the Tribe with its restoration efforts. In the early 1990s, Congress passed California Indian Policy Act, which commissioned the ACCIP to investigate and make recommendations for remedying the social and economic crises in Native communities. The ACCIP's recommendation that the Me-Wuk Indian Community of the Wilton Rancheria be "immediately restored" fueled Tribal politics throughout the decade.

The issue of federal recognition united and divided the Tribe's polity. Despite some political conflict, the Tribe continued to exist as a distinct social community. Social interactions – which include funeral gatherings, pan-tribal events, and community service projects – helped to maintain the cohesiveness of the community while debates flared about the administration of the Tribe's political affairs. CRIA governed Tribal politics until the early 1990s when some community members formed an Interim Council specifically to pursue federal recognition. The Tribe's subsequent political incarnations – the Elections Board Council, Miwok Cultural Preservation Association, Inc., and finally, the Executive Tribal Council – quibbled over specific issues, such as the administration of grant money, but continually worked to overcome their differences to achieve the common goal of restoration as a federally recognized Indian tribe.

92

With the aid of CILS and the ACCIP, the Tribe drafted several pieces of legislation between 1994 and 2000.  Encouraged by the repeated declarations of government agents and committees that the Wilton community should be "immediately restored," the Tribe reconciled their differences by focusing on their desire to achieve solidarity around the issue of federal recognition.  By 2000, the Tribe united under a single political entity by electing a new Executive Tribal Council, which is comprised of Tribal officers as well as representatives of the community's most prominent families.  The members of the Me-Wuk Indian Community of the Wilton Rancheria – who see their recent history of political conflict as a sign of democracy and their desire to act in the best interest of the community – have persisted in their efforts towards federal recognition of their community, which has existed as a distinct social and political community throughout the twentieth century and into the present day.

*Recommendations for Restoration*

Tribe members were not alone in their belief that their status as a federally recognized Indian tribe should be restored.  Following the *Tillie Hardwick* case and other successful lawsuits brought against the United States in relation to the Rancheria Act, Director of the BIA Sacramento Area Office Maurice Babby judged that the federal government would likely lose any future cases brought by the remaining terminated rancherias:

> the United States has <u>lost</u> on nearly every count with the result being restoration of tribal status, restoration capability of lands into trust, restoration of eligibility for Federal services and benefits, reimbursement for taxes paid and other damages and attorney's fees...

> [W]e are recommending that the Bureau recognize that through protracted and expensive litigation, both for the Indian people involved and the United States, that for the most part, the implementation of the Rancheria Act has been

93

successfully reversed and certain ground rules for settlement have been arrived at for all but a small handful of rancherias included in the Act.[332]

Accordingly, Babby recommended to the Assistant Secretary of Indian Affairs that the Wilton Rancheria be restored as a federally recognized tribe, along with nine other tribes.[333]

Babby also presented his views to CILS, and CILS advised him of its plans to file a class action lawsuit on behalf several of these tribes.[334] Babby noted that CILS would argue that all of the "unterminated" dependent members of California rancherias were "not only entitled to receive BIA services as individuals ... but that they may additionally have the right to organize" tribal governments, and also have land taken into trust."[335] CILS included the Wilton Rancheria on its list of tribes eligible to bring lawsuits on the foundation of this argument, and also advised the BIA to restore these tribes to avoid litigation.[336]

Babby himself had conducted reviews of the fifteen still-terminated rancherias identified by CILS. He wrote: "As a result of our review of existing records and our discussion of the

---

[332] Maurice M. Babby to Assistant Secretary - Indian Affairs, attn: Deputy to the Assistant Secretary, 5 June 1987, Private Collection of Wilton Rancheria, emphasis in original.

[333] Maurice M. Babby to Assistant Secretary - Indian Affairs, attn: Deputy to the Assistant Secretary, 5 June 1987, Private Collection of Wilton Rancheria.

[334] Maurice M. Babby to Assistant Secretary - Indian Affairs, attn: Deputy to the Assistant Secretary, 5 June 1987, Private Collection of Wilton Rancheria.
This was *Scotts Valley et al. vs. The United States*, which successfully restored the Scotts Valley Rancheria, Guidiville Band of Pomo Indians, Chico Rancheria and Lytton Band in 1991. Stipulation for Entry of Judgment, *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria, et al. v. United States of America, et al.*, No. C-86-0660 WWS, revised 17 August 1990, BIA-Central California Agency, Sacramento, CA, 3703-P5 FY90-91, Minutes, Resolutions, Guidiville Rancheria.

[335] Maurice M. Babby to Assistant Secretary - Indian Affairs, attn: Deputy to the Assistant Secretary, 5 June 1987, Private Collection of Wilton Rancheria.

[336] Maurice M. Babby to Assistant Secretary - Indian Affairs, attn: Deputy to the Assistant Secretary, 5 June 1987, Private Collection of Wilton Rancheria.

merits of the proposal, it is our recommendation that the proposal receive favorable

consideration as to the following rancherias: ... Wilton."[337]  Babby outlined the specific factors

he had considered during this review, and which he felt the Wilton Rancheria met.  These were:

> – previous determination as to the adequacy of the water and sanitation facilities provided under Section 3(c) of the Rancheria Act (as implemented by Indian Health Service under P. L. 86-121);

> – occupancy of rancheria prior to implementation of the Rancheria Act and the requested actions by the proposed distributees as reflected in the record and the distribution plan;

> – whether there currently exists, or previously existed, a large Indian population on, or adjacent to, the rancheria;

> – whether there were "dependent members" listed on the distribution plans whose Indian status was reinstated;

> – whether previous court judgments held that all obligations of the U.S. were adequately discharged under the Rancheria Act; and

> – whether rancheria lands are still, or believed to be, in Indian ownership.[338]

However, the BIA did not accept Babby's recommendation, and no action was taken to restore

the tribes.  As a result, CILS filed their lawsuit on behalf of the Scotts Valley Band of Pomo

Indians of the Sugar Bowl Rancheria et al., and, in 1991, received a positive stipulated

judgement restoring the Scotts Valley Band along with three other tribes.[339]  These events only

---

[337]  Maurice M. Babby to Assistant Secretary - Indian Affairs, attn: Deputy to the Assistant Secretary, 5 June 1987, Private Collection of Wilton Rancheria.

[338]  Maurice M. Babby to Assistant Secretary - Indian Affairs, attn: Deputy to the Assistant Secretary, 5 June 1987, Private Collection of Wilton Rancheria.

[339]  Stipulation for Entry of Judgment, *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria, et al. v. United States of America, et al.*, No. C-86-0660 WWS, revised 17 August 1990, BIA-Central California Agency, Sacramento, CA, 3703-P5 FY90-91, Minutes, Resolutions, Guidiville Rancheria.

further inspired the Me-Wuk Indian Community of the Wilton Rancheria to continue fighting for restoration of its status as a federally recognized Indian tribe.

*Interactions and Identifications of the Wilton Me-Wuk Community*

In the midst of the ongoing discussion and efforts towards restoration of their federally recognized status (described in more detail below), the members of the Wilton Rancheria community continued to gather in social and cultural contexts and to interact with other Indian communities and their local community. Throughout the 1980s and 1990s, the Wilton Rancheria community members gathered in large numbers for funerals. They participated in pan-tribal social, sporting, and cultural events, and took an active role in their local community through volunteer work.

In addition to Tribe members' oral histories regarding the social activities of the Wilton community (discussed above), the Tribe's ongoing involvement as a community is evident in its records of funeral gatherings and ongoing use of the Hicksville Cemetery.[340] The cemetery is "Located on Arno Road ... East of Highway 99," and was originally "part of an 1846 land grant to Billy Hicks from Captain John Sutter."[341] This 3-acre property was originally the Hicks family plot, and was then deeded to the Methodist-Episcopal Church in 1897.[342] Beginning with the interments of the McKean and Blue families, generations of Me-wuk continue to bury their

---

[340] Appendix A: Map: Places of Significance to the Ancestors and Members of the Me-Wuk Indian Community of the Wilton Rancheria.

[341] American Indian Burials, Hicksville Cemetery, compiled June 2002, <http://www.galtarnocemdist.com/gac-hc.htm>, accessed 6 April 2006.

[342] American Indian Burials, Hicksville Cemetery, compiled June 2002, <http://www.galtarnocemdist.com/gac-hc.htm>, accessed 6 April 2006.

relatives on the eastern side of the cemetery, a portion of the cemetery that is reserved for Native people.[343]  Tribe member Muriel Sangmaster explains that the Tribe periodically convened at the cemetery for gatherings and maintenance of the grounds and markers: "Our people would go down there and clean the cemetery all the time and they never charged the Indian people to use the cemetery."[344]  These activities were in addition to an annual gathering that takes place in the fall at the cemetery, a tradition continues today.[345]

Fifty-seven Native people were buried in the eastern section of the Hicksville Cemetery as of 2002.  Of these fifty-seven interments, three-quarters took place after the Tribe was terminated in 1964.  The people buried in the Hicksville Cemetery represent the Tribe's principal families, and the burials have occurred consistently between 1960 and 2001.[346]  While fewer ancestors of the Tribe were buried in the Hicksville Cemetery prior to termination, interment of Tribe members nonetheless occurred regularly there, with the first identifiable burial taking place in 1884 and the last in 1962.  Researchers could not identify the burial dates for twenty individuals; however, most of these individuals' family names appear in the Tribe's family

---

[343]  As mentioned previously in this report, Hicks reserved a portion of his family cemetery for Alec Blue's family.  American Indian Burials, Hicksville Cemetery, compiled June 2002, <http://www.galtarnocemdist.com/gac-hc.htm>, accessed 6 April 2006.

[344]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, p. 24.

[345]  *Wilton "Smoke Signals,"* August 1999, Private Collection of Wilton Rancheria.

[346]  Family names appearing in this list include Browns, Daniels, McKean, and Taylor.  American Indian Burials, Hicksville Cemetery, compiled June 2002, <http://www.galtarnocemdist.com/gac-hc.htm>, accessed 6 April 2006; Galt-Arno Cemetery District, Hicksville Cemetery, Hicksville Burial Records, 19 June 2002, <http://www.galtarnocemdist.com/gac-hcai.html>, accessed 6 April 2006.

trees.[347]  Funeral attendance, and the Hicksville Cemetery itself, are key elements in the

maintenance of ongoing relations between the families comprising the Wilton Rancheria

community.

Tribe member Mildred Williams recalls that the Wilton community came together to at

funerals to support grieving community members.  Describing what it is like to attend a Me-Wuk

funeral, Muriel explains that:

> If someone passed away, you got on the phone immediately and let everybody
> know about it.  And everybody would go to the house at night.  We would sit up
> with the body all night and they'd make coffee.  We'd sit up with the body and
> my grandmother's house smelled like flowers, even when there was no body
> there. All the people would sit in the room and when somebody would come in,
> everybody would stand up.  Then that person would go over to the casket and all
> the people in the room would go with them up to the casket.  They would sing
> Indian songs and cry.  They would do this for, I would say, a half hour to forty
> minutes, quite a while.  Then everybody would go sit down.  No one ever spoke.
> No one ever talked or anything, it was just real quiet and you just sat there until
> the next person came in.  You did that all night long.[348]

Mildred Williams remembers that "everyone" attended her grandfather Raymond Taylor's

funeral in 1995.[349]  About her father's funeral in 1989, she said: "[t]hat place was so full you

couldn't even get in there.  They said when my dad passed away you couldn't even get in the

mortuary it was so packed."[350]  Tribe member William Wayne Daniels has a similar memory of

the level of attendance at his stepfather's funeral, also in 1989:

---

[347]  Appendix C: Genealogical Charts.

[348]  Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, p. 23.

[349]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 28.

[350]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 24

> When my stepdad passed away we all went down to Hicksville except for me and
> my younger brother.  We stayed here [at his house on Wilton Rancheria] and had
> everything ready.  Everybody came, it was mostly family, he had a big family...
>
> We had a lot of cars.  We had to put cars out in the field here where they could
> park and go in and eat and talk...
>
> My step-dad a couple of days before Thanksgiving he passed away so we had to
> wait until after the holiday to bury him.  It was the same thing, we all went, his
> family, his grandkids, great-grandkids, everybody came.  There was a house full,
> I'll tell you.[351]

Daniels' stepfather was Charles McKean, a respected member of the community who served for

many years as the Tribe's chairman.  These oral histories show the internal connections between

Tribe members, and the sense of obligation they felt towards one another during difficult times.

Tribe members also consider their relationships with other tribes important, and they are

well known for their ongoing interactions with other (federally recognized) tribes.  For example,

the Tribe offered to "help prepare food," be "parking attendants," and to assist with "dance

grounds, jump house and other chores" at the 1999 Shingle Springs Big Time (an intertribal and

ceremonial social gathering).[352]  At the Big Time, they also volunteered to set up a food booth

where they could sell tacos and fry bread.[353]  In August 1999, the Tribe participated in pan-tribal

events by hosting a "gathering of the tribes picnic" with people from the Ione and Auburn

---

[351]  Interview with William Wayne Daniels, Sr. by Laurie Leclair, 10 March 2006, Wilton
Rancheria of Me-Wuk Indians, p. 15.

[352]  Wilton Indian Rancheria Interim Tribal Council Meeting Minutes, 8 July 1999, Private
Collection of Wilton Rancheria.

[353]  Wilton Indian Rancheria Interim Tribal Council Meeting Minutes, 8 July 1999, Private
Collection of Wilton Rancheria.

rancherias.[354]  The Tribe also holds annual Memorial Day picnics, softball games, and an Elder's

Day celebration, all of which are well attended by Wilton members and members of other

tribes.[355]

As well as other tribes, area organizations identify the Wilton Me-Wuk as a distinct

community.  The Wilton community was included on the list of Native Americans consulted by

the State of California Native American Heritage Commission.  The community was described

as a group which "may have knowledge of cultural resources" in relation to the sacred lands

investigations required for the implementation of development projects, such as, for example, the

extension of a gas pipeline through Sacramento County.[356]  In another instance, the Tribe was

listed as one of the "Effected Tribes and Bands" that would be impacted by a Sacramento-area

voltage project in an environmental impact study.[357]

In addition to identification by organizations, the Tribe is also involved with local non-

Native organizations and activities.  Serving as productive members of the broader community,

Tribe members volunteer for charitable events outside of the community.  In 2004, Tribe

members represented their community in a membership drive for a local public television

---

[354]  Wilton Indian Rancheria Interim Tribal Council Meeting Minutes, 19 August 1999, Private
Collection of Wilton Rancheria; Appendix A: Map: Places of Significance to the Ancestors and Members
of the Me-Wuk Indian Community of the Wilton Rancheria.

[355]  News from your Tribal Council, 11 May 2004, Private Collection of Wilton Rancheria.

[356]  Sacramento Municipal Utility District, "Debbie Pilas-Treadway to Alicia Bergstad, 12 July
2001," *Application for Certification, Cosumnes Power Plant, Volume 2-Appendices*, "Appendix 8.3B:
Letter to Native Amercian Heritage Commissioner (Including Response)" (Sacramento Municipal Utility
District, September 2001).

[357]  Western Area Power Administration, "Appendix D: Tribal Consultation," *Sacramento Area
Voltage Support: Draft, Environmental Impact Statement* (Western Area Power Administration,
November 2002), D.5, "Affected Tribes and Bands."

station.[358]  They have also "donated many hours to local charities such as the Elk Grove Clothes

Closet, Elk Grove Food Bank and Loaves and Fishes," and Tribe members provide a seniors

outreach program which is also voluntary.[359]  Throughout the years since termination, CRIA has

continued to provide leadership for and act as a representational body of the Wilton Rancheria to

the outside community.  Most recently, for example, CRIA registered its support for the Central

Valley Rails to Trails Foundation.[360]

*Wilton Rancheria Governance and Federal Recognition Efforts*

CRIA provided leadership for the Wilton Rancheria community since termination in

1964.  However, beginning in the early 1990s, the Tribe worked to reorganize its Tribal

government, an action initiated by efforts toward regaining federal recognition.  Congress had

expressed a genuine interest in addressing the social, political, and economic issues facing both

federally recognized and unrecognized California tribes.  This Congressional interest gave the

Tribe hope for restoration, and the members of the Wilton Me-Wuk community mobilized their

government to pursue this goal.

In 1992, Congress passed the California Indian Policy Act (Public Law 102-416), which

identified "an urgent need to clarify the eligibility of unrecognized and terminated California

Indian tribal groups to be federally acknowledged as Indian tribes with all the rights and powers

---

[358]  Interview with Mildred Williams by Heather Howard and Laurie Leclair, 15 February 2006, Wilton Rancheria of Me-Wuk Indians, p. 28.

[359]  Me-Wuk Indian Community of the Wilton Rancheria Brochure, ca. 2004, Private Collection of Wilton Rancheria.

[360]  "Central Valley Rails to Trails Foundation, Supporters," March 2006, <http://www.cvrtf.org/html/supporters.html,> accessed 6 April 2006.

attendant to that status."[361]  The Act recognized that California Indians were in a social and economic crisis that persisted despite public policies and federal programs, and it defined a need to make these policies and programs more effective.[362]  Under the Act, Congress established the ACCIP, a group instructed to make recommendations regarding "remedial measures to address the special status problems of California's terminated and unacknowledged tribes, and the needs of California Indians relating to economic self-sufficiency, health and education."[363]  The ACCIP studied these issues for five years, and in 1997 published its assessments in an extensive report.[364]

The ACCIP specifically noted that the Me-Wuk Indian Community of the Wilton Rancheria "should be immediately restored by Congress," along with the Graton Rancheria and the Alexander Valley Mishewal Wappo Tribe, which were also terminated under the 1958 Rancheria Act.[365]  Following on the release of the ACCIP report, the Tribe collaborated with the Graton Rancheria and the Alexander Valley Mishewal Wappo Tribe to draft legislation that would restore federal recognition to all three tribes under one bill.  The tribes were encouraged by the success of four other tribes also terminated under the Rancheria Act, which had

---

[361]  *Advisory Council of California Indian Policy Act of 1992*, 2 October 1992, *Congressional Record*, 102d Cong., 2nd sess., vol. 138, pt. 21, pp. 30392-30394.
Known as the *California Tribal Status Act* for short, and later amended to be called the *Advisory Council of California Indian Policy Act*; *Advisory Council of California Indian Policy Act of 1992*, 2 October 1992, *Congressional Record*, 102d Cong., 2nd sess., vol. 138, pt. 21, pp. 30392-30394.

[362]  *Advisory Council of California Indian Policy Act of 1992*, 2 October 1992, *Congressional Record*, 102d Cong., 2nd sess., vol. 138, pt. 21, pp. 30392-30394.

[363]  Advisory Council, "Executive Summary," p. 1.

[364]  Advisory Council on California Indian Policy, *Final Reports and Recommendations to the Congress of the United States Pursuant to Public Law 102-416* (September 1997).

[365]  Advisory Council, "Termination Report," p. 5.

collectively pursued and won a stipulated judgement (similar to that of the *Tillie Hardwick* case) in the case of *Scotts Valley et al. v. The United States*.[366]

Beginning in 1992, the Tribe held regular meetings to discuss its strategy for seeking restoration of their federal recognition.  In an open letter to the Wilton community members, the Tribal representatives stated: "We believe that the reestablishment of Tribal status for the Wilton Rancheria will have a long-term benefit to our children and restore part of their inheritance that was lost when the Rancheria was terminated."[367]  The letter asked all members of the former Wilton Rancheria to fill in a ballot stating whether or not they were interested in pursing restoration, and it invited them to a general meeting to be held on 30 June 1992.[368]  Kenneth R. McKean, a member of CRIA, approached CILS for legal assistance in pursuing this goal.[369]

<u>The Interim Council and the Wilton Miwok Cultural Preservation Association, Inc.</u>

By 1994, the Tribe had organized a council whose charge was to focus on federal recognition efforts.  The group consisted of some original distributees and their dependents, as

---

[366] Stipulation for Entry of Judgment, *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria, et al. v. United States of America, et al.*, No. C-86-0660 WWS, revised 17 August 1990, BIA-Central California Agency, Sacramento, CA, 3703-P5 FY90-91, Minutes, Resolutions, Guidiville Rancheria.

[367] Draft of Open letter regarding H.R. Bill 2144, Tribal Status Act, ca. 1992, Private Collection of Wilton Rancheria.

[368] Draft of Open letter regarding H.R. Bill 2144, Tribal Status Act, ca. 1992, Private Collection of Wilton Rancheria.

[369] Stephen V. Quesenberry to Kenneth R. McKean, 7 May 1992, Private Collection of Wilton Rancheria.

well as descendants of distributees who has passed away or were elderly.[370]  This "Interim

Council" was responsible for liaising with CILS and generating a newsletter.  The newsletter

shows that solidarity was foremost on the minds of the Interim Council members.  In one 1995

issue, they wrote that achieving federal recognition depended on Tribe members holding: "[the]

same vision and hope of unity in creating a strong tribal community.  A community that can

someday be self sufficient in making its own decisions as to what types of employment,

education, and healthcare is available for its members."[371]  Also in 1995, the Tribe drafted and

voted to adopt an Interim Constitution.[372]

      During 1995, CILS helped the Tribe index documents pertinent to its history and

relationship with the federal government.[373]  The following year, CILS agreed to "provide the

Tribe with legal assistance," and to help the Tribe with executing the terms of a grant it had

secured from the Administration for Native Americans of the Department of Health and Human

Services (ANA).[374]  The Tribe created a non-profit organization – the Wilton Miwok Cultural

Preservation Association, Inc. (MCPA) – to receive and administer the ANA grant, and the

---

[370]  The group consisted of Lana Darrow, Anita Franklin, Beverly Andrews, Mary Tarango, Margie Junkins, Dwayne Wilson, Dorothy Andrews, Joyce Dozier, and Linda Blue.  Wilton Miwok Interim Tribal Council, Wilton Rancheria Newsletter, March 1995, Private Collection of Wilton Rancheria.

[371]  Wilton Miwok Interim Tribal Council, Wilton Rancheria Newsletter, March 1995, Private Collection of Wilton Rancheria.

[372]  Interim Constitution of the Wilton Miwok Tribe, 23 October 1995, Private Collection of Wilton Rancheria.

[373]  Elaine to Jay, Memorandum regarding Index for the Wilton Me-wuk file, 14 February 1995, Private Collection of Wilton Rancheria.

[374]  Jay B. Peterson to Ben Delaney, 18 May 1995, Private Collection of Wilton Rancheria.

Interim Council oversaw the affairs of the organization.[375]  Once the Tribe had developed its

corporate framework and received its grant, CILS helped the Tribe plan its strategy toward

"actual political restoration."[376]

The $65,000 ANA grant was intended to help the Tribe achieve a number of ambitious

goals.  ANA provided this money to assist the Tribe in developing a new Tribal constitution,

including membership ordinances and election statutes, and to conduct the genealogical research

necessary to create a membership roll.  The grant was also intended to provide Tribe members

with training "in the conduct of tribal council meetings and in the methods for enacting and

implementing tribal statutes, exposure to concepts of tribal jurisdiction and particularly the

Tribe's relations with the United States, California and local governments."[377]  The Tribe had

one year to complete these tasks.[378]

The Interim Council immediately hired personnel to conduct genealogical research and to

develop the Tribal enrollment list, and obtained office space where this work could take place.[379]

---

[375]  Jay B. Peterson to Administration for Native Americans, 3 April 1995, Private Collection of
Wilton Rancheria.  MCPA received notice that it had been accepted as a charitable corporation by the
Franchise Tax Board, State of California on May 16, 1995. See Franchise Tax Board to Wilton Miwok
Cultural Protective Association, 16 May 1995, Private Collection of Wilton Rancheria; Franchise Tax
Board to Wilton Miwok Cultural Protective Association, attn: Mary Tarango, 13 April 1995, Private
Collection of Wilton Rancheria; Internal Revenue Service to Wilton Miwok Cultural Protective
Association, 2 May 1995, Private Collection of Wilton Rancheria.

[376]  Jay B. Peterson to Ben Delaney, 18 May 1995, Private Collection of Wilton Rancheria.

[377]  California Indian Legal Services to Ben Delaney, 3 April 1995, Private Collection of Wilton
Rancheria.

[378]  Wilton Miwok Interim Tribal Council Newsletter, Issue no. 2, 11 October 1995, Private
Collection of Wilton Rancheria.

[379]  Wilton Miwok Interim Tribal Council Newsletter, Issue no. 2, 11 October 1995, Private
Collection of Wilton Rancheria.

The Interim Council laid out a plan for the year, which included developing the Tribe's legal governing documents (constitution and ordinances), carrying out Tribal council training, producing the Tribe's genealogical record, writing its ethnohistory, and publishing a Tribal newsletter.[380]  With the help of CILS, the Tribe soon got these activities underway.

## The Elections Board Council

By 1996, the Wilton Me-Wuk community's Tribal government became a two-tiered entity.  Its two branches – the Interim Council and the Elections Board – were often at odds with each other, as Tribe members struggled to reach agreement about which group was the most appropriate to govern the Tribe's affairs.  Ultimately, Tribe members settled this debate by refocusing their energies on acting as a united community to achieve the goal of federal recognition.

The division of the Tribe's government arose from ideological differences regarding the administration of the ANA grant.  Although $65,000 was conservative in comparison to grant standards of the day and represented more money than the Tribe had ever amassed, the grant funds were insufficient to accomplish the designated array of tasks.  Some Tribe members began to feel uncomfortable with the self-appointed Interim Council's control over the funds, calling instead for an elected council.  By January 1996, the Tribe had a list of voting members and had elected individuals to a new governing body (which acted alongside the Interim Council) called the Elections Board Council.  The Elections Board Council members included Lloyd McKean,

---

[380]  Wilton Miwok Interim Tribal Council Newsletter, Issue no. 2, 11 October 1995, Private Collection of Wilton Rancheria.

George (a.k.a. Sonny) Williams, Mildred (a.k.a. Millie) Williams, Richard Taylor, and Cindy Williams-Jinzo – all of whom were either named in the Wilton Rancheria distribution plan or were the lineal descendants of those named in the plan.[381]

The Tribe continued to manage its affairs through both branches of their government: the Interim Council continued to administer the ANA grant and liaise with CILS, and the Elections Board Council provided a voice for the voting membership.  However, tensions soon arose.  The Interim Council members felt that their efforts to guide the Tribe toward recognition went unacknowledged, and suggested that the Elections Board Council did not always act in the best interest of the Tribe.[382]  Conversely, members of the Elections Board Council distrusted the Interim Council and wanted to be included in the decision-making process regarding the ANA grant and in the Tribe's dealings with CILS and other entities.  As officers elected by community members, the Elections Board Council felt that the Interim Council should concede to these demands.[383]

Despite these differences, both councils knew that the political atmosphere was ripe for pursing their federal recognition agenda, and that polemics within the Tribe could only slow their progress.  As Lloyd McKean wrote: "We wish to work harmoneously [sic] with the Interim Council.  We are mostly all family as well as fellow Miwoks...  [P]lease let's try to work

---

[381]  Wilton Miwok Interim Tribal Council to Lloyd McKean, et al., 27 January 1996, Private Collection of Wilton Rancheria; Appendix C: Genealogical Chart of the Brown Family, Genealogical Chart of the Daniels Family, Genealogical Chart of the Taylor Family, Genealogical Chart of the Williams Family.

[382]  Wilton Miwok Interim Tribal Council to Election Board Members, 7 May 1996, Private Collection of Wilton Rancheria.

[383]  Lloyd McKean to the Interim Council, 17 May 1996, Private Collection of Wilton Rancheria.

together as a unit not two different warring factions...  I wish everyone would put their personal feelings aside and work for one cause, that is tribal restoration."[384]  Tribal Community Representative Mary Tarango also asked Tribe members to support solidarity by inviting them to offer their input at a meeting with the Tribe's attorney.  She wrote: "*Your attendance and input is very important.*  Please come, so that you may be able to get first hand information regarding the direction in which the tribe must take."[385]

The Tribe was eligible to receive a second ANA grant to assist its members in their continued federal recognition efforts, but the Tribe's internal disunity jeopardized this funding.[386] Mary Tarango pointed this out, and urged Tribe members to unite so that they could get "back on track with business."[387]  The members of the Interim Council and the Elections Board Council worked together to complete the ANA grant application and to supply critical information, such as the Tribe's membership list.[388]  The Tribe wished to use this grant money to continue work on their existing projects (initiated by the first ANA grant), and to produce a Comprehensive

---

[384]  Lloyd McKean to Adelle Sanders, Project Director, and the Interim Tribal Council, 10 May 1996, Private Collection of Wilton Rancheria.

[385]  Mary Tarango to Wilton Tribal Members, 27 September 1997, Private Collection of Wilton Rancheria, emphasis in original.  See also Wilton Miwok Tribal Council General Meeting Agenda, 25 October 1997, Private Collection of Wilton Rancheria.

[386]  Mary Tarango to Wilton Tribal Members, 27 September 1997, Private Collection of Wilton Rancheria.  See also Wilton Miwok Tribal Council General Meeting Agenda, 25 October 1997, Private Collection of Wilton Rancheria.

[387]  Mary Tarango to Wilton Tribal Members, 27 September 1997, Private Collection of Wilton Rancheria.  See also Wilton Miwok Tribal Council General Meeting Agenda, 25 October 1997, Private Collection of Wilton Rancheria.

[388]  Wilton Miwok Cultural Protective Association Newsletter, Issue no. 14, 15 November 1997, Private Collection of Wilton Rancheria.

Community Needs Assessment.[389]  In 1997, the Tribe was successful in acquiring this second grant.[390]

Alongside the political differences – typical of any community – the Tribe experienced during the mid-1990s, the Wilton Me-Wuk community continued to functions socially.  In 1997, for example, the Tribe hosted a Me-wuk Big Time.  Tribe members organized, participated in, and interacted with other Indian organizations and tribes, and represented the Tribe in non-Native events.[391]  Members of the Wilton community met at various times to attend an acorn festival and the Big Times organized by neighboring Native communities.[392]  They also continued their scheduled annual fall gathering at the Hicksville Cemetery.[393]  In the midst of internal political strife, the Tribe remained a cohesive social community, an aspect of Tribe members' lives that facilitated the eventual reconciliation of political factions and the cooperation among members that would be necessary in the coming years.

<u>The Wilton Miwok Indian Rancheria Restoration Act</u>

Other political forces, such as the ACCIP, were at work for the Wilton Rancheria community during the mid-1990s.  In September 1997, the ACCIP completed its report on

---

[389]  Wilton Rancheria ANA Objectives, ca. 1995, Private Collection of Wilton Rancheria.

[390]  Wilton Miwok Cultural Protective Association Newsletter, Issue no. 14, 15 November 1997, Private Collection of Wilton Rancheria.

[391]  Wilton Miwok Indian Rancheria Background Information Concerning Tribal Restoration by Ruben Solis Ochoa, January 1997, Private Collection of Wilton Rancheria.

[392]  Wilton "Smoke Signals," August 1999, Private Collection of Wilton Rancheria.

[393]  Wilton "Smoke Signals," August 1999, Private Collection of Wilton Rancheria.

Indian affairs in California.  In the "Executive Summary" the committee submitted to Congress, the ACCIP wrote: "Today, of the 38 California rancherias terminated under the Rancheria Act of 1958, nine remain terminated.  Of these, at least three would meet the ... criteria used by the Federal government in evaluating a terminated tribe's eligibility for restoration...." – one of which was the Wilton Rancheria.[394]  The ACCIP noted that the Wilton Rancheria, as well as the Graton Rancheria and the Alexander Valley Mishewal Wappo Tribe, fulfilled the following criteria for federal recognition of an Indian tribe:

> an ongoing, identifiable community of Indians who are members of the formerly recognized tribe or who are their descendants ...
>
> located in the vicinity of the former reservation ...
>
> [who have] continued to perform self-governing functions either through elected representatives or in meetings of their general membership....[395]

Further, the ACCIP noted the continuation of cultural practices despite "a marked deterioration in their socio-economic conditions since termination and ... [that the] conditions [of Tribe members were] more severe than in adjacent rural areas or in other comparable areas within the state."[396]  The ACCIP therefore recommended that "[t]he Wilton Miwok Indian Community... should be immediately restored by Congress...."[397]

---

[394] Advisory Council, "Executive Summary," pp. 16-18.

[395] S. Rep. No. 330 to accompany S. 1747, A Bill Providing for Federal Recognition to the Ponca Tribe of Nebraska, and for Other Purposes, 101st Cong., 2nd Sess. 1990 (Testimony of Eddie F. Brown, Assistant Secretary – Indian Affairs) quoted in Advisory Council, "Executive Summary," pp. 16-18.

[396] S. Rep. No. 330 to accompany S. 1747, A Bill Providing for Federal Recognition to the Ponca Tribe of Nebraska, and for Other Purposes, 101st Cong., 2nd Sess. 1990 (Testimony of Eddie F. Brown, Assistant Secretary – Indian Affairs) quoted in Advisory Council, "Executive Summary," pp. 16-18.

[397] Advisory Council, "Executive Summary," p. 18.

In the same year the ACCIP released its report, the Tribe worked with CILS to prepare a bill "to reaffirm and clarify the Federal relationship of the Wilton Miwok Indians as a distinct federally recognized Indian tribe...," which was also known as the Wilton Miwok Indian Rancheria Restoration Act.[398]  This bill reiterated the ACCIP's findings, stating:

> of the 38 Rancherias terminated under the Rancheria Act of 1958, twenty-nine have been restored through litigation or legislation.  Of the remaining nine, the Advisory Council on California Indian Policy found that three, including the Wilton Miwok Indian Rancheria, would meet current federal recognition criteria and, in the interest of justice and fairness, should be immediately restored to federal recognition...

> the Wilton [interpolated: Rancheria] Miwoks were encouraged to accept the Federal government's plan to terminate the government-to-government relationship with the Tribe in return for certain benefits from the Federal Government which the Federal Government did not provide....[399]

The bill called for federal recognition and the restoration of the Tribe's rights and privileges as they existed before termination, as well as the restoration of federal services and benefits, and hunting, fishing, and water rights.[400]  It suggested a plan for future economic development, and that the former trust lands of the Rancheria be reconveyed to the government "in trust" for the Tribe.[401]  The bill also outlined Tribe's membership, interim government, and Tribal

---

[398]  Wilton Miwok Indian Rancheria Restoration Act (Introduced in the House), 105th Congress, 1st Session, 5 March 1997, Private Collection of Wilton Rancheria.

[399]  Wilton Miwok Indian Rancheria Restoration Act (Introduced in the House), 105th Congress, 1st Session, 5 March 1997, Private Collection of Wilton Rancheria.

[400]  Wilton Miwok Indian Rancheria Restoration Act (Introduced in the House), 105th Congress, 1st Session, 5 March 1997, Private Collection of Wilton Rancheria.

[401]  Wilton Miwok Indian Rancheria Restoration Act (Introduced in the House), 105th Congress, 1st Session, 5 March 1997, Private Collection of Wilton Rancheria.

constitution.[402]  The bill was to be introduced at the first session of the 105th Congress; however, it was never submitted.[403]

On 25 October 1997, the Wilton Me-Wuk community's Tribal Council and its non-profit organization, MCPA, met with representatives of the California Rural Indian Health Board, the BIA, ACCIP personnel, and other legal counsel.[404]  In MCPA's next newsletter, the Interim Council wrote: "The last general meeting was a wonderful example of how much the Wilton Miwok Cultural Protective Association and the Wilton Miwok Tribal Council cares about the tribe, by providing first hand knowledge directly from the experts who represented the invited agencies."[405]  The following year, in 1998, the Tribe began anew their efforts towards legislatively restoring federal recognition to the Wilton Me-Wuk community.

<u>Omnibus Bill for the Restoration of Terminated California Tribes</u>

In February 1998, the Tribe met with ACCIP staff and with representatives of the Graton Rancheria and the Mishewal Wappo Tribe of Alexander Valley to plan an omnibus bill to seek restoration of federal recognition to all three tribes.[406]  The members of the Wilton Me-Wuk

---

[402]  Wilton Miwok Indian Rancheria Restoration Act (Introduced in the House), 105th Congress, 1st Session, 5 March 1997, Private Collection of Wilton Rancheria.

[403]  Wilton Miwok Indian Rancheria Restoration Act (Introduced in the House), 105th Congress, 1st Session, 5 March 1997, Private Collection of Wilton Rancheria.

[404]  Wilton Miwok Tribal Council General Meeting Agenda, 25 October 1997, Private Collection of Wilton Rancheria.

[405]  Wilton Miwok Cultural Protective Association Newsletter, Issue no. 14, 15 November 1997, Private Collection of Wilton Rancheria.

[406]  Dale Risling to Tribal Chairman of Wilton Miwok Rancheria, Graton Rancheria and Mishewal Wappo Tribe of Alexander Valley, 5 February 1998, Private Collection of Wilton Rancheria.

community united around and placed a great deal of hope in the omnibus bill plan. The Wilton

Rancheria's non-profit corporation and Interim Council drafted a letter to all Tribe members and

"other interested parties" that clarified the relationship between the two governing bodies,

saying: "we are not divided because we all want restoration for our people."[407]

   In preparation for inclusion in the omnibus bill, the Tribe had identified its six principal

families – Daniels, Williams, Brown, Blue, Taylor, and McKean – whose members still resided

on the former Rancheria lands. The members of the Interim Council joined with representatives

of these key families to form a new Interim Tribal Council.[408] By this time, the Tribe's bid for

federal recognition had gained the support of numerous political leaders and entities, including

Tim Glidden, Congressman Don Young, Chief Counsel of the Senate Indian Affairs Commission

Paul Moorehead, and California Senators Dianne Feinstein and Barbara Boxer.[409]

   By summer 1999, the Wilton Interim Tribal Council was meeting directly with ACCIP,

CILS, and the representatives of the Graton and Alexander Valley rancherias to discuss the

Tribe's specific roles and responsibilities in the submission of the omnibus bill.[410] On 12 August

1999, when the ACCIP agreed to include Wilton with its omnibus bill, Wilton was the only

---

[407] Wilton Rancheria Corporation and Council to Wilton Rancheria Tribal Members and Other Interested Parties, 9 February 1998, Private Collection of Wilton Rancheria.

[408] The Daniels family appointed Darlene Daniels as its representative. The Williams family appointed Tisa Hernandez. Maxine Brown Franklin represented the Brown Family, and Lisa Aguilar represented the Blue family. At the time this was documented, the Taylors and McKeans had yet to appoint family members. Tribal Community Members of Wilton Rancheria to All Interested Parties, 24 February 1998, Private Collection of Wilton Rancheria.

[409] Ruben Solis Ochoa to Anita Franklin, et. al, 16 March 1998, Private Collection of Wilton Rancheria.

[410] See for example Wilton Indian Rancheria Interim Tribal Council Meeting Minutes, 12 August 1999, Private Collection of Wilton Rancheria;Wilton Indian Rancheria Interim Tribal Council Meeting Minutes, 19 August 1999, Private Collection of Wilton Rancheria.

rancheria out of the three that had its package prepared for the bill's submission.[411]

However, during this period differences within the Tribe became problematic in relation to its participation in the omnibus bill. The Tribe needed to submit its genealogical documentation as part of the reinstatement process, but that information was split between MCPA, which had hired a genealogist and possessed much of the information, and the Interim Tribal Council. To help reach a solution, the Tribe sought the mediation of the Indian Dispute Resolution Service, Inc.; members of both the Tribal and corporate councils negotiated and signed a mediation agreement soon after. According to the agreement, an interim council of twelve members – a joint group of Tribal and corporation council members – would form the governing body.[412]

By 13 April 2000, the omnibus bill, with the abbreviated title of *California Indian Act of 2000*, was drafted in time to be submitted to the 106th Congress by California Representative George Miller.[413] By this time, four other tribes had joined the bill.[414] The omnibus bill allowed

---

[411] Wilton Indian Rancheria Interim Tribal Council Meeting Minutes, 19 August 1999, Private Collection of Wilton Rancheria.

[412] Journal notes of the Wilton Indian Rancheria, 21 September 1999, Private Collection of Wilton Rancheria; Signatures to Agreement, 22 November 1999, Private Collection of Wilton Rancheria.
    The twelve signatories were: 1. Lana A. Darrow [WRIPA]; 2. Kenneith R. McKean, Sr.[WRIPA]; 3. Wayne McKean [WITC]; 4. Anita Franklin [WRIPA]; Dorothy Andrews [WRIPA]; 6. Richard Taylor; 7. Linda Blue [WITC]; 8. Maxine Brown [WITC]; 9. Sandra L. Taylor [WITC]; 10. George Sonny Williams [WITC]; 11. Darlene Daniels [WITC] and 12. Mary Tarango [WITC]. Signatures to Agreement, 22 November 1999, Private Collection of Wilton Rancheria.
    Alternates were also appointed to "serve in a capacity of sitting in for the purpose of having 12 members at the table to conduct business for the tribe." The Alternates were listed as Muriel Sangmaster, Leland Daniels, Duwayne Wilson, and Beverly Andrews. Mary Tarango to All Council Members, 19 March 2003, Private Collection of Wilton Rancheria. On August 30, 2003, a portion of the tribe voted to reject the mediation agreement. See Wilton Rancheria Tribal Elections, 30 August 2003, Private Collection of Wilton Rancheria, p. 9.

[413] *A Bill to restore Federal recognition to certain California Indian tribes, address the special land needs of the California Indians, establish treatment of California Indians in the programs and*

the tribes one year following enactment to organize their governments through elections, create

governing documents, and complete membership rolls in consultation with the Secretary of the

Interior.  The bill outlined membership in the restored "Wilton Indian Rancheria" as:

> (A) such individual's name was listed on the Wilton Indian Rancheria distribution roll compiled on August 13, 1959 ... pursuant to Public law 85ÿ09671;
> (B) such individual was not listed on the Wilton Indian Rancheria distribution list, but met the requirements that had to be met to be listed on the Wilton Indian Rancheria list;
> (C) such individual is identified as an Indian from Wilton in any of the official or unofficial rolls of Indians, or other documents, prepared by or at the direction of the Bureau of Indian Affairs, including the April 1, 1933, census roll or any other subsequent census roll prepared by the Bureau of Indian Affairs; or
> (D) such individual is a lineal descendant of an individual, living or dead, identified in subparagraph (A), (B), or (C).[415]

Until formal elections occurred on the Rancheria, the Interim Tribal Council would continue to

function "in the manner prescribed for the Tribal Council under the tribal constitution adopted on

---

*services of the Bureau of Indian Affairs, develop adequate California tribal justice systems, and for other purposes*, H.L.C. [Draft], 106th Congress, 2nd session, 13 April 2000, Private Collection of Wilton Rancheria.

By the time this bill was drafted, several other tribes had joined Wilton Rancheria and the Alexander Valley Mishewal Wappo Tribe.  These were the Pakan'yani Maidu of the Strawberry Valley Rancheria, the Colfax-Todd's Valley Consolidated Tribe, the Tsi-akim Maidu of Taylorsville Rancheria, and the Mark West Rancheria.  The Graton Rancheria pursued their own independent legislation, and were successfully restored in June, 2000, *Graton Rancheria Restoration Act*, 19 June 2000, H. Rpt. 106-677 (106-2), pp. 1-5.

[414] *A Bill to restore Federal recognition to certain California Indian tribes, address the special land needs of the California Indians, establish treatment of California Indians in the programs and services of the Bureau of Indian Affairs, develop adequate California tribal justice systems, and for other purposes*, H.L.C. [Draft], 106th Congress, 2nd session, 13 April 2000, Private Collection of Wilton Rancheria.

[415] *A Bill to restore Federal recognition to certain California Indian tribes, address the special land needs of the California Indians, establish treatment of California Indians in the programs and services of the Bureau of Indian Affairs, develop adequate California tribal justice systems, and for other purposes*, H.L.C. [Draft], 106th Congress, 2nd session, 13 April 2000, Private Collection of Wilton Rancheria, p. 9.

October 27, 1997."[416]  However, as Interim Tribal Council co-chairpersons Mary Tarango and

Anita Franklin later reflected, "our bill language did not get through the process and we were

omitted."[417]  However, in 2000, the Graton Rancheria regained its status as a federally

recognized tribe.[418]

Before and following their exclusion from the bill, the members of the Wilton Me-Wuk

community endeavored to work as a cohesive group.  Throughout the late 1990s, Tribe leaders

and members continued to meet regularly to discuss and resolve various Tribal matters.  At a

meeting on 18 April 1999, Tribe members held an open forum so that members could air their

various perspectives on determining Tribal membership criteria.  Similarly, the Tribe held an

open discussion about the control of ANA funding that same year.[419]  In a 2003 meeting, Tribe

members reflected on their agreement to work together towards recognition:

> It was agreed by all family representatives present, that the task of moving
> forward for restoration/federal recognition for members of the Wilton tribal
> community would be their personal commitment as outlined in the November 22,
> 1999 Mediation Agreement (as amended).  All family representatives voiced their
> commitment to not only represent their families but to also perform their duties as

---

[416] *A Bill to restore Federal recognition to certain California Indian tribes, address the special land needs of the California Indians, establish treatment of California Indians in the programs and services of the Bureau of Indian Affairs, develop adequate California tribal justice systems, and for other purposes*, H.L.C. [Draft], 106th Congress, 2nd session, 13 April 2000, Private Collection of Wilton Rancheria, p. 12.

[417] Mary Tarango and Anita Franklin to Connie Reitman, 25 June 2004, Private Collection of Wilton Rancheria.

[418] *Graton Rancheria Restoration Act*, 19 June 2000, H. Rpt. 106-677 (106-2), pp. 1-5.

[419] Wilton Indian Rancheria General Membership Meeting, 18 April 1999, Private Collection of Wilton Rancheria.
The Tribe did pass its resolution no. 1999-4-18-01 defining membership for the Rancheria on 18 April 1999.  See Excerpts taken from Resolution (No. 1999-4-18-01), Article II - Membership/Section 1, 18 April 1999, Private Collection of Wilton Rancheria.

official council members.[420]

Although differences continued to characterize these discussions, representatives continued to

work towards resolving their differences rather than dividing because of them.

Some Tribe members expressed concern that the Tribe was being unfairly judged as

fractionalized, when, in reality, Tribe members felt that their internal differences only

demonstrated that they cared passionately about the overall good of the Tribe. As Tribe member

James Hatch wrote to the ACCIP in 1999:

> [T]his is a democratic society which <u>allows</u> people to disagree, demonstrate, hold
> rallies, write letters to their congressmen and/or to the "press." And yet we feel
> Indian people are put to an "acid-test" which is unfair. If we don't <u>all</u> agree, or if
> there is a faction which disagrees we are stopped from obtaining what the
> majority of "our" people at Wilton want – <u>Restoration</u>. Please, with all due
> respect, allow them to disagree <u>and</u> allow us to pursue our goal of restoration.[421]

Because the members of the Wilton Rancheria community continued to share the goal of federal

recognition, this issue became the crux of their pursuit of solidarity.


*Tribal Organization, 2000-Present*

In 1999, the Tribe attempted to obtain a third ANA grant but was unsuccessful.[422] Ben

Delany, a representative from the California Indian Assistance Program, State of California

Department of Housing and Community Development, wrote Beverly Andrews, MCPA

---

[420] Wilton Tribal Meeting, Mediation Group/Family, Representative Minutes, 29 January 2003, Private Collection of Wilton Rancheria.

[421] James Hatch, et al. to Joseph Saulque, 20 January 1999, Private Collection of Wilton Rancheria, emphasis in original.

[422] See Suggestions to Improve Application, 12 February 1999, Private Collection of Wilton Rancheria.

administrative assistant, outlining his thoughts on why the Tribe had been unsuccessful.[423]

Delany believed that the Tribe was fortunate to have received two ANA grants, adding: "it is very difficult, even for recognized tribes to get 3rd and 4th grants. And, this is probably especially true for unrecognized tribes."[424] Delany further suggested that the Tribe might have succeeded had they accomplished the goals set out for their first grant.[425] As noted above, these goals were unrealistic and ambitious given the budget of $65,000. Since the main purpose of MCPA was to administer ANA grants and implement programs associated with this funding, the influence of Tribe members aligned with MCPA waned after the organization's ANA funding was cut. Nonetheless, the Tribe persisted in its goals to become federally recognized. As a local historian wrote in 2000: "Today the voice of the Miwok people is alive and well along the Cosumnes River. Efforts are taking place to have the Wilton Rancheria brought back to its status as federally recognized Indian tribe."[426]

Since 2003, the Tribe has focused its attention on restoration efforts by unifying its polity in a single body. In 2003, Mary Tarango and Anita Franklin were appointed as joint chairpersons and spokespersons for the Tribe, and those who had been primarily aligned with either MCPA or the Interim Council now came together to constitute a new Executive Tribal Council.[427] This Executive Tribal Council held regular meetings throughout 2003, and worked

---

[423] Ben Delaney to Beverly Andrews, 3 May 1999, Private Collection of Wilton Rancheria.

[424] Ben Delaney to Beverly Andrews, 3 May 1999, Private Collection of Wilton Rancheria.

[425] Ben Delaney to Beverly Andrews, 3 May 1999, Private Collection of Wilton Rancheria.

[426] Pinkerton, *History Happened Here*, p. 43.

[427] Wilton Tribal Meeting, Mediation Group/Family, Representative Minutes, 29 January 2003, Private Collection of Wilton Rancheria.

to communicate its efforts to the broader membership of the Tribe.[428]  In August 2003, the

majority of the membership elected a Tribal Council.[429]

At the beginning of 2004, the Tribe worked with CILS to establish and incorporate the

Me-Wuk Indian Community of the Wilton Rancheria Historical Preservation Society, with the

purpose of conducting and dissemination research about the  Me-Wuk Indian Community of the

Wilton Rancheria culture and history.[430]  The Tribe also continued to seek the advice of federal

agents and other California tribal organizations, such as the Inter-Tribal Council of California

and the Central California Agency of the BIA, in its ongoing efforts to be restored.[431]

In the fall of 2004, the Tribe received a promising endorsement from the Superintendent

of the Central California Agency of the BIA, Dale Risling, Sr.  Risling wrote:

---

[428]  Wilton Tribal Community General Meeting: Agenda, 11 January 2003, Private Collection of Wilton Rancheria; Wilton Tribal Community General Meeting: Agenda, 1 March 2003, Private Collection of Wilton Rancheria; Mary Tarango to All Council Members, 19 March 2003, Private Collection of Wilton Rancheria; Wilton Miwok Rancheria Interim Tribal Council Meeting: Agenda, 26 March 2003, Private Collection of Wilton Rancheria; Wilton Miwok Rancheria Tribal Council Meeting Minutes, 1 May 2003, Private Collection of Wilton Rancheria; Attendance Sheet, 3 May 2003, Private Collection of Wilton Rancheria; Minutes of the Wilton Miwok Rancheria Tribal Council Meeting, 15 May 2003, Private Collection of Wilton Rancheria.

[429]  Declaration of Publication (C.C.P. 2015.5), 28 August 2003, Private Collection of Wilton Rancheria; Wilton Rancheria Tribal Elections, 30 August 2003, Private Collection of Wilton Rancheria; Public Notice No. 764, 17 September 2003, Private Collection of Wilton Rancheria.
This public notice refers to the newly elected Tribal Council as the "Business Committee."  One year later, another group, consisting of some of the original members of the Interim Council made a similar claim of Tribal representation.  Despite these apparent divisions and though communication was at time strained, members of both groups continued to dialogue with each other.  Public Notice: Tribal Membership Meeting for Wilton Miwok Rancheria, ca. October 2004, Private Collection of Wilton Rancheria.

[430]  Bylaws of the Me-Wuk Indian Community of the Wilton Rancheria Historical Preservation Society, A California Public Benefit Corporation, approved 1 January 2004, Private Collection of Wilton Rancheria; Ann Gilmour to Henry Sangmaster, 26 January 2004, Private Collection of Wilton Rancheria.

[431]  Mary Tarango and Anita Franklin to Connie Reitman, 25 June 2004, Private Collection of Wilton Rancheria; Dale Risling, Sr. to Whom it May Concern, 17 September 2004, Private Collection of Wilton Rancheria.

Although the Wilton Rancheria has enjoyed previous federal recognition, the tribe has nonetheless over time reconstructed their tribal, cultural and political history to the extent that they have demonstrated beyond a doubt that they meet the following criteria for federal acknowledgment: The group has been identified as an American Indian Entity on a substantially continuos basis since 1900; A predominant portion of the group comprises a distinct community from historical times to the present; the group has maintained political influence or authority over its members as an autonomous entity from historical times to the present; a copy of the group's present governing document including its membership criteria; the group membership consists of individuals who descend from a historical Indian Tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity; the membership of the group is composed principally of persons who are not members of any acknowledged North American Indian tribe.[432]

Risling, who was well acquainted with the Tribe and aware of its internal differences, concluded that "The Me-wuk band of the Wilton Rancheria has demonstrated continuously that they are a tribe in every sense and as such certainly should be considered having their federal recognition restored."[433]

Superintendent Risling's endorsement was another – among many – that have motivated Tribe members to continue working towards federal recognition under the direction of their Tribal government.  Throughout the year 2005, the Tribe worked to collect enrollment records and begin the process of establishing and certifying their Tribal roll.[434]  To identify its membership, the Tribe sent a letter by registered mail to every person who had ever claimed to be a member of the Tribe.  This letter requested that any records supporting these individuals' membership be sent to the Tribe.  In addition, public notice was made in major publications in

---

[432] Dale Risling, Sr. to Whom it May Concern, 17 September 2004, Private Collection of Wilton Rancheria.

[433] Dale Risling, Sr. to Whom it May Concern, 17 September 2004, Private Collection of Wilton Rancheria.

[434] Appendix D: Pending, Current, and Deceased Membership.

four counties surrounding Wilton, California.  After a ninety-day period, those who had traced lineal descent from the 1958 list of Rancheria distributees conducted a vote and passed a redrafted constitution and membership ordinance.  The Tribe's membership ordinance provides for the broadest inclusive terms of lineal descent.[435]

Following the adoption of the constitution and membership ordinance, the 2003 elected Tribal Council voluntarily resigned their seats to allow a new election under the newly approved constitution.[436]  The mission and focus of the representatives elected in 2005 is the restoration of the Tribe's federally recognized status.  Following the completion of their mission, these representatives will step down and the Tribe will hold a vote to elect a formal Tribal Council as a federally recognized tribal government.  The members are also aware that restoration of the Tribe's federal recognition will lead to  another certification of membership and another leadership election.

The members of the Me-Wuk Indian Community of the Wilton Rancheria are passionate about the issues affecting their community.  They continue to meet and work together  towards their goal of achieving federal recognition through special legislation or other available means.  The January 2006 issue of the Tribe's newsletter, *Wilton "Smoke Signals,"* shows the ongoing cohesiveness of the community and its members' optimism about achieving federal recognition:

As we begin a New Year, it's a time to reflect on what has been accomplished

---

[435]  Constitution and By-Laws for the Me-Wuk Indian Community of the Wilton Rancheria, California, approved 13 February 2005, Private Collection of Wilton Rancheria; An Ordinance of the Me-Wuk Indian Community of the Wilton Rancheria Establishing Membership Enrollment Procedures, ca. 2005, Private Collection of Wilton Rancheria.

[436]  Election Ordinance of the Me-Wuk Indian Community of the Wilton Rancheria, adopted 24 January 2004, Private Collection of Wilton Rancheria.

from the past year and what needs to be accomplished in the New Year. As we look back on 2005, there have been some significant milestones made. First and foremost, the continued commitment from your tribal council to ensure restoration of federal recognition to its' [sic] members. The core of tribal council members who have met no less than thirty (30) times during the past year to strategize and develop a plan that will see the tribe to sovereignty through federal recognition. The representation and professional services from the tribe's attorneys and consultants who are working hard towards restoration, in spite of the tribe having no money at this time to compensate them. It is a total commitment and belief from all mentioned, that the tribal members of the Wilton Miwok Rancheria will be federally recognized before too long. Do your part and stay vigilant and supportive of these efforts![437]

As a community, the members of the Tribe have continued to come together to accomplish goals, such as fundraising, and to gather at community events like children's parties and elders' social events.[438] The Tribal Council and community members have also remained politically active: they have now completed the Tribe's Citizen Enrollment Files, and are in the process of creating their membership list.[439] At present, there are approximately 300 individuals enrolled with the Me-Wuk Indian Community of the Wilton Rancheria who meet the membership criteria set out the Tribe's constitution.[440]

---

[437] *Wilton "Smoke Signals,"* January 2006, Private Collection of Wilton Rancheria.

[438] See Wilton Rancheria Tribal Elections, 30 August 2003, Private Collection of Wilton Rancheria, pp. 14-19; Agenda: Gathering of Honored Elders Event, 7 June 2003, Private Collection of Wilton Rancheria.

[439] Interview with Muriel Sangmaster by Heather Howard and Laurie Leclair, 26 January 2006, Wilton Rancheria of Me-Wuk Indians, p. 18; Appendix D: Pending, Current, and Deceased Membership [Note: Of the 166 certified members of the Tribe, researchers received 158 "complete" enrollment files. There are an additional 152 "pending" or "deceased" members, making a total of 309. The Tribe has certified an additional 9 members for whom researchers did not receive enrollment files, bringing the total to 318 pending, current, and deceased members of the Tribe.].

[440] Muriel Sangmaster and Members of the Wilton Rancheria Tribe to Mr. Marston, 2 June 2003, Private Collection of Wilton Rancheria.

## VII. Summary and Conclusions

The citizens of the Me-Wuk Indian Community of the Wilton Rancheria are members of the Plains Miwok, a California Indian linguistic group which is believed to have inhabited lands along the lower Mokelumne and Cosumnes rivers and along the Sacramento River in aboriginal times.  In response to non-Native incursions, the ancestors of the Tribe fled the area, to which they returned by the mid-nineteenth century as ranch and farm laborers.  Records show that the Tribe's principal families – including the Blues/McKeans, Browns, Williams, Taylors, and Daniels – were present in the Wilton area by 1900.  By 1905, when Special Agent Charles E. Kelsey conducted a census of landless Indians in California, the ancestors of the Tribe were largely landless.  Under the  Indian Appropriations Act of 1909 – a result of Kelsey's work – the federal government established the Wilton Rancheria for the ancestors of the Tribe in 1927.

Throughout the existence of the Wilton Rancheria, Tribe members lived in poverty and struggled with substandard and undeveloped housing, water supply, sanitation, roads, farmlands, and irrigation – conditions that perpetuated their need to mobilize and participate in their Tribal government.  The Wilton Me-Wuk's Community Council, a governing body created under the IRA and which operated until 1961 when it was replaced by the Cosunmes River Indian Association, consistently petitioned the BIA to address the problems on the Rancheria.  From 1937 forward, members of the Tribe met regularly to discuss community concerns.  The Tribe also held regular elections to establish its leadership.  Although the titles of the Tribe's

123

governing bodies changed over time, the Tribe has consistently governed itself since the 1930s into the present.

During the difficult years of the 1930s, 1940s, and 1950s, the Tribe continued to function as a social as well as a political entity. Oral histories of Tribe members create a picture of the poor living conditions on the Rancheria, which compelled Tribe members to continue hunting, fishing, and gathering; to rely upon reciprocal kin relations; and to pursue seasonal wage labor to meet their most basic needs. The members of the Wilton community also came together regularly for cultural, social, and ceremonial purposes, even as some members migrated to urban areas for employment and education, a trend that gained momentum during the 1960s and 1970s. While younger members moved away from the former Rancheria lands, elder member remained on there and continue to form the base of the Wilton community. Nonetheless, most members of the Tribe have continued to reside very close to the Wilton Rancheria lands: two-thirds have continued to live within a 20-mile radius, and about 80 percent were born within 30 miles of the Rancheria lands since termination.

Beginning in 1949, the federal government investigated California's rancheria communities, which were universally found to be in a state of economic and social crisis. In order to divest itself of its responsibilities and obligations to rancheria communities, Congress passed the Rancheria Act in 1958, which required that rancheria roads, plumbing, irrigation systems, sanitation, and housing be brought up to code before the government-to-government relationship between the United States and the tribes could be severed. A 1952 study of the Wilton Rancheria recommended a subdivision plan be implemented, which would have significantly improved the Rancheria's infrastructure. However, in efforts to reduce costs, the

BIA neglected to fulfill its obligations, and the Wilton Rancheria was terminated in 1964 after supplying the Tribe with less than a quarter-mile length of road and minimal plumbing. Although Wilton's Community Council was actively involved in preparations for termination, the federal record indicates that the Tribe was not fully informed about the BIA's cost-cutting methods for repairing and upgrading the Rancheria's infrastructure.

By the 1970s, water supply, irrigation, and sanitation continued to be of critical importance to the Wilton community and its Tribal government. The California Rancheria Task Force investigated conditions on the Wilton Rancheria in 1972, and reported that the housing, water and irrigation systems, and roads on the Rancheria remained in deplorable condition. The Task Force determined that the federal government had not fulfilled the terms of the Wilton distribution plan or the Rancheria Act, and made a series of recommendations for repairs and upgrades. However, as with other rancherias named in the Task Force Report, appropriations were never made for repairs and upgrades on the Wilton Rancheria. As a result of the Task Force investigation, CILS coordinated a lawsuit – *Tillie Hardwick et al. v. the United States* – through which a collection of terminated tribes sued the federal government for failing to fulfill the terms of the distribution plans and the provisions of the Rancheria Act. The Tribe was dismissed without prejudice from this case; however the success of the lawsuit (in 1983) motivated Tribe members to pursue restoration of its status as a federally recognized Indian tribe.

In the 1980s and with the passage of the California Indian Policy Act in 1992, BIA Agent Maurice Babby, ACCIP, and CILS repeatedly asserted that federal recognition should be "immediately restored" to the Wilton Rancheria. To pursue this goal, the Wilton community

formed an Interim Council and drafted a new constitution to guide its Tribal government.

Although all community members agreed that restoring federal recognition to their Tribe was of

primary importance, the Tribe's polity divided on the issue.  For a time, the Interim Council and

another group called the Elections Board Council came into conflict with each other, mostly over

the distribution of grant money, administered by MCPA, the Tribe's non-profit organization.

Despite their differences, Tribe's leaders worked together and with CILS, ACCIP, and other

unrecognized tribes to draft several pieces of legislation, including the Wilton Miwok Indian

Rancheria Restoration Act and the Omnibus Bill for the Restoration of Terminated California

Tribes.  Although these pieces of legislation were never passed into law, the Tribe was

encouraged by repeated assertions from government agents, agencies, and outside entities that

federal recognition should be restored to the Wilton Rancheria.

The Tribe's leaders and members continued to work together to overcome their

differences and achieve solidarity around the issue of federal recognition.  Since 2000, the Tribe

has actively focused its attention on restoration efforts by unifying its polity in a single body: the

Executive Tribal Council, which is made up of elected leaders and family representatives.  Since

2003, the Tribe has created a Tribal roll, elected a new council, and drafted and adopted a new

constitution and membership ordinance.  As a group of individuals who are passionate about the

issues affecting their community, the Executive Tribal Council and members of the Wilton

community continue to come together to work towards their goal of achieving federal

recognition through special legislation.  Further, the Tribe perpetuated cohesiveness by

continuing to function as a social community by interacting at picnics, celebrations, funerals,

pan-tribal events, and engaging in volunteer work.

The historical documents and recollections of Tribe members speak to a history of community interaction that preceded termination and has continued beyond 1964 into the present day.  The records also show an earnest desire on the part of all community members to have their Tribe recognized by the federal government.  Through the social and familial bonds of their community, the ongoing existence of their political and cultural councils and associations, the creation of governing documents like their various constitutions and bylaws, their regular Tribal council and community meetings, and their continued recognition by government officials and agencies as a distinct entity, the Me-Wuk Indian Community of the Wilton Rancheria meets the mandatory criteria for federal acknowledgment.

**EXHIBIT "E"**



# Me-Wuk Indian Community
## of the Wilton Rancheria

4380 Fallow Drive                                                      (916) 393-3712
Sacramento, CA 95823                                                   (916) 428-4837

March 4, 2006

Mr. Clay Gregory, Regional Director
US DOI, BIA PRO
2800 Cottage Way
Sacramento, California 95825

       Subject:    **Positive Recommendation for Re-Recognition of the Me-Wuk
                  Indian Community of the Wilton Rancheria**

Dear Mr. Gregory:

In furtherance of the meeting held last year with you, Mr. Risling, and Fred Doka, we, the
undersigned members of the Me-Wuk Indian Community of the Wilton Rancheria, are
submitting the attached compilation of documents in support of our request for re-
recognition of the Me-Wuk Indian Community of the Wilton Rancheria as a federally
recognized Tribe. As discussed in our previous meeting, we are requesting a letter of
recommendation from the Pacific Regional Office to the BIA Assistant Secretary in
Washington, DC, that the Me-Wuk Indian Community of the Wilton Rancheria be
reinstated as a federally recognized Tribe.

Specifically, the Tribe would like an updated version of the letter sent dated September
2004 by the Central California Agency (see attached). The membership seeks that the
updated letter further include a recommendation that a Bureau of Indian Affairs
supervised election using a Bureau certified membership role be held within ninety (90)
days of restoration. The membership asks these things as a means of foregoing any
current or past claims of any tribal leadership or other position. Our submission is not
made on behalf of any past Tribal Council or the current Business Committee, but rather
by the undersigned members and all potential members who have pending files.

The recommendation we are seeking is consistent with past recommendations made by
the Pacific Regional Office and the Central California Agency, the ACCIP report
released in 1997, the 1972 report on termination, BIA findings regarding wrongful
termination and 1999-2000 legislation efforts by Central Office led by former staffer
Loretta A Tule.

The attached document provides: 1) correspondence from BIA regarding Wilton
Rancheria's restoration, and 2) a document that lays out the history of the Tribe before

and after 1959 "termination". We are providing this information to demonstrate our historical context on termination and our ability to reorganize a formal tribal government.

We are not requesting a thorough analysis of the document before another letter of recommendation from the Pacific Region is generated. Nor are we expecting the Bureau to draw any conclusions about the current leadership of the Tribe. We know any leadership matters will be resolved with formal elections upon re-recognition. Rather, we have gone to great lengths and expense to recompile information on the Wilton Rancheria so the Bureau may use it for reference purposes. We would ask that you return the document to us once you have completed our letter request until re-recognition has been completed.

We will be using your recommendation letter as part of our on- going efforts to restore our community to the status of a federally recognized Tribe. Timely processing of this request is critical to our overall re-recognition effort.

As you work through our documents and our request for recommendation you or your staff may have questions. To make matters as orderly as possible, as questions arise, please contact our tribal consultant Michael Derry at 760-861-4972. Mr. Derry will re-direct questions as appropriate to any of our technical experts, legal counsel or consultants or members.

Thank you for your time and attention to this matter of critical importance to our tribal Community.

Respectfully,


## Members of the Me-Wuk Indian Community of the Wilton Rancheria

| Printed Name | Signature |
| --- | --- |
| 1. William WAYNE DANIELS | William W Daniel |
| 2. SYlViA-WilSoN | Sylvia Wilson |
| 3. Sandra J. Willey, Heffington | Sandra Willey- Heffington |
| 4. Eugene McDonald | Eugene McDonald |
| 5. Paul Wilson | Paul Wilson |
| 6. GERALD C. DARROW | Gerald C Darrow |

7. Roland Smith        _Roland Smith_

8. RALPH C. DARROW      _Ralph C. Darrow_

9. Vincent g. Valdez      _Vincent g. Valdez_

10. Kimberly Franklin      _Kimberly Franklin_

11. SHARON Acuña      _Sharon Acuña_

12. Andrew Jang      _Andrew Jang_

13. Anthony andrade      _anthony andrade_

14. JAVIER Gonzalez      _Javier Gonzalez_

15. Andres Jang      _andres Jang_

16. Gracie Jang      _Gracie Jang_

17. Larry Valdez      _Larry Valdez_

18. Gerardo Gonzalez      _Gerardo Gonzalez_

19. MARcos Andrade      _Marcos andrade_

20. Desiree Ewell      _Desiree Ewell_

21. Mary Sangmaster      _Mary Sangmaster_

22. Raymond Taylor      _Raymond Taylor_

23. Robert R Taylor      _Robert R Taylor_

24. Henry D. Sangmaster      _Henry D. Sangmaster_

25. Kelly Sangmaster      _Kelly Sangmaster_

26. AAron Williams      _aaron Williams_

27. Vanessa Sangmaster      _Vanessa Sangmaster_

28. Dustin Williams      _Dustin Williams_

29. Alicia S. Jinzo — Alicia S. Jinzo
30. Joseph M. Jinzo Jr. — Joseph M Jinzo Jr.
31. Cindy Jinzo — Cindy Jinzo
32. Luis Tovar Jr — Luis Tovar Jr
33. Joanne Williams — Joanne Williams
34. Angel M. Hernandez — A Hernandez
35. Amanda Moore — Amanda Moore
36. Javier Chavez — Javier Chavez
37. Christinia chavez — Christinia chavez
38. Michael Sangmaster — Michael Sangmaster
39. Marian Sangmaster — Mariah Sangmaster
40. Robin Sangmaster — Robin Sangmaster
41. Richard Daniels — Richard Daniels
42. BERTHA E. McKean — Bertha E McKean
43. Mark Villanueva JR — Mark Villanueva J.R
44. Rayna Villanueva — Rayna Villanueva
45. ALEX Alvarado — Alex Alvarado
46. Anthony Alvarado — Anthony Alvarado
47. Marcelino Estrada — Marcelino Estrada
48. Esperanza Estrada — Esperanza Estrada
49. Ma G Villanueva — Ma G Villanueva
50. Mildred Williams — Mildred Williams

51. Angela Williams _____ _____
52. James Daniels _____ James Daniels
53. CARL RUBALCAVA _____ Carl Rubalcava Sr.
54. CARL Rubalcava _____ Carl Rubalcava Jr.
55. Eugene McDonald _____ Eugene McDonald Jr
56. Amy Estrada _____ Amy Estrada
57. Maria Estrada _____ Maria Estrada
58. Katie Estrada _____ Katie Estrada
59. Thomas Estrada _____ _____
60. Sally Wilson _____ Sally Wilson
61. Coyote Wilson _____ Coyote Wilson
62. Mary Jane Wilson _____ Mary Jane Wilson
63. Kellie Estrada _____ Kellie Estrada
64. Hilary Estrada _____ Hilary Estrada
65. Natalie Estrada _____ Natalie Estrada
66. Dustin Estrada _____ Dustin Estrada
67. JACQUELYN SMITH _____ Jacquelyn Smith
68. Jasmine Marie Juarez _____ Jasmine Marie Juarez
69. Gabrielle Chavez _____ _____
70. Henry Sangmaster _____ _____
71. Brianndon Estrada _____ Brianndon Estrada
72. Salina Smith _____ Salina Smith

73. Thalia Smith    Thalia Smith
74. Juanita Smith    Juanita Smith
75. Roland Smith    Roland Smith
76. Stephen L. Franklin JR    Stephen L Franklin Jr
77. VERONICA. M. ACUNA    Veronica Acuna
78. Kimberly Gallegos    Kimberly Gallegos
79. Alfred Wiilikms    Alfred Williams
80. Jose Trujillo Jr    Jose Trujillo Jr.
81. Shannon Fillmore    Shannon Fillmore
82. Tisa Marie Hernandez    Tisa Marie Hernandez
83. Jesse James Valdez    J. Valdez
84. ROBERT JOHN VALDEZ    Robert J Valdez
85. Sabrina Rincalrava    Sabrina Rincalrava
86. Kimberly Moore    Kimberly N Moore
87. Thomas ESTRADA    Thomas Estrada
88. Jesse Estrada    Jesse Estrada
89. Susanna Estrada    Susanna Estrada
90. Shellbe Daniels    Shellbe Daniels
91. Tonya Cervantes    Tonya Cervantes
92. Brandon Brandon    Brandon
93. Chris Estrada    Chris Estrada
94. Muriel Sangmaster    Muriel Sangmaster

95. Lorinda Peska
96. Chelsea Hawkins    Chelsea Hawkins
97. Travis Peska    Travis Peska
98. John Peska    John Peska
99. Sandra J Heffington (Willey) Wanda J Willey-Heffington
100. Sarah M. Willey    Sarah M Willey
101. Dovie Willey    Dovie J. Willey
102. Garrett Heffington    Garrett Heffington
103. DANA HEFFINGTON    Dana Heffington
104. Dennis Heffington    Dennis Heffington
105. Lester Heffington    Lester Heffington
106. NORMA HEFFINGTON    Norma Heffington
107. Kay Heffington    Kay Heffington
108. CINDY HEFFINGTON    Cindy Heffington
109. Jessica Hawkins/Evans    Jessica Hawkins/Evans
110. Glenda HAWKINS    Glenda Hawkins
111. Ciara Hawkins    Ciara Hawkins
112. RALPH DARROW JR.    Ralph Darrow Jr
113. Danielle Darrow    Danielle Darrow
114. Rachelle Darrow    Rachelle Darrow
115. WILLIAM DARROW    William Darrow
(Nicholas) 116. NICK Darrow    nicholas Darrow

117. Charles L Smith JR.    Charles L Smith jr

118. Charles R Smith    Charles R Smith

119. Naomi M. Smith    Naomi M. Smith

120. Tyese A Smith    Tyese A Smith

121. Kalim Flores Smith    Kalim M. Flores Smith

122.

123.

124.

125.

126.

127.

128.

129.

130.

131.

132.

133.

134.

135.

136.

137.

138.

**<u>EXHIBIT "C"</u>**

Letter to Clay Gregory dated March 4, 2006



JUN - 2 2006

# Me-Wuk Indian Community
## of the Wilton Rancheria

4380 Fallow Drive
Sacramento, CA 95823

(916) 393-3712
(916) 428-4837

March 4, 2006

Mr. Clay Gregory, Regional Director
US DOI, BIA PRO
2800 Cottage Way
Sacramento, California 95825

      Subject:    **Positive Recommendation for Re-Recognition of the Me-Wuk
Indian Community of the Wilton Rancheria**

Dear Mr. Gregory:

In furtherance of the meeting held last year with you, Mr. Risling, and Fred Doka, we, the
undersigned members of the Me-Wuk Indian Community of the Wilton Rancheria, are
submitting the attached compilation of documents in support of our request for re-
recognition of the Me-Wuk Indian Community of the Wilton Rancheria as a federally
recognized Tribe. As discussed in our previous meeting, we are requesting a letter of
recommendation from the Pacific Regional Office to the BIA Assistant Secretary in
Washington, DC, that the Me-Wuk Indian Community of the Wilton Rancheria be
reinstated as a federally recognized Tribe.

Specifically, the Tribe would like an updated version of the letter sent dated September
2004 by the Central California Agency (see attached). The membership seeks that the
updated letter further include a recommendation that a Bureau of Indian Affairs
supervised election using a Bureau certified membership role be held within ninety (90)
days of restoration. The membership asks these things as a means of foregoing any
current or past claims of any tribal leadership or other position. Our submission is not
made on behalf of any past Tribal Council or the current Business Committee, but rather
by the undersigned members and all potential members who have pending files.

The recommendation we are seeking is consistent with past recommendations made by
the Pacific Regional Office and the Central California Agency, the ACCIP report
released in 1997, the 1972 report on termination, BIA findings regarding wrongful
termination and 1999-2000 legislation efforts by Central Office led by former staffer
Loretta A Tule.

The attached document provides: 1) correspondence from BIA regarding Wilton
Rancheria's restoration, and 2) a document that lays out the history of the Tribe before

and after 1959 "termination". We are providing this information to demonstrate our historical context on termination and our ability to reorganize a formal tribal government.

We are not requesting a thorough analysis of the document before another letter of recommendation from the Pacific Region is generated. Nor are we expecting the Bureau to draw any conclusions about the current leadership of the Tribe. We know any leadership matters will be resolved with formal elections upon re-recognition. Rather, we have gone to great lengths and expense to recompile information on the Wilton Rancheria so the Bureau may use it for reference purposes. We would ask that you return the document to us once you have completed our letter request until re-recognition has been completed.

We will be using your recommendation letter as part of our on- going efforts to restore our community to the status of a federally recognized Tribe. Timely processing of this request is critical to our overall re-recognition effort.

As you work through our documents and our request for recommendation you or your staff may have questions. To make matters as orderly as possible, as questions arise, please contact our tribal consultant Michael Derry at 760-861-4972. Mr. Derry will re-direct questions as appropriate to any of our technical experts, legal counsel or consultants or members.

Thank you for your time and attention to this matter of critical importance to our tribal Community.

Respectfully,


**Members of the Me-Wuk Indian Community of the Wilton Rancheria**

|  | Printed Name | Signature |
|---|---|---|
| 1. | William WAYNE DANIELS | William W. Daniels |
| 2. | SYLVIA-WILSON | Sylvia Wilson |
| 3. | Sandra J. Willey, Heffington | Sandra J. Willey-Heffington |
| 4. | Eugene McDonald | Eugene McDonald |
| 5. | Paul Wilson | Paul Wilson |
| 6. | GERALD C. DARROW | Gerald C. Darrow |

7. Roland Smith

8. RALPH C. DARROW

9. Vincent J. Valdez

10. Kimberly Franklin

11. SHARON Acuña

12. Andrew Jang

13. Anthony andrade

14. Javier Gonzalez

15. Andrew Jang

16. Gracie Jang

17. Larry Valdez

18. Gerardo Gonzalez

19. Marcos Andrade

20. Desiree Elwell

21. Mary Jangmaster

22. Raymond Taylor

23. Robert R Taylor

24. Henry D. Sangmaster

25. Helly Sangmaster

26. Aaron Williams

27. Vanessa Sangmaster

28. Dustin Williams

29. Alicia S. Jinzo / Alicia S. Jinzo
30. Joseph M. Jinzo Jr. / Joseph M Jinzo Jr.
31. Cindy Jinzo / Cindy Jinzo
32. Luis Tovar Jr / Luis Tovar Jr
33. Joanne Williams / Joanne Williams
34. Angel M. Hernandez / A Hernandez
35. Amanda Moore / Amanda Moore
36. Javier Chavez / Javier Chavez
37. Christina Chavez / Christina Chavez
38. Michael Sangmaster / Michael Sangmaster
39. Marian Sangmaster / Marian Sangmaster
40. Robin Sangmaster / Robin Sangmaster
41. Richard Daniels / Richard Daniels
42. Bertha E. McKean / Bertha E McKean
43. Mart Villanueva JR / Mart Villanueva J.R
44. Rayna Villanueva / Rayna Villanueva
45. Alex Alvarado / Alex Alvarado
46. Anthony Alvarado / Anthony Alvarado
47. Marselino Estrada / Marselino Estrada
48. Esperanza Estrada / Esperanza Estrada
49. Ma B Villanueva / Ma Villanueva
50. Mildred Williams / Mildred Williams

51. Angela Williams                 _[signature]_
52. James Daniels                   James Daniels
53. CARL RUBALCAVA                  Carl Rubalcava Sr
54. CARL Rubalcava                  Carl Rubalcava Jr.
55. Eugene mcDonald                 Eugene mcDonald Jr
56. Amy Estrada                     Amy E[signature]
57. Maria Estrada                   Maria E[signature]
58. Katie Estrada                   Katie E[signature]
59. Thomas Estrada                  _[signature]_
60. Sally Wilson                    Sally Wilson
61. Coyote Wilson                   Coyote Wilson
62. Mary Jane Wilson                Mary Jane Wilson
63. Kellie Estrada                  Kellie Estrada
64. Hilary Estrada                  Hilary Estrada
65. Natalie Estrada                 Natalie Estrada
66. Dustin Estrada                  Dustin Estrada
67. JACQUELYN SMITH                 Jacquelyn Smith
68. Jasmine Marie Juarez            Jasmine Marie Juarez
69. Gabriella Chavez                _[signature]_
70. Henry Sangmaster                _[signature]_
71. Branndon Estrada               Branndon Estrada
72. Salina Smith                    Salina Smith

73. Thalia Smith    _Thalia Smith_
74. Juanita Smitn    _Juanita Smith_
75. Roland Smith    _Roland Smith_
76. Stephen L. Franklin JR    _Stephen L Franklin Jr_
77. VERONICA M ACUNA    _Veronica Acuna_
78. Kimberly Gallegos    _Kimberly Gallegos_
79. Alfred Wiilliams    _Alfred Williams_
80. Jose Trujillo Jr    _Jose Trujillo Jr._
81. Shannon Fillmore    _Shannon Fillmore_
82. Tisa Marie Hernandez    _Tisa Marie Hernandez_
83. Jesse James Valdez    _J J Valdez_
84. ROBERT JOHN VALDEZ    _Robert J Valdez_
85. Sabrina Rubalcava    _Sabrina Rubalcava_
86. Kimberly Moore    _Kimberly M Moore_
87. Thomas ESTRADA    _Thomas Estrada_
88. Jesse Estrada    _Jesse Estrada_
89. Susanna Estrada    _Susanna Estrada_
90. Shellbe Daniels    _Shellbe Daniels_
91. Tonya Cervantes    _Tonya Cervantes_
92. Brandon    _Brandon Cervantes_
93. Chris Estrada    _Chris Estrada_
94. Muriel Sangmaster    _Muriel Sangmaster_

95. Lorinda Peska
96. Chelsea Hawkins        Chelsea Hawkins
97. Travis Peska        Travis Peska
98. John Peska        John Peska
99. Sandra J Heffington (Willey) Sandra J Willey-Heffington
100. Sarah M. Willey        Sarah M Willey
101. Dovie Willey        Dovie G Willey
102. Garrett Heffington        Garrett Heffington
103. DANA    HEFFINGTON        Dana Heffington
104. Dennis Heffington        Dennis Heffington
105. Lester Heffington        Lester Heffington
106. NORMA   HEFFINGTON        Norma Heffington
107. Kay Heffington        Kay Heffington
108. CINDY HEFFINGTON        Cindy Heffington
109. Jessica Hawkins/Evans Jessica Hawkins/Evans
110. Glenda HAWKINS        Glenda Hawkins
111. Ciara Hawkins        Ciara Hawkins
112. RALPH   DARROW   JR.        Ralph Darrow Jr
113. Danielle Darrow        Danielle Darrow
114. Rachelle Darrow        Rachelle Darrow
115. WILLIAM DARROW William Darrow
(Nicholas) 116. NICK Darrow        Nicholas Darrow

117. Charles L Smith JR.     Charles L Smith Jr

118. Charles R Smith     Charles R Smith

119. Naomi M. Smith     Naomi M. Smith

120. Tyese A Smith     Tyese A Smith

121. Kalin Flores Smith     Kali M. Flores Smith

122.

123.

124.

125.

126.

127.

128.

129.

130.

131.

132.

133.

134.

135.

136.

137.

138.

# EXHIBIT "D"

*Longline Ass'n v. Nat'l Marine Fisheries Serv*., Civ. No. 01-765, slip op. (D.D.C. 2001)
Memorandum and Opinion dated August 31, 2001

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HAWAII LONGLINE ASSOCIATION,

    Plaintiff,

    v.

NATIONAL MARINE FISHERIES
SERVICE, and DONALD L. EVANS,
Secretary of Commerce,

    Defendants.

Civil Action No. 01-765 (CKK)

**FILED** ✓

AUG 3 1 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION
(August _3/_, 2001)

Presently before the Court is a Motion to Intervene filed by two conservation groups that assert an interest in this Administrative Procedure Act ("APA") litigation. Upon consideration of Proposed-Intervenors' Motion, Plaintiff's Opposition, Proposed-Intervenors' Reply, and Plaintiff's Surreply, the Court shall grant the motion in part and deny in part.

## I.
## BACKGROUND

This case involves a challenge by Plaintiff Hawaii Longline Association to a biological opinion issued in March of 2001 by the National Marine Fisheries Service ("NMFS"). Plaintiff, a Hawaii-based, non-profit association representing a portion of the Hawaiian fishery industry, characterizes its complaint as having two main grievances against the NMFS under the APA. Pl.'s Opp'n to Mot. to Intervene at 1. Plaintiff first alleges that the NMFS did not provide Hawaii Longline the opportunity to comment on the biological opinion prior to its final issuance. *Id.* Second, Plaintiff asserts that the biological opinion is, itself, arbitrary, capricious and

(N)

33

contrary to law. *Id.*

Proposed-Intervenors, Turtle Island Restoration Network and Center for Marine Conservation (collectively "Petitioners" or "Conservation Groups"), are both non-profit organizations that have an interest in conservation of the sea turtle population. Petitioners' Mot. to Intervene at 7, 9. Petitioners have moved to intervene in the instant case, as a matter of right, under Federal Rule of Civil Procedure 24(a)(2) and, alternatively, under a theory of permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(2). *Id.* at 17.[1] Defendants do not oppose intervention provided that such intervention does not exceed the scope of the present lawsuit. Defs.' Notice of Non-Opp'n to Mot. to Intervene. Plaintiff opposes intervention, arguing that intervention would be appropriate only if the Court decided to reach a remedy phase in the litigation. Pl.'s Surreply at 4.

## II.
## DISCUSSION

At the outset, it should be noted that courts need not consider a motion to intervene as an all-or-nothing proposition, but may limit intervention accordingly. *Harris v. Pernsley*, 820 F.2d

---

[1] Petitioners' original motion failed to comply with the technical requirements of Federal Rule of Civil Procedure 24(c), which requires that all motions to intervene "be accompanied by a pleading setting forth the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). While some courts have rejected intervention on the basis of such a deficiency, a number of other courts have ignored such non prejudicial technical failings. *See* 7C Charles Alan Wright and Arthur B. Miller, *Federal Practice and Procedure,* § 1914 (2d ed. 1986). In fact, in cases rejecting a motion to intervene on the basis of such a technical failure, courts have uniformly found there also to be a substantive defect in the motion for intervention. *Id.* In this case, Petitioners' Reply included their Answer to Plaintiff's complaint. The Court accepts the Answer. *See, e.g., Spring Const. Co., Inc. v. Harris*, 614 F.2d 374, 377 (4th Cir. 1980) (discussing the fact that Petitioner-Intervenor's "failure to file an accompanying pleading was rectified when it filed its amended complaint shortly thereafter"). However, the Court grants Plaintiff's Motion for Leave to File Surreply and considers it in the context of rendering this Memorandum Opinion.

592, 599 (3rd Cir. 1987) (stating that "[g]iven the nature of an applicant's interest, he or she may have a sufficient interest to intervene as to certain issues in an action without having an interest in the litigation as a whole"); *see also Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1495-96 (9th Cir. 1995). Furthermore, "[d]efendant -intervenors...may similarly have an interest only in particular counts, and the scope of their participation in the case should correspond with the scope of that interest." *United States v. S. Fla. Water Mgmt. Dist.*, 922 F.2d 704, 707 n.4 (11th Cir. 1991). To that end, the Court will look at each of the two claims Plaintiff has put forward and will decide whether intervention is appropriate in the context of each allegation.

## A.
## Intervention of Right as to the Issue of Plaintiff's Alleged Denial of Procedural Rights

Plaintiff first objects to Petitioners' intervention with regard to the issue of whether the fishery was denied proper comment before the biological opinion was issued. Pl.'s Opp'n to Mot. to Intervene at 5; Pl.'s Surreply at 2-4. The Court agrees with Plaintiff and denies Petitioners' Motion to Intervene as to that issue.

Petitioners seek intervention as a matter of right under Federal Rule of Civil Procedure 24(a)(2). The Rule provides, in relevant part:

> Upon timely application anyone shall be permitted to intervene in an action . . .
> when the applicant claims an interest relating to the property or transaction which
> is the subject of the action and the applicant is so situated that the disposition of
> the action may as a practical matter impair or impede the applicant's ability to
> protect that interest, unless the applicant's interest is adequately represented by the
> existing parties.

Fed. R. Civ. P. 24(a)(2). Based on the text of this rule, the United States Court of Appeals for

-3-

the District of Columbia Circuit recognizes four requirements for intervention of right: (1)

timeliness; (2) a cognizable interest; (3) impairment of that interest; and (4) lack of adequate

representation by existing parties. *Williams & Humbert, Ltd. v. W & H. Trade Marks, Ltd.*, 840

F.2d 72, 74 (D.C. Cir. 1988).

      As to this particular issue, the Court will focus its inquiry entirely on the second prong of

the analysis; namely whether Petitioners have a "cognizable interest" in Plaintiff's allegation that

it was not accorded the opportunity to present its case to the NMFS. This element, alone, proves

to be sufficiently dispositive in favor of Plaintiff. On this point, Plaintiff argues that Petitioners

lack standing with regard to the procedural claim. The District of Columbia Circuit requires an

intervenor to possess Article III standing. *City of Cleveland, Ohio v. Nuclear Regulatory*

*Comm'n*, 17 F.3d 1515, 1517 (D.C. Cir. 1994). As the Court of Appeals has stated:

> Rule 24(a)(2) requires the intervenor to demonstrate "an interest relating to the
> property or transaction which is the subject of the action." The rule impliedly
> refers not to any interest the applicant can put forward, but only to a legally
> protectable one. *See Donaldson v. U.S.*, 400 U.S. 517, 531 (1971) (applicant must
> demonstrate "significantly protectable interest"). Such a gloss upon the rule is in
> any case required by Article III of the Constitution. *See Allen v. Wright*, 468 U.S.
> 737 (1984) (discussing limits to standing); *Association of Data Processing*
> *Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152-53 (1970) (discussing
> "zone of interest" requirement).

*Southern Christian Leadership Conference v Kelley*, 747 F.2d 777, 779 (D.C. Cir 1984). In

essence, the District of Columbia Circuit has noted that a discussion of the interest requirement

contained in Rule 24 actually merges into a consideration of whether Petitioners have standing.

As was observed in *City of Cleveland*, "the underlying rationale for this requirement is clear:

because a Rule 24 intervenor seeks to participate on an equal footing with the original parties to

the suit, he must satisfy the standing requirements imposed on those parties." 17 F.3d at 1517.

-4-

Plaintiff argues that Petitioners do not have any interest in the question of whether the biological opinion should be remanded to the agency with instructions that Plaintiff should be granted a better opportunity to inform the agency regarding their decision. Pl.'s Opp'n to Mot. to Intervene at 5. Petitioners respond by alleging they do have standing, "to the extent that this litigation results in harm to turtles." Petitioners' Reply at 3. Petitioners further claim that since "HLA seeks relief that would increase longline fishing out of Hawaii, and since it is undisputed that longline fishing kills and otherwise harms endangered turtles, the Conservation Groups' standing is quite clear."

The problem with Petitioners' analysis is that they fail to respond to Plaintiff's argument on the question of whether the NMFS provided Plaintiff with an appropriate chance to comment on the biological opinion. In essence, by stating that they only have an interest in this litigation to the extent that it could harm the turtles, Petitioners essentially concede that they lack standing on the procedural question. Only Plaintiff, itself, can claim an interest in whether its procedural rights were violated. To extrapolate from a violation of Plaintiff's procedural rights a harm to the turtle population of the Pacific Ocean, as Petitioners seem to contend, would be to eviscerate effectively the substance of the standing inquiry. Thus, the Court denies Petitioners' Motion to Intervene as it relates to the question of whether or not Plaintiff's procedural interests were violated by the NMFS in the context of issuing the 2001 biological opinion.

**B.**
**Intervention of Right as to the Issue of Whether the Biological Opinion Was Flawed**

The second issue in this case involves the question of whether the biological opinion was arbitrary, capricious and contrary to law. Plaintiff alleges that the NMFS's conclusion that

-5-

certain species of sea turtles are placed in jeopardy by the fisheries' activities was flawed. *See* Pl.'s Compl. ¶2. As a consequence of this, Plaintiff also views the Reasonable and Prudent Alternatives ("RPA"s), established by the NMFS in the biological opinion to remedy the harm to the turtles, to be similarly misguided. Nonetheless, the grist of Plaintiff's Complaint is that the jeopardy conclusion was incorrect. *See* Pl.'s Prayer for Relief ¶ B.

Petitioners seek to intervene on the side of Defendants on this issue as demonstrated by their filing an Answer to Plaintiff's original Complaint. Petitioners assert that the NMFS correctly found that certain species of Pacific sea turtles were placed in jeopardy by the activity of the fisheries. Petitioners' Answer ¶4. However, while seeking to defend the NMFS's conclusion that the sea turtles are in jeopardy, Petitioners also purport to challenge the RPAs, established by the NMFS in the 2001 biological opinion. Petitioners' Reply at 9; Petitioners' Answer ¶7. To that end, Petitioners have filed suit in the United States District Court for the District of Hawaii challenging the sufficiency of the RPAs. Petitioners' Reply at 9. After reviewing the merits of each of Petitioners' arguments, the Court pursuant to its discretion grants their motion to intervene under Federal Rule of Civil Procedure 24(a)(2) as to the issue of the turtles' jeopardy, but not as to the question of whether the RPAs are arbitrary and capricious.

## 1.
## The NMFS's Jeopardy Finding

As indicated *supra*, there are four requirements for intervention under Rule 24(a)(2). The Court will first consider whether Petitioners' motion was timely made. "Whether a motion to intervene is timely made is 'to be determined from all the circumstances, including the purpose for which intervention is sought . . . and the improbability of prejudice to those already in the

case.'" *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) (quoting *Natural Resources Defense Council v. Costle*, 561 F.2d 904, 907 (D.C. Cir.1977)). In the instant case, the Conservation Groups filed their motion to intervene approximately two months after Plaintiff filed its original Complaint.

Plaintiff charges that any intervention will unduly delay the litigation and prejudice their interest. *See* Pl.'s Opp'n to Mot. to Intervene at 14. In relation to this point, the Court will condition Petitioners' intervention on their maintaining the same briefing schedule as Defendants in this case and will not accept from Petitioners any delay in their filings.

Additionally, Plaintiff also expresses concern that once Petitioners intervene they will attempt to have venue in this case transferred to Hawaii. Pl.'s Opp'n to Mot. to Intervene at 9; Pl.'s Surreply at 2. The Court has decided that it will not transfer this case to the United States District Court for the District of Hawaii. In support of this, the Court adopts the reasoning of a recent case decided by the District Court for the Eastern District of Virginia, *Beam Laser Sys., Inc. v. Cox Communications*, 117 F.Supp.2d 515, 517 (E.D. Va. 2000). *Beam* discusses various authority for the notion that an intervenor may not question venue. *Id.* The Court finds the rationale for such a proposition persuasive and will not permit Petitioners the opportunity to transfer this case to Hawaii. Both Plaintiff and Defendant prefer venue in this forum. *Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, No. 01-765 (D.D.C. August 7, 2001) (order discussing rationale for not transferring suit) (noting that "neither party seeks to move the litigation to another district"). In light of the fact that the original litigants do not wish the venue to be changed, the Court will not reopen this issue.

Thus, despite Plaintiff's argument, the Court finds that Petitioners' motion is timely after

-7-

considering all of the circumstances in this case, particularly Petitioners' interest in this ongoing issue, their prompt action in this matter, and the Court's addressing Plaintiff's concern regarding delay of the litigation.

As to the second factor of the intervention analysis, the Court finds that Petitioners have a cognizable interest in regard to whether or not the sea turtles are in jeopardy. Plaintiff argues that the Conservation Groups' interest in turtle conservation is not directly related to the issue of whether the biological opinion was arbitrary and capricious. Pl.'s Opp'n to Mot. to Intervene at 5-7; Pl.'s Surreply at 4. The Court disagrees with Plaintiff's analysis as to the jeopardy issue.

Plaintiff essentially marshals three arguments against intervention on this point. First, Plaintiff alleges that because they seek a remand of the biological opinion to the agency, Petitioners' interest is moot because "Plaintiff and petitioners would stand on the same footing before NMFS in any remand proceedings..." Pl.'s Opp'n to Mot. to Intervene at 6. However, such an abstraction neglects the realities of the present litigation. Petitioners' correctly note that "[i]f NMFS is ordered to prepare a new biological opinion it will not do so in a vacuum." Petitioners' Reply at 10. Considering the ongoing context of the litigation and the fact that any decision the Court reaches on the jeopardy question has the potential to affect sea turtles, the Court finds Petitioners do have an interest as to that issue. Additionally, any ruling that the court makes as to the legality of the biological opinion will be informed by the unique perspective of the Conservation Groups. This is particularly true in light of the fact that the NMFS is responsible for assimilating the two diverse viewpoints of both the Conservation Groups and the fishery in rendering its opinions, whereas the Petitioners bring solely a conservation perspective

to the litigation.  Petitioners' Reply at 8.  Given these factors it is clear that Petitioners have an interest in the jeopardy question.

Plaintiff also claims that since both they and Petitioners ultimately seek a remand of the biological opinion to the agency, Petitioners have no interest in the substance of this litigation. Pl.'s Opp'n to Mot. to Intervene at 6.  This argument essentially cuts against Petitioners' intervention on the issue of the adequacy of the RPAs.  Since the Court finds for Plaintiff on that issue, the Court does not need to reach the merits of such an argument in the context of the jeopardy question.

Lastly, Plaintiff claims that Petitioners should be permitted to intervene only if the issue of any interim relief should arise.  Pl.'s Opp'n to Mot. to Intervene at 6.  While Petitioners' might have an interest at such a stage, if it should arise in this litigation, the Court dismisses this argument because it finds that Petitioners have an actual interest in a portion of the litigation in its current disposition.

Since the Conservation Groups have adequately demonstrated their interest in the case as it relates to the potential harm the sea turtles might face if Plaintiff was to succeed in this action, *see* Petitioners' Mot. to Intervene at 6-11, and since they are the only party to exclusively represent a conservation perspective, the Court finds that Petitioners have a cognizable interest in the jeopardy aspect of the litigation.

The Court also finds that denial of intervention would impair the interest of Petitioners. If the Court were to find the NMFS in breach of the APA, the sea turtles might be affected. Petitioners have struggled for a number of years to achieve a jeopardy finding, just as Plaintiff has worked diligently to oppose such a conclusion.  *See, e.g.*, Petitioners' Reply at 1.  Denying

Petitioner the opportunity to inform the Court as to the jeopardy finding would work directly against their interest, possibly in an irreparable manner, given the context of the litigation and the familiarity of the parties with each other and the issues involved. The Court, therefore, finds that the Conservation Groups' interests would be impaired by denying intervention solely as to the question of the whether or not the NMFS's jeopardy finding is arbitrary and capricious.

Lastly, the Court finds that the Conservation Groups' interests are not adequately represented by the existing parties. In this case the government's interest in the jeopardy finding is not sufficient to bar Petitioners from intervening. The burden of showing inadequate representation rests on the potential intervenor. *See Castle*, 561 F.2d at 911. Furthermore, this is not an onerous burden, but rather a "minimal" one. *Id.* As the District of Columbia Circuit has noted, "[t]he applicant need only show that representation of his interest 'may be' inadequate, not that representation will in fact be inadequate." *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (citation omitted). Based on the liberal formulation of this test and the fact that Petitioners have shown that Defendants in this matter might not adequately represent their interest because of the government's dual responsibility to both constituencies, the Court finds that Petitioners' interest would be inadequately represented as to the jeopardy question absent intervention.

Based on the Court's consideration of these four factors, the Court shall exercise its discretion and grant Petitioners' motion to intervene as a matter of right as to the question of whether or not the 2001 biological opinion was correct in finding that sea turtles are in jeopardy. *See generally, Kelley*, 747 F.2d at 779; *Virginia v. Westinghouse Electric Corp.*, 542 F.2d 214, 216 (4th Cir. 1976) ("district court is entitled to the full range of reasonable discretion in

determining whether these requirements (of Rule 24(a)(2)) have been met"). Notably, however, the court shall limit intervention on this question to the issue of jeopardy from the perspective of a party whose sole focus is conservation of wildlife.

### 2.
### The Adequacy of the NMFS's RPAs

Lastly, the Court denies Petitioners' motion to intervene with respect to the question of whether the RPAs are arbitrary and capricious. Petitioners dispute the sufficiency of the RPAs established by the NMFS in the context of issuing the 2001 biological opinion and have already filed a separate action in Hawaii to litigate this precise question. *Id.* In fact, Petitioners concede in their motion that they "have a forum for their unique position." Petitioners' Mot. to Intervene at 9. Plaintiff's stated desire in this case is to primarily litigate the issue of the NMFS's jeopardy conclusion. To permit Petitioners to intervene on the question of whether or not *the RPAs* went far enough in their effort to protect the sea turtles would be to contort the original lawsuit into something it is not. Furthermore, it would seemingly align Petitioner's interest squarely with those of Plaintiff, which also seeks remand on the issue of the RPAs, albeit from a completely different perspective. Basically, allowing intervention on this issue would expand the scope of the litigation beyond that which was reasonably contemplated by the original parties.

Although no settled rule has been established, "[a]s between federal district courts...the general principle is to avoid duplicative litigation." *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976). Such a prudent guidepost is a general principle that courts use in order to promote efficiency and "comprehensive disposition of litigation." *Id.* Considering that Petitioners already have a forum in which to express their views on the question of the adequacy

of the RPAs, the Court denies the motion to intervene as to that issue.

## C.
## Permissive Intervention

In light of the Court's ruling on the Conservation Groups' motion to intervene as a matter of right, the Court denies Petitioners permissive intervention under Federal Rule of Civil Procedure 24(b)(2). As the District of Columbia Circuit has noted, "[d]istrict courts have the discretion...to deny a motion for permissive intervention even if the movant established an independent jurisdictional basis, submitted a timely motion, and advanced a claim or defense that shares a common question with the main action." *E.E.O.C. v. Nat'l Children's Center, Inc.*, 146 F.3d 1042, 1048 (D.C. Cir. 1998). Based on the rationale given in this Memorandum Opinion, the Court is not persuaded to grant permissive intervention as to the other grounds denied intervention as a matter of right.

## III.
## CONCLUSION

Based on the foregoing, the Court shall deny Petitioners' motion to intervene in part, and shall grant it in part, as discussed in this Memorandum Opinion. An Order accompanies this Memorandum Opinion.

August __31__, 2001

COLLEEN KOLLAR-KOTELLY
United States District Judge

-12-

Copy to:

Robert A. Nelson
STOEL & RIVES, L.L.P.
Suite 1100
1275 K Street, NW
Washington, DC 20005

Jeffrey W. Leppo
STOEL RIVES
600 University Street, Suite 3600
Seattle, WA   98101-3197

Lyn Jacobs
U.S. Department of Justice
Wildlife & Marine Resources Section
PO Box 7369, Ben Franklin Station
Washington, DC   20004

Adam D. Issenberg
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7369, Ben Franklin Station
Washington, DC 20044-7369

Monica Goldberg
Earthjustice Legal Defense Fund
1625 Massachusetts Ave., NW, Suite 702
Washington, DC   20036-2212

Paul H. Achitoff
Earthjustice Legal Defense Fund
223 South King Street, Suite 400
Honolulu, HI  96813

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| ME-WUK INDIAN COMMUNITY | ) | |
| OF THE WILTON RANCHERIA, | ) | |
| 4380 Fallow Drive | ) | |
| Sacramento, CA 95823-4419, | ) | |
|  | ) | |
| Plaintiff, | ) | Case No. 1:07CV00412 (RCL) |
|  | ) | |
| v. | ) | |
|  | ) | |
| DIRK A. KEMPTHORNE, | ) | |
| *in his official capacity as* | ) | |
| *Secretary of the Interior,* | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240-0002; | ) | |
|  | ) | |
| Defendant. | ) | |

_____)

## ORDER DENYING PROPOSED INTERVENORS' MOTION TO INTERVENE

THIS CAUSE, having come before this Court on Proposed Intervenors' WILTON MIWOK RANCHERIA, et. al's Motion to Intervene. Having considered the grounds set forth in Proposed Intervenors' Motion, Proposed Intervenors' supporting Memorandum and exhibits, and Plaintiff's Response and Memorandum in Opposition and exhibits thereto, and good cause having been shown, it is ORDERED that Proposed Intervenors' Motion to Intervene in the action styled Me-Wuk Indian Community of the Wilton Rancheria v. Dirk A. Kempthorne, Case No. 1:07-CV00-412 (RCL) is hereby DENIED.

IT IS SO ORDERED this ____day of _____, 2007.

_____
Honorable Royce C. Lamberth
United States District Court Judge