# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

ME-WUK INDIAN COMMUNITY OF THE
WILTON RANCHERIA,
7201 Sunbreeze Lane
Sacramento, CA  95828-6263,

      Plaintiffs,

    v.

DIRK KEMPTHORNE,
In his official capacity as Secretary of the Interior,
1849 C Street, NW
Washington, DC  20240-0002,

      Defendants.

WILTON MIWOK RANCHERIA, a formerly
federally-recognized Indian tribe, ITS
MEMBERS,
9300 W. Stockton Blvd.
Elk Grove, CA  95624
and DOROTHY ANDREWS,
9418 Rancheria Drive
Wilton, CA  95693

      Plaintiffs-in-Intervention

Case No.  1:07-CV-00412 (RCL)

**PROPOSED
COMPLAINT –IN-INTERVENTION**

(Declaratory and Injunctive Relief)

## NATURE OF THE ACTION

1.    Proposed Intervenors, Wilton Miwok Rancheria, a formerly federally- recognized

Indian Tribe, individual members of the Wilton Miwok Rancheria and Dorothy Andrews

(hereinafter "Plaintiffs"), submit this Proposed Complaint-in-Intervention against various federal

officials to vindicate the unlawful termination of the Wilton Miwok Rancheria under the

California Rancheria Act of 1958 ("Rancheria Act"), Pub. L. No. 85-671, 72 Stat. 619, *amended

by* Pub. L. No. 88-419, 78 Stat. 390.  Plaintiffs seek to remedy the failure of the Secretary of the

United States Department of Interior ("Secretary") to fulfill statutory obligations owed to the

Indian people of the Wilton Miwok Rancheria prior to the distribution in 1961 of the assets of the Wilton Rancheria, including the failure of the United States Department of Interior's Bureau of Indian Affairs ("BIA") to install water facilities and sanitation systems that met Sacramento County requirements; knowing violations of Sacramento County standards for road construction of sub-division plats; and failure to provide any agricultural development, training or irrigation facilities to the Tribe, as required by the Rancheria Act. Plaintiffs also seek to remedy the Secretary's breach of the fiduciary obligations owed by the United States to the people of the Wilton Miwok Rancheria in the formulation and implementation of the Plan for Distribution of the Assets of the Wilton Rancheria, approved August 18, 1958, in that the BIA failed to disclose facts that, if known to Plaintiffs, would have affected their decision to approve the Distribution Plan; the BIA used undue influence in obtaining Plaintiffs' consent to termination; and the BIA acted unlawfully in failing to meet Sacramento County standards for water, roads and housing. Plaintiffs also seek to remedy the failure of the Secretary of Health, Education and Welfare (now known as the Secretary of Health and Human Services) to fulfill statutory obligations owed to the Tribe and those Indian members and distributees affected by the Ranchreia Act prior to the distribution of the assets of the Wilton Miwok Rancheria, including the Secretary of Health, Education and Welfare's failure to construct, install, or otherwise provide a sanitation system for the Wilton Miwok Rancheria.

2.    Plaintiffs were members of the class of plaintiffs certified in the matter captioned *Tillie Hardwick, et al. v. United States of America, et al.*, No. C-79-1710 (N.D. Cal.) ("*Hardwick*"), in which that Court sought to remedy the unlawful termination and distribution of the lands located within several Rancherias located in the State of California, pursuant to the Rancheria Act. Class members, including members of Plaintiff Tribe had been included as members of the class certified by the Court (Order re Class Certification filed February 28,

1980), but were dismissed from the *Hardwick* case pursuant to the Order Approving Entry of Final Judgment entered on December 27, 1983 in accordance with the Stipulation of the Parties for Entry of Judgment. That Stipulation provided for the recognition of seventeen (17) tribes and the dismissal without prejudice of the members of twelve (12) other tribes, including members of Plaintiff Wilton Miwok Rancheria, from the *Hardwick* case. The Certificate of Counsel (for plaintiff class members) Re: Hearing on Approval of Settlement of Class Actions, filed on November 17, 1983 states:

> Class members from twelve (12) of the remaining seventeen rancherias represented in this action would be dismissed from this action without prejudice to their right to re-file another action or other actions on their behalf. No class member from these rancherias currently owns real property within the original rancheria boundaries. The property was either sold to non-Indians when the rancheria was terminated and the proceeds of these sales distributed to rancheria members in lieu of deeds to individual parcels of property or all of the property originally distributed was subsequently sold to non-Indians.

> In either case the federal defendants are unwilling to re-assume responsibility for any of these rancherias without a final judicial determination of their obligation to do so. Plaintiffs attorneys do not concede that the sale of rancheria property precludes distributees from obtaining judicial relief for wrongful termination (in some cases these class members may have the most significant damages claims). However, plaintiffs believe that these rancherias do present unique considerations and that it does not make sense to delay relief for those rancherias upon which class members still reside, while the parties litigate these other issues. Accordingly, plaintiffs attorneys believe that it serves the interests of the entire class to sever these claims from those of the seventeen rancherias and to dismiss those claims from this action without prejudice.

> Fn. 1 Alexander Valley would have been the thirteenth rancheria in this category but by oversight was omitted from the stipulation for entry of judgment and notice of settlement to the class. The parties propose to file a supplemental stipulation after the Court approves the current one and to obtain approval after notice to class members from Alexander Valley.

Contrary to the above statement, as is more particularly alleged hereafter, at the time the Stipulation was entered in 1983, several members of the Wilton Miwok Rancheria, including Plaintiff Dorothy Andrews, owned property within the boundaries of the Rancheria which had been distributed to tribal members in conjunction with the Tribe's unlawful termination in 1964. As a remedy for the Tribe's unlawful termination, Plaintiffs seek to be restored as a federally-recognized Indian tribe.

## JURISDICTION

3.      This Court has jurisdiction (a) under 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States; (b) under 28 U.S.C. § 1361 in that Plaintiffs seek to compel officers and employees of the United States and its agencies to perform duties owed to Plaintiffs; and (c) under 28 U.S.C. § 1362 in that that this is an action brought by an Indian Tribe or band based on claims arising under the Constitution and laws of the United States including U.S. Const. Art. II, § 8, cl. 3 (Indian Commerce Clause), the Rancheria Act, and federal common law.

## VENUE

4.      Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e) because Defendants reside in this District.

## PARTIES

5.      Plaintiff Wilton Miwok Rancheria is a Native American Tribe consisting of the Indian members and their Indian successors in interest, for whose benefit the United States acquired and created the Wilton Rancheria. The Tribe was a federally recognized Indian Tribe until it was unlawfully terminated on September 22, 1964.

4

6.     Plaintiff Dorothy Andrews is an original distributee of the land distributed to members of the Tribe at the time it was terminated. At all times material hereto, she was and is a resident of a parcel of land which was distributed to a tribal member in fee simple title as a result of the purported termination of the Wilton Rancheria. She resides at 9418 Rancheria Drive, Wilton, CA 95693, which is located within the boundaries of the former Wilton Rancheria.

7.     Defendant Dirk A. Kempthorne is the Secretary of the United States Department of Interior.

8.     Defendant Carl J. Artman is the Assistant Secretary for Indian Affairs of the United States Department of Interior.

9.     Defendant the United States Department of Interior is the cabinet level department of the United States government which is administered by the Secretary of the United States Department of Interior.

10.     Defendant Michael O. Leavitt is the Secretary of the United States Department of Health and Human Services.

11.     Defendant the United States Department of Health and Human Services is the cabinet level department of the United States government which is administered by the Secretary of the United States Department of Health and Human Services. Prior to 1979, the Department of Health and Human Services was named the Department of Health, Education, and Welfare.

12.     Defendants are officers or employees of the United States and have direct or delegated statutory duties in carrying out the provisions of the Rancheria Act as amended and for fulfilling the trust responsibilities of the United States toward Indian people.

## FACTUAL ALLEGATIONS

**A.    Historical Background of the Wilton Miwok Rancheria.**

13.    Plaintiff Tribal members are descendants of the Plains Mewok who lived and prospered in the Sacramento Valley since time immemorial.  The Cosumnes River borders Wilton Miwok land and provided a rich bottomland for agriculture and subsistence.  The reservation lands of the Wilton Miwok Rancheria, comprising a tract of 38.81 acres located in Sacramento County approximately twenty-four (24) miles south of Sacramento, California, were purchased and taken into trust by the United States on behalf of Plaintiffs in 1927, through funds appropriated for that purpose.  34 Stat. 325, 333 (1906); 35 Stat. 70, 76 (1908).  The members of the federally recognized Wilton Rancheria later voted to organize themselves under the provisions of the Indian Reorganization Act (48 Stat. 985) on June 15, 1935 and subsequently, on December 7, 1935 adopted a Constitution and Bylaws.  On January 15, 1936, the Secretary of the Interior approved the Tribe's Constitution and Bylaws (amended May 21, 1940).

**B.    Federal Termination Policy and the Rancheria Act.**

14.    During the 1950's, due to pressure from non-Indians who desired to develop tribal land and resources, the United States pursued a policy of "Termination" in respect to Indian tribes.  On August 1, 1953, Congress adopted House Concurrent Resolution 108 ("HCR 108"), H.R. Con. Res 108, 83d Cong., 1st Sess., 67 Stat. B132 (1953).  Although HCR 108 was merely a general policy statement it set the tone for the federal government's approach to Indian affairs during the 1950's and 1960's.  HCR 108 provided:

> Whereas it is the policy of Congress, as rapidly as possible, to make the Indians within territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship, and

6

> Whereas the Indians within the territorial limits of the United States
> should assume their full responsibilities as American citizens:  Now,
> therefore, be it Resolved by the House of Representatives (the
> Senate concurring), That it is declared to be the sense of Congress
> that, at the earliest possible time, all of the Indian tribes and the
> individual members thereof located within the states of California,
> Florida, New York and Texas, and all of the following named
> Indian tribes and individual members thereof, should be freed from
> Federal supervision and control and from all disabilities and
> limitations specially applicable to Indians[.]

After Congress passed HCR 108, the United States rapidly pursued the stated termination

policy through specific legislative enactments.  Tribes strongly opposed termination, however,

tribal consent was often not considered necessary to the implementation of the termination

policy.

15.    On August 18, 1958, as part of the United States' general termination policy,

Congress enacted the California Rancheria Act ("Rancheria Act"), P.L. 85-671, 72 Stat. 619,

amended by the Act of Aug. 1, 1964, P.L. 88-419, 78 Stat. 390.  Section 1 of the Rancheria Act

provided that the assets of 41 named Rancherias (including the Wilton Miwok Rancheria) "shall

be distributed in accordance with the provisions of this Act."  Section 2(a) of the Rancheria Act

required that either the Indians of each Rancheria or the Secretary of the United States

Department of the Interior, after consultation with the Indians, prepare a distribution plan for

each Rancheria.  Section 3 of the Rancheria Act required the Secretary to undertake certain

actions with respect to each Rancheria prior to distributing the land pursuant to the distribution

plans and removing them from trust status.  Section 3 of the Rancheria Act provided:

> Sec. 3.  Before making the conveyances authorized by this Act on any
> rancheria or reservation, the Secretary of the Interior is directed:
>
> (a) To cause surveys to be made of the exterior or interior boundaries of
> the lands to the extent that such surveys are necessary or appropriate for
> the conveyance of marketable and recordable titles to the lands.
>
> (b) To complete any construction or improvement required to bring Indian
> Bureau roads serving the rancherias or reservations up to adequate

standards comparable to standards for similar roads of the State or subdivision thereof. The Secretary is authorized to contract with the State of California or political subdivisions thereof for the construction or improvement of such roads and to expend under such contracts moneys appropriated by Congress for the Indian road system. When such roads are transferred to the State or local government the Secretary is authorized to convey rights-of-way for such roads, including any improvements thereon.

(c) To install or rehabilitate such irrigation or domestic water systems as he and the Indians affected agree, within a reasonable time, should be completed by the United States.

(d) To cancel all reimbursable indebtedness owing to the United States on account of unpaid construction, operation, and maintenance charges for water facilities on the reservation or rancheria.

(e) To exchange any lands within the rancheria or reservation that are held by the United States for the use of Indians which the Secretary and the Indians affected agree should be exchanged before the termination of the Federal trust for non-Indian lands and improvements of approximately equal value.

16.    Section 8 of the Rancheria Act required that prior to the termination of a rancheria, the Secretary of the Interior was to "protect the rights of individual Indians who are minors, non compos mentis, or in the opinion of the Secretary in need of assistance in conduct of their affairs. . . ."

17.    Section 9 of the Rancheria Act required that prior to the termination of a rancheria, the Secretary of the Interior was to implement education and vocational training programs for the benefit of the Rancheria Indians.

18.    Pursuant to the Rancheria Act, once the Secretary of the Interior had satisfied his duties under Section 3 and after the "plan for distribution of the assets of a rancheria or reservation" was approved and the distribution plan was final, Section 10(b) of the Rancheria Act provided:

the Indians who receive any part of such assets, and the dependant members of their immediate families who are not members of any other tribe or band of Indians, shall not be entitled to any of the services performed by the United States for Indians because of their status as

8

Indians all restrictions and tax exemptions applicable to trust or restricted land or interests therein owned by them are terminated, all statutes of the United States which affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner as they apply to other citizens or persons within their jurisdiction.

19.    The Rancheria Act was amended on August 11, 1964. Pub.L.No. 88-419, 78 Stat. 390. Specifically, Section 3 was amended to direct that the Secretary of Interior was to "contract, improve, install, extend, or otherwise provide, by contract or otherwise . . . irrigation facilities for Indian homes, communities, and lands" prior to distributing title to Rancheria lands.

20.    The 1964 amendments to the Rancheria Act also specified that the Secretary of Health, Education, and Welfare was to "construct, improve, install extend, or otherwise provide . . . sanitation facilities (including domestic and community water supplies and facilities, drainage facilities, and sewage and waste disposal facilities, together with necessary appurtenances and fixtures) . . . in accordance with the provisions of section 7 of the Act of August4, 1954 (58 Stat. 674), as amended (42 U.S.C. 2004a)."

## C.    Purported Termination of Plaintiff Wilton Miwok Rancheria.

21.    In August, 1958, pursuant to Section 10(a) of the Rancheria Act, the Secretary of the Interior made effective a document entitled "A Plan For The Distribution Of The Assets Of The Wilton Rancheria" ("Distribution Plan"). Pursuant to the Distribution Plan, the Secretary of the Interior intended to distribute the Tribe's roughly 38.81 acre reservation to eleven (11) individual Tribal members and the dependent members of their immediate families, with two additional lots to be held as community property. Pursuant to Section 3 of the Rancheria Act, in exchange for their agreement to the Distribution Plan, the Distribution Plan specifically provided that the eleven (11) distributees specifically requested that the Bureau of Indian Affairs:

1. Make such surveys as are necessary to convey merchantable and recordable title.

9

2. Rehabilitate the present domestic water system by replacing all leaky, defective water pipes and providing water connections to all occupied residences or other residences constructed or in the course of construction and more than fifty percent completed within a ninety (90) day period after approval of this plan by the Indians of the Wilton Rancheria.

3. Construct a road at the location shown on the attached map that will meet the minimum specifications of the Sacramento County Road Department and turn this road over to the County for operation and maintenance.

4. Cancel all reimbursable indebtedness owing to the United States on account of unpaid construction and/or operation and maintenance changes for water facilities.

5. Furnish each distributee with the approximate value of his lot at the time of the conveyance.

6. Convey to individual Indians according to this plan, and the map attached hereto which is part of this plan, unrestricted title to lands constituting the Wilton Rancheria. The attached sketch map indicates generally the location of lots to be conveyed. Title will be subject to existing rights-of-way, easements or leases and will include such mineral and water rights as are now vested in the United States.

22.    Pursuant to Section 3 of the Rancheria Act, the action that the distributees requested the Bureau of Indian Affairs to take was mandatory and the Tribe could not be terminated and Tribal assets could not be distributed and stripped of their protected trust status until such time as the United States satisfied these mandatory obligations. Once satisfied the termination and distribution would be complete, title could be lawfully conveyed to the distributees, the United States would no longer owe any fiduciary duty to the distributees and the distributees and the distributed land would no longer be exempt from any state and local laws, ordinances, or regulations.

23.    Throughout the history of the Wilton Rancheria, the Miwok people faced problems with sanitation facilities and domestic water supply. In 1949, a letter from the California Indian Agency to the Acting Director of Irrigation, Office of Indian Affairs, states that:

10

Of the many reservations and rancherias in Northern California badly in need of water, there are two . . . these places are the Wilton Rancheria, near Sacramento and Norton Field on the Hoopa Reservation.

At Wilton the well has sanded up and it will be necessary to drill and case a new 12 inch well. There is no other water available on the rancheria and the Indians must haul their water from neighboring ranches. There is insufficient water for the school children to bathe and on October 14 the County School Superintendent's office called asking that something be done. Today, the County Health Office called us and asked what could be done to remedy this deplorable situation.

24.    The Bureau of Indian Affairs failed to install water facilities and sanitation

systems for the Wilton Rancheria that met County requirements as shown in a letter from

Sacramento County regarding sanitation facilities at the Wilton Rancheria:

It is the decision of the Sacramento County Department that approval cannot be granted to this subdivision because evidence has not been presented to indicate:

1.    The presently undeveloped lots could be adequately sewered with individual sewage disposal systems when homes are constructed.

2.    That the sewage disposal systems on the developed lots could be adequately repaired should failures occur.

Relative to the second point above, a field investigation revealed that eight of the nine existing dwellings are discharging sewage onto the surface of the ground which constitutes a health hazard and a violation of Section 5, Sacramento County Ordinance No. 378. Eight of the existing dwellings are also using unsanitary privies which are health hazards violating County Ordinance No. 450, Section 2. Nowhere in your plan for subdivision is provision made for the abatement of these health hazards . . .

25.    The Bureau of Indian Affairs knowingly violated county standards for road

construction within sub-divisions. The BIA avoided meeting the County standard of "Class A"

roads (Sacramento County Ordinance No. 390) for sub-divisions of more than three residential

lots, by filing the plat with the BLM instead of with Sacramento County. By doing this, the BIA

avoided constructing the required "Class A" roads and instead contracted to construct "Class B"

11

roads. "Class A" roads are 40 ft. in width with curbs and sidewalks. The roads that the

government constructed at Wilton had internal rights-of-way of 42 ft. and access road right-of-

way of 60 ft.; with no curbs or sidewalks.

26.    The Bureau of Indian Affairs implemented no vocational or educational training

programs for the benefit of the Indians of the Wilton Rancheria.

27.    On May 19, 1961, John M. Kelly, Assistant Secretary of the Interior issued a

letter indicating that the requirements of the Rancheria Act had been satisfied and revoking the

Constitution and Bylaws of the Wilton Rancheria.

28.    On September 22, 1964, then Interior Secretary Stewart L. Udall published in the

Federal Register the following official notice of the termination of the Wilton Rancheria:

> Notice is hereby given that the Indians named under the Rancheria
> listed below are no longer entitled to any of the services performed
> by the United States for Indians because of their status as Indians,
> and all statutes of the United States which affect Indians because of
> their status as Indians, shall be inapplicable to them and the laws of
> the several States shall apply to them in the same manner as they
> apply to other citizens or persons within their jurisdiction. Title to
> the lands on this Rancheria has passed from the United States
> Government under the distribution plan of the Rancheria.
>
> [Names of individuals omitted]
>
> The Wilton Rancheria, 38 and 31/100 acres, is located north of the
> Wilton Post Office and general store, about twenty-four miles
> southeast of Sacramento, California, in Sacramento County.
>
> This notice is issued pursuant to the Act of August 18, 1958 (72
> Stat. 619), and becomes effective as of the date of publication in the
> FEDERAL REGISTER.

29 Fed. Reg. 13,146 (Sept. 22, 1964).

29.    The immediate effect of the termination of the Tribe and distribution of the

Wilton Miwok Rancheria was that: 1) there were fundamental changes in land ownership as

land passed from the Tribe to individuals; 2) the trust relationship between the United States and

the Tribe, and the United States and the reservation lands was terminated; 3) state and local

legislative jurisdiction was imposed; 4) state judicial authority was imposed; 5) exemptions from

state and local taxing authority was ended; 6) federal programs to the Tribe and its individual

members was terminated; 7) tribal sovereignty and tribal jurisdictional prerogatives were

effectively, though not technically ended as elements of tribal sovereignty generally cannot be

practically implemented by tribes that do not have a land base over which to exercise

sovereignty.

   30. Following termination, the United States distributed Plaintiffs' tribal landholdings

to the adult members of the Wilton Miwok Rancheria, including Plaintiff Dorothy Andrews. *See*

List of Wilton Miwok Rancheria Distributees (attached hereto as Exhibit A).

   31. The long term effect of the termination under the Rancheria Act, in addition to

those effects set forth in paragraph 29, was that a significant portion of tribal lands in California

were transferred out of tribal and Indian ownership as non-Indians purchased the land through

direct purchases, or through foreclosure actions and tax sales. In regard to the Tribe specifically,

the long term effect of the Rancheria Act has been that approximately fifty percent (50%) of the

Tribe's land has passed out of tribal and Indian ownership into non-Indian ownership.

**D.** **The *Hardwick* Litigation.**

   32. On July 10, 1979, in a case directly related to this action, a number of distributees

from 34 Rancherias that were terminated by the Rancheria Act brought suit against the United

States and county tax assessors and collectors for counties where Rancheria lands were located,

in the United States District Court for the Northern District of California. In *Hardwick*, the

plaintiffs asserted that the United States violated the Rancheria Act in its efforts to rapidly

terminate forty-one (41) Rancherias (including the Wilton Miwok Rancheria) under the

Rancheria Act. Specifically, the plaintiffs asserted that the United States failed to properly

inform the distributees of the legal effect of termination and that the distributees lands would be subject to state and local taxation and regulation and that the distributees would no longer have access to federal programs and protections. In addition, the plaintiffs in *Hardwick* asserted that the United States misrepresented to the distributees that termination was mandatory when in fact the Rancheria Act required the agreement of the distributees. Additionally, the plaintiffs asserted that the United States further violated the Rancheria Act because the United States did not satisfy its obligations under Section 3 of the Rancheria before terminating the tribes and distributing tribal lands and assets by conveying them to the distributees.

33.    On February 28, 1980, the distributees of the Wilton Miwok Rancheria were certified as members of the plaintiff class in the *Hardwick* litigation. *See* Order Re: Class Certification (Feb. 28, 1980), (attached hereto as Exhibit B).

34.    The plaintiffs' purpose in the *Hardwick* litigation was to undo all of the effects of the unlawful application of the Rancheria Act and to fully restore the tribes and the tribal reservations to the status they held before the unlawful termination. Thus, the plaintiffs sought a declaration stating that:

1.    The tribes and the tribal reservations were not lawfully terminated;

2.    The Termination Proclamation of each of the subject Rancherias was unlawfully published and that the Secretary of the Interior was under an obligation to declare the notices to be unlawful and rescind them;

3.    The Secretary of the Interior was under a duty to "unterminate" each of the subject rancherias, and to offer to repurchase at fair market value the lands originally conveyed to Indian distributees that had passed into non-Indian ownership and to return all such lands to into trust for the benefit of the tribes;

4.    The United States had a duty to treat the restored Rancherias as Indian reservations in all respects and to afford the tribes and individual tribal members of the Rancherias all the rights and

14

privileges and immunities ordinarily accorded to Indian tribes, bands and communities;

5.    That the subject Rancherias were to be treated as Indian reservations in all aspects;

6.    That all of the lands of the subject Rancherias were not subject to the jurisdiction of counties where the lands were situated, and further that the lands would not be subject to county regulation and taxation until such time as the lands were lawfully conveyed to individual distributees and removed from trust in full compliance with all of the provisions of the Rancheria Act.

35.    The plaintiffs in the *Hardwick* litigation also sought to void the distribution plans, restore the federal government's trust obligations to the plaintiffs, and to declare null and void the purported termination of the rancherias.

36.    On January 31, 1986, the *Hardwick* plaintiffs amended their complaint. The amendment allowed a number of tribes that had reconstituted their formal federally recognized governments to intervene directly in the *Hardwick* litigation. In addition, the amendment dropped as defendants a number of counties that had voluntarily resolved their issues with the tribes located in the specific counties.

37.    The plaintiff class in *Hardwick* consisted of all persons who received assets of the named rancherias pursuant to distribution plans prepared under the Rancheria Act. In addition to the distributees, their heirs and legatees and all Indian successors in interest to the real property distributed under the Rancheria Act were also parties to the litigation.

38.    Both prior to and subsequent to the filing of the *Hardwick* litigation, which addressed the rights of unlawfully terminated Indian tribes and their distributees, federal courts in California and the District of Columbia resolved disputes identical to those raised in the *Hardwick* litigation. *See, e.g., Smith v. United States*, 515 F.Supp. 56 (N.D. Cal 1975); *Duncan v. Andrus*, 517 F.Supp 1 (N.D. Cal. 1977); *Duncan v. United States*, 667 F.2d 36 (Ct.Cl. 1981). In those actions, the courts ruled that the termination of Hopland Rancheria and the Pomo

15

Indians of the Robinson Rancheria and their reservations were unlawful. The courts further ruled that the Rancheria reservation lands were never lawfully subjected to state and local regulation. The courts ordered the tribes and their reservations restored to the status they held immediately before the unlawful termination and directed that the reservation lands were to be treated as Indian country and subject to all of the privileges and protections that they were afforded under federal law prior to the unlawful termination.

39.     On July 15, 1983, with knowledge of the decisions rendered in *Smith v. United States*, 515 F.Supp. 56 (N.D. Cal 1975), and *Duncan v. Andrus*, 517 F.Supp 1 (N.D. Cal. 1977), and the pendancy of similar actions in *Duncan, et al. v. United States*, No. 19-75 (Ct.Cl.), and *Table Bluff Band, et al. v. Andrus*, No. C-75-2525 (N.D. Cal.), the remaining parties in the *Hardwick* litigation entered into a Stipulated Judgment. The Stipulation for Entry of Judgment, entered August 8, 1983 ("1983 Judgment"), restored the remaining class member tribes to their former tribal status by providing in paragraph 4 that:

> The Secretary of the Interior shall recognize the Indian Tribes, Bands, Communities or groups of the seventeen Rancherias listed in paragraph 1 as Indian entities with the same status as they possessed prior to the distribution of the assets of those Rancherias under the California Rancheria Act and said Tribes, Bands, Communities, or groups shall be included on the Bureau of Indian Affairs Federal Register list of recognized tribal entities pursuant to 25 C.F.R. section 83.6(b). Said Tribes, Bands, Communities, or groups shall be relieved of section 11 of the California Rancheria Act and shall be deemed entitled to any of the benefits or services provided or performed by the United States for Indian Tribes, Bands, Communities, or groups because of their status as Indian Tribes, Bands, Communities, or groups.

Pursuant to Paragraph 12 of the Stipulation for Entry of Judgment, the parties agreed that the United States District Court for the Northern District of California would retain jurisdiction over the *Hardwick* case.

40.     The Order Approving Entry of Final Judgment in Action was entered on Dec. 27, 1983, (attached hereto as Exhibit C). By virtue of its dismissal from the case, Plaintiff Wilton Miwok Rancheria was excluded from the seventeen Rancherias listed in the 1983 Judgment whose tribal status was restored.

E.     **Wilton Rancheria Was Erroneously Omitted From The *Hardwick* Restoration Judgment.**

41.     The members of the Wilton Miwok Rancheria were dismissed from the plaintiff class on the erroneous premise that "[n]o class member from these rancherias currently owns property within the original rancheria boundaries." *See* Certificate of Counsel Re Hearing on Approval of Settlement of Class Actions (Nov. 16, 1983), page 9 (attached hereto as Exhibit D). It was mistakenly believed that at termination, the tribal members of Wilton Rancheria had either sold the rancheria property to non-Indians or distributed it to rancheria members who subsequently sold it to non-Indians. *See* Stipulation for Entry of Judgment (July 19, 1983), ¶ 14 (attached hereto as Exhibit E). In any event, it was erroneously believed that the dismissed Wilton Rancheria members of the plaintiff class no longer owned any of the property that made up the former rancheria. *See* Exhibit D, page 9.

42.     In fact, at the time several members of the Wilton Miwok Rancheria owned and resided upon ten (10) of the twelve (12) residential parcels distributed within the boundaries of the Rancheria, either as original distributees or as the heirs or legatees of original distributees. *See* Map Showing Lands of Wilton Miwok Rancheria Distributed at Termination (attached hereto as Exhibit F). Jane Martinez Brown, the original distributee of Lot One who then still owned and resided on the same, attended and desired to present a statement at the hearing convened by the *Hardwick* court on whether to approve the class action settlement. Ms. Brown terminated her statement when she was informed that the Wilton Miwok Rancheria was not

17

included in the proposed settlement. *See* Findings and Recommendation of Magistrate J. S. Brennan, filed Dec. 15, 1983, pages 3-4 (attached hereto as Exhibit G). Moreover, at least one original distributee, Plaintiff Dorothy Andrews, and numerous heirs and legatees of other distributees continue to own land and reside on Wilton Rancheria today. *See* Lands Within the Original Boundaries of the Wilton Miwok Rancheria Presently Owned by the Distributees, Dependent Members, Their Heirs, or Legatees (attached hereto as Exhibit H).

43.    Jane Brown and the other distributees did not understand and know the specifics of the *Hardwick* proceedings. As a result of the mistaken dismissal as members of the plaintiff class in *Hardwick*, Plaintiffs have been unfairly denied restoration of their status as an Indian Tribe under the laws of the United States, a status unlawfully taken from Plaintiffs by the California Rancheria Act of 1958. Plaintiffs have continued to suffer the social and economic consequences of termination, which has made it difficult, if not impossible, for Plaintiffs to pursue their rights in the intervening years.

F.    **Wilton Rancheria Has Been Working For Many Years to Restore Its Federal Recognition.**

44.    Restoration has been at the forefront of Plaintiffs' concerns, transcending any internal political differences that may have arisen among the Tribe's members. Knowing that restoration required the cooperation of all tribal members, the families worked together with the Bureau of Indian Affairs, Superintendent Dale Risling of the Central California Agency and the Indian Dispute Resolution Services to reach a consensus on a strategy for restoration. On November 22, 1999, tribal members agreed to create an Interim Tribal Council to govern the Wilton Miwok Rancheria. *See* Mediation Agreement dated November 22, 1999 (attached hereto as Exhibit I). This is the current governing body of the Wilton Miwok Rancheria. *See* Letters From United States Department of the Interior, BIA dated August 24, 2004, September 17, 2004,

June 14, 2006 and September 12, 2006 (attached hereto as Exhibit J). The Interim Tribal Council represents over three hundred (300) tribal members of the Wilton Miwok Rancheria.

45.    Termination has not prevented members of the Wilton Miwok Rancheria from continuing to exercise their tribal rights and from working together as an Indian community. Today the Wilton Miwok Rancheria continues to consist of the same large families, a majority of whose members live and work in Sacramento County. Each of these historic families is represented on the Interim Tribal Council for the Wilton Miwok Rancheria. Those members who live away from the Rancheria maintain continuing social and political ties with members and their families who remain on the former Rancheria.

46.    The Wilton Miwok Rancheria has not had to work alone in seeking restoration of its federally recognized status. In 1992, Congress established the Advisory Council on California Indian Policy ("ACCIP"), a statewide Indian Council consisting of representatives of California's federally recognized, terminated and unacknowledged tribes. 106 Stat. 2131, as amended by 110 Stat. 766. The ACCIP's mandate included the submission of recommendations to Congress for addressing the needs of California's Indian tribes. In its September 1997 report to Congress, the ACCIP recommended that federal recognition of the Wilton Miwok Indian Community be immediately restored. *See* ACCIP Final Report and Recommendations to the Congress of the United States, page 18 (attached hereto as Exhibit K).

47.    In 1998, tribal members began a vigorous pursuit of Congressional support for their restoration. Plaintiffs worked with the ACCIP and other California tribes seeking restoration, culminating in discussions with legislative staff of the House Resources Committee to discuss development of an omnibus California bill to provide for the restoration of Wilton and other terminated rancherias. In April 2000, a final bill, sponsored by House Representative George Miller, was drafted that would have restored federal recognition to six California tribes

including the Wilton Miwok Rancheria. However, the Wilton Miwok Rancheria was not included in the final bill. Since that time, the Wilton Miwok Rancheria has continued to seek and to receive support from the local community for its restoration efforts. Superintendent Dale Risling, Sr provided letters of support for the restoration of Wilton Rancheria. *See* Exhibit J.

48.    The strain and impact of the termination left the Tribe struggling for many years to continue and maintain its governance. This was extremely difficult and time consuming because the Tribe has few resources. Plaintiffs are one of a handful of terminated California tribes that remains unrecognized by the federal government. *See* Status of California Rancherias Terminated Pursuant to the Rancheria Act (attached hereto as Exhibit L).

49.    The stipulated judgment entered in *Hardwick* makes clear the continuing right of those members of the rancherias dismissed from the plaintiff class to seek restoration of their Indian status. Under its terms, the claims of the Wilton Miwok Rancheria were dismissed "without prejudice to their being refiled in another action." *See* Exhibit E ¶ 14. Further, in the event the members of the Wilton Miwok Rancheria did refile their claim, the United States stipulated that it would not "assert any laches defense to any such subsequent action" if it could not have been asserted prior to *Hardwick* being filed. *Id.*

### FIRST CLAIM FOR RELIEF
### (Breach of Rancheria Act Against All Defendants except Michael O. Leavitt and the United States Department of Health and Human Services)

50.    Plaintiffs re-allege paragraphs 1 through 49 and incorporate those paragraphs herein as if set forth in full.

51.    Under Section 3 of the Rancheria Act, the Secretary of Interior was required to complete construction or improvement to bring roads serving the Rancheria up to adequate standards for similar roads of the State or subdivision thereof prior to terminating the Rancheria and its members.

20

52.    Despite these specific obligations, Defendants wrongfully terminated Plaintiffs by developing distribution plans and conveying deeds to parcels of the Rancheria before and/or without providing roads that were up to adequate standards for subdivision roads within the County of Sacramento.

53.    Under Section 3 of the Rancheria Act, the Secretary of Interior was required to install and/or rehabilitate Rancheria irrigation and domestic water and sanitation systems so that said systems would be adequate to meet the reasonable needs of all the Indians of the Rancheria, prior to terminating the Rancheria and its members.

54.    Despite these specific obligations, federal defendants wrongfully terminated Plaintiffs by developing distribution plans and conveying deeds to parcels of the Rancheria before and/or without negotiating for or providing irrigation and domestic water and sanitation systems adequate to meet the Plaintiffs' needs.

WHEREFORE, the Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF
### (Breach of the Rancheria Act, as Amended, Against All Defendants)

55.    Plaintiffs re-allege paragraphs 1 through 54 and incorporate those paragraphs herein as if set forth in full.

56.    In 1964, Congress amended Section 3(c) of the Rancheria Act, as set forth in paragraphs 19 and 20 of this Complaint.

57.    One effect of the 1964 amendments was to substitute the phrase "sanitation facilities" for the phrase "irrigation or domestic water systems," thereby expressly stating that services required by section 3 included ". . . drainage facilities and sewage – and waste-disposal facilities . . ." and shifting the authority for this particular duty to the Secretary of Health, Education, and Welfare.

21

58.     Following enactment of the 1964 amendments to the Rancheria Act, the Defendants breached their statutory and fiduciary duties by failing to take steps to renegotiate the provisions of the distribution plans pertaining to water sources and water systems.

WHEREFORE, the Plaintiffs pray for relief as set forth below.

## THIRD CLAIM FOR RELIEF
### (Breach of Trust Against All Defendants)

59.     The Plaintiffs re-allege paragraphs 1 through 58 and incorporate those paragraphs herein as if set forth in full.

60.     In passing the Rancheria Act into law, Congress intended that termination would be the result of a voluntary process by which designated Indian communities would choose to accept termination in exchange for the provision of a number of government services which would aid those communities in becoming economically sound, including, the provision of domestic water and sanitation facilities.

61.     Congressional intent behind the Rancheria Act, as well as the fiduciary duty owed by the Defendants to the Plaintiffs, required the BIA to accomplish the congressional policy of termination in a manner calculated to advance the interests of said Indians.  The Defendants breached their trust duty to the Plaintiffs under the Rancheria Act in the following ways:

a.      Defendants interpreted the Rancheria Act to require termination of the Tribes named therein.

b.      Defendants approved the distribution plans without expressly providing therein for installation of water systems and sources, and sanitation facilities, fully adequate to meet the needs of all distributes and resident Indians;

c.      Defendants limited water service under the distribution plans, as approved, to those distributes who were fortunate enough to have residences already built or under construction;

d.      Defendants failed to accurately install, or secure for the Rancheria, water and sanitation systems that were fully adequate to meet the needs of all Indian

residents and distributes for the foreseeable future, prior to conveyance of the Rancheria's assets in fee to the distributes; and

e.    Defendants arbitrarily and capriciously interpreted the term "water system" as used in the Rancheria Act to include only a water source and a sufficient distribution system to deliver water to any of the Rancheria's parcels. On this basis, they refused to provide necessary plumbing to Rancheria housing to allow the residents to make beneficial use of the water, or to satisfy local city and county health codes that applied to these parcels after deeds were recorded.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment and request the following legal and equitable relief:

62.    (1)    That this Court declare that:

(i)    Wilton Miwok Rancheria was unlawfully terminated, and its assets distributed, in violation of Section 2(b) and 3(c) of the Rancheria Act and the government's trust policy;

(ii)    The deeds conveyed to the individual Indian distributees are voidable, and the Secretary of the Interior is under a duty to take former Rancheria lands back into federal trust status at the option of each distributee, or their legal heirs or Indian successors in interest;

(iii)    Termination Proclamations for the Rancheria were unlawfully published, and the Secretary of the Interior is under an obligation to rescind the same;

(iv)    The Wilton Miwok Rancheria is not a terminated Tribe within the meaning of Section 10(b) of the Rancheria Act, and the Defendants are under an obligation to treat them as a federally-recognized Tribe;

(v)    The Constitution and Bylaws of the Wilton Miwok Rancheria, adopted December 7, 1935, are restored;

23

(vi)    The Secretary of the Interior is under a duty to afford to the Wilton Miwok Rancheria all rights, privileges and immunities ordinarily accorded to a federally-recognized Indian Tribe;

(vii)    The lands comprising Wilton Miwok Rancheria were and still are "Indian Country" and that such lands now or in the future to be acquired by the Tribe are immune from local property taxation, assessment or other civil regulatory jurisdiction and shall be restored to the same status as before termination;

(viii)    The lands comprising the Wilton Miwok Rancheria are not subject to the jurisdiction of Sacramento County, and further that the lands would not be subject to county regulation and taxation until such time as the lands were lawfully conveyed to individual distributees and removed from trust in full compliance with all of the provisions of the Rancheria Act;

(ix)    The Secretary of the Interior is under a duty to acquire and take land into trust for the benefit of the Wilton Miwok Rancheria pursuant to the Indian Reorganization Act, 25 U.S.C. § 465;

(x)    The Secretary of the Interior is under a duty to take into trust a land base for the benefit of the Tribe, with such land to be considered "Indian country" as defined in 18 U.S.C. § 1151.

(2)    That this Court issue preliminary and permanent injunctive relief compelling the Defendants to afford the Wilton Miwok Rancheria all rights, privileges and immunities ordinarily accorded to a federally-recognized Indian Tribe.

(3)    That this Court order Defendants to pay Plaintiffs their costs of suit and reasonable attorneys' fees.

(4)    That this Court order such further relief as it shall deem appropriate.

24

Dated: May 25, 2007

Respectfully submitted,

**FREDERICKS & PEEBLES LLP**
CHRISTINA V. KAZHE
JOHN NYHAN
ROSE WECKENMANN

By: _____
JOHN NYHAN (DC BAR NO. 467082 )
Attorneys for Plaintiffs-in-Intervention,
WILTON MIWOK RANCHERIA, a
formerly federally-recognized Indian
Tribe, ITS MEMBERS, and DOROTHY
ANDREWS

## Exhibits to Complaint-in-Intervention

A:     List of Wilton Miwok Distributees.

B:     Order Re: Class Certification February 28, 1980, in *Tillie Hardwick v. United States of America*, U.S.D.C. Northern District of California No. C-79-1710-JF.

C:     Order Approving Entry of Judgment in Action filed December 27, 1983 in *Tillie Hardwick v. United States of America*, U.S.D.C. Northern District of California No. C-79-1710-JF.

D:     *Certificate* of Counsel Re: Hearing on Approval of Settlement of Class Actions filed November 16, 1983, in *Tillie Hardwick v. United States of America*, U.S.D.C. Northern District of California No. C-79-1710-JF.

E:     Stipulation for Entry of Judgment filed July 19, 1983 in *Tillie Hardwick v. United States of America*, U.S.D.C. Northern District of California No. C-79-1710-JF.

F:     Map Showing Lands of Wilton Miwok Rancheria Distributed at Termination.

G:     Findings and Recommendation of Magistrate Joan S. Brennan re Approval of Class Action Settlement, filed December 15, 1983 in *Tillie Hardwick v. United States of America*, U.S.D.C. Northern District of California No. C-79-1710-JF.

H:     Chart, Lands Within the Original Boundaries of the Wilton Miwok Rancheria Presently Owned by the Distributees, Dependent Members, Their Heirs, or Legatees.

I:     Mediation Agreement dated November 22, 1999.

J:     Letters From United States Department of the Interior, BIA dated August 24, 2004, September 17, 2004, June 14, 2006 and September 12, 2006.

K:     Advisory Council on California Indian Policy ("ACCIP") Final Report and Recommendations to the Congress of the United States.

L:     Status of California Rancherias Terminated Pursuant to the Rancheria Act.

## List of Wilton Miwok Rancheria Distributees

| Distributee | DOB | Last Known Address | Dependant Members | Lineal Descendants and Approx. Number |
|---|---|---|---|---|
| Jane Brown | 9-20-1922 | Deceased | Donald Brown<br>Debra Brown (Blue) | Yes |
| Archie Williams | 10-08-1907 | Deceased | Mildred Williams<br>Jerome Williams<br>Alfred Williams<br>Wilson Williams<br>Carol Mae Williams<br>Silvia Williams<br>Joanna Williams | Yes (120) |
| Eva Irish | 1-28-1893 | Deceased | | |
| Dorothy Andrews | 8-16-1930 | Box 66<br>Wilton, CA 95693 | Jacqueline Andrews<br>Anita Andrews<br>Beverly Andrews<br>Lawrence Andrews<br>David Andrews | Yes (15) |
| Ella Porter Taylor and Arthur Taylor | 4-15-1888 | Deceased | Rhonda Taylor | Yes (93) |
| Annie McKean | 7-4-1882 | Deceased | Charles McKean Jr.<br>John McKean | Yes (95) |
| John McKean | 6-21-1916 | Deceased | | |
| Ada Madrigal | 4-15-1888 | Deceased | | |
| Gertrude Dupree | 2-9-1892 | Deceased | | |
| Charles McKean, Jr. | 12-6-1904 | Deceased | Paul McKean<br>Lloyd McKean<br>Billie Daniels<br>Jimmie Daniels<br>Richard Daniels | Yes (46) |
| Virgie Hatch | 10-3-1901 | Deceased | | Yes (42) |
| Cosumnes River Indian Association | | | | N/A |

FILED

FEB 20  11 41 AM '80

WILLIAM L. WHITTAKER
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA.

1
2
3
4
5
6
7
8
9          IN THE UNITED STATES DISTRICT COURT

10         FOR THE NORTHERN DISTRICT OF CALIFORNIA

11
TILLIE HARDWICK, et al.,          )    NO. C-79-1710-SW
12                                )
                  Plaintiffs      )    ORDER RE: CLASS
13                                )    CERTIFICATION
    v.                            )
14                                )
UNITED STATES OF AMERICA,         )
15  et al.,                       )
                                  )
16  _____ )    Defendants.

17          Plaintiffs' motion for certification of a plaintiff

18   and defendant class in the above-entitled action came on

19   regularly for hearing in the above-entitled Court on February 11,

20   1980, at 11:00 a.m..

21          California Indian Legal Services appeared by David

22   Rapport for the plaintiffs.  Assistant United States Attorney

23   Paul M. Locke appeared for the federal defendants.  The Lake

24   County Counsel's Office by Robert L. Bridges, Deputy County

25   Counsel, appeared for defendant Cora L. Taylor, Tax Collector of

26   Lake County.  The Law Offices of Ronald E. Hothem by Julie A.

27   Torres, appeared as counsel for the Mendocino County defendant.

28          The Court, having considered the written and oral

29   arguments of counsel and the pleadings and evidence submitted

30   in this action, and good cause appearing therefor

31          NOW HEREBY ORDERS:

32          1.  Plaintiffs action is certified to proceed as a

Copies mailed to parties
of Record

class action under Fed. R. Civ. P. 23(a) and 23(b)(2) for the purpose of determining the federal defendants' liability to the class. The plaintiff class consists of all those persons who own any of the assets of the following California Indian rancherias pursuant to distribution plans purportedly prepared under the California Rancheria Act, Act of August 18, 1958 (72 Stat. 619), or as amended by the Act of August 11, 1964 (78 Stat. 390), any heirs or legatees of such persons and any Indian successors in interest to real property so distributed:

| | |
|---|---|
| Alexander Valley | Mission Creek |
| Auburn | Mooretown |
| Big Valley | Nevada City |
| Blue Lake | North Fork |
| Buena Vista | Paskenta |
| Cache Creek | Picayune |
| Chico | Pinoleville |
| Chicken Ranch | Potter Valley |
| Cloverdale | Quartz Valley |
| El Dorado | Redding (Clear Creek) |
| Elk Valley | Redwood Valley |
| Graton | Rohnerville |
| Greenville | Ruffeys |
| Guidiville | Scotts Valley |
| Indian Ranch | Smith River |
| Lytton | Strawberry Valley |
| Mark West | Wilson |

action impractical within the meaning of Fed. R. Civ. Rule

23(a)(1).

DATED: FEB 27 1980

THE HONORABLE SPENCER WILLIAMS
JUDGE of the U.S. District
Court For The Northern District
Of California.
MST

-3-

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEC 27   5 45 PM '83

WILLIAM . . . TAKER
U.S. . . . . COURT
NO DIST. OF CA

TILLIE HARDWICK, et al.,        )
                                )
                    Plaintiffs, )    C 79-1710SW
                                )
v.                              )    ORDER APPROVING ENTRY OF
                                )    FINAL JUDGMENT IN ACTION
UNITED STATES OF AMERICA, et al.,)
                                )
                    Defendants  )
_____)

100

ORDER

Upon review of the stipulation of parties for entry of
judgment in the underlying action, as well as the Findings and
Recommendations of Magistrate Joan Brennan based upon a public
hearing on the proposed settlement on December 15, 1983, IT IS
HEREBY ORDERED that judgment be entered for PLAINTIFFS, according
to the terms of the stipulation filed by the parties on August 2,
1983.

IT IS SO ORDERED.

DATED:                          _____
                                UNITED STATES DISTRICT JUDGE


ENTERED IN CIVIL DOCKET  12/27/ 19 88

DAVID J. RAPPORT
LESTER J. MARSTON
CALIFORNIA INDIAN LEGAL SERVICES
200 West Henry Street
Post Office Box 488
Ukiah, California 95482
Telephone: (707) 462-3825

Attorneys for Plaintiffs

FILED

Nov 17  11 32 AM '03

WILLIAM L. WHITTAKER
CLERK
U.S. DISTRICT COURT
NO. DIST. D. CA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TILLIE HARDWICK, et al., | No. C-79-1710-SW |
| Plaintiffs, | CERTIFICATE OF COUNSEL RE: HEARING ON APPROVAL OF SETTLEMENT OF CLASS ACTIONS |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

David Rapport, attorney of record for plaintiffs herein, hereby certifies as follows:

I am an attorney in the employ of California Indian Legal Services (C.I.L.S.), a California non-profit corporation receiving a grant from the Legal Services Corporation for provision of legal services to indigent California Indians.  One

-1-

of the principal activities of C.I.L.S., since its establishment in 1968 has been representing Indian victims of the disastrous federal policy of "termination" embodied in the California Rancheria Act of 1958, 72 Stat. 390, in vindicating their rights. When this action was filed in 1979, C.I.L.S. already was litigating or had litigated (in 15 different lawsuits) the validity of the implementation of the California Rancheria Act at nine specific Rancherias.  Among those cases have been Kelly v. U.S. Dep't. of the Interior, 339 F. Supp. 1095 (E.D. Calif., 1976); Duncan v. Andrus, 517 F. Supp. 1 (N.D. Calif., 1977); Smith v. U.S.A., 515 F. Supp. 56 (N.D. Calif., 1978); Duncan v. U.S.A. (Duncan I), 597 F.ed 1337 (Ct. Cl., 1979), vacated and remanded sub nomine U.S.A. v. Duncan, 446 U.S. 903 (1980); Duncan v. U.S.A. (Duncan II), 667 F.2d 36 (Ct. Cl., 1981), cert. pending; Taylor v. Hearne, 637 F.2d 689, (9th Cir., 1981), cert. den., 454 U.S. 851; Upper Lake Pomo Ass'n. v. Watt, No. C-75-0181 SW (N.D. Calif.; Partial Summary Judgment entered in May, 1979); Table Bluff Band v. Watt, 532 F. Supp. 255 (N.D. Calif., 1981), appeal on damages pending.

At present, C.I.L.S. is litigating the damage claims of the people of the Robinson Rancheria in the Court of Claims (Duncan v. U.S.A., supra), and similar claims of the people of the Upper Lake and Table Bluff Rancherias before, respectively, the Northern District of California and the Ninth Circuit Court of Appeal.

The basic legal issues in these cases are (1) the nature and extent of the obligations of the United Staes and the rights of plaintiffs as Rancheria Indians under the trust

-2-

relationship which exists between the United States and
plaintiffs under the Rancheria Act and under the respective
Rancheria distribution plans, and (2) the nature and scope of the
relief to which plaintiffs would be entitled upon a showing that
federal defendants breached those obligations in implementing the
Rancheria Act at the rancherias represented in this action.

The essence of plaintiffs' legal claims is as follows:

1) both the trust relationship and the Rancheria Act
imposed upon the United States the legal obligation to provide
the Indians of the Rancherias subject to the Act with:

(a) sufficient accurate information upon which to
base an informed decision about whether or not to accept
termination under the Rancheria Act; and

(b) through, among other things, the promulgation
of regulations imposing standards on the provision of
improvements under the Rancheria Act that assured that all
improvements would meet applicable state and county legal
requirements, to ensure that the distribution plans prepared
under the Act -- as promulgated, approved and implemented --
fairly and adequately provided for the reasonable needs of the
people of the Rancherias for water and sanitation facilities and
other improvements, benefits and services necessary to enable
them successfully to assimilate into the surrounding non-Indian
community;

2) the disbtibution plans constituted binding contracts
under which the United States bound itself to provide adequate
water, sanitation and other improvements, benefits and services
to the people of the Rancherias in exchange for the termination

-3-

of plaintiffs' special Indian status under the trust relationship between plaintiffs and the United States, and the termination of the trust and Indian country status of the lands of the Rancherias;

3) federal defendants' breach of fiduciary, statutory and/or contractual obligations would entitle plaintiffs to relief which would include restoration of their Tribal and personal status as Indians, restoration of the Indian country status of the rancherias, the right to restore Rancheria lands to federal trust status for the benefit of persons or entities designated by plaintiff landowners, the right to participate in federal benefits, services and programs provided especially to Indians, and money damages for losses proximately caused by the premature, unauthorized or otherwise unlawful implementation of the Rancheria Act.

Plaintiffs' basic factual contentions are that federal defendants did not provide plaintiffs with sufficient accurate information upon which to base informed decisions about whether or not to accept termination; that by failing to adopt proper standards and otherwise, federal defendants failed to ensure that the distribution plans -- either as approved or as implemented -- for the Rancherias represented herein adequately provided for the reasonable needs of all of the Rancherias' people; and thus that the distributions of Rancheria assets and the concomitant termination of plaintiffs' Indians rights and status were not validly effected pursuant to, as authorized by, in accordance with or under the provisions of the Rancheria Act.

Because proceedings were deferred pending the outcome

-4-

1  of settlement negotiations, plaintiffs have not moved for summary

2  judgment and defendants have not yet responded to any such

3  motion.  However, based upon defendants' answers in this case and

4  the positions taken by federal defendants in other untermination

5  cases, plaintiffs anticipate that were these cases to proceed

6  further, defendants' legal contentions probably would be that

7  except as provided in the Rancheria Act, plaintiffs lacked vested

8  or other interests in Rancheria lands; that there has been no

9  government-to-government relationship between plaintiff Bands and

10  the United States; that the general trust relationship between

11  the United States and Indians did not impose any specific

12  obligations upon federal defendants in implementing the Rancheria

13  Act; that the Rancheria Act vested the federal agencies involved

14  with broad discretion in promulgating, approving and implementing

15  distribution plans thereunder; that distribution plans were and

16  are not binding contracts; that while a distribution of Rancheria

17  assets which is not preceded by provision of adequate services

18  under §3 of the Rancheria Act does not terminate the Indian

19  status of distributees and dependents, any declaratory and/or

20  equitable relief for violation of federal trust or statutory

21  obligations in the course of implementing the Rancheria Act should

22  be limited to restoring plaintiffs to their former status as

23  Indians and enabling Indian landowners to elect to return their

24  lands to exactly the same status as existed prior to approval of

25  the distribution plan -- i.e., ownership by the United States

26  without specification of a trust beneficiary; and that money

27  damages are not recoverable against the United States for any

28  losses which plaintiffs may have suffered by reason of the

-5-

premature or otherwise unlawful implementation of the Rancheria Act, because the United States neither has waived its immunity to suit nor has any federal statute or regulation created a cause of action for money damages cognizable under the Tucker Act, 28 U.S.C. §1346(b).

Plaintiffs anticipate that defendants' factual contentions would be that the United States provided Rancherias with sufficient accurate information upon which to base their respective decisions to accept termination; that the distribution plans adequately provided for the needs of the people of the Rancherias; that the facilities, benefits and services actually provided to the Rancherias by the United States adequately met the reasonable needs of the recipients; and that plaintiffs sustained no compensable losses by reason of the distribution of Rancheria assets.

Prior to filing motions for partial summary judgment, plaintiffs in both cases conducted extensive discovery by means of written interrogatories and deposition.  Through this discovery, plaintiffs have been able to document fairly detailed histories of the Rancherias and their respective relationships with defendants up until the present.  Based on this material, plaintiffs have prepared a memorandum in support of partial summary judgment on all issues except defendants' liability for money damages and various letters to the federal defendants.

Based upon this evidence, it is the opinion of the undersigned that the principal material factual assertions made in support of plaintiffs' motions for partial summary judgment are not likely to be subject to genuine dispute, and that these

facts, considered in light of the legal principles established in the unappealed final judgments in <u>Knight</u> v. <u>Kleppe</u>, <u>supra</u>, <u>Duncan</u> v. <u>Andrus</u>, <u>supra</u>, <u>Daniels</u> v. <u>Andrus</u>, <u>supra</u>, <u>Smith</u> v. <u>U.S.A.</u>, <u>supra</u>, and <u>Table Bluff Band</u> v. <u>Watt</u>, <u>supra</u>, clearly entitle plaintiffs to the relief which they seek herein.  However, it also is the opinion of the undersigned that full and vigorous dispute of plaintiffs' legal contentions and factual claims could put at risk some of the most significant relief plaintiffs seek, and would certainly and substantially delay the receipt of any relief to which plaintiffs ultimately are held to be entitled. Substantial delays in entry of judgments awarding plaintiffs equitable relief could render the actual receipt of such relief uncertain, because of the possibility of federal budget cuts and policy changes.

Recognizing that a prompt settlement would be mutually beneficial, the parties have pursued lengthy settlement negotiations.  After extensive, painstaking negotiations and consultations with their respective clients, counsel for the parties agreed upon the stipulations for entry of judgment which were filed on July 23, 1983, and which is before the court for approval.

Under the settlement plaintiffs and the "class members" represented by them from seventeen (17) of the thirty-four (34) rancheris represented herein would receive the following relief:

1)  Their status as Indians under the laws of the United States is confirmed;

2)  Each Rancheria is to be listed in the Federal

///

Register as an Indian Tribal entity pursuant to 25 C.F.R. Part
83.6(b);

3)   Any plaintiff(s) or the Indian successor(s) thereof
who received fee title to an interest in a former trust allotment
by reason of the distribution of Rancheria assets will be
entitled to return said interest to trust status for the benefit
of such Indian person(s) as the grantor may specify;

4)   Within two years from the date judgment is entered,
each plaintiff Band is entitled to convey its community-owned
lands to the United States to be held in trust for the benefit of
the Band or the Indians of the Rancheria, as the Band may
specify;

5)   Any plaintiff(s) or Indian heir(s), devisee(s) or
successor(s) in interest thereof owning land within his/her/their
Rancheria may elect to convey said land back to the United States
to be held in trust for the Indian class member(s) or entity
specified by the grantor(s);

6)   The Secretary of the Interior shall facilitate the
return of lands to trust status by providing reasonably necessary
survey, title and recording assistance;

7)   The distribution plans for both Rancherias would be
of no further force and effect, and notice thereof would be
published in the Federal Register; however, there would be no
effect on vested rights created or conveyances authorized or
effected thereunder, or on the rights of subsequent bona fide
purchasers for value.

///

///

-8-

Class members from twelve (12) [1] of the remaining seventeen rancherias represented in this action would be dismissed from this action without prejudice to their right to refile another action or other actions on their behalf.  No class member from these rancherias currently owns real property within the original rancheria boundaries.  The property was either sold to non-Indians when the rancheria was terminated and the proceeds of these sales distributed to rancheria members in lieu of deeds to individual parcels of property or all of the property originally distributed was subsequently sold to non-Indians.

In either case the federal defendants are unwilling to re-assume responsibility for any of these rancherias without a final judicial determination of their obligation to do so.  Plaintiffs attorneys do not concede that the sale of rancheria property precludes distributees from obtaining judicial relief for wrongful termination (in some cases these class members may have the most significant damages claims).  However, plaintiffs believe that these rancherias do present unique considerations and that it does not make sense to delay relief for those rancherias upon which class members still reside, while the parties litigate these other issues.  Accordingly, plaintiffs attorneys believe that it serves the interests of the entire class to severe these claims from those of the seventeen

1.  Alexander Valley would have been the thirteenth rancheria in this category but by oversight was omitted from the stipulation for entry of judgment and notice of settlement to the class. The parties propose to file an supplemental stipulation after the Court approves the current one and to obtain approval after notice to class members from Alexander Valley.

1   rancherias and to dismiss those claims from this action without

2   prejudice.

3           The other four (4) rancherias (Scotts Valley,

4   Guideville, Graton and Auburn) were the subject of prior law

5   suits.  Plaintiffs attorneys were attorneys of record in these

6   prior actions and the undersigned reviewed the stipulations and

7   judgments in each of these cases prior to signing the stipulation

8   for entry of judgment in this case.  I am satisfied that those

9   distributees from these rancherias who were parties to these

10  prior actions and received benefits under judgments in these

11  prior actions are precluded from further litigating the validity

12  of the government's actions in terminating their rancherias under

13  the California Rancheria Act.  Some class members who were not

14  parties to prior actions from Scotts Valley, Guideville and

15  Graton rancherias will have the right under the proposed

16  settlement in this action to file a new law suit, since their

17  claims are dismissed without prejudice on the same terms as are

18  the class members from the other twelve (12) rancherias.  The

19  action involving Auburn Rancheria was brought and settled as a

20  class action and for that reason binds all distributees from that

21  rancheria.

22          As to the seventeen (17) rancheria, in exchange for the

23  prompt and certain granting of this equitable and declaratory

24  relief without the risks, delays and ordinary uncertainties of

25  litigation and possible appeals, plaintiffs' claims for money

26  damages in these cases would be dismissed with prejudice and

27  further actions arising out of the purported termination of the

28  Rancherias would be foreclosed.

-10-

Having litigated to conclusion other major untermination cases, being presently involved in the litigation and/or appeal of the liability and damage aspects of such cases in the Court of Claims, the Court of Appeals and the district court, and having weighed the benefits of the proposed settlement against the potential risks and delays inherent in litigating this case to its conclusion, it is the opinion of the undersigned that approval of the settlement would be in the best interests of both the named plaintiffs and the class of persons represented by them. This opinion is based upon the following considerations:

1.  <u>Likelihood of Recovery and Adequacy of Settlement</u>

Although it is a virtually certainty that plaintiffs would receive at least some equitable relief (if only because defendants agree that provision of adequate water and sanitation facilities under §3 of the Rancheria Act is a condition precedent to lawful termination, and the Bureau of Indian Affairs and I.H.S. both have identified numerous rancherias receiving benefits under this settlement as among those at which §3 water and sanitation facilities were not adequately completed prior to distribution of Rancheria assets, see letter from Locke, dated Feb. 1, 1982, and letter from Rapport, dated March 3, 1983 (copies of which are attached hereto as Exhibit "A"), the nature and extent of the relief to which plaintiffs would be entitled is likely to be the subject of considerable dispute. Based upon experience in other similar cases, the undersigned anticipates that defendants would be most likely to litigate to the fullest extent the nature of the <u>status quo ante</u>, and thus plaintiffs' right to have community lands returned to trust for the benefit

-11-

of specified Tribal entities, to have individual lands returned to trust status for named individual beneficiaries, and to receive B.I.A. assistance in returning lands to trust.

The undersigned believes that at least some plaintiffs and unnamed class members have sustained money damages as the direct result of wrongful termination, that such damages are susceptible to proof and that the United States should be held liable for such damages.  However, individual class members with significant damage claims will have the right to exclude themselves from the settlement by giving notice to the Court. Plaintiffs' attorneys believe this protects the rights of those class members, while benefitting those others who believe that an immediate settlement  outweighs uncertain, future damage awards. In addition to legal uncertainties, regarding liability (e.g., whether a particular rancheria was illegally terminated) some plaintiffs' claims for money damages could be subject to problems of proof and the passage of time.

In the opinion of the undersigned, the potential long-term value of the equitable relief to be granted to the Bands, individual plaintiffs and class members under the settlement stipulations in all probability will far exceed the money damages which might be recovered in these actions were they not to be settled, particularly where those who feel they have significant damages claims have the option not to participate in this settlement.

2.  <u>Avoidance of Future Litigation and Other Problems</u>

Unless this case is settled, trials may be necessary, and appeals almost certainly would follow, thus delaying receipt

of any meaningful relief for at least one, and possibly as many

as three years. During that time, it is likely that some elderly

plaintiffs and class members will pass away, and thus be denied

the benefit of any relief eventually awarded. Additional delays

will increase the tax liability of Indian landowners and the risk

that lands may be lost. The transfer of interests in property by

conveyance or inheritance also will be more complicated and

costly. Also, during that time, plaintiffs

not only would be denied access to many of the federal Indian

services they desperately need, but also would run the risk that

changes in federal policies might eliminate some of the services

and benefits plaintiffs otherwise might have received.

In summary, the proposed settlement would immediately

grant plaintiffs substantially all of the equitable relief they

seek in their lawsuits, in exchange for dismissal with prejudice

of damage claims which are subject to legal uncertainties and

problems of proof, and may be of substantially less value over

time than the equitable relief provided. Moreover, there can be

no assurance that changes in federal Indian policy while this

case is being litigated will not render equitable relief awarded

several years from now much less valuable than that relief would

be today.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

For all of these reasons, it is the opinion of the undersigned that the settlement set forth in the Stipulation for Entry of Judgment is fair, adequate and reasonable, and thus should be approved by the court.

DATED: 11/16/83

Respectfully submitted,

DAVID J. RAPPORT
LESTER J. MARSTON
CALIFORNIA INDIAN LEGAL SERVICES
Counsel for Plaintiffs

By: _____
DAVID J. RAPPORT

-14-

U.S. Department Justice

*United States Attorney*
*Northern District of California*

Refer to:
   Land and Natural
   Resources Division
   #2073

*16th Floor Federal Building - Box 36055*
*450 Golden Gate Avenue*
*San Francisco, California 94102*

*Branch Office:*
*675 N. First Street, Suite 508*
*San Jose, California 95112*

February 1, 1982

Mr. David J. Rapport, Esq.
CALIFORNIA INDIAN LEGAL SERVICES
200 West Henry Street
P. O. Box 488
Ukiah, California  95482

Dear Mr. Rapport:

      Re:  Tillie Hardwick, et al. v. U. S., et al.
          Civil No. C-79-1710 SW (N. D. Calif.)

      Pursuant to our conversations and meeting of January 18, 1982, the Government is willing to discuss settlement of the following rancherias:

            Chicken Ranch          Potter Valley
            Cloverdale             Redwood Valley
            Greenville ?           Rohnerville ?
            Mooretown ?            Smith River
            Picayune

      We also invite your arguments in support of any additional rancherias that you believe should be included in settlement discussions with those listed above.

      In addition, there are several other rancherias listed in the Complaint which are the subject of litigation in other proceedings. We believe that disposition of this classification of rancherias should also be discussed in our settlement conference.

            Very truly yours,

            JOSEPH P. RUSSONIELLO
            United States Attorney

      By:  *Paul E. Locke*

            PAUL E. LOCKE
            Assistant United States Attorney

PEL:nam
cc:  William M. Wirtz, Assistant Regional Solicitor, Department of
     the Interior, Sacramento, CA
    Duke McCloud, Attorney, Department of Health & Human Services,
     Rockville, MD

EXHIBIT "A"

PAGE 1 OF 15 PAGES

1  DAVID J. RAPPORT
LESTER J. MARSTON
2  California Indian Legal Services
200 West Henry Street
3  Post Office Box 488
Ukiah, California 95482
4  Telephone: (707) 462-3825

5  Attorneys for Plaintiffs

6  JOSEPH P. RUSSONIELLO
United States Attorney
7  RODNEY H. HAMBLIN
Assistant United States Attorney
8  PAUL E. LOCKE
Assistant United States Attorney
9  450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
10  Telephone: (415) 556-5134

11  Attorneys for Federal Defendants

12

13

14          IN THE UNITED STATES DISTRICT COURT

15      FOR THE NORTHERN DISTRICT OF CALIFORNIA

16  TILLIE HARDWICK, et al.,          )  No. C-79-1710-SW
                                      )
17              Plaintiffs            )  STIPULATION FOR ENTRY
                                      )  OF JUDGMENT
18          v.                        )
                                      )
19  UNITED STATES OF AMERICA, et al., )
                                      )
20          Defendants.               )
                                      )

21

22          The parties to the above-entitled action, recognizing

23  the uncertainties in law and the burden of further litigation,

24  and in order to make mutually beneficial settlement of these

25  actions, subject to approval of the Court pursuant to Federal

26  Rules of Civil Procedure, Rule 23(c), stipulate that the Court

27  may enter judgment as follows:

28  / / / / / / / /

1.    That the seventeen Rancherias which are the subject
of the provisions of paragraphs 2 through 13 inclusive, of this
stipulation, are as follows:

Big Valley

Blue Lake

Buena Vista

Chicken Ranch

Cloverdale

Elk Valley

Greenville

Mooretown

North Fork

Picayune

Pinoleville

Potter Valley

Quartz Valley

Redding

Redwood Valley

Rohnerville

Smith River

These rancherias are more fully described in the
attached Exhibit "A", which is incorporated herein by reference
as though set forth in full.

2.    The Court shall certify a class consisting of all
those persons who received any of the assets of the rancherias
listed and described in paragraph 1 pursuant to the California

/ / / / / / /

-2-

1  Rancheria Act 1/ and any Indian heirs, legatees or successors in

2  interest of such persons with respect to any real property they

3  received as a result of the implementation of the California

4  Rancheria Act.

5       3.  The status of the named individual plaintiffs and

6  other class members of the seventeen rancherias named and

7  described in paragraph 1 as Indians under the laws of the United

8  States shall be restored and confirmed.  In restoring and

9  confirming their status as Indians, said class members shall be

10 relieved from the application of Sections 2(d) and 10(b) of the

11 California Rancheria Act and shall be deemed entitled to any of

12 the benefits or services provided or performed by the United States

13 for Indians because of their status as Indians, if otherwise quali-

14 fied under applicable laws and regulations.

15      4.  The Secretary of the Interior shall recognize the

16 Indian Tribes, Bands, Communities or groups of the seventeen

17 rancherias listed in paragraph 1 as Indian entities with the same

18 status as they possessed prior to distribution of the assets

19 of these Rancherias under the California Rancheria Act, and said

20 Tribes, Bands, Communities and groups shall be included on the

21 Bureau of Indian Affairs' Federal Register list of recognized

22 tribal entities pursuant to 25 CFR, Section 83.6(b). Said Tribes,

23 Bands, Communities or groups of Indians shall be relieved from

24 the application of section 11 of the California Rancheria Act and

25 shall be deemed entitled to any of the benefits or services

26 provided or performed by the United States for Indian Tribes,

27

28  1/  Act of August 18, 1958, P.L. 85-671, 72 Stat. 69, as
    amended by the Act of August 11, 1964, 78 Stat. 390.

1  Bands, Communities or groups because of their status as Indian

2  Tribes, Bands, Communities or groups.

3        5.   The Court shall not include in any judgment entered

4  pursuant to this stipulation any determination of whether or to

5  what extent the boundaries of the rancherias listed and described

6  in paragraph 1 shall be restored and shall retain jurisdiction to

7  resolve this issue in further proceedings herein.

8        6.  Any named individual plaintiff or class member who

9  received or presently owns fee title to an interest in any former

10  trust allotment by reason of the distribution of the assets of

11  any of the Rancherias listed in paragraph 1 shall be entitled to

12  elect to restore any such interest to trust status, to be held by

13  the United States for the benefit of such Indian person(s).

14        7.   Within two years of date of notice of this

15  judgment, as provided in paragraph 9, the Indian Tribes,

16  Bands, Communities or groups of the seventeen rancherias listed

17  in paragraph 1 that are recognized by the Secretary of the

18  Interior pursuant to paragraph 4 herein may arrange to convey

19  to the United States all community-owned lands within their

20  respective rancherias to which the United States issued fee

21  title in connection with or as the result of the distribution

22  of the assets of said rancherias, to be held in trust by the

23  United States for the benefit of said Tribes, Bands, Communities

24  or groups, authority for the acceptance of said conveyances

25  being vested in the Secretary of Interior under section 5 of

26  the Act of June 18, 1934, "The Indian Reorganization Act," 48

27  Stat. 985, 25 U.S.C. §465 as amended by section 203 of the

28  / / / / / / /

-4-

Indian Land Consolidation Act. Pub. L. 97-459, Title II, 96 Stat. 2515 and/or the equitable powers of this court.

8.   Any named plaintiff or other class member herein may elect to convey to the United States any land for which the United States issued fee title in connection with or as the result of the distribution of assets of said rancherias to be held in trust for his/her individual benefit or the benefit of any other member or members of the rancheria, authority for the acceptance of said conveyances being vested in the Secretary of the Interior under section 5 of the Act of June 18, 1934, "The Indian Reorganization Act," 48 Stat. 985, 25 U.S.C. §465 as amended by section 203 of the Indian Land Consolidation Act, Pub. L. 97-459, Title II, 96 Stat. 1512 and/or the equitable powers of this court.

9.   Upon entry of judgment herein the United States shall give personal mail notice to each individual plaintiff and other class members (to the extent such persons can be identified and located through the exercise of reasonable efforts) that said individuals may elect to return their lands to trust pursuant to the judgment entered pursuant to this stipulation. Said notice shall advise that the Bureau of Indian Affairs will assist those individuals desiring to convey lands to the United States, including providing for forms and instructions. In addition, the United States shall aid and assist class members in perfecting said conveyances by obtaining any necessary policies of title insurance or taking any other actions administratively required to complete such conveyances. Nothing in this Stipulation shall require the United States to provide funds for the payment of real property taxes which may have

//

accrued in the past or may accrue in the future with respect to lands located on any Rancheria as described in Exhibit A; provided, however, that this Stipulation does not represent a concession by any party hereto that any of said property is subject to real property taxes.

The United States shall also give general notice of the rights provided by this paragraph 9 by publishing notice once each week for one month in newspapers of general circulation most likely to be read by class members, and by posting notice in a conspicuous location on or near each of the seventeen rancherias named in paragraph 1.

10.  The Secretary of the Interior, named individual plaintiffs, and other class members agree that the distribution plans for these Rancherias shall be of no further force and effect and shall not be further implemented; however, this provision shall not affect any vested rights created thereunder.

11.  All claims whatsoever for money damages against the United States resulting from the distribution of the assets of the seventeen rancherias named in paragraph 1 under the Rancheria Act and arising out of the implementation of said Act shall be dismissed with prejudice, plaintiffs having specifically considered the potential value of said claims, the probability of the success thereof, and the value of the relief to be obtained under this settlement agreement.

12.  For the purpose of resolving any disputes which arise among the parties in the course of implementing the judgment to be entered pursuant to this stipulation, or for extending the time

//

within which any act may or must be performed under this Stipulation, the Court shall retain jurisdiction over this matter for a period of two (2) years from entry of judgment, or for such longer time as may be shown to be necessary on a duly-noticed motion by any party.

13.    Entry of judgment pursuant to this stipulation shall constitute a final settlement of all claims which named plaintiffs and plaintiff class members have or may have against the United States and its officers and employees arising out of the implementation of the California Rancheria Act at the seventeen Rancherias listed in paragraph 1.

14.    Except as hereafter specifically provided in paragraphs 15-19, the claims asserted in this action by or on behalf of any persons who received any of the assets of the Graton, Scotts Valley, Guideville, Strawberry Valley, Cache Creek, Paskenta, Ruffeys, Mark West, Wilton, El Dorado, Chico or Mission Creek Rancherias are dismissed without prejudice to their being refiled in another action and defendants shall not assert any laches defense to any such subsequent action they could not have asserted prior to the date this action was filed.

15.    The claims of Ethel Whiterock, Minerva Pike, Jesse Elliott, Nora Cooper and Irene Young who received assets from the termination of the Guideville Rancheria under the California Rancheria Act shall be dismissed on grounds of res judicata based on the stipulation and judgment entered in Whiterock et al. v. Udall, Fed. Dist. Ct. N.D. Cal. No. 50584 SAW.

16.    The claims of all the named and unnamed class members represented in Taylor et al. v. Hickel, C-70-719 SAW (N.D. Cal.)

//

from the Auburn Rancheria shall be dismissed on grounds of res judicata.

17.  The claims asserted in this action against the United States on behalf of Frank Truvido and Gloria Truvido of Graton Rancheria who were parties to <u>Frank Truvido and Gloria Truvido v. Morton</u>, C-72-181 GBH (N.D. Cal.), shall be dismissed on grounds of res judicata.

18.  The claims asserted in this action on behalf of Teresa Boggs of the Scotts Valley Rancheria who was a party to <u>Teresa Boggs and Bessie Ray v. Rogers C.B. Morton</u>, C-71-1714 RFP (N.D. Cal.), shall be dismissed on the grounds of res judicata.

19.  The claims asserted in this action by any person who received any of the assets of the Robinson or Table Bluff Rancherias pursuant to the California Rancheria Act shall be dismissed from this action since prior to filing of this action those persons had filed independent actions in <u>Duncan et al., v. Andrus</u>, Fed. Dist. Ct., N.D. Cal. No's C-71-1572 WWS, C-71-1713 WWS and <u>Duncan et al., v. U.S.</u>, (Ct. Cls.) No 19-75 and <u>Table Bluff Band et al., v. Andrus</u>, No. C-75-2525 WWS, which actions are still pending.

Dated: _July 19, 1983_                CALIFORNIA INDIAN LEGAL SERVICES

                                      By: _____
                                          DAVID J. RAPPORT
                                          Attorneys for Plaintiffs

                                          JOSEPH P. RUSSONIELLO
                                          United States Attorney

Dated: _July 15, 1983_

                                      By: _____
                                          PAUL E. LOCKE
                                          Assistant United States Attorney

## RANCHERIA DESCRIPTIONS

### BIG VALLEY

The Big Valley Rancheria, 118.45 acres, is located on the south shore of Clear Lake near Finley in Lake County, California.

Tract 1: SE1/4NW1/4, NE1/4SW1/4 and Lot 3 (being the fractional NE1/4NW1/4), Section 32, T. 14 N., R. 9 W., Mount Diablo Meridian, California.

Tract 2: That portion of the SE1/4SW1/4 Section 29 and NE1/4NW1/4 Section 32, T. 14 N., R. 9 W., Mount Diablo Meridian, which is north of the United States Meander Line for Clear Lake and which is above the low water line of Clear Lake, subject to a flowage easement.

### BLUE LAKE

The Blue Lake Rancheria, 30.92 acres, is located adjacent to the city of Blue Lake, Humboldt County, California.

A tract of land situate in a portion of the SE1/4SW1/4 Section 19 and in a portion of the NE1/4NW1/4 Section 30, T. 6 N., R. 2 E., Humboldt Meridian and more particularly described in a Warranty Deed recorded in Volume 107 of Deeds, page 224 in the records of Humboldt County, California.

### BUENA VISTA

The Buena Vista Rancheria, 67.5 acres, is located in Amador County, California.

Commencing at the NE corner of Section 19, T. 5 N., R. 10 E., Mount Diablo Meridian, California, thence running west along section line 578 feet, thence at right angles south 5280 feet, thence at right angles east 578 feet, thence at right angles north 5280 feet to place of beginning.

### CHICKEN RANCH

The Chicken Ranch Rancheria, 40 acres, is located in Tuolumne County, California.

E1/2E1/2NE1/4 Section 20, T. 1 N., R. 14 E., Mount Diablo Meridian, California.

-1-

## CLOVERDALE

The Cloverdale Rancheria, 27.50 acres, is located adjacent to and south of the town of Cloverdale, Sonoma County, California.

All these certain lots, pieces or parcels of land, situate, lying and being in the Township of Cloverdale, County of Sonoma, State of California, and bounded and particularly described as follows, to wit:  Beginning at a point in the center of the main public road leading from Cloverdale to Healdsburg and at the northwesterly corner of the land formerly owned by Louis Bee, which is an iron pipe two (2) inches in diameter, two (2) feet long, driven below the surface of the ground, from which a fir tree five (5) feet in diameter marked "R.M.", and known as station 8 on the Muscalacon Grant Line bears south 47  W., 39.38 chains distant; thence N. 47  40' E., along the northerly line of the land formerly owned by Louis Bee, 49.25 chains; thence north 59  15' W., 6.071/2 chains to the southerly line of the land of Helena M. Woolsey, thence S. 47  28' W., along the southerly line of the land of Helena M. Woolsey, 46.68 chains to the center line of the hereinbefore mentioned public road; thence S. 34  15' E., along the center line of said road 5.71 chains to the place of beginning, containing 27.50 acres. (Note – above area included Northwestern Pacific Railroad right of way.)

## ELK VALLEY

The Elk Valley Rancheria, 100 acres, is located near the town of Crescent City, Del Norte County, California.

SE1/4SE1/4, S1/2S1/2NE1/4SE1/4 Section 22; SW1/4SW1/4, S1/2S1/2NW1/4SW1/4 Section 23, T. 16 N., R. 1 W., Humboldt Meridian, California.

## GREENVILLE

The Greenville Rancheria, 275 acres, is located approximately three miles east of Greenville, Plumas County, California.

Parcel 1: N1/2 Lot 4, Section 5; N1/2 Lot 1, Section 6, T. 26 N., R. 10 E., Mount Diablo Meridian, California.

Parcel 1A: SE1/4 Section 31, T. 17 N., R. 10 E., Mount Diablo Meridian, California.

Parcel 2: Beginning at the S.E. corner of Plumas County Swamp and Overflowed Land Survey No. 37, N. 31 1/4  E., 3.72 chains from the 1/4 Section corner on the South line of Section 6, T. 26 N., R. 10 E., M.D.M., and running thence N.

72 1/2  W., 15.80 chains; thence N. 4 E., 42.00 chains, thence E. 2.06 chains, thence N. 14.03 chains; thence E. 7.97 chains to the North and South centerline of said Section 6; thence S. 23.85 chains to the center of said Section 6; thence E. 5.00 chains; thence S. 4 1/2  W., 36.88 chains to the place of beginning, containing 75 acres.

## MOORETOWN

The Mooretown Rancheria, 160 acres, is comprised of two parcels, one-half mile apart.  It is located in Butte County, California.

Parcel 1: N1/2NE1/4 Section 22 T. 20 N., R. 6 E., Mount Diablo Meridian, California.

Parcel 2: N/1/2NE1/4 Section 23, T. 20 N., R. 6 E., Mount Diablo Meridian, California.

## NORTH FORK

The North Fork Rancheria, 80 acres, is located about two miles from the town of North Fork, Madera County, California.

SE1/4NE1/4 Section 20, and SW1/4NW1/4 Section 21, T. 8 S., R. 23 E., Mount Diablo Meridian.

## PICAYUNE

The Picayune Rancheria, 80 acres, is located three miles south of Coarsegold in Madera County, California.

N1/2NE1/4 Section 29, T. 8 S., R. 21 E., Mount Diablo, Meridian.

## PINOLEVILLE

The Pinoleville Rancheria, 99.53 acres, is located in Mendocino County, California.

Tract 1: A portion of Lot 142 of Healey's Survey and Map of the Yokayo Rancho containing 3 acres and more particularly described in deed filed in Book 123 of Deeds, page 148, Recorder's Office, County of Mendocino.

Tract 2: A portion of Lots 141 and 142 of the Yokayo Rancho containing 96.53 acres and more particularly described in deed filed in Book 133 of Deeds, page 283, Recorder's Office, County of Mendocino.

## POTTER VALLEY

The Potter Valley Rancheria, 96 acres, is located near the town of Potter Valley, Mendocino County, California.

Tract 1: A metes and bounds description in Section 19, T. 17 N., R. 11 W., Mount Diablo Meridian and more particularly described in Deed recorded in Book 116 of Deeds, Page 197, Mendocino County, containing 16 acres.

Tract 2: NW1/4SE1/4, SE1/4NW1/4 Section 35, T. 18 N., R. 12 W., Mount Diablo Meridian, containing 80 acres.

## QUARTZ VALLEY

The Quartz Valley Indian Reservation, 604 acres, is located in Siskiyou County, California.

Tract 1: NW1/4, W1/2SW1/4 Section 2, T. 43 N., R. 10 W., E1/2SE1/4 Section 3 and a fractional portion of the NE1/4NE1/4 Section 3, T. 43 N., R. 10 W., Mount Diablo Meridian, containing 364 acres.

Tract 2: E1/2SE1/4 Section 34 and SW1/4 Section 35, T. 44 N., R. 10 W., Mount Diablo Meridian, containing 240 acres.

## REDDING

The Redding Rancheria, 30.89 acres, is located south of Redding in Shasta County, California.

Tract No. 8 of the Anderson Valley Farms, situate, lying and being on the Rancho Buena Ventura or Reading Grant, in the County of Shasta, State of California.

## REDWOOD VALLEY

The Redwood Valley Rancheria, 80 acres, is located north of the town of Redwood Valley, Mendocino County, California.

NE1/4SW1/4, fractional part of SE1/4NW1/4 Section 32, T. 17 N., R. 12 W., Mount Diablo Meridian and fractional part of Lot 131 of Healey's Survey and Map of Yokayo Rancho.

## ROHNERVILLE

The Rohnerville Rancheria, 15.22 acres, is located near Fortuna, Humboldt County, California, and overlooks the village of Ronherville.

-4-

Tract 1: A parcel of land situate in the E1/2SE1/4 Section 1, T. 2 N., R. 1 W., Humboldt Meridian containing 15 acres and more particularly described in a deed recorded in Volume 116 of Deeds, page 93 in the records of Humboldt County, California.

Tract 2: Commencing at the NW corner of the above tract and running thence N. 37 20' W. 215.5 feet; thence S. 10.6 feet; thence W. 40 feet; thence N. 60 feet; thence E. 40 feet; thence S. 37 20' E. 277 feet; thence S. 89 W. 37.5 feet to place of beginning, containing 0.22 acres, together with a spring.

## SMITH RIVER

The Smith River Rancheria, 163.96 acres, and an unsurveyed island known as Prince Island, 14.25 acres, are located in Del Norte County, California.

Tract 1: Frac. W1/2, N1/2NW1/4NE1/4, NE1/4NE1/4 Section 17, T. 18 N., R. 1 W., Humboldt Meridian, California, containing 163.96 acres.

Tract 2: Unsurveyed island in the Pacific Ocean about 3/4 mile north of Smith River in Section 17, T. 18 N., R. 1 W., Humboldt Meridian, designated on the official plat of survey as Hunters Rock and on the U.S.C. & G. Chart No. 5900 as Prince Island, 14.25 acres.

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

I am a citizen of the United States, over the age of eighteen years, with my business address at 200 West Henry Street, Ukiah, California 95482, employed in the County of Mendocino and am not a party to the within action.

On the 20th day of July, 1983 , I served the within: Stipulation For Entry Of Judgment

on Defendants in said action, by placing a true copy thereof enclosed in a sealed envelope with the correct postage thereon ally prepaid in the United States post office mail box at Ukiah, California, addressed as follows:

| | | |
|---|---|---|
| Paul E. Locke<br>Asst. U.S. Attorney<br>P.O. Box 36055<br>450 Golden Gate Ave.<br>San Francisco, CA 94102 | Robert L. Bridges<br>Deputy County Counsel<br>255 N. Forbes Street<br>Lakeport, CA 95453 | John C. Drummond<br>County Counsel<br>County of Mendocino<br>Courthouse, Rm. 304 -<br>Ukiah, CA 95482 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 20, 1983 at Ukiah, California.

*Lisa Elgin*

LISA ELGIN



WILTON RANCHERIA

T.6N., R.7E. M.D.M.     SACRAMENTO COUNTY

PROPOSED DISTRIBUTION

Proposed Road ————
Water tank ✛
Fence ————o————
Existing road ·········

FILED

DEC 1 5 1983

WILLIAM L. WHITTAKER
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

*98*

TILLE HARDWICK, et al.,          )
                                 )
                Plaintiffs,      )     No. C-79-1710-SW
                                 )
         vs.                     )     FINDINGS AND
                                 )     RECOMMENDATION
UNITED STATES OF AMERICA,        )
et al.,                          )
                                 )
                Defendants.      )
_____ )

This matter came on for hearing on December 14, 1983, for a recommendation as to whether the district court should approve the terms of a class action settlement agreement and enter a stipulated judgment against the United States.  David Rapport and George Foreman appeared on behalf of the plaintiffs;  Paul Locke appeared for the defendant United States.

This is a class action lawsuit to set aside the termination of thirty-four California Indian Rancherias under the California Rancheria Act (the Act) and to recover damages for alleged violations of the Act and the federal

government's obligations as trustee.  On August 2, 1983,

the plaintiffs and the federal defendant filed a written

agreement compromising and settling certain claims of

the Indians against the United States.

Briefly, the settlement affects seventeen of the

thirty-four rancherias.  Under the terms of the proposed

stipulated judgment, Indian class members from the seventeen

affected rancherias would:

(1) have restored their individual status as Indians

under federal law;

(2) have restored their status as federally recognized

Indian Tribes, Bands, Communities or groups;

(3) have the right to convey to the United States

property they received when the rancherias were terminated,

to be held in trust for the benefit of the current owner

or owners or such other rancheria member as the owner or

owners shall designate;

(4) dismiss with prejudice claims for damages against

the United States.

Within two years of the judgment, the Indian Tribes,

Bands, Communities or groups of the seventeen affected

rancherias would have the right to convey to the United

States community-owned lands within the rancherias, to be

held in trust for the benefit of  the conveying Tribe,

Band, Community or group.

Class members from twelve other rancherias would

FINDINGS AND
RECOMMENDATION

-2-

1   dismiss without prejudice their claims.  Class members from

2   the five remaining rancherias, who settled their claims

3   against the United States in prior actions, would dismiss

4   with prejudice their actions.

5        On October 21, 1983, the district court approved the

6   notice to class members advising class members that they

7   could opt out of the class or submit written objections

8   to the proposed settlement on or before November 21, 1983.

9   The notice also advised class members of the December 14,

10  1983 hearing at which they could appear.

11       Approximately 40 class members appeared for the

12  December 14, 1983 hearing.  After David Rapport described

13  the terms of the settlement, the court afforded each class

14  member the opportunity to speak in support of or opposition

15  to the proposed settlement.

16       Six class members spoke:  Silvia (Green) White, William

17  Richards, Bertha Stewart, Jane Brown, Ed Sanderson and

18  Frank Hossler.  Four of them -- Ms. White, Ms. Stewart and

19  Mr. Richards of the Smith River Rancheria, and Ed Sanderson

20  of the Quartz Valley Rancheria -- favor trust status and

21  support the settlement, although Ms. White and Ms. Stewart

22  believe that additional land should be included in the

23  settlement.  Ms. White specifically objected to the exclusion

24  of two parcels used as a parsonage and church on the Smith

25  River Rancheria.  See generally White's Exhibit 1.

26       Ms. Brown of the Wilton Rancheria terminated her

FINDINGS AND
RECOMMENDATION
                            -3-

1    statement when she was informed that Wilton is not included

2    in the proposed settlement.  Mr. Hossler of the Smith River

3    Rancheria was the only class member who did not endorse

4    the overall settlement and he simply requested an additional

5    thirty days to study the terms of the agreement.

6        Based on the materials presented to the court, having

7    heard the arguments of counsel and the statements of the

8    class plaintiffs, the undersigned recommends that the

9    settlement agreement be approved by the district court and

10   that judgment be entered in accordance with the stipulated

11   judgment filed by the parties on August 2, 1983.

13   DATED: December 15, 1983

15        JOAN S. BRENNAN
         United States Magistrate

FINDINGS AND
RECOMMENDATION

**Lands Within The Original Boundaries**
**Of The Wilton Miwok Rancheria Presently Owned By**
**Distributees, Dependant Members, Their Heirs or Legatees**

| Parcel | Distributee | Owner As Of 7/1/1983 (*Tillie Hardwick* Settlement) | Indian Owner At Restoration | Owner As Of 11/1/2006 | Current Indian Owners |
|---|---|---|---|---|---|
| Lot 1 126-0230-010 | Jane D. Brown | Jane D. Brown | Yes | Jane D. Brown | Yes |
| Lot 2 126-0220-004 | Archie G. Williams | Jan C. Springer and Velma M. Springer his wife as Joint Tenants | No | Norman H. Orrick and Marilyn D. Orrick | No |
| Lot 3 126-0230-005 | Eva Irish | Theodore H. Bergala | Yes | Michael Steel and Susan Steele, husband and wife as Joint Tenants | No |
| Lot 4 126-0230-006 | Dorothy Andrews | Melvin and Barbara Wormington | No | Cindy Ann Chafin, Unmarried Woman | No |
| Lot 5 126-0230-009 | Ella and Arthur Taylor | Eddie Taylor and Ronda Benson [Taylor] | Yes | Edward Taylor, Ronda Benson, Delores Hernandez, Andrea Vera, and Robert Benson | Yes |
| Lot 6 126-0220-003 | Annie McKean | Charles J. McKean, Jr | Yes | Myrna McKean | No |
| Lot 7 126-0220-002 | John McKean | Bertha E. McKean | Yes | Stephen Alan Major, an unmarried man, and Laura Ann Shembery, an unmarried woman as joint tenants | Yes |
| Lot 8 126-0230-007 | Ada Louise Madrigal | Dorothy Andrews | Yes | Dorothy Andrews | Yes |
| Lot 9 126-0230-008 | Cosumnes River Indian Association | Cosumnes River Indian Association | Yes | Cosumnes River Indian Association | Yes |
| Lot 10 126-0230-004 | Gertrude Dupree | Gertrude Dupree | Yes | Patricia Baker and James Baker | Yes |
| Lot 11 126-0230-003 | Charles J. McKean Jr. | Charles J. McKean Jr. | Yes | William Daniels, Clifford McKean, James Daniels | Yes |
| Lot 12 126-0230-002 | Virginia Hatch | Herman and Constance Tripp | Yes | Maureen C. Franklin | No |
| Lot 13 126-0230-001 | Consumnes River Indian Association | Consumnes River Indian Association | Yes | Maureen C. Franklin | No |
| Lot 14* 126-0220-001 | Charles McKean, Jr. | Charles J. McKean, Jr. | Yes | Clifford H. McKean | Yes |

*Although the Distribution List provides for 13 Lots, the Distribution Map provides for 14 Lots.

## AGREEMENT

In order to move ahead with the process of restoring our Tribe that was terminated by the federal government in 1959 to full status of federal recognition, the undersigned have reached the following negotiated agreements:

1.) The undersigned agree that for the purpose of the tribal restoration process the official base membership of the Tribe will begin with the members listed: in the census documents of 1933/1935 and 1941, in the 1959 list of distributees and dependent children and all lineal descendants of the members referred to above.

2.) The undersigned further agree that for the purpose of the restoration process the composition of the Interim Tribal Council will be six members with two full-time alternates from each of the two groups: from Mary's Tarango's group there will be Mary Tarango, Sandy Taylor, Maxine Brown Franklin, George (Sonny) Williams, Linda Blue and Darlene Daniels with Muriel Sangmaster and _____ serving as the alternates, and (b) from Anita Franklin's group there will be Anita Franklin, Wayne McKean, Kenneth McKean Sr., Lana Darrow, Dorothy Andrews and Richard Taylor serving with Duwayne Wilson and Beverly Andrews as alternates.

3.) The undersigned further agree that the Tribe's name will be the Wilton Miwok Rancheria for purposes of Restoration. The undersigned further agree that after Restoration this name may be revisited and changed if this is the will of the general tribal membership.

4.) Furthermore, the undersigned understand that during the legislative period, up to the time of passage and full tribal restoration, people handling the legislation may have questions that they need the interim tribal council to answer before they are able to move the process along. In order to be fully responsive to such inquiries, in a timely manner, we understand that Anita and Mary are designated to serve jointly as the official points of first contact. After being contacted, Mary and Anita will work together in notifying the undersigned and scheduling a full meeting of the undersigned, within forty-eight hours of being contacted, to discuss how to respond. Any issue raised will be resolved in negotiations among the undersigned in such a scheduled meeting with the assistance of mediators, David Lent and Steven Haberfeld, from Indian Dispute Resolution Services (Inc).

5.) The undersigned further agree that the agreements outlined above are entered into in good faith and understanding, and will be jointly supported during the time the legislation is being considered and drafted by the Department of Interior and the U. S. Congress. The undersigned also agree that we will not in any way disrupt or jeopardize the Restoration Process until full tribal recognition has been granted by the federal government.

6.) The undersigned agree to provide a copy of the Agreement to Superintendent, Mr. Dale Risling, of the Central California Agency of the Bureau of Indian Affairs, at 1824 Tribute Road, Sacramento, California.

7.) The parties agree that when Wilton Miwok Rancheria is restored to federal recognition, the Interim Tribal Council created by paragraph 2 above, shall work with the membership in developing and initiating a Tribal Constitution to be voted on and approved by the tribal general membership for the purpose of establishing a tribal government. The Interim Tribal Council shall continue to represent the tribal membership under this agreement until the membership of the Rancheria has enacted a Constitution, conducted an election for a tribal council under the Constitution, and elected a new tribal council.

**EXECUTION OF INSTRUMENTS:** The undersigned shall do all things reasonably necessary to carry out the terms of this Agreement.

**THE EFFECT OF THE AGREEMENT:** This Agreement, and each provision thereof, is expressly made binding upon each of the parties. Parties signatures below.

12. *Mary Narango*  7916 Farnell Way  
~~Sacramento, CA~~  
95823  11/22/99

1. *Ronald J. Burton*  11·22·99  
Name and address

2. *Samm R. McKean Sr.* 9344 Rancheria Dr. Wilton CA 95693  11-22-99  
Name and address  Date

*Wayne R. McKean* 6441 PECAN AVE Orangevale Ca 95662  11-22-99  
Name and address  Date

4. *Clita Jones*  3949 Wildrose Way Sacto. Ca. 95826  11-22-99  
Name and address  Date

5. *Doreen Andrews* 9418 Pancheria Dr.  11-22-99  
Name and address  Wilton Ca. 95693  Date

6. *Richard Jayla* 8099 E Stockton Blvd Sacto, Ca 95823  11-22-99  
Name and address  Date

7. *Linda Blue* 3129 Berkshire Way Sacramento Ca 95864  11/22/99  
Name and address  Date

8. *Maxine Brown Franklin* 3532 Cordwood Way  11/22/55  
Name and address  Sac, CA 95826  Date

9. *Sandra L. Taylor* 7366 Branbury Way Sac, CA  11-22-99  
Name and address  95828  Date

10. *Diane Williams* (Sonny)  11-22-99  
Name and address  Date

11. *Darlene Daniels* 7329 Branbury Wy Sacto CA 95828  11-22-99

The Agreement described above was negotiated and concluded in the presence of mediators from Indian Dispute Resolution Service, Inc. (Sacramento, California).

*David Lent*  and  *Steven Haberfeld*  11-22-99  
David Lent  Steven Haberfeld  Date

12.

2



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Central California Agency
650 Capitol Mall, Suite 8-500
Sacramento, CA 95814

IN REPLY REFER TO

August 24, 2004

RE: Support of Restoration Efforts of The Wilton Miwok Rancheria

To Whom it May Concern:

The Bureau of Indian Affairs, Central California Agency recognizes and supports the efforts of the Wilton Miwok Rancheria tribal community in their pursuit of having their Federal Recognition restored. Forty-one Federally recognized tribes throughout California had their Federal recognition terminated as a direct result of the Rancheria Act of 1958, as amended and Wilton was one of these tribes. The tribe's recourse in challenging their termination on the premise of being illegal or wrongful through a Federal court action has long expired, leaving the Wilton Rancheria with limited options to seek relief.

In the Advisory Council on California Indian Policy Act of 1992, Congress established a state wide Indian Council that was directed to submit recommendations to Congress that included remedial measures to address the special status problems of California's terminated and unacknowledged tribes and the Bureau of Indian Affairs served on that Council as an ex-officio member. In that report which was submitted to Congress in 1998, it was recommended that " The Wilton Miwok Community, the Federated Tribes of the Graton Rancheria, and the Mishewol-Wappo Tribe of Alexander Valley should be immediately restored by Congress".

For the purposes of restoring Federal Recognition, the Bureau recognizes those members identified as part of the completed "Mediation Agreement of 1999" as the representatives of the Wilton Tribal community. To advance the tribes efforts to re-acquire Federal recognition and resolve ongoing internal political strife, this agreement was developed, agreed to by all parties and implemented. It is our understanding that as of this date, this agreement is still in affect and that the following individuals still represent the Mediation Agreement:

Ms. Mary Turango-Co-Chairperson
Ms. Anita Franklin-Co-Chairperson
Ms. Darlene Daniels-Vice-Chairperson
Mr. Richard Taylor-Treasurer

If you have any questions regarding this matter, please contact Raymond Fry, Deputy Superintendent, Tribal Services at (916) 930-3794.

Sincerely,

Dale Risling, Sr
Superintendent



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Central California Agency
650 Capitol Mall, Suite B-500
Sacramento, CA 95814

IN REPLY REFER TO

**SEP 17 2004**

To Whom It May Concern:

The original land base for the Me-Wuk Indian Community of the Wilton Rancheria consisted of 38.81 acres and was purchased with appropriated funds by the Federal Government in 1927.

The recognition of this Band of Me-wuk Indians, as a tribe took place when they were provided the opportunity to vote as a tribe whether to accept or reject the Indian Reorganization Act (IRA) of 1934, as the Statute with which to formally organize the tribe. Pursuant to Section 16 of the IRA, the tribe did on November 6, 1935, ratify a Constitution and By-laws which effectively formally organized this tribe.

The Wilton band of Me-wuk Indians was one of the 41 tribes in California who had their Federal Recognition terminated as a result of the Rancheria Act of 1958, as amended.

To provide the Federal Government a means for determining that certain American Indian Groups exists as tribes, they established departmental procedures and policy that provided a number of criteria to be met in order to have the government acknowledge their federal recognition.

The Government Acknowledgement Procedures, as utilized by the Branch of Acknowledgement and research were initially designed to be applicable for groups(tribal) who have never had federal recognition. Yet the criteria setforth in this process covers a number of different categories so thoroughly that they can and are used for tribes seeking federal recognition under a legislative or court processes.

Although the Wilton Rancheria has enjoyed previous federal recognition, the tribe has nonetheless over time reconstructed their tribal, cultural and political history to the extent that they have demonstrated beyond a doubt that they meet the following criteria for federal acknowledgement: The group has been identified as an American Indian Entity on a substantially continuous basis since 1900; A predominant portion of the group comprises a distinct community and has existed as a community from historical times to the present; the group has maintained political influence or authority over its members as an autonomous entity from historical times to the present; a copy of the group's present governing document including its membership criteria; the groups membership consists of individuals who descend from a historical Indian Tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity; the membership

of the group is composed principally of persons who are not members of any acknowledged North American Indian tribe.

The Me-wuk band of the Wilton Rancheria has demonstrated continuously that they are a tribe in every sense and as such certainly should be considered having their federal recognition restored.

Sincerely,

Dale Risling, Sr.
Superintendent

JUN 14 2006

To Whom It May Concern:

In 1927, the Federal Government purchased 38.81 acres (original land base) with appropriated funds for the 150 Miwok Indians living in this area known as the Wilton Rancheria, Sacramento County, California. The group was organized under the Indian Reorganization Act of June 18, 1934, as amended, as the Me-Wuk Indian Community of the Wilton Rancheria. Federal recognition was extended to the Me-Wuk Indian Community of the Wilton Rancheria when the adult Indians were provided the opportunity to vote as a tribe at a special election to accept or reject the terms of the Indian Reorganization Act (IRA) of June 18, 1934, as amended. On June 15, 1935, the adult voters of the Wilton Rancheria voted to accept the provisions of the IRA. Pursuant to section 16 of the IRA, the tribe ratified a constitution and bylaws on December 7, 1935, and the Secretary of the Interior approved the constitution on January 15, 1936, which effectively formally organized the tribe.

Federal recognition of the Me-Wuk Indian Community of the Wilton Rancheria was terminated in 1964 in accordance with the provisions of the Rancheria Act of 1958, as amended. At the time of termination, there were 33 Indians living on approximately 39 acres of land. The Wilton Rancheria was one of the 41 tribes in California whose Federal recognition was terminated as result of the Rancheria Act.

To provide a means for determining that certain American Indian groups exist as a tribe, the Federal Government established departmental procedures and policy for acknowledging that certain American Indian groups exist as tribes. Acknowledgment shall subject the Indian tribe to the same authority of Congress and the United States to which other federally acknowledged tribes are subjected. The Federal Government acknowledgment procedures, as utilized by the Branch of Acknowledgment and Research, were initially designed to be applicable for groups (tribal) who have never had federal recognition. However, the criteria set forth in this process cover a number of different categories so thoroughly that they can and are used for tribes seeking federal recognition under a legislative or court processes.

Although the Wilton Rancheria no longer had federal recognition status, the Tribe has over time reconstructed its tribal, cultural, and political history to the extent it has demonstrated beyond a doubt that the tribe meets the following criteria for federal acknowledgement: (1) The group has been identified as an American Indian entity on a substantially continuous basis since 1900; (2) A predominant portion of the group comprises a distinct community and has existed as a community from historical times to the present; (3) A copy of the group's present governing document including its membership criteria; (4) The group's membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes, which combined and functioned as a single autonomous political entity; (5) The membership of the group is composed principally of persons who are not members of any acknowledged North American Indian tribe.

Page 2

The Me-Wuk Indian Community of the Wilton Rancheria has demonstrated continuously that they are a tribe in every sense, and, as such, certainly should be considered having their Federal recognition restored.

Sincerely,

*Troy Burdick*

Troy Burdick
Superintendent

bcc:    BIAM-3201-P5 Wilton Rancheria FY 2006
        BIAM-37102-T1 Tribal Operations Chron CY 2006
        BIAM-10102-T1 Superintendent Chron CY 2006
        Blind Copy (Carol)

CBRogers-Davis:06/14/2006

# United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS
Central California Agency
650 Capitol Mall, Suite 8-500
Sacramento, CA  95814-4710

IN REPLY REFER TO

## SEP 1 2 2006

TO WHOM IT MAY CONCERN:

The Bureau of Indian Affairs, Central California Agency, recognizes and supports the efforts of the Wilton Miwok Rancheria tribal community in its pursuit to regain its Federal Recognition status. Forty-one federally recognized tribes throughout the State of California had their Federal Recognition terminated as a direct result of the Rancheria Act of 1958, as amended, and the Wilton Rancheria was one of those tribes. The Tribe's recourse in challenging its termination on the premise of being illegal or wrongful through a federal court action has long expired, leaving the Wilton Rancheria with limited options to seek relief.

In the Advisory Council on California Indian Policy Act of 1992, Congress established a statewide Indian Council consisting of representatives of federally recognized, terminated and unacknowledged California Tribes, with the Bureau of Indian Affairs serving on that Council as an ex-officio member. The Advisory Council was directed to submit recommendations to Congress regarding remedial measures to address the special status problems of California's terminated and unacknowledged tribes. In that report submitted to Congress in 1998, the Advisory Council recommended that "The Wilton Miwok Indian Community, the Federated Indians of the Graton Rancheria, and the Mishewol-Wappo Tribe of Alexander Valley meet the current criteria for restoration and should be immediately restored by Congress."

For the purposes of restoring Federal Recognition to the Wilton Rancheria, the Bureau of Indian Affairs recognizes those members identified as part of the completed "Mediation Agreement of 1999" as the representatives of the Wilton Tribal community. To advance the Tribe's efforts to reacquire Federal Recognition and to resolve ongoing internal political strife, this agreement was developed, agreed to by all parties and implemented. It is our understanding that as of this date, this agreement is still in effect and that the following individuals still represent the Mediation Agreement:

    Ms. Mary Tarango, Co-Chairperson
    Ms. Anita Franklin, Co-Chairperson
    Ms. Darlene Daniels, Vice-Chairperson
    Mr. Richard Taylor, Treasurer

Please contact Carol Rogers-Davis, Acting Tribal Operations Officer, at (916) 980-3764 should you have any questions with regard to this matter.

Sincerely,

Troy Burdick
Superintendent

# Advisory Council on California Indian Policy

# Final Reports and Recommendations to the Congress of the United States

## Pursuant to Public Law 102-416

## Executive Summary

## September, 1997

## ACKNOWLEDGEMENT

*The Advisory Council wishes to acknowledge the many California Indians and other individuals who testified at public hearings, participated in the Council's Task Forces, provided documentation, prepared drafts of specific reports, or otherwise supported, encouraged, or contributed to the preparation of these reports.*

# TABLE OF CONTENTS

I.  Introduction ................................................................................................ 1

    A. Creation of the Advisory Council on California Indian Policy ................... 1

    B. Context of the Work of the Advisory Council .......................................... 2

        1. A Federal Pattern of Dishonor and Neglect ................................... 2

        2. Federal Awareness of the Situation of the California Indians (1852-1997) ............ 4

        3. The Time for Decisive Federal Action is *Now* ............................... 9

    C. Major Themes of the ACCIP Reports ...................................................... 10

        1. The Need to Recast the Federal-Indian Relationship in California ............ 10

        2. The Need to Formulate a New Federal Indian Policy In California Through a Dialogue Between the Federal government and the California Indians ........................ 10

        3. The Need to Address Specific Substantive Issues Identified in the Advisory Council's Reports ............................................. 10

    D. The Advisory Council's Proposed Definition of California Indian ................. 11

II.  The Reports and Recommendations ................................................................ 12

    A. The Report of Federal Recognition .......................................................... 12

    B. The Report on Termination ...................................................................... 16

    C. The Community Services Report ............................................................... 19

    D. The Report on Economic Development ..................................................... 23

    E. The Report on Trust and Natural Resources .............................................. 28

    F. The Report on Indian Education ................................................................ 31

    G. The Report on California Indian Cultural Preservation ............................... 37

        Recommendations for Congress ................................................................ 38

    H. The Report on Indian Health .................................................................... 43

Endnotes ........................................................................................................... 47

# I.   Introduction

## A.   Creation of the Advisory Council on California Indian Policy

In the Advisory Council on California Indian Policy Act of 1992,[1] Congress established a statewide Indian Council consisting of representatives of federally recognized, terminated and unacknowledged California tribes. The Advisory Council was directed to submit recommendations to Congress regarding remedial measures to address the special status problems of California's terminated and unacknowledged tribes, and the needs of California Indians relating to economic self-sufficiency, health and education. Section 5 of the Act provides, in part, that the Council shall:

> (3) conduct a comprehensive study of -
>
>> (A) the social, economic, and political status of California Indians;
>> (B) the effectiveness of those policies and programs of the United States that affect California Indians; and
>> (C) the services and facilities being provided to California Indian tribes, compared to those being provided to Indian tribes nationwide . . .

And further provides that the Council shall:

> (6) submit, by no later than the date that is 36 months after the date of the first meeting of the Council, a report on the study [studies] conducted under paragraph (3) together with proposals and recommendations . . . and such other information obtained pursuant to this section as the Council deems relevant, to the Congress, the Secretary, and the Secretary of Health and Human Services; and
>
> (7) make such report available to California Indian tribes, tribal organizations and the public.

The Advisory Council, which held its first meeting in April 1994, established special task forces on recognition, health, education, economic development, culture and community services (encompassing governance and census issues) and held numerous public hearings throughout California. Its reports address each of these subject areas, in addition to termination issues and the relationship between the federal trust responsibility and the protection of Indian lands and natural resources in California. On July 27, 1997, the Council held a statewide meeting of the California tribes in which it reviewed and received further public comments on the final drafts of the Council's reports.

Gathering information in each of these subject areas from California's many recognized, terminated, and unacknowledged tribes, and from the Bureau of Indian Affairs (BIA) and other federal and state agencies, has been a daunting task. Many people have assisted and cooperated in this historic endeavor, which represents the first time that California Indians have been invited to speak directly to Congress about their problems. Thus, the Council's reports and recommendations represent the views of California Indian people speaking about their problems, most of which can be traced to their unique historical circumstances and the inconsistent and misguided federal policies that have shaped their history.

The Advisory Council's report to Congress includes this executive summary, eight separate reports (on recognition, termination, health, education, culture, community services, economic development, and natural resources/trust responsibility), and an overview of California Indian history.

## B.    Context of the Work of the Advisory Council

The reports of the Advisory Council focus on the contemporary and continuing effects of the federal government's unjust and inequitable treatment of the California Indians. Not injustice isolated in time or effect, but a pattern of injustice that stretches across the better part of two centuries and threatens to enter a third. Not injustice based on ignorance or inadvertence, but injustice that has been acknowledged, documented and studied by the federal government—then to a large extent ignored. Institutionalized injustice that has affected every aspect of Indian life in California. Injustice which has evolved from state-sanctioned efforts to "exterminate" the Indians, to federal policies that perpetuate various forms of economic and social oppression, deprivation of rights, and poverty within California's Indian communities.

Thus, it is appropriate that a brief history of the California Indians be given in order to understand and place in context their present situation. Although the Advisory Council's recommendations are forward-looking, the unique history of the California Indians and the extraordinary regularity with which they have been studied in the past, then largely ignored, serves to place their recommendations in a clearer light.

### 1.    A Federal Pattern of Dishonor and Neglect

While the history of the Federal-Indian relationship in California shares some common characteristics with that of Native peoples elsewhere in the United States, it is different in many aspects.[2] It includes the unprecedented magnitude of non-native migration into California after the discovery of gold in 1848, nine days before the signing of the Treaty of Guadalupe Hidalgo; the Senate's refusal to ratify the 18 treaties negotiated with California tribes during 1851-52; and the lawless nature of California's settlement after the Treaty of Guadalupe Hidalgo, including state sanctioned efforts (countered only by nominal federal resistance) to "exterminate" the indigenous population.[3]

A number of major events which occurred during the period from 1848 to 1853 had significant negative consequences for California Indians. The 1848 Treaty of Guadalupe Hidalgo between the United States and Mexico had resulted in a large cession of land to the United States, including more than 70,000,000 acres in California to which the California Indians had aboriginal title.[4] Although the United States initiated efforts to investigate and resolve the Indians' claims, these efforts were thwarted by the discovery of gold in California in 1848 and the subsequent influx of thousands of Anglo-Europeans, hungry for California's mineral wealth and its vast fertile valleys, who immediately clashed with the Indians. In addition, the admission of California to statehood in 1850 increased resistance by the State's representatives to the Indians' land claims.

At the federal level, in 1851 the United States had Commissioners in the field negotiating treaties with approximately one-third to one-half of the California tribes. Eighteen treaties were negotiated with 139 Indian signatories between March 19, 1851, and January 7, 1852.[5] However, when the treaties were presented to the United States Senate, under pressure from the California congressional delegation, it refused to ratify them. Additionally, the Senate took the extraordinary step of placing the treaties under seal. Contemporaneous with the initiative to negotiate treaties with the California tribes, Congress had passed the Land Claims Act of 1851,[6] which provided that all lands in California, the claim to which was invalid or not presented within two years of the date of the Act, would pass into the public domain. Thus, while the treaty negotiations were in progress, the limitations period on all California land claims, including Indian claims, was running as matter of federal law. Not surprisingly, the California Indians were unaware of the need to present their claims, and failed to meet the 1853 statutory deadline.[7] Their fate as landless Indians was then sealed when the Senate refused to ratify the treaties. Deprived of protected legal title to their lands by treaty or formal claim, the California Indians, with the exception of certain bands of Mission Indians which were protected in their occupancy by early Spanish land grants, became homeless.

These actions by the United States Government are the genesis of the tribal status problems in California. Had the treaties been ratified, they would have established an Indian land base in California of approximately 8.5 million acres, and accorded formal recognition to most of the unacknowledged California Indian groups that are currently seeking federal recognition. In addition, had Congress required the Attorney General to file claims on behalf of the unlettered and uninformed Indian tribes under the 1851 statute's claims procedure, it is likely that additional California tribes would have been recognized and their lands protected from adverse claims. Because of these early breaches of faith by the United States, the California Indian land base today is minuscule, a large number of California tribes have no land whatsoever, and the majority of California Indians, whose lands were taken and tribes dispersed through allotment and military force, are deemed ineligible for programs funded through the BIA.

To say that the native Indian tribes and bands of California suffered greatly with the influx of Anglo-Europeans during the mid-1800s is to grossly understate the brutality with which they were treated. The California Indian population in 1851 has been conservatively estimated at over 100,000.[8] Thirty-nine years later, the report of the Commissioner of Indian Affairs for 1890 recorded a population of 15,293. This represents almost an 85% decline in population from the most conservative 1851 population estimates. Indian people were forced off their land, relocated away from populated areas, and often served as a source of indentured labor for the largely White population. It was not unusual during this wild period of California history for groups of Indians to be hunted down and slaughtered with impunity.[9] Indian culture was brutally repressed and the federal government's weak attempts to protect isolated Indians from genocide (the term "extermination" was in popular usage at the time) by certain elements of the White population were largely unsuccessful. Some Indian groups were forcibly removed to the four authorized California reservations,[10] but even this "solution" afforded them only a small measure of physical protection and subsistence.

Major shifts in federal Indian policy at the national level during the late 19th century exacerbated the Indian problems in California. The passage of the General Allotment Act in 1887 opened parts of the limited number of Indian reservations in California to non-Indian settlement and divided the tribal land base. More lands passed out of Indian ownership, Congress' efforts to assimilate the Indian people failed, and more California Indians were rendered homeless and defenseless against a hostile White population. The situation at the turn of the last century was exceedingly grim. The incidence of disease and death among California Indians was extremely high, tribal culture in many areas had been devastated, and most of the dwindling population of California Indians sought refuge in remote areas of the state where they were tolerated rather than accepted.

In 1905, the injunction of secrecy on the 18 unratified treaties was removed by order of the Senate, and for the first time the public was informed of their existence. At the behest of government officials and citizens sympathetic to the economic and physical distress of California Indians, Congress passed special legislation to acquire isolated parcels of land for homeless California Indians. The Indian Appropriation Act for the fiscal year ended June 30, 1905, authorized an investigation of the conditions among the Indians of northern California and directed that some plan for their improvement be submitted to the next Congress. C.E. Kelsey was designated special agent to conduct the investigation. Kelsey commenced his investigation on August 8, 1905, and over the next several months personally inspected almost every Indian settlement between the California-Oregon border and Mexico. Between 1906 and 1910, a series of appropriation Acts were passed that provided funds to purchase small tracts of land in the central and northern parts of the state for the landless Indians of those areas. A number of Indian communities, and remnant groups of larger aboriginal tribes and bands, were restored to modest parcels of land and given some measure of protection and recognition by the federal government. These land acquisitions resulted in what has been referred to as the Rancheria System in California.

In 1934, Congress passed the Indian Reorganization Act (IRA).[11] The IRA announced a new federal Indian policy encouraging tribal self-government and eliminating the "absolutist" executive discretion previously exercised by the Interior Department and the Office of Indian Affairs.[12] In addition, it stemmed the dramatic loss of Indian land that had become the hallmark of the Allotment Period[13] by prohibiting the transfer of Indian land except under narrowly defined conditions.[14] Pursuant to the IRA's policy of reconstituting tribal governments, the BIA supervised elections among the California tribes, including most of the rancheria groups, on whether to accept or reject the tribal reorganization provisions of the IRA.[15]

Although many tribes accepted the provisions of the Act, ultimately, few California tribes benefitted economically from the IRA because of the continuing inequities in the funding of federal Indian programs in California[16] and the fact that implementation of the IRA in California was cut short by another shift in federal Indian policy.

Beginning in 1944, forces within the BIA began to propose partial liquidation of the rancheria system.[17] This recommendation was prompted in part by a sincere dissatisfaction with the inherent problems that existed as a result of the way the rancherias were acquired and managed by the federal government. Yet, this limited initiative evolved over the next 14 years into a policy that advocated termination of the federal trust responsibility to *all* California tribes and the total withdrawal of BIA programs from California. Thus, even the limited efforts to address the needs of California Indians at the turn of the century, and again through passage of the IRA, were halted by the federal government when it adopted the policy of termination. California became a primary target of this policy when Congress slated forty-one (41) California rancherias for termination pursuant to the Rancheria Act of 1958.[18]

Under the terms of the Rancheria Act, lands were distributed in fee to individual Indians, but the water and sanitation facilities promised the Indians under the terms of the Act were, in virtually every circumstance, either inadequate or not provided at all. Moreover, the Indians' dire need for adequate housing was not even addressed. As a consequence, most of the distributed lands were rendered uninhabitable and were subsequently sold or passed out of Indian ownership pursuant to tax sales, or sales made under duress to obtain the most basic necessities of life. This situation persisted until the late 1960s when the California tribes, assisted by Legal Services attorneys, commenced a series of lawsuits to un-terminate the California rancherias and to restore to California tribes and bands the recognition, authority and eligibility for programs that had been stripped from them by the ill-fated termination policy and decades of BIA inaction and incompetence in overseeing their Indian affairs.

During the past quarter century, judicial decisions and settlements have restored 27 of the 38 rancherias that were terminated under the original Rancheria Act.[19] Two additional tribes, the United Auburn Indian Community and the Paskenta Band of Nomlaki Indians, were restored by Acts of Congress in 1993.[20]

Since the late 1960s and the advent of the Indian Self-Determination Policy, California tribes—federally recognized, terminated and unacknowledged—have struggled on a number of fronts to reverse the effects of inconsistent federal policies and institutionalized federal neglect of the California Indians. Their efforts have been concentrated in four major areas: (1) equal treatment and parity in funding between BIA programs and services provided through the Sacramento Area and other BIA Area Offices; (2) restoration of federal recognition and services to tribes terminated under the California Rancheria Act; (3) implementation of federal acknowledgment criteria that accord fair consideration to the unique history and problems of California's unacknowledged tribes; and (4) the eligibility of non-federally recognized California Indians for Snyder Act programs. The Advisory Council's reports document these decades-long efforts and provide compelling justification for Congressional intervention to resolve them in a manner favorable to the California Indians.

## 2. Federal Awareness of the Situation of the California Indians (1852-1997)

There are few, if any, tribes of American Indians which have been studied with the frequency and attention accorded the California Indians. With an astonishing regularity, Congress, the Executive Branch, the State of California, and private entities, have been motivated to examine and report on the condition of the California Indians. What motivated them? Certainly, to some extent, the complaints and pleas of the California Indians themselves. But, even more so, the authors of these reports were moved by the clear injustice of the Indian situation in California. E. F. Beale, Superintendent of the California Indian Agency, writing in 1852 to the Commissioner on Indian Affairs, advised that if the government failed to take immediate measures to preserve the California Indians from "total extinction" it would subject the American republic to "everlasting disgrace."[21] Superintendent Beale was alluding to the responsibility that arose from the government's knowledge of the Indians' desperate condition; that, at some point, governmental neglect in

the face of such knowledge and the means to redress the Indians' condition would be seen as malevolent and disgraceful. As Beale put it, action was necessary "to [preserve] us ... from the charge of intentional and premeditated extinction of our Indian population." His words, with their references to the gap between the observed injustices and the political will to redress them, and to the conflict between the accumulation of wealth and the observance of basic human rights, ring true today:

> Driven from their fishing and hunting grounds, hunted themselves like wild beasts, lassoed, and torn from homes made miserable by want, and forced into slavery, the wretched remnant which escapes starvation on the one hand, and the relentless whites on the other, only do so to rot and die of a loathsome disease, the penalty of Indian association with frontier civilization.... I earnestly call the early attention of the government to this condition of affairs, and to a plan I have proposed in a previous letter for its relief. It is a crying sin that our government, so wealthy and so powerful, should shut its eyes to the miserable fate of these rightful owners of the soil. What is the expense of half a million for the permanent relief of these poor people to a government so rich? A single dry-dock, or a public building, costs twice that, and is voted without a dissenting voice: and yet here are seventyfive thousand human beings devoted to a death so miserable that humanity shudders to contemplate it, and these very people the owners of that soil from which we monthly receive millions; that very soil whose timely golden harvests have saved from bankruptcy, probably, the very men who will oppose this appropriation. I ask an appropriation of five hundred thousand dollars for the Indians in this State.[22]
> [Emphasis in original.]

Beale's plea for the Indians' relief established themes that echo in every report and statement on the condition of the California Indians spanning the last century and a half: governmental knowledge of the inhumanity and injustice of the treatment of the Indians, followed by either its refusal to act or its adoption of a policy or course of action that provided little to alleviate the conditions complained of, and in some instances actually aggravated them. The Advisory Council's reports, submitted almost a century and a half after Beale's, provide recommendations designed to break this historical pattern of federal malfeasance and neglect.

In general, Beale's report and those that followed envisioned a federal response that would improve the health, education and general welfare of the California Indians. It is thus appropriate, in this first report to Congress by the California Indians themselves, to list some of the most significant of these earlier reports and to provide excerpts from each, which demonstrate the history of the inequitable treatment of the California Indians.

## 1883: Report on the Condition and Needs of the Mission Indians of California, Made by Special Agents Helen Jackson and Abbot Kinney, to the Commissioner of Indian Affairs[23]

> From tract after tract of [their aboriginal] lands they have been driven out, year by year, by the white settlers of the country, until they can retreat no farther.... The responsibility for this wrong rests, perhaps, equally divided between the United States Government, which permitted lands thus occupied by peaceful agricultural communities to be put "in market," and the white men.... The Government cannot justify this neglect on the plea of ignorance.[24]

> We recommend the establishment of more schools. At least two more are immediately needed. ... These Indians are all keenly alive to the value of education. In every village that we visited we were urged to ask the Government to give them a school.[25]

**1906:** ## Report of Special Agent C.E. Kelsey to the Commissioner of Indian Affairs[26]

The responsibility of the National Government for the present condition of the non-reservation Indians of California seems clear. Had the Government given these Indians the same treatment as it did other Indians in the United States, their condition today would be very different. . . .

. . . It should be remembered that the Government still owes these people considerable sums of money, morally at least, but the Government owes more than money. No amount of money can repay these Indians for the years of misery, despair, and death which the Governmental policy has inflicted upon them. No reason suggests itself to your special agent why these Indians should not be placed in the same situation as all other Indians in the United States. . . .[27]

**1926:** ## Transactions of the Commonwealth Club of California[28]

The executive has always in fact admitted a much more definite obligation toward Indians whose right to land, assistance, and protection, was specifically safeguarded by treaty, than to those unfortunate Indians, like those of California, who have never been able to point to a definite promise on the part of the United States measuring the irreducible minimum of protection to which they were entitled.[29]

**1926:** ## The Legal Status of the California Indian[30]

[The Indians of California] are the neediest of their race, and yet they receive, in educational and health services, and in more direct aid, far less per capita than the average throughout the country.[31]

**1933:** ## Superintendent O.H. Lipps' Statement on the Condition of the California Indians Under the Jurisdiction of the Sacramento Indian Agency[32]

In the first place, it should be stated that the situation of the Indians under this [Sacramento Indian] Agency differs from that in any other part of the State or Nation where large numbers are affected. Here the Indians were ruthlessly and utterly dispossessed by the early gold miners, and unlike Indians in the extreme Northwestern and Southern parts of the State, no Executive Order, or other reservations were ever provided for those living in the Sacramento and Joaquin valleys and along the Sierra foothills. . . . From a condition of self-supporting, free men they were at once reduced to a state of peonage, in many cases were sold into slavery, and thus despoiled of the lands of their fathers and ground down into the earth by irresistible force, they have been almost compelled to become vagabonds and pitiable objects of destitution, want and misery.[33]

You and other members of your Committee visited and inspected a number of these rancherias when you held hearings in California last year. You saw how utterly hopeless it is for the Indians to improve their conditions without some aid from the Government. You heard the stories of their destitution and suffering from the Indians themselves, and I am sure your personal knowledge of the situation will enable you forcibly to present their needs and the justice of their plea for help to the proper authorities in Washington who may be in position to answer, at least in part, their cry for help.[34]

**1937:** ## Report of the Secretary of the Interior on Senate Bill 1651 and Senate Bill 1779, to Amend the California Indian Jurisdictional Act of May 18, 1928

The total of land now held in trust for California Indians, much of it of poor quality, is approximately 368,000 acres. But there has been no adequate assistance in matters of credit or agricultural organization; and it must be said that an expenditure of not less than $20,000,000 of Federal funds, across 50 years of time, has left the great majority of the California Indians in a state of acute poverty.

**1944:** <u>The Status of the Indian in California Today, A Report by John G. Rockwell, Superintendent of the Sacramento Agency to the Commissioner of Indian Affairs</u>

> With little land, with no other resources, with not even adequate credit facilities available, the thought is inescapable that the restrictive control exercised by the Federal Government over these Indians is a handicap rather than an assistance.[35]

> . . . We need to take stock of ourselves and recognize how woefully inadequate our Welfare Service is. [36]

**1969:** <u>Final Report to the Governor and the Legislature by the State Advisory Commission on Indian Affairs</u>

> [We recommend that the] California Indians be declared eligible to participate in all federally funded programs for Indians on the same basis as Indians in other states. . . .[37]

**1969:** <u>Senate Joint Resolution No. 32, California Legislature, August 21, 1969</u>[38]

> Whereas, The Indians of California are virtually excluded from participation in various federal programs and services that are available to other Indians of the United States; . . . . therefore, be it

> *Resolved by the Senate and Assembly of the State of California, jointly,*

> That the Legislature of the State of California respectfully memorializes the President and the Congress of the United States to establish a policy that insures that California Indians are included to the fullest extent in various federal programs and services that are available to other Indians of the United States.

**1969:** <u>Report of United States Senate Special Subcommittee on Indian Education of the Committee on Labor and Public Welfare</u>

> While the Federal Government has been devising new programs to assist the Indian and while Congressional expenditures for Indian education have increased significantly since World War II, these benefits have not accrued to California Indians. The withdrawal in the late 1940's and early1950's of the already minimal Federal assistance which California Indians then received has been well documented. . . . Although the Federal program [for Indian health care] in California was never large, even that was phased out by the Public Health Service [after it assumed responsibility in 1955]. . . . The Federal government discontinued its minimal welfare assistance to California Indians in 1952. . . in 1955]. . . .

**1971:** <u>Decent Homes: A Report on the Need for an Emergency Housing Grant for Rural California Indians, California Indian Legal Services</u>[39]

> Out of a rural Indian population of about 40,000, *at least seventy per cent*, and probably closer to ninety per cent, are ill housed. . . . During the last three years, the Bureau of Indian Affairs in California has had an annual housing budget of about $300,000 per year. . . . [which] represents about one per cent of the money needed to substantially improve the overall housing picture for California Indians. . . . It is estimated by Bureau officials that to substantially correct the situation, about *thirty million dollars* would be needed in California.[40] [Emphasis in original.]

**1972:** <u>Statement of Senator John Tunney before the United States Senate: Discrimination against California Indians</u>[41]

> . . . California is not now receiving a fair share of BIA and IHS funds and all California Indians are morally and legally entitled to participate on an equal basis in BIA and IHS programs in the fields of education, health, housing, and economic development.

## 1973: Indian Eligibility for Bureau Services—A Look at Tribal Recognition and Individual Rights to Services[42]

[H]istorically, California Indians have received much less consideration than Indians of other states. . . .[43] [Emphasis in original.]

. . . California Indians number 36,489 as documented by the 1970 census. They are all presently eligible for BIA services, yet the Bureau has only been funded to serve the 6,151 Indians living on trust lands. It is true that all of the native California Indians have been served to some extent, yet the degree has been greatly limited by the available funds. It is apparent that the BIA must be appropriated the funds which are commensurate with its obligation.[44]

The 1973 BIA budget allocated $5,117,000 to spend for California Indians. To bring the allocated funds in accordance with the true eligible service population, the federal government should appropriate approximately $11,172,000 which includes $600,000 for Johnson O'Malley funds to help remedy the educational crisis among native California Indians.[45]

## 1976: Study by the Department of Housing and Community Development, State of California

Examination of the Bureau of Indian Affairs (BIA) Budget data since 1969 reveals that California has not been receiving its fair share of BIA allocations based on its service population or on its needs and that action is required to rectify the present inequitable funding levels.

California Indians who comprise almost 7% of the BIA's service population have received only 1 - 2% of the Bureau's total budget since 1969. . . . [L]ong term underfunding of the Bureau's Sacramento Area Office (encompassing the State of California) has caused economic hardship for the Indians of California.

## 1977: A Report to the Commissioner of the Bureau of Indian Affairs Regarding Funding of Bureau Programs in the Sacramento Area[46]

[A chart for FY 1975] shows the percentage of the total [B.I.A.] allotment for each area, i.e. Sacramento received 1.32% of the total funds available with a population of 36,255 or 6.68% of the population. Based on population, Sacramento has a low $309.97 of the total allotments made for Fiscal Year 1975. . . . Minneapolis's net allotment is $859 per person. . . . [T]he average for Billings is $970 [per person] . . . . [T]he average for Portland is $1,576 per person. . . .[47]

## 1984: Report of the California Indian Task Force[48]

Administratively, the Sacramento Area in Fiscal Year 1984 had an assigned budget of $14,212,000 representing 1.7 percent of the overall Bureau budget and approximately 173 [personnel] positions . . . compared to a Bureau-wide total of 14,690 or 1.2 percent.[49] [Emphasis in original.]

[For California Indians] there are large areas of unmet needs in terms of housing, educational levels and in nearly all areas of Bureau programs that are normally provided elsewhere. . . .[50]

. . . . The funding base of five or ten years ago appears to have been established at minimum levels to accommodate a program directed toward a land base that has not changed significantly but which requires a higher level of management and toward a population base greatly underestimated. . . . Even a three-fold increase in base funding for California would not address the needs of approximately 50,000 California Indian people who cannot establish tribal membership but who are nevertheless eligible for many programs.[51]

In summary, funding levels determining the base allocation for the Sacramento Area are based upon incorrect numbers. Few programs, availability of some State programs and a service concept based upon trust property management and individual service has kept funding levels low. Moreover, because of the long period involved in

termination matters here in the State of California, general programs to meet the needs of the Indians of California, whether they be members of tribal or other groups or not, has [sic] been inadequate.[52]

## 1991: Summary Report on the California Consultation Meeting, Stanford University, May 5, 1991[53]

Historically, the Bureau's programs in California have focused upon programs related to trust land and assets and upon limited services to Indian people who were either reservation/rancheria residents or in close proximity. Hence, base funding levels in California have always been extremely limited and inadequate. Established at minimal levels, funding has remained relatively constant for years. Funding levels do not reflect any adjustments to accommodate increasing workload, increasing demands for services, an increase in the number of tribal governments, and increasing need based on the increasing capability of tribal governments.

A strong theme evident throughout the testimony was the inadequacy and inequity of California funding levels. In many instances, equity funding was tied to a request for base tribal funding. While equity arguments certainly support such funding, testimony made it clear that the equity issue goes beyond the immediate need for base funding. As tribal capability increases, the opportunity and need to expand into additional activities increased also. Hence, base funding represents the starting point for redressing equity issues.

Still to be addressed is the larger question of how, in a more equitable manner that is responsive to the total situation in California, to allocate total federal dollars. Both on a tribal basis and in terms of total Indian population, California has been grossly under funded.[54]

These and other reports support the premise that inconsistent and misguided federal policies have played a dominant role in denying many California Indians their status as tribal peoples, and in perpetuating the gross under-funding of Indian programs and services in California. Within the Departments of the Interior and Health and Human Services, the Advisory Council's reports document a pattern of institutional bias, if not outright discrimination, against California Indians in the funding and implementation of these programs and services relative to other areas of the country.[55]

## 3. The Time for Decisive Federal Action Is *Now*

History cannot be rewritten, yet its continuing effects can be examined and understood, and efforts initiated in the present to remedy them. This is the goal of the Advisory Council: that its recommendations not languish with those of previous reports, but instead provide a blueprint for a unique partnership between the California Indians, Congress and the Executive Branch, within the context of the Federal-Indian trust relationship and Congress' long-standing dealings with the California Indians, to address the special status problems of California's unacknowledged tribes and the institutionalized under-funding of federal Indian programs and services in California.

Looking at the current problems of California Indians against the sobering backdrop of California Indian history, it is not surprising that in many areas the California tribes have fallen far short of their aspirations and potential. Congress itself recognized this in the language and purpose of the Advisory Council on California Indian Policy Act of 1992, and in the Act's intent to give the California Indians a primary role in the formulation of recommendations to address these problems. To this end, the recommendations of the Advisory Council are forward-looking, targeting the present-day effects of past injustices and proposing solutions that will require a true partnership and close cooperation between federal and tribal officials into the next century.

## C.   Major Themes of the ACCIP Reports

There are three major areas of need identified by the Advisory Council in its reports. These needs gravitate around the themes of relationship, policy and specific substantive issues. An examination of the specific problems, however, reveals that the failure of relationship and policy is pervasive. Thus, the recommended solutions to substantive problems frequently depend on and are tied to changes in federal policy and, ultimately, the way in which the federal government deals with California Indians.

### 1. The Need to Recast the Federal-Indian relationship in California

California Indians seek a *true partnership* with the federal government *based on principles of justice and equity.* This means creating new opportunities by linking federal resources and support with. demonstrated and potential tribal self-sufficiency initiatives. California Indians seek the opportunity to fully develop and build upon their own initiatives for survival and selfdetermination, but they need the support of Congress and the Executive Branch in creating the appropriate legal and financial mechanisms to implement the Advisory Council's recommendations, coupled with the technical assistance necessary to develop and enhance tribal capacity.

### 2. The Need to Formulate a New Federal Indian Policy in California Through a Dialogue Between the Federal  Government and the California Indians

For more than a century, California Indians suffered the unilateral imposition of federal policies of forced assimilation, neglect and termination. Even when genuine concern was expressed for the needs of the California Indians, the proposed solution, with rare exceptions, was formulated by the BIA based on *its* view of the Indians' needs. Today, this lack of dialogue is manifest most clearly in the BIA's attempts to restrict eligibility for federal Indian programs and services to members of federally recognized tribes—in violation of federal law and contrary to its own past dealings with other categories of California Indians.[56] Continuation of this kind of one-sided policy formulation is neither acceptable nor appropriate in light of Congress' broad and unprecedented mandate in the Advisory Council on California Indian Policy Act of 1992.[57]

Speaking on the floor of the House regarding passage of the Act and the significance of the Advisory Council's report to Congress, Representative George Miller put it this way:

> *This report will provide a blueprint for the future of California Indians. We will use the recommendations of the council as we approach California Indian policy in the 1990s and on into the next century. The bill puts the tribes at the helm and empowers them to come up with new ideas to achieve funding equity and to resolve the plight of unacknowledged tribes.[58]*

### 3. The Need to Address Specific Substantive Issues Identified in the Advisory Council's Reports

Two major substantive themes surface throughout the reports: (1) unresolved questions of tribal and individual Indian status; and (2) the historical and continuing inequities in the development and funding of federal Indian programs and services in California. A third theme, which lies at the heart of tribal economic

survival and the promise of self-determination, is the lack of adequate tribal homelands in California. Currently, federal policy and/or legislative constraints limit development of a comprehensive program for addressing the land needs of California tribes.

## D.   The Advisory Council's Proposed Definition of California Indian

The Advisory Council's recommendation for a new definition of "California Indian" is relevant to each of the Council's reports and is, therefore, repeated in most. More importantly, the definition is an integral part of the Council's effort, through its recommendations, to reestablish the proper boundaries of the Federal-Indian trust relationship in California. Moreover, the Council's proposed definition parallels Congress' adoption, in the Indian Health Care Improvement Act Amendments of 1988, of a uniform definition of California Indian for purposes of health care.[59]

Historically, Congress has dealt with California Indians as a discrete group for purposes of federal benefits and services, as evidenced by the Homeless California Indian Appropriations Acts of the early 1900s, the California Indian Claims Cases, and the current eligibility of California Indians for health care services provided by the Indian Health Service (IHS). In addition, several federal agencies have recognized the unique history of federal relations with California Indians, and have adjusted their eligibility criteria accordingly. These federal actions are consistent with the principle that programs authorized by the Snyder Act,[60] which is the primary authority for most BIA and IHS programs, are for the "special benefit" of all Indians, and that any ambiguity should be resolved in favor of *inclusion*.[61] The BIA, however, after decades of similarly recognizing the broad eligibility of California Indians for federal Indian programs has, since the mid-1980s, insisted that only members of federally recognized tribes are eligible for the services it provides, even where the particular statute or regulation is intended to have a broader application.

Thus, the Advisory Council strongly urges Congress to reconfirm its long-standing relationship with *all* California Indians by adopting the following definition of California Indian for purposes of eligibility for all programs and services available to Indians based on their status as Indians:

"California Indian" shall include:

- any member of a federally recognized California Indian tribe;

- any descendant of an Indian who was residing in California on June 1, 1852, but only if such descendant
  - is a member of an Indian community served by a tribe, the BIA, the IHS or any other federal agency, and
  - is regarded as an Indian in the community in which such descendant lives;

- any California Indian who holds trust interests in public domain, national forest or Indian reservation allotments in California;

- any California Indian who is listed on the plans for distribution of assets of California rancherias and reservations under the Act of August 18, 1958 (72 Stat. 619), and any descendant of such an Indian; and

- any California Indian who is listed on the rolls of California Indians prepared in 1933, 1955 and 1972 for the distribution of the United States Court of Claims and Indian Claims Commission awards.

TO THE CONGRESS OF THE UNITED STATES PURSUANT TO PUBLIC LAW 102-416          THE ACCIP FINAL REPORTS AND RECOMMENDATIONS...

Case 1:07-cv-00412-RCL     Document 25-12     Filed 10/24/2007     Page 16 of 55

## II.   The Reports and Recommendations

The Advisory Council reports and recommendations are, as Congressman George Miller aptly stated, "a blueprint for the future of California Indians," and should, as he suggests, put "the tribes at the helm" so that the solutions implemented are those of their own choosing.

The eight reports cover the following subjects: Recognition, Termination, Community Services, Education, Economic Development, Trust and Natural Resources, Culture, and Health. In addition, the Historical Overview report, which provides important historical information on the California Indians and their relations with the federal government, will assist the reader in placing the reports and recommendations in context. What follows is a brief summary of each report, accompanied by a list of the related Advisory Council recommendations. Some recommendations, such as the proposed definition of "California Indian," appear in more than one report because of their importance and relevance to more than one subject area.

### A.   The Report on Federal Recognition

**Summary:** At every hearing the Advisory Council conducted, the testimony confirmed that tribal status clarification is a primary issue of concern to California Indians. The term "unacknowledged" refers to those Indian groups whose status as tribes has never been officially "recognized" by the United States or, if recognized in the past, is now denied by the United States. There are more unacknowledged Indian tribes in California than in any other single state.

The current federal acknowledgment process (25 C.F.R. Part 83) is not appropriate for California tribes. Since the procedure was established in 1978, only one California tribe has successfully completed the process. A major problem with the current process is that it requires unacknowledged tribes to prove their status as self-governing entities continuously throughout history, substantially without interruption, as though that history did not include the federal and state policies that contributed to the destruction and repression of these very same native peoples and cultures.

The issue of federal recognition is crucial to all California Indians because its focus is the development of a coherent and consistent federal process for determining which Indian tribes shall be included within the federal-tribal trust relationship. This report discusses the history of federal neglect of California Indians and how that history has led to the current situation of many of the unacknowledged tribes. It also discusses the problems presented by the current federal acknowledgment process, and explains how the proposed "California Tribal Status Act of 1997," or equivalent administrative policy and regulatory changes, will result in a more just procedure for California tribes seeking federal acknowledgment.

The report does not recommend specific tribes for recognition, because the entire recognition process, as applied to California Indians, is flawed. Indeed, the Advisory Council recommends that the Federal Acknowledgment Procedure be modified to ensure that all California tribes seeking recognition are assured of a fair determination of their status.

### Recommendations:

1.  **The California Tribal Status Act of 1997 (CTSA) should be enacted to address the unique status problems of California's unacknowledged tribes.**

**Discussion:** This California-specific legislation contemplates the creation of a Commission on California Indian Recognition with the authority to review and decide petitions for federal acknowledgment submitted by unacknowledged California Indian tribes under definite administrative procedures and guidelines. These procedures and guidelines have been developed through an extensive consultation conducted under the auspices of the Advisory Council and involving representatives of California's federally recognized, terminated and unacknowledged tribes, as well as California's highest ranking BIA and Indian Health Service (IHS) representatives.

The federal acknowledgment criteria contained in the draft bill are derived from early standards for federal recognition discussed by former Solicitor Felix S. Cohen in his treatise on Federal Indian Law (the Cohen criteria). The existing federal regulations (25 C.F.R. Part 83 — Procedures For Establishing That An American Indian Group Exists As An Indian Tribe), judicial decisions, as well as the provisions of earlier federal acknowledgment bills introduced in the House and Senate, were also used. The proposed criteria contain special provisions that address the unique problems the existing federal acknowledgment process poses for California tribes.

The Advisory Council recommends that the 12-year Commission, which would be based in California, be supported by an annual appropriation of $1,500,000 for the lifetime of the Commission. It should be noted that funding of the BIA's Branch of Acknowledgment and Research (BAR) for the last 17 years has not materially assisted in the resolution of acknowledgment petitions submitted by California tribes.

> 2. As an alternative to legislative action, the Secretary of the Interior should institute fundamental policy changes to the Federal Acknowledgment Process on behalf of California's unacknowledged tribes. These changes should include:
>
> a. Use of rebuttable presumptions to: (1) mitigate the historical effects on California's unacknowledged tribes of repressive federal and state Indian laws and policies that sought to destroy or discourage essential aspects of tribal authority and culture; and (2) extend federal acknowledgment to tribes meeting the previous federal acknowledgment standards;
>
> b. An allowance for gaps of up to 40 years in the proof submitted in support of a petitioner's identification as an Indian group and its exercise of political influence or use 1934, the date of the Indian Reorganization Act, as the date from which proof of these criteria shall be required;
>
> c. Evaluation of evidence of "community" for California Indian groups should focus on networks of social interaction between group members, rather than on geographic proximity of community members; and
>
> d. Revision of the term "predominant portion," as it applies to that part of the membership of the petitioner comprising a community, to a "substantial portion."

**Discussion:** The application of a rebuttable presumption to three of the BAR criteria for federal acknowledgment (identification as an Indian group on a substantially continuous basis, evidence of community, and exercise of political influence or authority) creates a fairer allocation of the burden of proof. See Section 6(c) of the CTSA. In addition, the California approach creates a rebuttable presumption of federal acknowledgment if the following three requirements are met:

> — not less than 75 percent of the current members of the petitioner are descendants of members of the California Indian group with respect to which the petitioner bases its claim of acknowledgment;
>
> — the membership of the petitioner is composed primarily of persons who are not members of any other Indian tribe; and
>
> — the petitioner is the successor in interest to a treaty or treaties (whether or not ratified), or has been the subject of other specifically listed federal actions.

Once these requirements are met, the presumption is that the petitioner has been previously acknowledged and is deemed to have met the first three criteria for present acknowledgment. See Sections 6(d)(1) and (2) of the CTSA.

The Advisory Council recommends that the criteria dealing with identification as an Indian group and the group's exercise of political influence over its members allow for gaps of up to 40 years and include a rebuttable presumption stating that changes in the community interaction, organization or political influence of a California Indian group, which occurred during the period 1852 to 1934, did not constitute either abandonment or cessation of tribal relations. The reason for the allowance for interruptions and this presumption is that the federal government should not be allowed to benefit from its own policies and laws, and those of the State of California, which prohibited or discouraged essential elements of tribal authority and culture during this time period. In effect, the federal and state governments created conditions in California during this period that made it impossible, or extremely dangerous or difficult, for most California Indian tribes, especially those who were not "protected" by the Missions, to freely or publicly engage in tribal relations or to identify themselves as Indians. It would be unconscionable to force California Indian groups that suffered through this period to provide evidence that, for the most part, does not exist because of the actions or neglect of the federal and state governments. If there has been voluntary abandonment or cessation of tribal relations during this period, it is properly the federal government's burden to prove it.

A second approach would be to require proof of identification as an Indian group from 1934, the date of the Indian Reorganization Act (IRA), to the present. This approach makes sense for two reasons. First, the advent of a new Indian reorganization policy represented the first time, since the pre-treaty era, that California tribes were encouraged to function openly and publicly. Second, using 1934 as the base date would also eliminate the need to include those provisions mentioned above governing presumptions and allowances for interruptions in continuity of tribal identity and exercise of tribal political influence. For example, a petitioner would have to demonstrate evidence as a distinct Indian group from 1934 to present, and if the character of the group as an Indian entity has from time to time been denied, this would not be considered conclusive evidence that this criterion has not been met. This would be a workable and fair way to apply this criterion to petitioning California tribes.

The Advisory Council recommends that the term "community" be defined more broadly to account for the fact that genocide and California state laws which indentured Indians and discriminated against them during the latter half of the 19th century resulted in wide geographic dispersal of tribal members. Therefore, for California Indian groups, the focus of the term should be on networks of social interaction between group members, regardless of territorial proximity, though the geographic proximity of members to one another and to any group settlement or settlements would still be a factor in determining whether a community exists. Moreover, as long as there is an existing community that can demonstrate descendancy from an Indian group that historically inhabited a specific area, it should suffice.

Finally, the requirement that a "predominant portion" of the membership of the petitioner comprise a community as defined is problematic. The Advisory Council recommends that a "substantial portion" be set as the standard. This standard reflects the unique problems created by wide geographic dispersal and dislocation of California Indian Groups.

3. **Technical assistance to complete the Federal Acknowledgment Process should be provided to those petitioning California tribes that have requested such assistance.**

**Discussion:** For the past 36 months the Advisory Council has provided state-wide leadership and a forum for tribes to communicate, assist each other and organize resources. It is necessary for this forum to continue. Re-authorization of the Advisory Council is one potential mechanism for ensuring ongoing leadership. A consortium of tribes with adequate funding would be another vehicle.

The lack of available funds to assist the California tribes in completing petitions and developing realistic economic plans is extremely alarming because the Task Force learned at the White House and national meetings of unacknowledged tribes, that other regions with far fewer tribes in need of completing the process have received far more financial support. In the last 36 months, the Recognition Task Force was given a budget of $25,000 to work on recognition issues and to finalize this report. With this modest sum, the Task

Case 1:07-cv-00412-RCL          Document 25-12          Filed 10/24/2007          Page 19 of 55

Force was able to organize educational meetings and workshops on legislation, attend and represent the California tribes at meetings, as well as gather information from the BAR and tribes to complete this report. This work is vital and is essential for the petitioning tribes of California, and should be supported by adequate funding.

At least $500,000 a year for the next 12 years should be appropriated for this technical assistance. Two aspects of assistance relative to the acknowledgment process should be provided: (1) assistance in completing the petition and review process, and (2) assistance in formulating realistic economic development plans upon acknowledgment.

4. There needs to be a clear definition of California Indian for purposes of eligibility for all federal programs and services available to Indians based on their status as Indians. (See definition of "California Indian" at Section I(D), *supra*, at page 14.)

## B.     The Report on Termination

**Summary:** The Termination Policy sought to end the special trust relationship between the United States and Indian people that had been the cornerstone of federal-Indian relations since the United States' earliest years.  In light of the destitute living conditions of most California tribes, Congress intended termination of the trust relationship to take place only after specific services were provided to prepare them for the discontinuation of federal aid and supervision, and only after the affected tribe consented to termination. In practice, however, the Executive branch achieved tribal consent through misrepresentation and undue influence, and then terminated federal status without providing the preparatory services.

Despite the fact that the termination policy has been expressly repudiated by both Congress and the Executive branch, some California tribes remain "terminated." Moreover, those that have been restored have not received adequate federal assistance in reestablishing sovereign relations with the federal government, in strengthening their own governments, and in acquiring lands to replace those lost through termination. This report addresses the historical context of the termination policy and the lingering effects of termination on California Indians, and contains recommendations for remedying the continuing effects of this failed federal policy.

### Recommendations:

1.   Congress should enact comprehensive legislation establishing a process for the expedited restoration of the remaining terminated California tribes, including modification of the criteria used to evaluate requests for tribal restoration.

**Discussion:**  Though termination has not been the official policy of the federal government since 1970,[62] there has not been a single comprehensive piece of federal legislation to restore the remaining terminated California tribes. This is particularly striking in light of the fact that the federal government has lost or settled all of the California rancheria un-termination cases litigated over the past quarter century. Certainly, Congress has shown its awareness of the need for restoration of terminated tribes by passing at least 12 individual restoration bills between 1973 and 1990.  It was not until 1993, however, that Congress finally acted to legislatively restore any terminated California tribes.  The two tribes restored by Congress—the Paskenta Band of Nomlaki Indians and the United Auburn Indian Community—bring the total number of California tribes restored through litigation or legislation to 29.

Today, of the 38 California rancherias terminated under the Rancheria Act of 1958, nine remain terminated.  Of these, at least three would meet the following criteria used by the Federal government in evaluating a terminated tribe's eligibility for restoration:

1. there exists an ongoing, identifiable community of Indians who are members of the formerly recognized tribe or who are their descendants;

2.  the tribe is located in the vicinity of the former reservation [or rancheria or other lands set aside for their use];

3. the tribe has continued to perform self-governing functions either through elected representatives or in meetings of their general membership;

4. there is widespread use of their aboriginal language, customs and culture;

5. there has been a marked deterioration in their socioeconomic conditions since termination; and

6. their conditions are more severe than in adjacent rural areas or in other comparable areas within the State.[63]

Generally, Criteria 5 and 6 have not been an issue in the restoration of terminated California tribes because the effects of termination were so devastating, both economically and socially. Moreover, despite the negative effects of termination on tribal organization and culture in California, most of California's terminated tribes do not have trouble meeting Criteria 4. Criteria 1, 2 and 3, however, have proven the most difficult to meet for tribes seeking restoration.

Criteria 2 and 3 should be modified or eliminated. Termination often resulted in the loss of land to creditors and tax sales. Moreover, the former rancherias were often located in economically depressed areas, and tribal members reasonably chose to move to more urbanized areas to seek employment. In addition, termination removed two major factors that contributed to the political cohesiveness and function of the tribal entity—tribal communal lands and the federal-tribal trust relationship. When the government distributed tribal lands per capita and severed the trust relationship, the focus of the tribal community naturally shifted from a communal self-governing function based on a common interest in tribal land and federal Indian programs, to individual survival. Tribal relationships receded from formal self-governing functions required by the common ownership of land and common interest in the benefits of the federal-tribal trust relationship to more subtle, less formal, social, economic and religious interactions between tribal members. Thus, requests for restoration of terminated California tribes should be evaluated under criteria that take account of those factors inherent in the termination process which discouraged Indian people from remaining on their former lands and removed the incentive for them to continue to maintain a formal governing structure.

2. **Congress should appropriate funds to assist those terminated California tribes seeking restoration.**

**Discussion:** Terminated tribes seeking restoration must employ attorneys, anthropologists and other experts to help them prove that they meet the government's criteria for restoration. To defray these and other costs of the tribal restoration effort, terminated tribes usually turn to charities and select public agencies, such as the Administration for Native Americans (ANA) and the State of California's Indian Assistance Program, for seed money to begin the challenging process of initiating and coordinating the effort to restore tribal status through litigation or legislative advocacy. Unlike unacknowledged tribes seeking federal recognition, the terminated tribes have no access to technical assistance or support from the BIA. In essence, the tribes bear the entire administrative and financial burden of reversing the effects of a policy that the federal government itself now recognizes as misguided.

3. **Congress should appropriate supplemental "Restored Tribes" funding for newly restored California tribes.**

**Discussion:** With respect to newly-restored tribes, the initial tasks faced by the tribes are the development and adoption of comprehensive governing documents, obtaining funds for land acquisition and essential tribal operations, and reestablishing a working partnership with the BIA and other federal agencies. These essential tasks, which present problems to even well-established tribes, often threaten to overwhelm a newly-restored tribe because of the lingering effects of termination. Without "Restored Tribes" or some other form of supplemental funding, newly restored tribes often lack the means to establish and minimally staff a tribal office as a base of tribal operations. Though the challenges of operating tribal programs and exploring options for economic development are imposing even when funds are available, the difference is that, with supplemental funding, the tribe possesses the financial means to begin developing the capacity to carry out these self-governing functions.

The "Restored Tribes" funding would also be a gesture of good faith and a sound investment by Congress in Indian tribes whose tenacity in seeking restoration will likely be replicated in pursuit of their status and interests as self-governing entities.

4. Congress should enact legislation (a) stating that it is the policy of the United States Government, in carrying out its public and other federal land management functions, to assist newly restored California tribes in identifying and acquiring public and other federal lands, which have been or may be classified as available for disposal under federal law, for the purpose of meeting tribal housing and economic development needs; and (b) directing federal agencies to consult with the tribes in identifying such public and other federal lands within or near the aboriginal territories of the tribes suitable for such purposes.

**Discussion:** The restored California tribes each have a very limited land base, or no land at all. The lack of an adequate land base is the primary limiting factor in the efforts of restored tribes to reconstitute their tribal governments, provide housing for tribal members, and develop local economies. Without the ability to acquire federal lands in trust, the primary means of funding tribal land acquisition for housing and economic development is the Department of Housing and Urban Development's Indian Community Development Block Grant Program. In the past, this program has given many California tribes the funding they needed to acquire small parcels of private land, primarily for housing. Its effectiveness today for this purpose is more limited. This is due to the increasingly tight restrictions that the Secretary of the Interior has placed on the fee-to-trust land acquisitions, coupled with the State of California's heightened scrutiny of fee-to-trust transfers because of their potential to give the tribes the means of engaging in gaming operations, which have proven to be a successful vehicle for tribal economic development. These factors have stalled tribal efforts to expand their limited land base and develop economically feasible operations capable of generating jobs for tribal members and revenues for provision of essential tribal governmental services, such as education, health care, housing, and reservation infrastructure improvements.

California tribes, especially those that have had their federally recognized status restored, need affirmative action by Congress to simplify the transfer of federal lands for the creation or expansion of tribal homelands. The current federal land acquisition regulations and policies are simply not adequate to address the immediate needs of these tribes or, for that matter, of most of California's recognized tribes. The restored tribes need a congressional remedy responsive to their unique situation, as well as that of the other landless or land-poor California tribes.

5. The Wilton Miwok Indian Community, the Federated Indians of the Graton Rancheria, and the Mishewal Wappo Tribe of Alexander Valley should be immediately restored by Congress. In addition, the other tribes that remain terminated should receive special consideration, according to criteria modified as recommended above, when they are ready to seek restoration.

**Discussion:** The Wilton Miwok Indian Community, the Federated Indians of the Graton Rancheria and the Mishewal Wappo Tribe of Alexander Valley meet the current criteria for restoration and should be immediately restored.

6. Congress should enact legislation declaring that it is the policy of the United States to not interfere with decisions regarding enrollment and eligibility criteria for restored tribes, and that no federal agency should try to influence a restored California tribe to limit its membership to persons listed on the distribution roll prepared pursuant to the Rancheria Act, and their descendants.

**Discussion:** In its advisory capacity to newly restored tribes, the BIA often urges the tribes to confine their membership to persons appearing on the distribution list prepared during termination, and their descendants. This advice interferes with the tribes' exclusive sovereign power to determine tribal membership, sows conflict among different groups of potential members, and ignores the fact that many tribal members were arbitrarily omitted from the distribution list in the first place. However, because the advice also serves to limit the scope of the BIA's trust responsibility, it is unlikely that the BIA will abandon this practice without legislative direction to do so.

## C.   The Community Services Report

**Summary:** Studies conducted by federal, state and private agencies spanning almost a century have reached the same conclusion: California Indians have not received their fair share of federal Indian program dollars and have been denied access to some programs provided to tribes in other Bureau of Indian Affairs (BIA) service areas. As a result, California Indians in general have not attained the same level of development as other Indian groups. The reports reaching this unanimous conclusion have come from both Republican and Democratic administrations, as well as from non-profit organizations.

The BIA funds different programs based on a variety of criteria. Many programs, such as Tribal Priority Allocations (TPA), are funded each year based on historical funding levels. Others are funded based on formulae that take into account eligibility requirements and other factors. Still other programs, such as general welfare assistance and contract support, are based strictly on need. Finally, some programs are funded on the basis of competitive grants. When the BIA budget is viewed in terms of per capita expenditures, however, it becomes clear that all of the types of funding determinations have disadvantaged California Indians.

Inequity toward California Indians continues in BIA allocations for many programs, even when its own service population data are employed. The degree of inequity is understated, however, because the BIA systematically undercounts California Indians by employing inappropriate criteria for counting its service population in California. While no reliable count of California Indians has been conducted, all of the available figures indicate that the BIA severely undercounts the service population in California. For example, the 1990 Census figure for Indians living in the rural parts of California counties containing Indian reservations is slightly more than double the 1989 BIA service population figure for California. Similarly, the 1997 IHS service population figure for California is more than double the 1995 BIA figure. The IHS count of California Indians living in rural areas alone is substantially higher than the BIA service population for the entire state. In fact, the number of California Indians that were certified to participate in the distribution of funds from the California Land Claims cases in 1972 is higher than the BIA's 1995 service population figure. Thus, it appears that the service population would at least double if more appropriate criteria were applied to California Indians. Accordingly, this report documents current inequities in federal allocations for California Indians by calculating per capita expenditures using not only the actual BIA service population statistics, but also the more appropriate figures that are approximately twice those employed by the BIA.

The history of federal policy toward California Indians affords insight into the weaknesses of the BIA's service population criteria. In particular, the limitation of service population to members of recognized tribes is suspect in the context of California history. In California, individuals who hold public domain or national forest allotments, and individuals who participated in claims awards based on the unratified California treaties can prove that the federal government views them as Indians, even though the BIA refuses to recognize their tribal groups.

In addition, the failure of the federal government to ratify the 18 California Indian treaties and to establish a suitable reservation land base for California's tribes undermines the rationale for applying the general criterion limiting service population to Indians "on or near reservation" in California. For analogous reasons, this geographic criterion is currently not applied to Indians in Oklahoma and Alaska. Early BIA reports document situations in which the members of small aboriginal bands of California Indians were granted allotments on the public domain in lieu of reservations or rancherias.[64] These same groups were later ignored as tribal communities because of their individual, as opposed to communal, ownership of trust land. In essence, the allotments served in lieu of a reservation or communal land base; however, the BIA later denied responsibility for recognition of the tribal group because it lacked any communal trust land. Not only do some of these groups deserve to be recognized, their members are entitled to be counted as part of the BIA service population and therefore eligible for federal Indian programs and services.

While the BIA has since the mid-1980s moved toward a uniform criterion for eligibility for most of its programs—membership in a federally recognized tribe—Congress and other agencies of the federal government have begun to modify the eligibility criteria for some programs to include off-reservation Califor-

nia Indians and members of unacknowledged tribes. Illustrations include the IHS (administering broadly inclusive language from the 1988 amendments to the Indian Health Care Improvement Act) and the Department of Education's Indian Controlled Schools Enrichment Program, authorized by recent amendments to the Indian Education Act which exempt California, Oklahoma, and Alaska Indians from geographic criteria.

Budget data from the 1980s and 1990s confirms that the inequities have persisted. Using figures from the most comprehensive funding category—Operation of Indian Programs—and the BIA's official service population figures over the years 1990-95, it is apparent that California Indians receive only one-third to one-half the funding received by all other Indians. Similarly, funding from the IHS for California Indians is about 30-40% less than the national average over the period 1988 through 1995. Housing and Urban Development Indian Housing programs also show a systematic under-funding over the last decade.

The BIA also under-serves the Sacramento Area in administrative capacity as compared to other BIA areas. The area office serving California Indians has one of the lowest shares of BIA personnel and the smallest square footage of office space.

The effects of these documented inequities are manifest in the diminished social and economic welfare of California Indians relative to Indians elsewhere in the country. When compared to reservation Indians elsewhere, California Indians have higher rates of poverty, lower incomes, less education, and higher rates of unemployment. Only in household characteristics do California reservation Indians do better than non-California reservation Indians. These combined indices of social and economic conditions puts California reservation Indians among the lowest socioeconomic groups in Indian country. Since Indians are already among the poorest groups in the country, California Indians are among the most economically deprived groups in the nation. The past and present history of administrative neglect and under-funding has contributed to the social and economic conditions endured by California reservation Indians.

### Recommendations:

1. There needs to be a clear definition of California Indian for purposes of eligibility for all federal programs and services available to Indians based on their status as Indians. (See definition of "California Indian" at Section I(D), *supra*, at page 14.)

2. In appropriating and allocating budget funds for individual benefit programs, Congress and the BIA should increase amounts directed to the Sacramento Area Office to ensure that per capita spending for California at least equals the national per capita spending average for all areas of Indian country. Per capita spending for California should be calculated taking into account an Indian service population based on the definition of California Indian recommended above. In addition, Congress should pass legislation that ensures that the BIA, the IHS, the Department of Housing and Urban Development (HUD), and all other federal agencies are funding California Indian tribes at levels comparable to national averages for Indians.

3. Congress should appropriate, and the BIA allocate, the funds necessary to determine the number of California Indians eligible for General Assistance welfare benefits under the Snyder Act. All eligible individuals should be provided with these benefits in the next budget cycle.

**Discussion:** Although the Secretary of Health and Human Services was directed to determine the number of California Indians eligible for health care services provided by the IHS,[65] the Secretary has not done so. Thus, there is no reliable estimate of the number of California Indians eligible for Snyder Act programs.

4.  Congress should appropriate, and the BIA allocate, adequate funds for the planning, establishment, and ongoing operation of tribal law enforcement and justice systems in California.

**Discussion:**  Such law enforcement systems may take the form of individual tribal institutions, consortia, special-purpose entities, or contracts with state or local agencies. Particular attention should be given to support tribal initiatives in the areas of child welfare, environmental control, housing administration and evictions, and drug law enforcement. There should be no requirement that these systems resemble non-Indian law enforcement or judicial institutions, so long as they comply with applicable federal law. Once such tribal systems are established, they should receive BIA funding support at per capita levels that are at least equal to the average per capita funding for tribal law enforcement and justice systems outside of California. Per capita spending for California should be calculated taking into account the revised service population, based on the definition of California Indian recommended above.

5.  Congress should enact legislation authorizing each California tribe to initiate retrocession of Public Law 280 jurisdiction from the State of California to the federal government, either in whole or in part. The legislation should establish a federal commitment to fund and provide technical support for the development of law enforcement and justice systems in California as recommended above. Furthermore, where Public Law 280 remains in effect, Congress should clarify those areas of tribal civil and criminal jurisdiction that remain concurrent with state jurisdiction.

6.  The Congress and Executive Branch should recognize the disproportionate loss of aboriginal lands by California Indians and make special provisions to ensure that California tribes are not "penalized" for their small land bases in the formulation and application of federal funding formulas that include size of the tribal land base as a criterion for distribution of funds.

7.  Congress should enact legislation establishing the necessary policy and legal framework to assist California tribes to acquire public and other federal lands for tribal homelands, housing, economic development, and cultural and natural resource protection. The legislation should (a) state that it is the policy of the United States Government, in carrying out its public and other federal land management functions, to assist California tribes, especially newly recognized and newly restored tribes, in identifying and acquiring public and other federal lands, which have been or may be classified as available for disposal under federal law; and (b) direct federal agencies to consult with the tribes in identifying such public and other federal lands—within or near the aboriginal territories of the tribes—suitable for such purposes. (See also Recommendation 4 of the Termination Report.)

**Discussion:**  Many recognized California tribes have land bases that are inadequate to meet their immediate needs for housing and economic development.  Some lack any land base whatsoever. Most newly recognized and newly restored tribes find themselves in the same situation. A land acquisition program is needed which specifically targets the land needs of currently recognized California tribes and anticipates the future acknowledgment or restoration of many currently non-recognized California tribes. Public or other federal lands could be identified through a tribal-agency consultation process and set-aside for specific tribal purposes.[66] Lands identified for transfer to the tribes should have economic development potential and reasonable access to water and roads.

Case 1:07-cv-00412-RCL     Document 25-12     Filed 10/24/2007     Page 26 of 55

8. The Secretary of the Interior should coordinate with Interior agencies and other cabinet level officers to develop a comprehensive approach for identification of public and other federal land that could be made available for disposal to California tribes for housing, economic development and cultural and natural resource protection purposes. (See also Recommendations 4 and 5 of the Economic Development Report.)

9. Congress should authorize supplemental appropriations for the BIA, IHS and HUD to specifically target the needs of California Indians. These funds are justified as a long overdue remedial measure to address the severe socio-economic effects of decades of federal underfunding of Indian programs and services in California. These funds should be used to develop tribal administrative capacity and infrastructure, develop and fund program consortia for small tribes, and should be aimed at alleviating the chronic poverty, lack of housing, unemployment, and health service inequities suffered by California Indians. Target remedial funding levels should be indicated by adding shortfalls from the national average over recent historical time periods.

10. Congress should establish a base funding amount for needy small tribes in California for development of tribal governmental and administrative capacity.

## D.    The Report on Economic Development

**Summary:**  The prospect of economic development for most California tribes is grim. Although California Indian tribes consistently express their desire to develop economically in ways that are culturally appropriate and environmentally safe, very few opportunities exist to do so. One major obstacle is that most tribes in California have land bases that are too small to support business development, are usually isolated from business centers, and lack natural resources that can be put to commercial use.

The other major obstacle is that years of inequitable funding of tribal governments in California has left them without the administrative capability and infrastructure necessary for successful economic planning. The federal government's neglect has forced many California tribes to focus on basic issues of survival, rather than on the more practical issues associated with economic development. Thus, the majority of California tribal governing bodies are not experienced in management, preparation of business plans, organizational development, legal and physical infrastructure development, critical analysis of market opportunities and project feasibility, accessing capital for enterprise development, or labor force requirements.

This combination of obstacles has left the tribes with limited options.  For those tribes located near large urban centers or recreation areas, gaming operations are an alternative because they require a relatively small capital investment compared to their profit and job-generation potential. But while gaming has provided the economic mechanism through which some California tribes have dramatically reduced poverty and unemployment on their reservations, California's hostility to Class III gaming operations and the resulting lack of tribal-state Class III gaming compacts, has jeopardized this area of federally-sanctioned tribal economic development. Also, some reservations with areas of open, unproductive land located near urban areas have become targets for private waste management companies seeking new locations for municipal and industrial waste disposal.

Both of these kinds of economic development are often perceived as "undesirable" either because of the nature of the economic activity or their potential to create adverse social and environmental effects. However, even when those effects have been adequately addressed by the tribe or, in appropriate circumstances, an involved federal agency, opposition to tribal development initiatives often continues.

The report's review of selected tribal case histories reveals that some federal activities have contributed to the economic well-being of tribes. First, the presence of IHS-contracted clinics has contributed to the development of the administrative capacity of contracting tribes. Second, the BIA's Area Credit Office has, in some cases, been able to facilitate access to managerial and technical expertise, as well as access to equity and debt financing for tribal ventures. This assistance was very valuable to the tribes that received it. Unfortunately, allocations of federal dollars to the BIA's economic development programs have declined dramatically since 1993 and tribes have found it extremely difficult or impossible to access loans for enterprise development, even when viable market opportunities have been identified, technical assistance has been available, and enterprise feasibility has been determined. Third, there was a tendency among California tribes—after years of struggling to develop alternative kinds of enterprise development and facing ever-increasing tribal unemployment and poverty rates—to turn to gaming, as sanctioned under the Indian Gaming Regulatory Act of 1988, as the most immediate source of relief.  Yet, the viability of gaming as a primary means of achieving long-term tribal economic development is now in question because of the lack of any tribal-state compact for Class III gaming in California and the Supreme Court's recent decision foreclosing any tribal remedy against the State when it refuses to make good faith efforts to negotiate such a compact.[67] Still, it appears that until the market for casinos becomes inundated, a significant number of California tribes will turn to the gaming industry as their only viable alternative to the growing levels of reservation poverty and unemployment, and the trend towards further reductions in federal funding for Indian programs.

The report identifies legal obstacles to tribal economic development and suggests ways in which Congress can clarify tribal taxing and regulatory authority to remove them, thereby enhancing the tribes' ability to initiate

Case 1:07-cv-00412-RCL     Document 25-12     Filed 10/24/2007     Page 28 of 55

and sustain economic development, and reap the full benefit from the use of reservation lands and resources. In addition, the report discusses various models for economic development, including the creation of a Tribal Homelands Private Investment Corporation, similar to the Overseas Private Investment Corporation, as a means of stimulating private investment in underdeveloped and developing tribal economies in California.

Recommendations:

### General Policy Guidelines

1. Federal policy initiatives for Indian economic development in California must acknowledge and respond to the diverse and unique situations of Indians in California. Policy initiatives should not pit federally recognized tribes against unacknowledged tribes, unaffiliated Indians or the large urban Indian population.

2. Federal policy initiatives for Indian economic development in California must address the potential conflict between sovereignty and trust responsibility by accommodating tribal self-determination on the one hand and assuring that the federal trust responsibility is properly discharged on the other.

### Base Level Funding—Development of Tribal Capacity

3. There must be an immediate response to the needs of California tribes through a special appropriation of multi-year, base level funding to provide tribes with sufficient and stable funding to address basic governmental and programmatic infrastructure issues. Base level federal funding is necessary to develop tribal governmental capacity to initiate economic development and multiyear funding is critical to long-range tribal planning and attainment of economic development goals.

### Land Acquisition and Administration

4. The Secretary of the Interior should coordinate with Interior agencies and other cabinet level officers to develop a comprehensive approach for identification of public and other federal land that could be made available for disposal to California tribes for housing, economic development, and cultural and natural resource protection purposes. The policy should allow land management agencies to enter into three-party land transactions involving agencies, tribes and private landowners as a means of facilitating tribal acquisition of private lands located on or near reservations. If development of such a policy is not within the existing authority of the Secretaries, Congress should enact legislation providing authority for such transactions. (See also Recommendation 4 of the Termination Report; and Recommendation 7 of the Community Services Report.)

5. The Secretary of the Interior should work with the California tribes to develop a comprehensive tribal land acquisition program, similar to but more expansive than past initiatives under the Indian Reorganization Act (IRA) and other statutes. Emphasis should shift from isolated, non-productive parcels to lands that may provide viable economic development potentials.

**Discussion:** California tribes that were parties to the 18 treaties negotiated in 1851-52 would have retained 8.5 million acres of their aboriginal homelands had the treaties been honored by the Senate. When the Senate refused to ratify the treaties and Congress extinguished the California tribes' land claims in the California Land Claims Act of August 3, 1851,[68] the tribes lost claims to their entire aboriginal homeland, totaling more than 70,000,000 acres. Today, the tribal land base in California is just over 400,000 acres (about .6% of the aboriginal land base), with an additional 63,000 acres of land held in individual trust allotments. Given this history and the large number of impoverished, resource-poor tribes in California, even a modest program of land acquisition should have as its target a long-term goal of returning thousands of acres of public lands to tribal ownership.

6. Existing land acquisition programs, such as that administered by the Department of Housing and Urban Development (HUD), should be expanded and strengthened through interagency coordination and streamlining of the bureaucratic processes (e.g., by designating an agency official to coordinate BIA/IHS/HUD involvement). In addition, the existing formulas for determining grants should be revised so that they do not discriminate against small tribes.

7. The process for transfer of lands from fee-to-trust status needs to be facilitated in California by:

   a. legislative or regulatory reform to allow identification of "land consolidation areas" (perhaps corresponding to aboriginal territories or service areas) within which acquired lands may be treated as contiguous to reservations.

   b. a unitary, coordinated environmental review process.

   c. a comprehensive program to address land contamination issues, including environmental review requirements related to land acquisition and the procedures for assessing and resolving contaminant issues. The program should facilitate a process for transferring or donating to tribes private lands within Indian country that have undergone environmental cleanup.

## Off-Reservation Economic Opportunities

8. There is a need to explore tribal economic development opportunities that are not tied to a land base or restricted to Indian country. For example, a program should be developed to provide tax or other incentives for private businesses that promote Indian participation or commit to support tribal economic development by pursuing Indian training and employment goals. Given the inadequate and geographically dispersed land bases of California tribes, such programs should not be restricted to reservation lands, although reservation-based businesses might be given greater incentives.

## Expansion of Existing Programs/New Programs

9. Existing Indian economic development programs should be reauthorized and expanded. For example:

   a. The BIA Loan Guaranty Program and the administering Sacramento Area Credit Office should be funded at increased levels.

   b. The BIA should provide training and technical assistance in tribal

TO THE CONGRESS OF THE UNITED STATES PURSUANT TO PUBLIC LAW 102-416    THE ACCIP FINAL REPORTS AND RECOMMEN...

Case 1:07-cv-00412-RCL    Document 25-12    Filed 10/24/2007    Page 30 of 55

governance and political infrastructure development, particularly to newly recognized and restored tribes.

c. The BIA should strengthen enforcement of its federal trust responsibility in order to ensure the protection of natural resources held in trust (tribal and allotted). A mechanism for such enforcement might be the creation of a joint review board comprised of BIA, other federal, and tribal officials who would review plans for economic development activities that are opposed by tribal members on the basis of threats to cultural, environmental or physical health.

10. Congress should enact legislation creating a California Tribal Homelands Private Investment Corporation, similar to the existing Overseas Private Investment Corporation (OPIC), as a means of encouraging American, including Native American, private investment in underdeveloped and developing tribal economies in California through a program of direct loans and loan guarantees that provide medium- to long-term funding to ventures involving significant equity and/or management participation by American businesses.

## Technical Assistance—Building Tribal Capacity

11. Funding should be made available to support training of California tribes and individual tribal members in a broad range of technical areas, including but not limited to administrative capacity building, physical and social infrastructure development, strategic planning for business and economic development, marketing and business feasibility analysis, business plan development, business management, and federal and state laws relating to tribal economic development.

## Gaming

12. The Secretary of the Interior, pursuant to the federal trust responsibility, should promulgate regulations establishing a procedure to allow a tribe to engage in Class III gaming if a state fails or refuses to enter into good faith negotiations to conclude a tribal-state compact under the Indian Gaming Regulatory Act (IGRA).

13. Congress, in addition to or in the absence of Secretarial action to promulgate regulations providing a remedy to tribes under the IGRA when a state fails to negotiate in good faith, should amend the IGRA to establish a fixed time period, once a tribe initiates discussion with a state on a Class III gaming compact, in which to conclude the compact, but if a compact is not concluded despite the good faith efforts of the tribe within the statutory time period (e.g., 90 or 180 days), the tribe should be able to go directly to the Secretary of the Interior for approval of its Class III gaming operation.

**Discussion:** California has a long and ugly history of opposition to any form of tribal sovereignty. From the initial decision of the State Legislature in 1852 to oppose Senate ratification of the 18 Indian treaties negotiated by federal commissioners, and the State's resulting genocidal policies of enslavement and "extermination" of the Indian population, to the modern-day opposition to the exercise of reserved Indian fishing rights and tribal regulatory and taxing authority, California has demonstrated its hostility to tribal sovereign authority and the continued efforts of the indigenous peoples of California to chart their own political and economic destiny. Thus, the good faith negotiations that Congress envisioned would occur between the tribes and the States under IGRA immediately encountered the institutional hostility of California

to tribal sovereignty. IGRA anticipated this problem and provided a federal court remedy where a state refuses or fails to engage in good faith negotiations initiated by a tribe. This remedy, however, disappeared with the Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, 116 S. Ct. 1114, 134 L.Ed.2d 252 (1996), leaving the states free to flaunt the good faith provisions of IGRA without sanction.[69] California has taken full advantage of its immunity by resisting good faith efforts by the gaming tribes of California to conclude tribal-state compacts on Class III gaming operations. In short, the Congressional compromise of tribal jurisdiction reflected in the IGRA has not worked in California.

What are the alternatives? One would be for Congress to specifically amend the IGRA to eliminate the States' participation—through the mechanism of compacting—in the Class III approval process. In other words, to return to the "bright line" aspect of the *Cabazon* decision[70] modified only by a process of Secretarial review and approval similar to that which exists in the IGRA.[71] Such an amendment would probably not succeed because the compacting process has worked in other states and because the States would undoubtedly oppose any process that foreclosed their involvement in decisions on Class III gaming. A more realistic and acceptable alternative for both States and tribes would be to amend the IGRA to establish a fixed time period for a tribe and a state to conclude a compact on Class III gaming once the tribe has initiated the process. Then, if a compact is not concluded despite the good faith efforts of the tribe within the statutory time period (e.g., 90 or 180 days), the tribe should be able to go directly to the Secretary of the Interior for approval of its Class III gaming operation in accordance with applicable statutory or regulatory criteria. Certainly, such an alternative would reinstill the process with the elements of state accountability and fair dealing that Congress originally intended in passing the IGRA, but which *Seminole* undermined through its broad interpretation of the States' Eleventh Amendment immunity.

## Tribal Jurisdiction

14. Congress should enact legislation recognizing that tribal governmental powers are coextensive with the boundaries of the tribe's reservation, and that the tribe's powers are exclusive on Indian lands within the reservation boundaries and concurrent on non-Indian lands. The legislation should expressly preempt the imposition of a state possessory interest tax on non-Indian lessees of Indian trust lands within reservation boundaries.

The Supreme Court's decisions in <u>Brendale</u>[72] and <u>Yakima</u>[73] substantially undermined tribal taxing, planning and regulatory authority. Those decisions allow states to reach into the territories of sovereign tribes to implement potentially conflicting zoning and land use policies on non-Indian lands, and to derive tax revenues from Indian-owned fee lands. The approach recommended above emphasizes the "territorial" aspect of Indian sovereignty by focusing the determination of jurisdiction on the "Indian country" status of the area rather than the trust or fee status of individual parcels.

TO THE CONGRESS OF THE UNITED STATES PURSUANT TO PUBLIC LAW 102-416    THE ACCIP FINAL REPORTS AND RECOM......

Case 1:07-cv-00412-RCL    Document 25-12    Filed 10/24/2007    Page 32 of 55

## E.  The Report on Trust and Natural Resources

**Summary:** The trust relationship between the United States and Indian peoples pervades all areas of Indian law. It is both a source of federal power over Indians, and a substantive limit on that power. It requires the federal government to deal with the Indians in good faith. Moreover, treaties, statutes and other federal actions create specific fiduciary duties, enforceable in the federal courts through actions for declaratory and injunctive relief and, in appropriate cases, money damages.

The BIA interprets its trust responsibility narrowly, both in defining what duties are owed and the class of Indians entitled to the benefits of trust protection. Even though contradicted by its own past actions, the BIA currently takes the position that only federally-recognized tribes and their members are entitled to participate in federal programs and services for Indians. Moreover, the BIA defines "federally recognized" as applying to only those tribes listed pursuant to 25 C.F.R. Part 83, even in cases where contrary evidence demonstrates previous acknowledgment and lack of termination by Congress. These agency interpretations of the scope of the federal trust responsibility have a disproportionate impact in California because of the large number of unacknowledged tribes in the state.

One of the most important trust duties is the duty of the federal trustee to protect the Indian land base and its resources and, in appropriate situations, to administer the lands and resources for the benefit of the Indians. The BIA has not met this responsibility in California. One reason for this is that the BIA has not maintained current, comprehensive data on the Indian land and natural resource base in California. In addition, the lack of skilled personnel, especially natural resource experts, at both BIA Sacramento Area and California Agency levels, precludes any regular and systematic collection of data on natural resources and severely restricts the availability of technical assistance needed to assist California tribes in their efforts to protect and manage trust resources.

Despite these problems, California tribes have demonstrated remarkable initiative in attempting to address environmental and natural resource protection and management issues. The report discusses a few of those tribal initiatives.

In light of the essential role that water has played in the development of Indian lands, especially in the arid Southwest, the report devotes a special section to the discussion of Indian water resources in California and the problems, both immediate and anticipated, associated with the lack of any systematic approach to inventorying and documenting tribal water rights in California. Another section of the report is devoted to the complex process for acquisition of land in trust status. While fraught with problems, pitfalls, and delays, the fee-to-trust process is nevertheless of acute importance to the California tribes, many of whom lack homelands or have homelands of insufficient size to undertake economic development.

### Recommendations:

### Trust Responsibility—Equity

1.  There needs to be a clear definition of California Indian for purposes of eligibility for all federal programs and services available to Indians based on their status as Indians. (See definition of "California Indian" at Section I(D), *supra*, at page 19.)

2.  Congress should appropriate base level funding for all of California's federally recognized tribes for the development and support of tribal planning and administrative capacity, including plans with natural resource protection and land use components.

**Discussion:** One of the most well-documented conclusions gleaned from the BIA's own records and reports is that California Indians have consistently been allocated less than their fair share of federal Indian programs and program dollars. As a result, California tribes have received and continue to receive disproportionately lower levels of benefits and services from the BIA relative to other areas of the country. This lack of equitable and adequate funding and services has prevented the BIA from properly discharging its trust obligations, and has crippled tribal efforts to protect and manage natural resources. Base level funding for tribes in California is essential to close this institutional gap in federal funding and services, and to assist the tribes in developing and enhancing their own capacities for natural resource protection and management.

3. As part of their trust responsibility, federal land management agencies should be required to develop protocols outlining a procedure for consultation with California Indian tribes before authorizing activities that might adversely impact nearby or adjoining tribal lands.

**Discussion:** Currently, the Bureau of Land Management and the United States Forest Service are required to consult with appropriate Indian tribes only when the approval of leases and permits, or other activities will adversely affect the tribe's use of the federal lands.[74] These agencies should also be required to engage in meaningful consultation with tribes prior to allowing activities on federal lands that might adversely impact tribal lands.

4. The federally recognized status of the Koi Nation of the Lower Lake Rancheria should be immediately clarified by the Assistant Secretary of Indian Affairs. In the absence of any action by the Secretary, Congress should enact legislation clarifying that the Koi Nation of the Lower Lake Rancheria continues to be federally recognized.

**Discussion:** The Koi Nation of the Lower Lake Rancheria is a federally recognized tribe, as evidenced by previous acquisition of land in trust for the Tribe's benefit, as well as the Tribe's participation in an IRA election. The Tribe has never been terminated, but was never included on the list of federally recognized tribes updated periodically in 25 C.F.R. Part 83. Because of the Tribe's wrongful omission from this list, it is now prevented from effectively exercising its powers of self-government, and members are unable to obtain federal benefits and services available to Indians based on their status as Indians.

## Water Resources

5. The Department of the Interior should compile and consolidate existing data on Indian water resources in California and assist the California tribes in preparing current inventories of their water resources. In appropriate situations, the Department should assist the tribes in quantifying their water rights. Congress should appropriate funds for this purpose.

**Discussion:** The first step in protecting a tribe's water rights is the preparation of a water resource inventory. This preliminary action has not been taken for most tribes in California. Thus, the tribes' reserved water rights are jeopardized by competing uses. This situation also hinders reservation housing and business developments that require water.

6. Congress should clarify that tribes can temporarily market or lease their water rights to off-reservation users.

**Discussion:** Officials of the Department of the Interior have taken the position that water is a trust asset that cannot be sold without the permission of Congress pursuant to the Non-Intercourse Act. Given this position, Congress should clarify that any tribe can market their water resources during periods in which a tribe does not need or cannot use all of the water to which it is entitled.

Land Acquisition and Administration (See Recommendations in Community
Services, Termination and Economic Development Reports.)

## Public Domain Trust Allotments

7.    Congress should appropriate funds to address the needs of the Indian
owners of public domain trust allotments. This would include funding for
land surveys to resolve boundary disputes, to quiet title to easements
established by prescriptive use, and to enjoin trespass to the land and to
resources, such as minerals and timber. Congress should clarify that all
owners of public domain trust allotments are eligible for these services,
whether or not they belong to a federally recognized tribe.

8.    As part of its trust responsibility, the Department should establish
priorities for conducting water resource inventories—including surface and
subsurface water sources—of public domain trust allotments in California
and, where necessary, quantify the allotment's reserved water right.
Congress should appropriate funds for this purpose.

9.    Congress should appropriate funds for creation of a special position or
positions within the Sacramento Area Office charged with the following
responsibilities: gathering data related to preparation of allotment resource
inventories; exercising allotment rights protection authority (e.g., in quiet
title, trespass and boundary dispute matters); leasing and permitting
activities involving allotment resources; and developing a public information
program that would inform public domain allottees of their rights and
responsibilities with respect to the lands held in trust on their behalf by the
United States.

## F.   The Report on Indian Education

**Summary:**  Indian people and tribes in California have long recognized and continue to recognize the importance and power of education. Education is inextricably linked to the survival of Indian people and tribal communities at every level. For the individual, education is the source of his or her upliftment and future prosperity, through the acknowledgment of cultural identity and through the acquisition of skills of trade or profession. For the tribe or Indian community collectively, education is the source of continuing cultural vitality, resiliency and group prosperity as members of the community contribute to the growth and change of tribal and community life. But these positive benefits of education cannot be realized by California Indians unless the barriers blocking the effectiveness of Indian education efforts in California are removed.

The problem areas have been identified and documented in this report.  They are generally grouped into four broad categories: the lack of California Indian control, the lack of inclusion of California Indian culture and perspective, overly restrictive eligibility criteria, and the lack of equitable funding.  The root cause of these problems is the historical and ongoing discrimination by the BIA against California Indians and tribes and the failure of the federal government to adequately tailor programs and services to meet the unique needs of California Indians in those programs not involving the BIA.

In effect, California Indians are still contending with assimilationist practices, even though the federal policy of assimilation as a guiding principle for the relationship between the federal government and the Indian tribes was discredited and abandoned long ago. The fact is that the policy of Indian self-determination in education, as in other areas, has never been implemented in California in a tangible way. Consequently, those programs and services designed to achieve the goals of self-determination and to uphold a government-to-government relationship between the federal government and the tribes of California have little or no effect in practical terms. Meanwhile, the vast majority of California Indian children continue to languish within a public school system that institutionally invalidates them.  It is precisely because most Indian children and adults in California never achieve their educational potential, that the promise of Indian self-determination in education must finally become a reality in California.

In the areas of higher, adult and vocational education, where Congress has provided at least some programmatic and funding tools for Indians to progress into skilled and professional positions, the policies of the BIA have short-circuited the opportunities for many California Indians.  In these programs, the overarching issues of equity funding and individual eligibility for BIA programs are most clearly evident. Thousands of California Indians have been denied access to these education programs by administrative fiat implemented in violation of federal law.[75]  Even those California Indians who have not been denied services through the BIA's arbitrary attempt to redefine the California Indian service population are nevertheless denied adequate educational funding and support because the BIA continues to allocate to California Indians less than their fair share of the Indian education budget. More recently, the BIA has used the budget allocation process to foreclose program eligibility for all California Indians who are not members of federally recognized tribes. By moving all Indian education programs into its Tribal Priority Allocation method of dividing up program funding, the BIA effectively allocates all education funding to California's federally recognized tribes without regard to the Snyder Act's broad mandate to provide education assistance to "Indians throughout the United States."[76]

The most successful educational projects and initiatives in California have been those that have placed control of education programs with parents and tribes at the local level. This includes the Noli School located on the Soboba Reservation, the Four Winds Charter School in Chico, and the formulation of the United Tribes Education Coalition (UTEC) to advocate on behalf of Indian children and parents and to address a myriad of problems in several local public school districts serving the children of multiple tribes. As these few examples illustrate, approaches in California are varied, but they are affected by many of the same issues: tribal control and the concomitant need for tribal infrastructure development, eligibility requirements and funding.  The greatest single reason for the lack of success and unpopularity of BIA programs has been that they have failed to involve Indians in their planning and implementation.

As presented in the recommendations herein, a joint study must be conducted to devise a plan to develop this new tribally controlled system of education. The study should focus at the local and tribal levels, not merely at the state level. Tribes and unrecognized California Indians have to this point worked with the existing local school systems and, in some cases, have had some measure of success. These efforts should not be disrupted but should be complemented in the proposed study—by applauding local efforts to work together, and by providing answers to problems that have prevented continued growth. In areas where there has been greater conflict, this process should be an opportunity to address issues in a positive environment which stimulates creation of new options not previously available.

Each of the Advisory Council's recommendations is aimed at assisting Congress in formulating thoughtful approaches tailored to meet the needs of California Indians in the area of education. In order to translate these recommendations into successful programs, the suggested approaches must be backed by funding commitments from both Congress and the BIA. Congress must make the necessary appropriations and the BIA must ensure that the funds are made available promptly and in a manner consistent with effective program implementation. Without adequate funding, even the most carefully crafted programs are unlikely to succeed. Historically, California Indians and tribes have suffered from both failings, inadequate program development and inadequate funding. Nevertheless, they have retained the vision that Indian education in the State of California may one day enable individuals and Indian communities and tribes to reach their ultimate potential. It is well past time, as we approach the twenty-first century, to attain that vision.

## General Recommendations

1. There needs to be a clear definition of California Indian for purposes of eligibility for all federal programs and services available to Indians based on their status as Indians. (See definition of "California Indian" at Section I(D), *supra*, at page 14.)

2. Create a grant program for the development of curricula for use in tribally-controlled or public schools, which fully integrates California tribal histories, languages and cultural perspectives. The entities eligible for the grants would be tribes (both recognized and unrecognized), consortia of tribes, Indian organizations, and collaborative projects between tribes and Indian organizations and school districts. School districts would be ineligible to apply on their own.

3. Enact legislation authorizing the establishment of a joint federal/state/tribal team to study, devise and implement a plan to coordinate comprehensive delivery of services among the 27 State of California Indian Education Centers and the BIA's tribally-controlled school programs. The study would address issues concerning (a) the establishment of tribally-controlled schools, possibly utilizing the facilities and resources of those state Indian Centers already established on or near reservations, and (b) the potential for utilizing some state centers as regional technical assistance centers for Indian-specific programs.

   Recommendations made under the joint study should be implemented with final decision-making authority in the hands of tribes in consultation with Indian educators and administrators. This will ensure that tribally-controlled schools and Indian Education Centers are designed to address the educational needs of those tribes and the local Indian community.

## Program Specific Recommendations

## Bureau of Indian Affairs Programs and Services:

### Sherman Indian High School

4. Enact legislation mandating that the management and administration of Sherman Indian High School be turned over to California Indians.

5. Enact legislation setting forth enrollment eligibility criteria specifically for California Indian students attending BIA-controlled day schools and boarding schools consistent with the definition of California Indian recommended above.

6. In the same legislation, enact provisions which explicitly allow for BIA-controlled day schools and boarding schools to receive funding for eligible California Indian students based on the new enrollment criteria. This will require amending 25 U.S.C. 20007(f) to define "eligible Indian student" to include a California-specific provision consistent with the definition of California Indian recommended above.

### Tribally-Controlled Contract Schools

7. Enact legislation exempting California from the prohibition of new school start-ups contained in the 1995 Department of the Interior Appropriations Act. Enact legislation specifically authorizing establishment of day schools and boarding schools in California under contract with California tribes, consortia of tribes and Indian organizations serving California Indian children.

8. Increase federal appropriations and BIA allocation of funding for such schools so that per capita spending for California at least equals national per capita expenditures. Per capita spending for California should be calculated using a method for determining service population based on the definition of California Indian recommended above.

### Johnson O'Malley (JOM)

9. The BIA distribution formula under the Tribal Priority Allocation (TPA) system for JOM monies should be reexamined by Congress and the BIA, in consultation with California tribes. An alternate funding and distribution method for California should be specified by legislation or regulation, in which:

   a. Base level funding for California JOM programs would be determined according to a student count using the definition of California Indian recommended above.

   b. Specific program monies would be distributed on the basis of actual counts of students to be served by the programs.

   c. There would be express language indicating that the FY 1995 cut off does not apply in California.

d. There would be a provision specifying that any California JOM monies not contracted for in a particular year would be added to funds available for tribally-controlled contract school start-ups in California.

**Discussion:** The BIA should reconsider the distribution formula for TPA-JOM funds because: (a) it locks in a pattern of inequitable funding; (b) it excludes California Indians who are eligible for education programs authorized by the Snyder Act, but are not members of federally recognized tribes; (c) it disadvantages small tribes; and (d) the transfer disregarded the overwhelming opposition from California Indian tribes and individuals.

### Tribally-Controlled Community Colleges

10. Congress and the BIA should allocate planning grants for at least two new tribally-controlled community colleges in California.

11. Increase BIA funding for existing tribally-controlled community colleges in California even as new colleges are established, so that per capita spending for California at least equals national per capita expenditures. Per capita spending for California should be calculated using a method for determining service population based on the definition of California Indian recommended above.

### Higher Education Scholarships

12. Enact legislation directing the BIA to revise its eligibility criteria for higher education scholarships so that all California Indians who meet the definition of California Indian recommended above are also eligible for the scholarships. These eligibility criteria should also be revised to clarify that California Indians need not reside "on or near" a reservation in order to qualify for such scholarships. In addition, the legislation should be retroactive, and provide that California Indians who were denied higher education scholarships in the past be reimbursed for educational loans, or be eligible for loan forgiveness.

13. Increase BIA funding for scholarships to California Indians so that per capita spending for California approximates national per capita expenditures. Per capita spending for California should be calculated using population figures based on the definition of California Indian recommended above.

### U.S. Department of Education Programs and Services:

### Formula Grant Program (Title IX, Subpart I)

14. Implement federal regulations that define the "establishment" of an Indian parent committee to mean the "consistent functioning of the committee during the previous year." The regulations should specify that if such a committee fails to function consistently, the tribal application option is triggered. Evidence of the consistent functioning of the committee would be regular meetings and regular majority Indian parent membership on the committee.

THE ACCIP FINAL REPORTS AND RECOMMENDATIONS 33

Case 1:07-cv-00412-RCL    Document 25-12    Filed 10/24/2007    Page 39 of 55
TO THE CONGRESS OF THE UNITED STATES PURSUANT TO PUBLIC LAW 102-416

15. Implement federal regulations modeled after the pre-1984 regulations which provide detailed language regarding access to documents, needs assessment, evaluation, hiring, responsibilities of the Local Education Agency (LEA) and parent committee, and composition of the parent committee.

## Special Programs and Projects to Improve Educational Opportunities for Indian Children (Title IX, Subpart 2) and Special Programs Relating to Adult Education for Indians (Title IX, Subpart 3)

16. Fully appropriate Title IX, Subpart 2 and 3 programs, with any funding formula to include California-specific provisions that ensure per capita spending that at least approximates national per capita expenditure for all programs.

17. The funding formula should also include the option that tribes may devise consortia or intertribal associations to apply for and administer such funds, or that they may apply separately and later combine funds and administer the programs jointly.

### Impact Aid

18. Enact legislation amending 20 U.S.C. § 7701 *et seq.* and providing direction for revised implementing regulations in the following categories as specified:

   a. Local Educational Agency Eligibility

   Provide for exemption of public school districts in California from eligibility requirements dealing with minimum numbers of federally connected children (i.e. more than 400 or at least 3% of student enrollment.)

   b. Application for Payment

   Require joint application by tribe(s) and school district(s), requiring joint signature by tribal government representative(s) and the district superintendent. Alternatively, require tribal approval and sign-off on the Annual Impact Aid application submitted by the district to the federal government.

   c. Payment

   Provide for payment of funds to either the tribe(s) or the district, with release of funds dependent upon joint signature by both tribal and district representatives. Provide for notification of funding to both the tribe(s) and the district.

   d. Tribal Option to Remove Children and Contract for Services

   Provide for a tribal option prior to proceeding through the complaint process to remove all or a portion of its children from the public schools and apply directly for Impact Aid monies to provide educational services for those children. Impact Aid funds would be made available to tribes for all children residing on the reservation who choose to attend the tribal school (regardless of affiliation with the tribe) through the BIA tribally-controlled school program. Provide tribe(s) the option to gradually phase in a tribally-

Case 1:07-cv-00412-RCL    Document 25-12    Filed 10/24/2007    Page 40 of 55

controlled school program by allowing tribe(s) to apply for funds on a periodic basis, as the children are removed from the public school or choose to attend the tribal school.

### e. Indian Policies and Procedures

Provide for specific requirements in the district's Indian Policies and Procedures which restore former federal regulation provisions regarding meaningful Indian input.

Define meaning of "equal participation of Indian children" such that it is understood to include qualitative outcomes (achievement of grade level goals, test scores, grade point averages, dropout rates, enrollment in college preparation classes, graduation rates, alternative assessment outcomes, etc.) of Indian students in comparison to non-Indian students.

Define meaning of data and program information that must be provided to parents and tribes such that it encompasses and is coordinated with the collection and disaggregation of data referenced in Title I of the Improving America's Schools Act.

### f. Federal Reporting

Provide for reporting by the school district to the federal government concerning the equal participation of Indian children, as well as program financial information.

## Regional Assistance Centers

19. Develop federal regulations, consistent with 20 U.S.C. § 8621(b), which require the two California Regional Assistance Centers to establish positions for Indian education program specialists, with the following duties:

a. To disseminate to tribes, on an ongoing basis, information about all federal and state grant programs available to serve Indian children and adults, including higher education financial aid services for California Indians.

b. To provide Indian parents with information and training regarding the function and role of Indian parent committees under various programs, as well as technical assistance for the proper functioning of the committees.

## Bilingual Education, Language Enhancement and Language Acquisition Programs

20. Enact legislation amending Title VII of the Improving America's Schools Act, 20 U.S.C. § 7404, to include unrecognized or unacknowledged California tribes, Indian organizations or consortia of tribes, and Indian organizations in the list of Native American entities eligible for the program.

## G.  The Report on California Indian Cultural Preservation

**Summary:** The following are essential principles which pervaded the entirety of the testimony and input offered in support of this report. These principles are fundamental to a discussion of cultural and religious practices of California Indians:

— Significant components of Indian religious and cultural practices in California are land-based.

— Particular sites are of religious significance since time immemorial and continue to be used contemporaneously to the fullest extent possible.

— Many cultural practices are tied to the land and natural resources of a geographic area.

— Native value systems are religion-based, so all aspects of native life carry religious overtones, including hunting, fishing, gathering practices, and child welfare.

— California Indians continue to maintain oral traditions and ceremonial practices that reflect native religions. During the course of these hearings, speaker after speaker shared current practices and discussed the extent to which traditions and cultural practices have survived and are reemerging despite centuries of assault and hostile government policies.

— There is tremendous diversity among native groups in California, facilitated by a cross-tribal tradition of tolerance and acceptance.

— California has a unique history, including the experience with unratified treaties and the California Land Claims cases, which established that "unrecognized" aboriginal Indians in California are identifiably Indian, and are legally and morally entitled to religious and cultural rights and protections.

— The violent and dishonorable treatment of California Indians— as reflected in federal law, policy and practice—has resulted in large numbers of landless, widely dispersed Indians. This calls for the development of innovative, community-based approaches to protect the cultural and religious practices of California Indians.

### Recommendations:

The following recommendations of the Advisory Council are based upon: (a) oral and written testimony collected over the past year and a half, (b) input from a diverse group of individuals who contributed to the development of this report, and (c) the findings and conclusions contained herein. The recommendations are not intended to be all-encompassing remedies to the problems facing the preservation of California Indian cultures. Rather, they are offered as starting points for a rudimentary good faith effort by Congress to acknowledge its moral and legal responsibility to protect and aid Indian tribes.

## Recommendations for Congress

1. For California Indians not affiliated with a "recognized" tribe listed pursuant to 25 C.F.R. Part 83, it is recommended that Congress (a) facilitate immediate Part 83 recognition for petitioning California tribal groups (see Recommendation 1 of the Recognition Report), and (b) strengthen service delivery for California Indian people by adopting the definition of "California Indian" stated in Section I(D), *supra*, at page 19.)

**Discussion:** As Congress has recognized by enacting cultural protection legislation, there is a compelling need to preserve Indian families and their cultural and religious practices. California Indians, even those not affiliated with a Part 83 tribe, should benefit from the cultural protection legislation already enacted by Congress, including the Indian Child Welfare Act (ICWA) and laws protecting the practice of Indian religions.

2. Given the unique circumstances of California Indians, creative initiatives should be pursued to increase access to private lands, such as tax incentives and immunity from liability, for private property owners who make land accessible for Indian cultural and ceremonial use.

3. The American Indian Religious Freedom Act should be amended to provide a cause of action to tribes and Indian practitioners, so that they can enforce the substantive provisions in the law and protect their religious and cultural interests.

4. Congress should amend the National Historic Preservation Act to:

   a. Provide for the development and implementation, following appropriate consultation with tribes, tribal organizations, and traditional cultural leaders, of uniform government-wide consultation requirements for all federal agencies when an agency's proposed undertaking, including any developments that are reasonably foreseeable as a result of the undertaking, may have effects or adverse effects on properties of traditional religious and cultural importance to Indians, that are included, or may be eligible for inclusion, on the National Register of Historic Places. The government-wide consultation requirements should take into consideration the differing cultural practices and norms of Indians. Possible models for these consultation requirements include the Bureau of Land Management Native American consultation requirements. Traditional cultural leaders should be involved in all consultations regarding properties of traditional religious and cultural significance to Indians.

**Discussion:** Presently, there are a variety of consultation guidelines throughout the federal government. These guidelines are not consistent and frequently are inadequate to deal with the unique issues facing Native Americans. Although the Department of the Interior Office of American Indian Trust will in the near future publish its proposed guidelines for compliance with the Executive Order on Sacred Sites, there is no assurance that agencies other than Interior will adopt the same guidelines. This balkanization of practices and guidelines can only deter, rather than support consultation. Native Americans become frustrated, to say the least, with all of the varying requirements. Uniform consultation requirements would provide all parties with the assurance that the consultation process will take place in the same manner with all agencies. Thus, patterns of conduct and consultation precedents can be developed which can only help in further refining the process.

Consultation with traditional cultural leaders already is required under the National Historic Preservation Act (NHPA) Section 1069 Regulations [see 36 C.F.R. 800.1(c)(2)(iii)]. The regulation does not limit the participation only to traditional cultural leaders from recognized federal tribes. Traditional cultural leaders often are the most important source of information and guidance on culturally significant properties. Their exclusion can only lead to ill-formed decisions which could have a drastic adverse effect on such properties. The regulations already have recognized the value of traditional cultural leaders in Section 106 consultations and that value should be codified to assure compliance.

> **b.** The definition of "federal undertaking" should be amended to include reasonably foreseeable projects arising out of, or as a result of, the proposed activities or activity.

**Discussion:** Presently, the term "federal undertaking" in the NHPA is narrowly and arguably defined so as to include only the project or activity itself [see NHPA Section 301(7)]. Frequently, federally funded or permitted projects are not completed in a vacuum. Rather, the federal project is tied to the development of other projects, some other public lands or even private land. These additional projects would not occur without the federal project. The development of the related projects can, and often does, increase the potential effects and adverse effects of the federal undertaking on properties of traditional religious and cultural value. Accordingly, the definition should be amended to include reasonably foreseeable projects arising out of, or as a result of, the federal undertaking.

> **c.** Federal agencies should consult with Indian tribes and organizations, including traditional cultural leaders, at the earliest possible stage of a federal undertaking. Such consultations should not only follow the uniform government consultation requirements (see above), but also National Register Bulletin No. 38. The federal agencies should also take into consideration the limited resources of many tribes and organizations and adjust their consultations to accommodate those limited resources.

**Discussion:** Presently, federal law requires that a Section 106 review take place "prior to the approval of the expenditure of any federal funds on the undertaking or prior to the issuance of any license." [NHPA Section 106.] Federal implementing regulations further require that the "Agency Official should ensure that the Section 106 process is initiated early in the planning stages of the undertaking, when the widest feasible range of alternatives is open for consideration." [36 C.F.R. 800.3(c)]. Codification of the "earliest point in the planning process" requirement will further enforce the statutory requirement that federal agencies not wait, as they often do, until virtually the last minute to comply with Section 106.

National Register Bulletin No. 38 sets forth the National Park Service's guidelines on consideration of traditional cultural properties for nomination or eligibility to the National Register of Historic Places. Even though these guidelines are very thorough and useful, they are seldom followed. Unfortunately, the guidelines do not meet the status of regulations; however, some federal courts have cited the guidelines favorably in their decisions with regard to the Section 106 process. Giving the guidelines statutory or regulatory authority would provide for uniform government consultation requirements, and more uniform standards for other Section 106 responsibilities, such as the investigation and evaluation of traditional and cultural properties.

> **d.** Where any federal agency determines, following consultation with Indian tribes and organizations, including traditional cultural leaders, that a federal undertaking, including reasonably foreseeable related projects, will have an adverse effect on properties of traditional religious and cultural importance to Indian tribes, organizations or traditional cultural leaders, the federal agency in consultation with the Advisory Council on Historic Preservation and the State Historic Preservation Officer will, in seeking ways to avoid or reduce the effects, prefer preservation of the property(ies) over its partial or complete destruction. The federal agency will only permit

Case 1:07-cv-00412-RCL    Document 25-12    Filed 10/24/2007    Page 44 of 55

partial or complete destruction of a property of traditional religious and cultural importance after the agency has determined that there is no other reasonable and feasible alternative to the partial or complete destruction.

**Discussion:** The requirement of no reasonable and feasible alternative already is well known in federal and state law. For example, the Federal Transportation Act, Section 4(f), contains the same requirement with regard to the construction of highways through national monuments or parks. Its inclusion here will serve to enforce the standard that traditional cultural properties should be considered as important as other culturally significant properties.

5. Congress, in the exercise of its trust responsibility, should provide tribes with the tools to protect their resources, by acknowledging and protecting in-stream use of water for maintenance of Indian fisheries and the integrity of reservation watersheds.

6. All California Indians, as defined in Section I(D), *supra*, at page 14, should be exempted from laws limiting the taking, use and possession of items used for religious and ceremonial purposes, such as feathers from eagles and migratory birds, and animal parts from native wildlife species. If exemptions cannot be granted, accommodations must be fashioned to eliminate the criminalization of the taking and possession of religious artifacts and ceremonial regalia.

7. Congress should amend the Native American Graves Protection and Repatriation Act (NAGPRA) to:

   a. accommodate claims involving tribes with diverse and mixed historical tribal affiliations, as well as the claims of unacknowledged and terminated groups;

   b. change the priority for repatriation from individual lineal descendants to culturally affiliated tribes; and

   c. establish and fund a centralized California Indian Repatriation Center to disseminate repatriation information, document current excavation, and assist tribes through a grant program to cover costs of repatriating human remains, associated items and objects of cultural patrimony. The Center would not have authority to petition for repatriation of items, but would facilitate implementation of NAGPRA in California.

**Discussion:** Both NAGPRA and the California State Native American Heritage Commission give priority to lineal descendants for repatriation requests. Documentation from individual tribal members regarding the most likely descendant or lineal descendent criteria is difficult, if not impossible, to establish. This difficulty is compounded by the inconsistencies between federal requirements and state recording practices, adoptions and relocations, and inadequate record-keeping practices by the BIA.

8. Congress should mandate that all federal agencies develop protocols regarding consultation with federally recognized, unacknowledged and terminated California tribes on all federal actions that may adversely affect Native American cultural resources within the tribes' aboriginal territories.

9. California tribes should receive adequate federal financial support to establish justice systems, either individually or as part of a consortium of tribes, so that they can effectively implement the Indian Child Welfare Act.

## Recommendations for Federal Agencies

10. The National Park Service (NPS) should implement a comprehensive gathering policy for American Indians which recognizes the benefits of Native gathering to NPS goals and which does not make "direct ancestral association" a prerequisite for gathering in a park unit.

**Discussion:** This recommendation is supported by current land management policies and federal law: (1) land management philosophies at the federal level are shifting towards "ecosystem management," which considers traditional Native cultural uses of natural resources to be beneficial in the reproductive potential of plant species[77]; (2) the President of the United States has ordered all federal land management agencies to work with tribes and tribal groups in a government-to-government relationship, and to consider the impact of current policies on Native religions and cultural practices; and (3) the American Indian Religious Freedom Act, 42 U.S.C. § 1996, mandates a review of agency policies and guidelines in an effort to identify procedures which may pose obstacles in meeting the intent of the Act.

11. The U.S. Forest Service (USFS) should develop a final, comprehensive policy covering the complete range of Native American issues that arise in the management of national forests, and which clearly reinforces the tribal-federal trust relationship. This policy should apply to all California Indians, as defined in Section I(D), *supra*, at page 14, and should clearly articulate a no permit/no limit policy for non-commercial collecting for personal or Native community cultural use.

12. The USFS should also establish and fully fund tribal relations programs in each region and include permanent staff in each national forest, who are accessible to tribes with whom they must consult under the government-to-government relationship. The tribal relations programs should be funded to carry out education and training of agency line officers and staff in all divisions and programs whose policies and programs impact tribal resources. Training should emphasize the beneficial effects on plant and animal populations from local and regional traditional Native use and management.

13. The Environmental Protection Agency (EPA) and USFS should develop a partnership with impacted federally recognized and unacknowledged California tribes to implement a comprehensive pesticide and herbicide use consultation policy which recognizes aboriginal gathering practices and tribal interests in maintaining aboriginal rights and culturally relevant practices. Such a partnership should include tribal-federal agreements or mitigation plans with tribes impacted by proposed chemical sprays.

14. The EPA should formally respond to the California Indian Basketweavers Association petition to bring federal protection to California Indian gatherers, and should continue to investigate ways to protect Native people from harm caused by pesticide application on or near traditional food and plant gathering areas.

15. The current Bureau of Land Management (BLM) Native American Policy should be amended, after consultation with California Indians, to provide adequate guidelines for access and use of culturally significant areas. The California Indian Policy should provide a mechanism for awarding cultural resource use permits, which takes into account California Indian knowledge of, and respect for, their ancestral areas, and which eliminates unnecessary interference from BLM officials with California Indian religious practices as they take place. The terms for awarding the permits should be agreed upon prior to actual use, with a mechanism for immediate dispute resolution.

16. The Department of Defense should adopt regulations for appropriate tribal-federal consultation to ensure the protection of historically significant sites, and develop mitigation measures when a culturally sensitive area on or near lands held by the Department is to be developed. Funding should be made available through the Department of Defense to hire consultants chosen by the impacted tribes to conduct studies on whether a proposed action may have an adverse effect on religious or culturally significant properties administered by the Department.

17. The criteria used by the Administration for Native Americans with regard to funding provided under the Native American Languages Act should be modified to: (1) extend program funding cycles to five to 10 years; (2) eliminate burdensome or unnecessary accounting requirements; and (3) adopt a separate funding equation for California, which takes into account the large number of small tribes and the huge language diversity and dialect differences.

## H.   The Report on Indian Health

**Summary:**  This report is an assessment of the status of Indian health care programs in California. Principal issues identified by tribes, tribal health programs, urban health programs, non-federally recognized tribes, and persons of Indian descent eligible for services from the IHS, are analyzed and presented in significant detail in support of the recommendations included in Section II of the report.

In light of the identified funding deficiencies for California Indian health programs, testimony was provided wherein the issue of "Agency level assessments" on the IHS budget was raised and identified as an area to be studied as a source of funding that should be utilized to meet the unmet need in California. Sections III through VI provide historical background and a chronology of events in the history of health services in California and document the tribes' efforts to bring about equity in funding for health care services for the Indian people of California. A summary of testimony presented to the Health Task Force is included in Section V of the report.

### Recommendations:

1.  **Additional funding required for comprehensive health care services:** There are several different standards against which the level of funding necessary to operate a comprehensive health program for California Indians can be measured, including comparisons with other IHS areas, existing IHS Resource Allocation Methodology, local market comparisons, and national expenditure comparisons. Only the local market comparison methodology adjusts adequately for regional differences in the cost of providing health services and is free of political considerations. After surveying the California indemnity insurance market and the more directly analogous Health Maintenance Organization market, it was decided that the most appropriate comparative cost would be $2,400 per person per year. This figure represents the 1996 cost of providing comprehensive health care services in California.

    To calculate the level of additional funding from the IHS, two additional planning assumptions would have to be made. The first is that the maximum penetration of the census population by the IHS funded health care system is approximately 66%. This percentage is higher than the current penetration rate of 52% which is somewhat depressed compared to historic rates and reflects the impact of consistent and significant underfunding. The second planning assumption is that 33% of the individual Indians who seek care at IHS funded Tribal Health Programs will be covered by alternative insurance, primarily Medi-Cal, the California Medicaid program. This rate of coverage is higher than the rate on the IHS maintained RPMS database but compares with rates found by Dr. Trudy Bennett in her 1994 study of Indian Health Care in California and information from a cross section of Tribal Health Programs. Given these planning assumptions, the calculation for additional funding from the IHS would be as follows:

$$122,004 \times .66 \times .66 \times \$2,400 - \$72,425,848 = \$55,122,152$$

*(Service population times the penetration rate times the rate of uninsured users times the market cost of comprehensive care, minus the available IHS funding level, equals the level of under-funding for tribal health programs in California.)*

2. The California Contract Health Service Delivery Area (CHSDA): The CHSDA currently consists of 37 rural counties. These counties were first identified administratively by the IHS as its official service areas and were later codified in statute as part of the Amendments to the Indian Health Care Improvement Act of 1988 (Pub. L. No. 100-713). Currently only two of the 37 CHSDA counties are without federally recognized tribes—Mariposa and Trinity. There are seven additional counties not included in the CHSDA, but could join it as a result of the granting of federal recognition to tribes located in the counties. The counties have large Indian populations, significant portions of which are California Indians.

It is therefore recommended that these counties be brought into the CHSDA as soon as possible and that funding for each of them be added to the IHS program within the area.

Using the same funding formula identified above, the new funding necessary to fully establish a comprehensive health program for the identified Indian population is as follows:

| County | Population | Additional Cost |
|--------|-----------|-----------------|
| Marin | 963 | $ 978,531 |
| Napa | 781 | 816,488 |
| Kern | 7,329 | 7,662,029 |
| Merced | 1,680 | 1,756,339 |
| Stanislaus | 4,363 | 4,561,254 |
| Monterey | 3,136 | 3,278,488 |
| San Luis Obispo | 2,364 | 2,471,420 |
| TOTAL ADDITIONAL COST | | $21,524,549 |

3. Contract Health Services: The Contract Health Service funding shortfall for California is $8 million dollars and is included in the global request for comprehensive health services.

4. Small Tribes Facilities Program: It is recommended that Congress fund the Small Tribes Facilities Program in order to correct the major deficiencies that exist for tribally operated health programs in California. Approximately $10 million dollars is required to correct identified deficiencies in tribal health and alcohol programs resulting from Deep Look Surveys conducted by the IHS California Area Office. IHS must be directed to survey all tribal, urban and alcohol programs. Information included in this report shows that only 24 health programs and three alcohol programs are included in the most recent Deep Look Survey, which indicates that approximately $5,385,061 is required to correct all existing deficiencies. This figure is calculated without the inclusion of information from and deficiencies of four residential alcohol programs, nine tribal health programs and seven urban health programs.

5. Construction of Youth Regional Treatment Centers: It is recommended that $10,000,000 be provided by Congress for construction of two Youth Regional Treatment Centers in California as authorized in Pub. L. No. 94-437 as amended.

6. **Environmental Health:** It is recommended that the IHS work with the BIA, the EPA and tribes to address the environmental health issues directly related to the dumping of toxic waste on California Indian reservations. There have been no definitive studies completed to identify the cost of clean up of the most dangerous sites—at Laytonville and Torres Martinez—however, the cost could be in the hundreds of millions of dollars. This is an urgent situation and must be acted upon without delay.

7. **Sanitation facilities funding requirements:** It is recommended that $18,761,000—the underfunded amount in sanitation facilities—be made available. These facilities are significantly underfunded for FY 96. The total project cost was estimated at $34,926,100 but the actual funding plan was $16,165,100.

8. **Urban Indian Health Program** recommendations are as follows:

   a. Health care reform legislation must include provisions for Essential Community Provider status, 100 percent cost-based reimbursements, grant subsidies, residency programs, and allocations of capital funds. This status, available to tribally operated programs, should be granted to all current and future Urban Indian Health Programs.

   b. Immediate transitional funding is vitally needed by Urban Indian Health Programs to build the infrastructure necessary to compete in a reformed health care delivery system. Any health care reform legislation must include the infusion of these capital dollars. Immediate technical assistance must be provided in the areas of managed care systems, capitated health care systems, computerization, quality assurance, cost accounting, management information systems, networking and other related systems needed to move successfully into health care reform.

   c. The present funding level of Urban Indian Health Programs must be increased to be commensurate with the average level of need funded for other IHS programs. Current level of need funded for tribal and IHS-operated programs is approximately 67%, whereas the level of need funded for Urban Indian Health Programs is approximately 22%.

9. **Traditional Indian Medicine:** In the area of Traditional Indian Medicine, it is recommended that the IHS, at the Headquarters level, collaborate with the Health Care Finance Administration to reform reimbursement regulations to include payment for traditional practitioners.

10. Recommendations regarding the IHS Scholarship Program are as follows:

   Amend 25 U.S.C. § 1603 to read:

   "Indians" or "Indian," unless otherwise designated, means any person who is a member of an Indian tribe . . . except that, for the purpose of sections 1612, 1613 and 1613a of this title, such terms shall mean any individual who (1) irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band or other organized group of Indians, including those tribes, bands or groups terminated since 1940 and those recognized now or in the future by the State in which they reside, or who is a descendant, in the first or second degree, of any such member, or (2) is an Eskimo or Aleut or other Alaska Native, or (3) is considered by the Secretary of the Interior to be an Indian for any purpose, or (4) is determined to be an Indian under regulations promulgated by the Secretary.

OR

Amend § 1613a to incorporate the broad definition of "Indian" applicable to §§ 1612 and 1613.

In either case, the amendment should be written to apply retroactively and mandate that those who were denied scholarships based on the IHS interpretation of the 1992 amendments should have their alternative loans repaid.

11. **Data collection and reporting recommendations are as follows:**

a. It is recommended that IHS work with tribes and tribal contractors to evaluate IHS data reporting needs. Are items required in the past necessary in the current healthcare system (e.g. blood quantum)?

b. It is recommended that IHS work with tribes and tribal contractors to identify an electronic solution to meet the data reporting needs of IHS at headquarters and Area Office levels, as well as the needs of state governments, tribal governments, healthcare providers, insurers (including HMOs, PPOs), accrediting and licensing agencies, local program administrative and financial management, and local programs for other system needs.

c. It is recommended that IHS work with tribes and tribal contractors in evaluating an electronic medical record as replacement for the Resource and Patient Management System (RPMS). The system should be commercially available, interface with other computer systems (e.g. financial and billing), be modifiable by users to meet their specific needs (e.g. tribe of enrollment), be user-friendly, contain rigid security systems for protection of the data, and support creation of user-defined reports. In the interim, the RPMS should be revised to provide some of the features mentioned above.

d. It is recommended that, in the interim, IHS revise the RPMS to define/ redefine data dictionary; capture required data to support patient and insurance billing; allow easy modification of data fields to capture data required by states; contain user-friendly report generation capabilities across all modules; accept/import data from other software programs (e.g. reference laboratory results, coding system upgrades); interface with other commercially available software programs; and capture and report quality indicator data.

e. It is recommended that Congress allocate funds for ongoing staff training in the RPMS. Congress should also allocate funds for video conferencing through partnerships with local community colleges, libraries or health programs and IHS trainers.

12. **Creation of Statewide Indian Health Advisory Board:** Congress should create and fund a state-wide advisory board made up of California Indians, including representatives designated by federally recognized and unacknowledged California tribes and other eligible Indian population groups, to consult with and advise the IHS in an oversight capacity regarding health care delivery issues and in updating tribal service contracts.

)

# ENDNOTES

1   Pub. L. No. 102-416 (October 14, 1992), as amended by Pub. L. No. 104-109 (February 12, 1996).

2   See Carey McWilliams, *California: The Great Exception*, (Peregrine Smith, Inc., 1976), at 50-51.

3   The refusal to ratify the treaties resulted in the displacement and impoverishment of Native peoples on a scale unparal-leled in United States history in terms of acreage of aboriginal lands taken and the number of tribes affected. Not only were the California tribes deprived of their aboriginal lands, encompassing more than 70,000,000 acres, but they were denied the benefit of treaties negotiated in good faith that would have set aside approximately 8.5 million acres of land for 139 tribes.

4   See Bruce S. Flushman and Joe Barbieri, "Aboriginal Title: The Special Case Of California," 17 Pacific Law Journal 391, 403 (1986) and authorities cited therein.

5   See Act of September 30, 1850, 9 Stat. 519; 9 Stat. 558; and the California Indian Act of 1850, 9 Stat. 572. Representa-tives from 139 different Indian groups agreed to sign the 18 proposed treaties, thereby acknowledging the jurisdiction of the United States, agreeing to refrain from hostilities, and relinquishing all claims to their aboriginal territory. In return, the U.S. promised to establish reservations for the Indian groups, provide them protection from non-Indians, as well as clothing, food and education on the "art of civilization." See R.F. Heizer, *The Eighteen Unratified Treaties of 1851-1852 Between the California Indians and the United States Government*, (University of California Press, 1972), 33.

6   Act of March 3, 1851, 9 Stat. 631, entitled "An Act to Ascertain and Settle the Land Claims in the State of California."

7   These events had great significance in later efforts by the California Indians to obtain redress for the taking of their aboriginal lands. Those efforts culminated in the controversial settlement of the California Indian land claims in 1964 and the eventual per capita distribution of an amount representing compensation to the Indians of 47 cents per acre for their aboriginal lands. The history of the California Indian land claims is comprehensively set forth in Flushman and Barbieri, *supra* note 4.

8   H.R. Rep. No. 801, 103d Cong., 2nd Sess. 2 (1994). Estimates of the California Indian population in the 1850s are based on the estimated Indian population prior to arrival of the first Spanish expeditions in 1766. See Claims of California Indians: Hearing on H.R. 491 Before the Committee on Indian Affairs, 70th Cong., 1st Sess. 23 (1928) (Statement of Congressman Lea); Edward D. Castillo, *The Impact of Euro-American Exploration and Settlement*, in 8 *Handbook of North American Indians* 99 (R. Heizer, ed., Smithsonian, 1978) (nearly 300,000 unconquered natives); Cook, *Historical Demography* in *id.* at 91 (310,000, although estimates range from 133,000 to 260,000).

9   In 1860, the United States Senate considered a bill (H.R. 215) that proposed the transfer of federal responsibility for the California Indians to the State of California. The sometimes acrimonious debate over the bill focused on the widely reported accounts of the slaughter of California Indians by militia raised in the name of the State of California and supported in part by state funds. *Congressional Globe*, 36th Cong., 1st Sess., pp. 2365-2369 (Senate Debate, May 26, 1860), reprinted in Robert F. Heizer (ed.), *Federal Concern about Conditions of California Indians 1853 to 1913: Eight Documents* (Ballena Press, 1979), at 29-50 [hereinafter "Heizer"].

10   See Act of April 13, 1864, 13 Stat. 39 ["Four Reservations Act"].

11   25 U.S.C. §§ 461 *et seq.*

[12]  Robert N. Clinton et al., *American Indian Law* (3rd ed. 1991), 359.

[13]  The disastrous effects of the allotment period were detailed in a memorandum presented by John Collier, Commissioner of Indian Affairs, to the House Committee on Indian Affairs in 1934:  See Hearings on H.R. 7902 before the House Comm. on Indian Affairs, 73rd Cong., 2d Sess. 16-18 (1934).  Collier pointed out that, during the period from 1887 to 1934, Indian land holdings were reduced from 138,000,000 acres to 48,000,000, a loss of 65 per cent of the Indian land base.

[14]  See 25 U.S.C. § 464.

[15]  The Interior Board of Indian Appeals has held that the federal government's action in holding an IRA election within a rancheria community is determinative of the issue of whether the rancheria was recognized as a tribe prior to enactment of the Rancheria Act. See *United Auburn Indian Community v. Sacramento Area Director*, IBIA No. 92-186-A, 24 IBIA 33 (decided May 28, 1993).

[16]  See § V of the ACCIP Community Services Report.

[17]  See, e.g., "The Status of the Indian in California Today, a Report by John G. Rockwell, Superintendent of the Sacramento Agency to the Commissioner of Indian Affairs," Sacramento Indian Agency, 1944.

[18]  Act of August 18, 1958, Pub. L. No. 85-671, 72 Stat. 619, as amended by the Act of August 11, 1964, Pub. L. No. 88-419, 78 Stat. 390.

[19]  See Appendix B to the ACCIP Termination Report.

[20]  See Auburn Indian Restoration Act, Act of October 31, 1994, 108 Stat. 4533, 25 U.S.C. §§ 1300l *et seq.*; and Paskenta Band Restoration Act, Act of November 2, 1994, 108 Stat. 4793, 25 U.S.C. §§ 1300m *et seq.*

[21]  E.F. Beale, "Recommendations on Federal Assistance for California Indians, 1852," contained in Documents of the Senate of the United States During the Special Session Called March 4, 1853,  Executive Document No. 4, (Gov't Printing Office, Washington, D.C., 1853), pp. 377-80 .  Reprinted in Heizer, *supra* note 9, at 5.

[22]  Id. at 2-3.

[23]  Helen Jackson and Abbot Kinney, "Report on the Condition and Needs of the Mission Indians of California," contained in Reports of Committees of the Senate of the United States, 48th Congress, 2nd Sess, and Special Sess., March, 1885, at pp. 120-196. Reprinted as Appendix XV in Helen Hunt Jackson, *A Century of Dishonor* (1885), and in Heizer, *supra* note 9, at 75-93.

[24]  Heizer, *supra* note 9, at 76.

[25]  Id. at 83.

[26]  C.E. Kelsey, "Report of Special Agent for California Indians" (1906), reprinted in Heizer, *supra* note 9, at 123-150. Kelsey's report was commissioned by the United States Congress.  33 Stat. 1058 (1905).

[27]  See Heizer, *supra* note 9, at 139.

28    "Indians in California," in *Transactions of the Commonwealth Club of California*, Vol. XXI, No. 3, June 8, 1926.

29    Id. at 106.

30    Chauncey Goodrich, *The Legal Status of the California Indian*, 14 Cal. L. Rev. 83 (1926). Chauncey Goodrich was a member of the Indian Section of the Commonwealth Club of California and conducted his research under the auspices of the club.

31    Id. at 97. Goodrich relied on Indian BIA figures in official reports to calculate that annual expenditures for fiscal year 1923-24 were $29.00 per capita for California Indians and $40.00 per capita for all other Indians. If one excluded from the latter statistic the fee-simple allotted Indians who had been "so largely released from federal guardianship," the $40.00 figure increased to $66.00 per capita for Indians outside of California. *Id.*, at n.55.

32    Lipps's detailed statement appears in his letter of November 9, 1933, to Senator Burton K. Wheeler, co-author of the Wheeler-Howard Act, better known as the Indian Reorganization Act of 1934, 25 U.S.C, § 461 *et seq.*

33    Id. at 1.

34    Id. at 7.

35    John G. Rockwell, *The Status of the Indian in California Today* (1944), pp. iii.

36    Id. at 126.

37    "Final Report to the Governor and the Legislature by the California State Advisory Commission on Indian Affairs" (1969), p. 12.

38    See Id., Appendix E, p. 33.

39    *Congressional Record*, July 16, 1971, S11323-11324. Included as part of the statement by Senator John Tunney.

40    Id. at S11323.

41    *Congressional Record*, May 31, 1972, S8591.

42    Report to the BIA, Ernest Stevens and John Jollie, Co-Chairs.

43    Id. at 27.

44    Id. at 31.

45    Id. at 34.

46    Prepared by William D. Oliver, former Administrative Officer to the Sacramento Area, at the request of the Sacramento Area Indian Advisory Board.

[47] Id. at 4. In making the calculations, the author compared only expenditures for programs that existed at both Sacramento and the other BIA area offices.

[48] This task force was appointed by Secretary of Interior William Clark during the Ronald Reagan administration.

[49] "Report of the California Indian Task Force" (October, 1984), p. 2.

[50] Id. at 12.

[51] Id. at 34-35. See also id. at 12: "These [population] numbers . . . have not been utilized in the past to determine or establish funding or program levels. . . ."

[52] Id. at 13.

[53] Prepared by California Indian Legal Services for the George Washington National Indian Policy Center.

[54] Summary Report on the California Consultation Meeting, Stanford University, May 5, 1991, at 7-8.

[55] In Rincon Band of Mission Indians v. Harris, 618 F.2d 569 (9th Cir. 1980), the Ninth Circuit Court of Appeals held that the IHS had breached its statutory responsibilities to the California Indians under the Snyder Act, 25 U.S.C. § 13, by failing to develop distribution criteria rationally aimed at an equitable division of its funds. Id. at 575. It was not until the Rincon case was won and Congress established the "Equity Fund" in FY 1981 that California Indians began to receive an increased, though still inequitable, share of the Indian health care funding appropriated by Congress.

[56] See Malone v. Bureau of Indian Affairs, 38 F.3d 433, 438 (9th Cir. 1994).

[57] See Pub. L. No. 102-416, § 5(5).

[58] Congressional Record, H7975 (August 11, 1992).

[59] See 25 U.S.C. § 1679.

[60] 25 U.S.C. § 13.

[61] Malone, supra, 38 F.3d at 438.

[62] See Message from the President of the United States Transmitting Recommendations for Indian Policy, H.R. Doc. No. 363, 91st Cong., 2nd Sess. (1970).

[63] See S. Rep. No. 330 to accompany S. 1747, A Bill Providing for the Restoration of Federal Recognition to the Ponca Tribe of Nebraska, and for Other Purposes, 101st Cong., 2nd Sess. 1990 (Testimony of Eddie F. Brown, Assistant Secretary - Indian Affairs).

[64] See, e.g., the Report of L.A. Dorrington to the Commissioner of Indian Affairs, dated June 3, 1927, at pp. 2, 5, 8, 11, 16, 22 (wherein Mr. Dorrington recommends against acquiring land for various bands of California Indians because their members held public domain and Indian allotments).

Case 1:07-cv-00412-RCL    Document 25-12    Filed 10/24/2007    Page 55 of 55

[65] See 25 U.S.C. § 1679.

[66] For a thoughtful discussion of some recent precedents for transferring public lands to Indian tribes as a means of "doing justice," even though existing law may not compel such action, see Imre Sutton, *Indian Land, White Man's Law: Southern California Revisited*, Amer. Indian Culture and Research Journal 18:3 (1994) 265-270. Professor Sutton suggests that "[p]erhaps we need to negotiate not just in terms of law, but in terms of ethics and ecology. . . ." (*id.* at 268) and recommends that Indian reserves could be created out of some of the national forests and the holdings of the Bureau of Land Management (*id.* at 269).

[67] *Seminole Tribe of Florida v. Florida*, 116 S. Ct. 1114, 134 L. Ed.2d 252 (1996).

[68] 9 Stat. 631.

[69] Whether a tribe, in the absence of state consent to suit, can request that the Secretary prescribe procedures [See 25 U.S.C. §§ 2701(d)(7)(B)(vii)] under which the tribe may engage in Class III gaming activities, is still an unsettled issue. *See, e.g., Seminole Tribe of Florida v. State of Florida*, 11 F.3d 1016, 1029 (11th Cir. 1994).

[70] *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987).

[71] The Spokane Tribe in Washington State has made the argument that, even in the absence of congressional action, either a tribal remedy must be read into the IGRA or it must be declared unconstitutional. *See United States of America v. Spokane Tribe of Indians*, CS-91-0104-FVS (E.D. WA), Answer, Counterclaims and Third-Party Complaint for Declaratory Judgment, Injunctive and Declaratory Relief, at p. 7 (filed April 5, 1994), currently on appeal to the Ninth Circuit Court of Appeals. Specifically, the Spokane Tribe argued that: (1) if there is no remedy, IGRA is unconstitutional in its entirety; and (2), in the alternative, the Secretary of the Interior has a trust obligation to provide a remedy by promulgating regulations allowing Class III gaming when a state refuses to negotiate in good faith. *Id.*

[72] *Brendale v. Confederated Tribes and Bands of the Yakima Reservation*, 492 U.S. 708 (1989).

[73] *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251 (1992).

[74] See § II of the ACCIP Report on California Indian Cultural Preservation.

[75] See, e.g., *Malone v. Bureau of Indian Affairs*, 38 F.3d at 439-440.

[76] 25 U.S.C. § 13.

[77] See, Richard Haeuber, "Setting the Environmental Policy Agenda: The Case of Ecosystem Management," 36 Nat. Res. L. Jour. 1 (Winter 1996). Ecosystem management is an ecological and systematic approach to managing natural resources at a landscape scale. Such a system considers the importance of protecting ecosystems as well as individual species; factoring natural disturbance regimes into management schemes; and the utility of a core reserve/buffer zone design approach for natural resource protection. In the 1970s the concept was recast in the form of *biosphere reserves* that included *transition zones* of human activity compatible with the natural ecosystem.

Ecosystem Management is being fully explored by 18 federal agencies, and the major land management agencies already have drafted guidance regarding its adoption. Moreover, the former White House Office on Environmental Policy has undertaken a major ecosystem management initiative, including demonstration projects, and both the 103rd and 104th Congress held numerous hearings and briefings in both the House and Senate regarding legislation to amend the Federal Land Policy and Management Act. 26 U.S.C. §§ 1701-1704 (1988). See Haeuber at 9-10.

# Status of California Rancherias
## Terminated Pursuant to the Rancheria Act

| | Restored Through *Tillie Hardwick* Litigation (17 Tribes) | Restored Through *Scotts Valley* Litigation (4 Tribes) | Restored Through Separate Litigation (6 Tribes) | Restored Legislatively (3 Tribes) | Remains Terminated (10 Tribes) |
|---|---|---|---|---|---|
| **40 Terminated CA Tribes** | | | | | |
| **Alexander Valley** | | | | | **X** |
| Auburn | | | | X | |
| Big Sandy | | | X | | |
| Big Valley | X | | | | |
| Blue Lake | X | | | | |
| Buena Vista | X | | | | |
| **Cache Creek** | | | | | **X** |
| Chicken Ranch | X | | | | |
| Chico | | X | | | |
| Cloverdale | X | | | | |
| **El Dorado** | | | | | **X** |
| Elk Valley | X | | | | |
| Guidiville | | X | | | |
| Graton | | | | X | |
| Greenville | X | | | | |
| Hopland | | | X | | |
| **Indian Ranch** | | | | | **X** |
| Lytton | | X | | | |
| **Mark West** | | | | | **X** |
| **Mission Creek** | | | | | **X** |
| Mooretown | X | | | | |
| **Nevada City** | | | | | **X** |
| North Fork | X | | | | |
| Paskenta | | | | X | |
| Picayune | X | | | | |
| Pinoleville | X | | | | |
| Potter Valley | X | | | | |
| Quartz Valley | X | | | | |
| Redding | X | | | | |
| Redwood Valley | X | | | | |
| Robinson | | | X | | |
| Rohnerville | X | | | | |
| **Ruffeys** | | | | | **X** |
| Scotts Valley | | X | | | |
| Smith River | X | | | | |
| **Strawberry Valley** | | | | | **X** |
| Table Bluff | | | X | | |
| Table Mountain | | | X | | |
| Upper Lake | | | X | | |
| **Wilton** | | | | | **X** |